**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE BLUE NOTE, INC. d/b/a The Point, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No._____ |
| THE CITY OF CHICAGO, a Municipal Corporation, THE CITY OF CHICAGO DEPARTMENT OF BUSINESS AFFAIRS AND CONSUMER PROTECTION, THE CITY OF CHICAGO DEPARTMENT OF BUILDINGS, MATTHEW BEAUDET, in his official capacity; CHICAGO POLICE DEPARTMENT, DAVID O. BROWN, in his official capacity, and FLAT IRON BUILDING, LLC, an Illinois limited liability Company, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, The Blue Note, Inc. d/b/a The Point, by and through its attorneys, RKF Global PLLC, complains against Defendants the City of Chicago, a Municipal Corporation, the City of Chicago Department of Business Affairs & Consumer Protection, a Municipal Corporation, the City of Chicago Department of Buildings, a Municipal Corporation, Matthew Beaudet, in his official capacity as the Commissioner of the Department of Buildings, the Chicago Police Department, David O. Brown, in his official capacity as Superintendent of the Chicago Police Department, and Flat Iron Building, LLC, an Illinois limited liability company, and in support thereof states as follows:

## JURY TRIAL

1.    Plaintiff requests a trial by jury on all issues properly triable.

1

## INTRODUCTION

2.     Plaintiff brings this action to redress acts of equal protection violations pursuant to 42 U.S.C. § 1983 (Count I); retaliation in violation of the First Amendment pursuant to 42 U.S.C. § 1983 in violation of Plaintiff's right to free speech (Count II); violations of Plaintiff's due process rights pursuant to 42 U.S.C. § 1983 (Count III); violations of Illinois Law for Abuse of Process (Count IV); and Conspiracy (Count V).

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

4.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because Plaintiff and Defendants either reside in this district or have their principal place of business in this district, and all events giving rise to Plaintiff's claims occurred within this district.

## PARTIES

5.     The Blue Note, Inc. d/b/a The Point ("The Point" or "Plaintiff") is an Illinois corporation, as well as a bar and music venue, with its principal place of business located at 1579 N. Milwaukee Ave., Space 1569, Chicago, Illinois 60622 (the "Property"). The Point is a duly licensed bar that operates out of the Property.

6.     Flat Iron Building, LLC ("FIB") is an Illinois limited liability company with its principal place of business located at 40 E. Oak Street, Chicago, Illinois 60611. Flat Iron Building was Plaintiff's commercial landlord for the Property for the period from July 27, 2020 until on or around October 31, 2022.

7.     Berger Realty Group, LLC ("Berger") is, and was, FIB's agent for all matters

related to the Property.

8.     Defendant City of Chicago ("City") is a municipality incorporated under the laws of the State of Illinois. Pursuant to Illinois law, the City possesses the power to license, regulate and/or prohibit the sale of alcoholic beverages at retail within its boundaries.  Said powers include the power, by "general ordinance", to determine the number, kind and classification of local liquor licenses issued within its political subdivision provided said power is not exercised inconsistent with the Illinois Liquor Control Act. *See* 235 ILCS 5/4-1 (1992).

9.     The Department of Business Affairs and Consumer Protection ("BACP") issues business licenses in the City and regulates industries as diverse as retail, food establishments, day care centers, manufacturing facilities and motor vehicle repair shops. BACP also regulates the sale of retail liquor in the City. BACP prosecutes business license violations on behalf of the City and determines whether to seek to revoke or modify a business license and, in this matter, a Late-Hour License (defined below).

10.     The Department of Buildings inspects property in the City, issues building Municipal Code violations, and ensures compliance with City building regulations.

11.     Matthew Beaudet ("Beaudet") is the Commissioner of the City of Chicago Department of Buildings.

12.     The Chicago Police Department ("CPD") is the municipal law enforcement agency for the City under the jurisdiction of the City Counsel.

13.     Superintendent David O. Brown ("David Brown") is the Superintendent of CPD.

## FACTUAL ALLEGATIONS

*Plaintiff's Lease*

14.     At all relevant times until October 28, 2022, the FIB was the owner of the Property,

as well as the entire Flat Iron Arts Building located at 1579 N. Milwaukee Ave., Chicago, Illinois 60622, and 1565 N. Milwaukee Ave., Chicago, Illinois 60622 (the "Arts Building").

15.     On or around July 27, 2020, Plaintiff and FIB entered into the Flat Iron Building Commercial Lease for the Property (hereinafter the "Original Lease"). (Lease attached as Exhibit A).

16.     On or around February 19, 2021, Plaintiff and FIB amended the Lease to "restate certain terms on page 2 of the Lease for the purpose of clarifying ambiguous language." (The "Lease Amendment" attached as Exhibit B; Original Lease and Lease Amendment collectively referred to as "Lease").

17.     Prior to Plaintiff's execution of the Lease, the Property was occupied by a bar called "The Flat Iron Chicago" ("The Flat Iron Bar"). The Flat Iron Bar was open "DAILY 4pm-4am | FRI 3pm-4am | Sun 1pm-4am."

18.     The Flat Iron Bar marketed itself as a "a product of the Wicker Park community and its history" and "wanted to tap that talent and give Chicago's artists an opportunity to inspire the public that frequents our neighborhood and our bar."

19.     The Flat Iron Bar began operating in 2005.

20.     As early as 2005, and prior to Plaintiff signing the Lease, the Property operated as a late-night hour bar in the Wicker Park neighborhood, and served patrons that were similar to patrons who Plaintiff intended to attract to The Point.

*Plaintiff's Licenses*

21.     Plaintiff has a "Late Hour Plan" liquor license (Code: 1484; License # 45681; Exp: 11/15/22) for the Property which allows Plaintiff to remain open until 4:00 a.m. or 5:00 a.m.

4

depending on the day of the week (hereinafter a "Late-Hour License").

22.     Upon information and belief, a Late-Hour License is only applicable to, and remains with, the address for which it is granted and cannot be transferred for use at a new or different address (i.e., Plaintiff's Late-Hour License is specific to the Property address.)

23.     Upon information and belief, Plaintiff is permitted to transfer or sell its Late-Hour License to another entity or individual only if that entity or individual uses the Late-Hour License at the Property.

24.     Plaintiff has a property interest in the Late-Hour License, and the Late-Hour License has considerable monetary value.

25.     When Plaintiff purchased its Late-Hour License and signed the Lease, it did so with the full knowledge and understanding that it was required by the City to use the Late-Hour License for the Property only.

26.      A Late-Hour License allows Plaintiff the special privilege of serving alcohol until 4 a.m. on weeknights and 5 a.m. on Friday nights/Saturday mornings and Saturday nights/Sunday mornings.

27.     Plaintiff has a Public Place of Amusement License ("PPA") (Code: 1050; License # 45679; Exp: 11/15/22) which allows Plaintiff to operate a music venue out of the Property with a capacity of over 100 patrons. Plaintiff's PPA also allows Plaintiff to charge admission to enter the Property during or before a show or concert.

28.     Plaintiff has a Tavern License (Code: 1470; License # 45680; Exp: 11/15/22) which allows Plaintiff to operate a bar out of the Property. (Plaintiff's Tavern License, PPA, and Late-Hour License collectively referred to as "Licenses").

29.     Plaintiff paid $350,000.00 to the prior owner of the Late-Hour License for use of

the Late-Hour License at the Property.

30.     Plaintiff has paid $11,117.00 in fees to the City in connection with its Licenses since January 28, 2021.

31.     Plaintiff purchased the Late-Hour License in reliance on having the opportunity to use the Late-Hour License at the Property for the length and negotiated term of the Lease (i.e., 20 years).

32.     Plaintiff's business model is reliant on its Licenses.

33.     Plaintiff's Late-Hour License allows it to stay open and serve alcohol later on weekend nights.

34.     The majority of Plaintiff's revenue is generated during the morning hours of 1:00 a.m. and 4 a.m./5 a.m. (depending on the day) which is, in part, because other bars in the area which do *not* hold a Late-Hour License are not allowed to operate or sell alcohol during those time periods.

35.      Plaintiff's PPA allows Plaintiff to charge patrons admission for tickets to Plaintiff's shows and concerts. Even if Plaintiff allowed patrons to attend shows free of charge, the Property would still require a PPA since the Property allows for capacity over 100 patrons. Without a PPA, Plaintiff will not be able to operate as a music venue.

36.     By virtue of the alterations and improvements made by Plaintiff, and since Plaintiff's Late-Hour License is specific to the Property, the Property is unique and specifically tailored to Plaintiff's needs based on its business model. There is no substitute space available in the City for Plaintiff.

37.     As set forth in detail below, the City has caused all of Plaintiff's Licenses to expire as of November 15, 2022.

*Plaintiff's Operation of The Point and Improvements to the Property*

38.    At the time that the Lease was entered into, the Property was not suited for Plaintiff's vision of a bar and music venue and required significant renovations.

39.    Plaintiff's business model is to operate a music venue, and the PPA allows Plaintiff to charge patrons for admission to the shows and concerts which Plaintiff hosts.

40.    Since July 2020, Plaintiff has spent roughly $500,000.00 on improvements designed to convert the Property into a music venue.

41.    The improvements which Plaintiff made to the Property include, but are not limited to: (a) installation of a new sign in the front of the Property; (b) rebuilding two bars; (c) replacement of the entire floor (due to the presence of asbestos); (d) painting the ceiling; (e) re-wiring of the entire electrical system to comply with City codes; (f) installation of new draft system to both bars; (g) installation of a new cooler room; (h) installation of new POS system; (i) installation of full length mirrors behind both bars; (j) renovations to both bathrooms; (k) installation of stage for music performances; (l) installation of a lighting rig on the truss; and (m) installation of a new audio system.

42.    Plaintiff made these improvements based, and in reliance, on its principal's reasonable belief that it would be able to operate a bar and music venue out of the Property for the entirety of the 20-year term on the Lease (including both 5-year options.)

43.    Plaintiff began operation of The Point as a bar and music venue on May 1, 2021.

44.    Plaintiff held all required Licenses, had a Lease that ran for 20 years (including both 5-year option periods), and had the start-up capital to transform the Property in a suitable and appealing music venue.

45.    Plaintiff has paid $516,381.09 in rent to FIB since it entered into the Lease and

began operating as The Point.

46.     Plaintiff has paid $266,291.05 in rent to FIB since FIB demanded payment in September of 2022.

*The City's Elimination of 5:00 A.M. Liquor Licenses*

47.     Beginning in at least January of 2020, the City initiated a concerted effort to eliminate bars with Late-Hour Licenses under the belief that establishments holding Late-Hour Licenses contribute to violent crime in the areas in which they operate.

48.     Plaintiff was not aware of this concerted effort until, at the earliest, when it was closed by CPD on February 8, 2022.

49.     On or around July 19, 2022, 2nd Ward Alderman Brian Hopkins was quoted in an article recounting an interview he gave, which stated:

> Second Ward Ald. Brian Hopkins, who represents parts of River North, as well as Wicker Park and West Town, told Block Club Chicago last week that bars with late-night tavern licenses — establishments that can serve until 4 a.m. on most nights, and until 5 a.m. Sunday — are "attracting the most violence." He's targeting downtown late-night tavern licenses, including those in River North. Hopkins also took to Twitter last week to argue his case writing that the police agree with his intentions.
>
> This week, Hopkins reiterated his stance in his July 18 newsletter to constituents writing that late-night violence in entertainment districts, such as the Hubbard Street restaurant and bar strip, causes "strain on police resources to handle these sizable late-night crowds."
>
> (*See* Exhibit C "Chicago Ponders Eliminating 5 A.M. Bar Licenses Downtown"; Exhibit D "No More After-Hours Bars In River North? Alderman Looks To Kill 5 AM Licenses As Area Struggles With Shootings.")

50.     The Tweet referenced in the above article states "know who else agrees? the police, who are called to respond at 5am to unruly and intoxicated crowds -- crowds that now contain an increasing proportion of individuals with loaded guns."

51.     In a February 7, 2022 interview, 1st Ward Alderman Daniel La Spata stated that

"[he]… aims to meet with [Plaintiff] and local police soon to bolster their violence prevention plan. One measure that could help, the alderperson said, is cutting back The Point's hours of operation. Currently, the bar is allowed to stay open until 4 a.m. most of the week because [Plaintiff] holds a Late Hour Liquor License. On Sundays, the bar is permitted to stay open until 5 a.m." (*See* Exhibit E article published by Block Club Chicago titled "Wicker Park Bar Owner Says City Violence, Not Late-Night Hours, To Blame After Another Shooting At The Point.")

52.     The City's plan to eliminate Late-Hour Licenses is consistent with its 2021 rollback of alcohol sales, restricting those sales past midnight, and was conceived for the same or similar purposes.

53.     In 2015, the City enacted its "Public safety threat – Summary closure – When authorized" ordinance. (the "Summary Closure Ordinance").  *See* Municipal Code of the City of Chicago 4-4-285.

54.     The Summary Closure Ordinance essentially grants CPD the immense power to immediately close a business which CPD, in its sole discretion, believes is associated with violence.

55.     A business closed by the Summary Closure Ordinance is not allowed to re-open until it provides an approved "plan of action" or prevails on an appeal through the license disciplinary process.

56.     A "plan of action" is referred to as a nuisance abatement plan (a "Nuisance Abatement Plan"). A Nuisance Abatement Plan sets forth operating and security criteria that a Late-Hour License holder (as well as other licenses) must follow, or else face additional legal and financial consequences. Examples of penalties associated with a licensee's failure to abide by a Nuisance Abatement Plan include, but are not limited to, fines, extension of the length of the

Summary Closure, and/or imprisonment.

57.     CPD's exercise of its authority under the Summary Closure Ordinance is entirely discretionary. Between the effective date of the Summary Closure Ordinance and September 2022, 58 Chicago businesses were closed under the Summary Closure Ordinance as the result of a shooting; most of those businesses are (or were) located on the South and West Sides.

58.     CPD retains the discretion to enforce the Summary Closure Ordinance on both a geographical and business-by-business basis.

59.     In 2019, following a shooting of a security guard and the owner in the alley of the business which occurred during operating hours, Sound Bar, located at 226 W. Ontario St., Chicago, Illinois, was closed by CPD under the Summary Closure Ordinance. Upon information and belief, the entity that owned Sound Bar was a Late-Hour License holder.

60.     On May 19, 2022, a mass shooting occurred during operating hours at the McDonald's located at 10 E. Chicago Ave., Chicago, Illinois, in the River North neighborhood. In that instance, CPD did not inspect the business. Instead, the Department of Buildings issued a closure order based on alleged building violations; violations that it uncovered only after inspection of the premises following the shooting. Upon information and belief, the entity that owns this McDonald's is not a Late-Hour License holder.

61.     On September 18, 2021, a shooting occurred during operating hours at LiqrBox and Joy District. Those businesses were not closed by CPD or cited or closed by the Department of Buildings. Upon information and belief, LiqrBox and Joy District, a bar at 112 W. Hubbard St., are part of an entertainment group co-owned by individuals with ties to the City. Upon information and belief, LiqrBox has a Late-Hour License while Joy District does not.

62.     On January 1, 2023, a person was shot and killed during operating hours at The

Lyon's Den Hookah Lounge located at 2123 W. Division St., Chicago, Illinois. Upon information and belief, "[n]eighbors said the shooting was the culmination of a string of fights, rowdiness and other incidents that [took] place outside the BYOB business, and some are demanding officials shut it down." The City, however, did not issue a Summary Closure Notice to the hookah lounge. Upon information and belief, the hookah lounge is not a Late-Hour License holder. (Exhibit F).

63.     A CPD representative stated that the reason that CPD did not close the hookah lounge was because "[i]n order for us to implement a summary closure, there has to be a violation done from the business itself… [i]n this specific incident from that evening, Lyon's Den had done everything as a business what they were supposed to do. And so in that reasoning for it, even though it was a tragic incident, the Police Department cannot hold the business at that point liable… Lyon's Den ownership is cooperating with police to establish a plan of operation for the business. That could include additional security and reduced hours of operation."

64.     This language is in direct conflict with CPD's decision to close Plaintiff, as well as findings made in the Final Order (described below), wherein a City appointed commissioner upheld the decision by CPD to close Plaintiff based on the same reasoning CPD employed when it decided not to issue a Summary Closure Notice to the hookah lounge.

65.     Beginning in at least January of 2020, the City put a plan into action to either revoke or modify Late-Hour Licenses generally through threat of revocation, by using BACP as a prosecutorial arm to initiate enforcement proceedings and cause a licensee to either enter into a Nuisance Abatement Plan, or face a License Revocation Hearing.

66.     Nuisance Abatement Plan terms include, but are not limited to, restricting the hours of operation of the Late-Hour License, requiring a licensee to police the common way (i.e., City property.) Those terms include no milestones of completion or process that would relieve a

licensee from the conditions and requirements of the Nuisance Abatement Plan.

67. Beginning on February 8, 2022, the City initiated its plan of action to either revoke or modify Plaintiff's Late-Hour License by using BACP as a prosecutorial arm to initiate enforcement proceedings against Plaintiff – certain of which it did not provide Plaintiff notice of – and cause Plaintiff to either enter into a Nuisance Abatement Plan, or face a License Revocation Hearing.

*February 6, 2022 Shooting and Aftermath*

68. On February 6, 2022, Daveon Montgomery ("Montgomery") and three (3) other individuals arrived at the Property at 2:46 a.m. (Montgomery and the other individuals hereinafter referred to collectively as "Suspects").

69. Upon attempting to enter the Property, the Suspects were immediately searched by Plaintiff's security personnel. The Suspects were patted down, told to empty their pockets, and required to produce a valid form of ID proving that they were at least 21 years old.

70. A pat down of the Suspects did not reveal any weapons or contraband of any kind.

71. The Suspects all produced valid forms of identification which were then scanned, and once determined to be valid, the Suspects were permitted entry into the Property.

72. While at the Property, Montgomery purchased a round of drinks with his credit card.

73. Montgomery's credit card was registered to "Daveon Montgomery" and Montgomery signed the credit card receipt.

74. The Suspects remained at the Property without incident until they departed around 4:49 a.m.

75. The Suspects completely removed themselves from the Property, and proceeded to

a location where they were no longer within view of the Property.

76.     The Suspects walked to their parked vehicle on North Avenue, where Montgomery retrieved a firearm and returned to the general vicinity of the Property.

77.     It has been reported and alleged that, at roughly 5:06 a.m. and after operating hours, Montgomery, while standing on the sidewalk *across the street* from the Property at 1562 N. Milwaukee, fired at least eleven (11) 9mm bullets directly into the Property, causing serious injury to one individual who was at the Property at the time of the shooting.

78.     Montgomery then fled the scene. Montgomery turned himself in to the relevant authorities several days later.

79.     CPD arrived at the Property shortly after the shooting occurred.

80.     Plaintiff and its employees fully cooperated with CPD. Plaintiff allowed CPD full and unfettered access to the Property, its security cameras, and its employees. After conducting its own investigation, Plaintiff provided CPD with the identity of *all* of the Suspects within a few short days (if not hours) of the shooting.

81.     The responding officer with Badge No. 07043 (the "R/O") issued Plaintiff's representative Anestis Tandari a citation for having "numerous patrons inside the bar after the bar closed at 0500 hrs." (the "Citation" attached as Exhibit G).

82.     Upon issuance of the Citation to Mr. Tandari, the R/O stated something to the effect of, "I did not want to give you this ticket, but someone higher up directed me to. I think it's total bullshit."

83.     The Citation would later be used by BACP as the foundation for the sole count lodged against Plaintiff as part of a license revocation proceeding targeting Plaintiff's Late-Hour License. Plaintiff was not given notice of the license revocation proceeding until after it made

several statements to the media (described below), after it filed the Appeal (described below), and after Plaintiff paid the renewal fees for its Licenses in September of 2022. Plaintiff's principal was not provided timely or proper notice by BACP, and only learned of the existence of the license revocation proceeding after he was informed that a hold had been placed on Plaintiff's Licenses, roughly ten (10) months after the Summary Closure proceeding had been initiated.

84.     On February 8, 2022, the Property was ordered closed by "Order of the Superintendent of Police" pursuant to the Summary Closure Ordinance. ("Property Closure Order" attached as Exhibit H).

85.     The Property Closure Order was specific to "The Point" and shuttered the Property only (i.e., no other businesses within the Arts Building were ordered closed by the CPD under the Summary Closure Ordinance.)

*Closure of the Arts Building*

86.     At all relevant times, the Arts Building had (and has) several other tenants, and each tenant has its own address. One such address is 1565 N. Milwaukee Ave, Chicago, Illinois 60622.

87.     Although the Arts Building has several addresses, they are all part of the same overall building structure.

88.     Upon information and belief, all tenants of the Arts Building reside above a common basement, which runs the length of the entire building and which is not specific to or leased by any tenant. At all relevant times, FIB was responsible for the condition and maintenance of the Arts Building basement.

89.     On February 7, 2022, Plaintiff's representative Jun "Joe" Lin participated in a Zoom call with Berger representatives Brian Loft and Rachel Breidinger, Berger's "Director of Operations" ("Breidinger").

14

90. During the February 7, 2022 Zoom call, Breidinger and Mr. Loft expressed sympathy to Plaintiff's representative, Mr. Lin, and stated that FIB did not expect Plaintiff to pay rent during the period in which the Property remained closed. Neither Mr. Loft nor Breidinger stated that Plaintiff could not re-open using its Late-Hour License or that either was aware of any opposition the City might have to Plaintiff's re-opening.

91. The Arts Building and the Property were inspected by the City on February 18, 2022.

92. On or around February 18, 2022, the "Entire Premises" (i.e., the Arts Building) was ordered closed by Department of Buildings inspector Bill Bugajski. ("Arts Building Closure Notice" attached as Exhibit I).

93. The Arts Building allows for occupancy of numerous tenants. Some of these tenants include, but are not limited to artist studios, a flower shop, and a smoke shop.

94. On March 2, 2022, Breidinger emailed Beaudet stating:

> I am the Director of Operations for Berger Realty Group and want to assure you we are committed to addressing all of the issues cited by the inspectors in regards to The Point as well as the Flat Iron Arts Building.
>
> Would you be open to getting on a call with me to discuss the issues at hand?
>
> (March 2, 2022 email attached as Exhibit J).

95. Beaudet responded, stating:

> Thank you for your email. Attached please find a copy of the Emergency Closure Notice for dangerous and hazardous violations and a copy of the 53 violations recorded on February 18, 2022. I believe that the property is being sent to the Circuit Court of Cook County and will be the subject of compliance monitoring by the Court and subsequent inspections to verify compliance. Your architect will be able to inform you as to which building permits will need to be obtained and which will require permits with stamped architectural drawings and other documentation.

(*Id*.). (Exhibit K was attached to Exhibit J).

96.     Upon information and belief, the Arts Building is not currently subject to compliance monitoring as the case has not been sent to the Circuit Court of Cook County.

97.     Although the "Entire Premises" was ordered closed, the Emergency Closure Notice states: "I, Matthew Beaudet, Commissioner of the City of Chicago Department of Buildings… hereby find that the property commonly known as **The Point, located at 1565 N. Milwaukee Avenue**, Chicago, Illinois is a public nuisance that is dangerous, hazardous and endangers the public health…" (emphasis in original).

98.     As evidence of an alleged public safety threat, the Emergency Closure Notice cites electrical violations, basement violations, "Fire Protection/Egress/Structural Violations", and plumbing violations.

99.     Although The Point does not own the Arts Building, the most significant violations cited by the Department of Buildings in the Emergency Closure Notice related to common areas of the Arts Building affecting all Arts Building tenants (i.e., basement, fire protection, and plumbing violations).

100.     Though the "Entire Premises" was ordered closed, Beaudet singled out Plaintiff as the *only* business subject to the Emergency Closure Notice.

101.     The Emergency Closure Notice concluded: "It has therefore been determined that the building poses an immediate danger to the tenants and occupants of the premises and constitutes an imminent threat to the public at large. THEREFORE, by the police powers vested in me Matthew Beaudet as Chicago Building Commissioner, I hereby order that **The Point, located at 1565 N. Milwaukee Avenue**, Chicago, Illinois be immediately closed, and remain vacant…"

16

102.     Since February 18, 2022, The Point has been the *only* tenant of the Arts Building to have been closed by the City, notwithstanding the fact that the Arts Building Violations cited building code violations relating to the common areas and structural components of the Arts Building.

103.     Plaintiff was singled out in the Emergency Closure Notice as a means to keep Plaintiff closed longer than the maximum period identified in the Summary Closure Ordinance, and so that the City could either modify or revoke Plaintiff's Late-Hour License during the period wherein Plaintiff remained closed.

104.     Upon information and belief, on or after March 2, 2022, but before March 29, 2022, Beaudet and Breidinger participated in at least one telephone conference wherein Beaudet agreed not to enforce the Arts Building Violations on the Arts Building or close or restrict the other tenants of the Arts Building – other than Plaintiff – so long as FIB agreed to forego repairing the Arts Building Violations until Plaintiff's Late-Hour License was either modified or revoked by the City.

105.     Between March 2, 2022, and March 29, 2022, Ms. Berger and FIB representatives ceased responding to Plaintiff's representative's outreach. Mr. Loft told Mr. Lin to contact Berger's principal, Ms. Berger, directly.

106.     On March 29, 2022, Mr. Lin participated in a Zoom call with Ms. Berger and Breidinger.

107.     On that Zoom call, Mr. Lin asked Ms. Berger when the Arts Building Violations would be completed, and cited the Lease and FIB's obligations to complete repairs on the Arts Building.

108.     Ms. Berger responded to Mr. Lin by stating that Plaintiff "signed a lease with two dead guys" (apparently in reference to Ms. Berger's deceased father and his now deceased leasing

representative), and that she "had nothing to do with it." Ms. Berger further stated that "New York real estate" was going to turn the Arts Building into a shopping mall, and that she "did not think the City would ever let [Plaintiff] open again."

109.    Mr. Lin responded that he would handle Plaintiff's issues with the City, and that FIB should instead concentrate on repairing the Arts Building Violations.

110.    Ms. Berger responded by reiterating that she "spoke with someone from the [City] and that [she did] not think the [City] would ever let [Plaintiff] open again." Ms. Berger further stated that her "advice" was for Mr. Lin to "walk away."

111.    Mr. Lin responded, asking about rent abatement during the period where the Arts Building was ordered closed, a condition that was agreed to with Mr. Loft and Breidinger in February of 2022.

112.    Ms. Berger stated that FIB had, to date, only hired a consultant and had not taken any other steps to repair the Arts Building Violations.

113.    Ms. Berger further stated that she had spoken with a number of "politicians and powerful people" and that the City will "never let [Plaintiff] open again."

114.    Ms. Berger further stated that Plaintiff "should think about being a 2:00 a.m. bar if [Plaintiff] wanted to re-open, or walk away."

115.    Despite Ms. Berger's communication with Beaudet that Berger was "committed to addressing all of the issues cited by the inspectors in regards to [Plaintiff] as well as the [Arts Building]," FIB did not undertake any meaningful repairs to address the Arts Building Violations that caused the Property and the Arts Building to be closed.

116.    Although the "Entire Premises" was ordered closed by the City based on common, fire protection, and structural issues with the Arts Building, the Property was the *only* business

18

located within the Arts Building which was closed by the City.

117.    Where any *building, structure*, or *premises* has been ordered closed pursuant to Section 14A-3-307.1 and notice is posted in accordance with Section 14A-3-307.2, it is unlawful for any *person* to enter the closed portion of the *building*, *structure*, or *premises* except for the express purpose of correcting violations of the *Chicago Construction Codes*, or for purposes of inspection at the direction of the *City* official identified on the notice.

118.    The "Entire Premises" (the Arts Building) was closed pursuant to Section 14A-3-307.1.

119.    The City has selectively enforced Section 14A-3-307.1, as Plaintiff is only business located in the Arts Building to have been closed by the City.

*Plaintiff's Correspondence With the FIB*

120.    Plaintiff and FIB came to an agreement on or around February 7, 2022, whereby Plaintiff would not be responsible for any rental payment *until* the Property was reopened and the Arts Building violations were corrected.

121.    FIB acknowledged on February 24, 2022, that, "[g]enerally speaking, anything listed as "Entire Building" is ours. Any others that include the basement may be ours or yours; we will assess that during our visit later today." (February 24, 2022 email attached as Exhibit L).

122.    On February 28, 2022, Plaintiff offered to assist FIB with the repairs. Plaintiff's representative wrote that "[he] would like to get the repairs done and permits pulled as soon as possible." (February 28, 2022 email attached as Exhibit M).

123.    On March 2, 2022, FIB's representative responded, writing "[w]hat we want to do is allow you to focus only on the violations related to your space and we'll focus on the building related issues. Please do not pull a permit for building related issues, we'll take care of that." (First

March 2, 2022 email attached as Exhibit N).

124.    Also on March 2, 2022, FIB's representative reiterated that "[a]s I mentioned before, do [n]ot pull a permit for any building related work. This can backfire significantly on us and you. I understand you are anxious to move forward but it's a big mistake *the city has included all the violations under the bar when clearly there are many issues unrelated to the bar*" and again instructed "[d]o not pull any permits." (Second March 2, 2022 email attached as Exhibit O) (emphasis added).

125.    In furtherance of FIB's agreement with the City not to repair the Arts Building Violations, Plaintiff was given specific direction from FIB *not* to perform any work on any part of the Arts Building outside of the Property.

126.    In furtherance of FIB's agreement with the City not to repair the Arts Building Violations, FIB did not make any material repairs to the Arts Building violations.

127.    On March 8, 2022, FIB gave Plaintiff direction to pull permits for and complete all repairs *for the Property only*. (March 8, 2022 email attached as Exhibit P).

128.    Plaintiff responded the same day reminding FIB that "[i]t is my understanding that the violation in the basement also needs to be corrected in order for the building department to allow me to resume operations. Because of this, can you let me know when permits for your portion has been applied for and approved. And when that work is done and approved by the building department since I cannot resume normal operations until that is completed. I need to know the approximate time that my business will be closed for." (Second March 8, 2022 email attached as Exhibit Q).

129.    On or around June 7, 2022, counsel for Plaintiff sent FIB a certified letter informing FIB, among other things, that Plaintiff would be ready to reopen by August 8, 2022, that the Arts

Building Violations had not been corrected, and that Plaintiff would not be able to reopen unless and until the Arts Building Violations were corrected by FIB.

130.    FIB responded on June 8, 2022 stating, among other things, that it had pulled all necessary work permits for the Arts Building, that there is some work that may not be complete by the requested date, that "[a]s far as rent abatement, we communicated that we may decide to defer rent payments until The Point was allowed to operate again, but never that rent would be fully abated. Regardless, no agreement was ever formalized by written amendment to the lease," and that Plaintiff is somehow in breach of the Lease.

131.    Despite the claims made in FIB's June 8, 2022 letter, Plaintiff did not observe any actual work occurring at the Arts Building, and the work FIB could not guarantee would be finished was not designed to address any of the code violations cited by the City.

132.    On or around August 26, 2022, Plaintiff responded to FIB through counsel stating, among other things, that FIB "ha[d] failed to address several outstanding building violations, including at least the issues related to the basement of the Arts Building, which include (1) the required fire separation for the basement ceiling, (2) structural issues, and (3) the proper manhole cover. In any event, we are informed that you have not requested the scheduling of a final inspection. We are advised by the City of Chicago Building Department that we will not be permitted to re-open The Point until such time as those violations have been cured by Berger Realty."

133.    On or around September 13, 2022, FIB responded through counsel stating, among other things, that counsel would not provide any new information on the status of the Arts Building violations, that Plaintiff is responsible for its own "exigent financial circumstances," and that Plaintiff owes $242,428.80 in back rent.

134.    In furtherance of its agreement with the City not to repair the Arts Building Violations, FIB refused to correspond with Plaintiff in any meaningful way or give Plaintiff any reasonable assurances that the Arts Building Violations were being addressed.

135.    FIB later sold the Arts Building (on or around October 31, 2022) without ever repairing the Arts Building Violations.

*BACP Prosecution – Summary Closure*

136.    CPD, citing the Summary Closure Ordinance, ordered the Property to be closed, effective February 8, 2022.

137.    Plaintiff timely submitted a request for a Probable Cause Hearing, and that request was accepted by BACP.

138.    Between February and March of 2022, Plaintiff attempted to negotiate a Nuisance Abatement Plan with BACP.

139.    By agreement, Plaintiff and BACP continued the Probable Cause Hearing in the hopes of finalizing a Nuisance Abatement Plan.

140.    Plaintiff saw little downside in attempting to negotiate a Nuisance Abatement Plan with equitable terms, as the Department of Buildings had ordered the *entire* Arts Building closed on February 18, 2022; and that inclusive closure would have prevented Plaintiff from opening even if it had finalized a Nuisance Abatement Plan or prevailed at the Probable Cause Hearing.

141.    During this same time period, FIB also represented that it would address and remedy the Arts Building Violations.

142.    On February 15, 2022, representatives from Plaintiff, the City, the CPD, and BACP participated in a remote meeting.

143.    During that meeting, City's counsel suggested that CPD conduct a security

22

walkthrough at the Property to review Plaintiff's proposed security plan.

144.    On February 18, 2022, Plaintiff's and the City's respective representatives conducted a walkthrough of the Property to discuss Plaintiff's security plan.

145.    Although the walkthrough's purpose was to enable a discussion between Plaintiff's principal and CPD to establish parameters of a security plan that would be included within a Nuisance Abatement Plan, City inspectors from the Department of Buildings were brought to the Property on the security plan walkthrough, and subsequently issued the Arts Building Violations and Emergency Closure Notice.

146.    Upon information and belief, the security plan walkthrough was only a ruse to facilitate entry into the Property by representatives from the Department of Buildings such that they could identify alleged building code violations designed to keep Plaintiff closed beyond the maximum period identified in the Summary Closure Ordinance (i.e., the Emergency Closure Notice).

147.    As of February 18, 2022, Plaintiff was completely dependent on FIB to repair the Arts Building Violations since the "Entire Premises" was ordered closed by the City, and Plaintiff was not permitted to pull or obtain permits for areas outside its leased premises. Even if Plaintiff would have entered into a Nuisance Abatement Plan, it would not have been able to re-open until the Arts Building Violations were repaired, or the City withdrew them.

148.    On February 17, 2022, BACP sent its "initial draft" of the Nuisance Abatement Plan (the "Initial Draft").

149.    The Initial Draft provided, among other things, that the "incident…occurred outside of the licensed premises," that the Nuisance Abatement Plan would include a "heightened enforcement of rules on the licensed premises to be applied immediately upon reopening," that

"[Plaintiff] shall be open no longer than 2:00AM on Sunday night through Friday night; and 3:00AM on Saturday night," and that Plaintiff "shall... [s]upply at least six (6) trained and licensed security guards who shall patrol both the interior and the immediate exterior areas of the Premises, *including across the street*, until thirty (30) minutes after closing." (emphasis added).

150.    The only language included in the Initial Draft which would allow for Plaintiff to be released from the requirements of the Nuisance Abatement Plan was: "[s]ix (6) months after the execution of the Nuisance Abatement Plan, [Plaintiff]… can contact the Chicago Police Department and the Department of Law to *potentially* set up a meeting with respect to the modification in the hours of operation." (emphasis added).

151.    The plain language of the Initial Draft included no criteria or direction that (even after the 6-month statutory period had lapsed) Plaintiff could follow to seek release from the requirements, or to show that it had complied fully with the Initial Draft, such that the terms would no longer restrict Plaintiff's business.

152.    Upon information and belief, the City only enters into Nuisance Abatement Plans which allow the City the option to extend the terms of the Nuisance Abatement Plan at its sole discretion, without objective criteria, and in perpetuity.

153.    Nuisance Abatement Plans also state that, "[t]he conditions imposed pursuant to [a] [Nuisance Abatement Plan] shall apply to the business address, Licensee, and to all officers, managers, partners, and direct and indirect owners of the licensed entity" and "[t]he sale of the business… does not void the above conditions on the license."

154.    Not only would agreement to enter into the Nuisance Abatement Plan have affected Plaintiff's operation of the bar and its ability to remain profitable, but would also have negatively impacted in its Late-Hour License and the value of the business moving forward and/or in the

event Plaintiff resolved to sell or transfer its Late-Hour License.

155.     On March 8, 2022, Plaintiff's counsel sent revisions to the Initial Draft (the "Revised Draft").

156.     The Revised Draft accepted the restricted hours, but specifically sought criteria that would prohibit the Nuisance Abatement Plan to extend in perpetuity, at the City's sole discretion, and with no guarantee of due process to allow the Plaintiff the opportunity to be relieved of the plan's restrictions should it meet the plan's criteria (i.e., to have an independent body evaluate the City's position.)

157.     Plaintiff's Revised Draft specifically excluded the City's proposed requirement that Plaintiff be required to "patrol… across the street" from the Property, as Plaintiff is not legally permitted to police a City-owned public way that has association with or adjacency to the Property.

158.     BACP did not provide comment on the Revised Draft until March 29, 2022 (the "Third Draft"), twenty-one (21) days after Plaintiff's counsel sent the Revised Draft.

159.     The Third Draft did not reintroduce the requirement that Plaintiff patrol across the street from the Property; however, BACP did remove Plaintiff's proposed language designed to ensure that the Nuisance Abatement Plan could not extend indefinitely and without available due process.

160.     The Third Draft mirrored the language of the Initial Draft in stating that "[s]ix (6) months after the execution of the Nuisance Abatement Plan, the [Plaintiff] and their representative can contact the Chicago Police Department and the Department of Law to *potentially* set up a meeting with respect to the modification in the hours of operation." (emphasis added).

161.     Following the exchange of competing drafts, Plaintiff was left with only two options: (1) sign a Nuisance Abatement Plan for an indefinite period of time that rendered

Plaintiff's Late-Hour License meaningless and valueless; or (2) proceed to a Probable Cause Hearing.

162.     Plaintiff's principal reached out to the Executive Director of the Public Building Commission of the City, Carina Sanchez, in an effort to obtain more information and to provide any advice she might offer to assist in remedying Plaintiff's quandary. Ms. Sanchez stated to Mr. Lin that she had received a call from Beaudet, who told her he would not communicate with her concerning Plaintiff or Mr. Lin in writing. Beaudet further admonished Ms. Sanchez that she should "not get involved with [Plaintiff or Mr. Lin]."

*The Probable Cause Hearing*

163.     In support of the Summary Closure, BACP submitted a Vice Investigation Report (the "Vice Report") which purported to outline the basis and support for the Summary Closure. (Vice Report attached as Exhibit R).

164.     The "Purpose" of the Vice Report is as follows:

Investigating officer (I/O) has initiated this Summary Closure report upon assignment by Lt. Chibe #591 on 07 February 2022. The closure was initiated following two (2) aggravated battery with a gun incidents, one (1) Liquor license violation where citations were issued… and one (1) Weapons Violation arrest. The shooting incidents occurred in a four (4) month span leaving a total of six (6) persons shot with one (1) fatally. The Continued operations of [The Point] presents an immediate and on-going public safety threat and warrants the application of Summary Closure.

(*Id.*).

165.     The referenced "Liquor license violation" is the Citation.

166.     The Vice Report made clear that the relevant issues to be considered were contained within the Report's self-described "Purpose." Specifically, summary closure was "warrant[ed]" based on two (2) gun incidents, one (1) liquor license violation, and one (1) weapons violation arrest.  (*Id.*)

167. On June 22, 2022, a Probable Cause Hearing (the "Probable Cause Hearing") was conducted before an administrative officer (the "Commissioner").

168. At the Probable Cause Hearing, BACP presented its case "on paper" and submitted the Vice Report (with accompanying exhibits) as its *only* evidence in the matter. BACP did not call any fact witnesses to provide foundation, context or other support for the information contained in Vice Report. Plaintiff's hearsay objections were overruled, though Plaintiff acknowledges that the rules applied at the Probable Cause Hearing included relaxed evidentiary standards regarding hearsay evidence.

169. Plaintiff was denied the right of cross examination to question any witness possessing knowledge as to how the Vice Report was compiled, or what underlying information was relied upon in creating the Vice Report.

170. Prior to the Probable Cause Hearing, Plaintiff was unaware that the City did not intend on calling any witnesses to lay the foundation or otherwise to support the statements made and conclusions drawn in the Vice Report.

171. Plaintiff was left with the burden of defending itself against unsupported conclusions of law and fact.

*The Ruling*

172. On July 8, 2022, the Commissioner issued his ruling "Affirming the Summary Closure After Probable Cause Hearing" and held that, "[b]ased on the totality of the circumstances, the City of Chicago/BACP proved by a preponderance of the evidence, that a public safety threat occurred at [The Point] on February 6, 2022." (The "Final Order" attached as Exhibit S).

173. According to the Summary Closure Ordinance "'Public safety threat' means the occurrence of all of the following: (1) a violent offense occurs at an establishment during the

establishment's operating hours, and (2) the violent offense involves acts of the licensee/owner, or its employees, agents or patrons, or otherwise involves circumstances having a nexus to the operation of the establishment, and (3) the superintendent reasonably determines, based on data or information in the superintendent's possession, that continued operation of the establishment presents a danger to the public."

174.     Regarding the Citation, the Final Order held that the Vice Report was not clear on the allegations regarding the single liquor license violation, and that BACP did not prove that a Liquor License violation occurred by a preponderance of the evidence.

175.     Regarding the alleged weapons violation, the Final Order concluded that the offender from that incident was arrested across the street and down the block from the Property, and that neither the female offender nor the CPD officer testified at hearing, that the Vice Report "…does not specify what the name of the bar was, where it was located, or when the altercation occurred," and that the female individual who was arrested never entered the Property and was not one of their patrons.  *(Id.* at p. 4., ¶ 10.)

176.     Regarding the October shooting, the Final Order stated "[t]he mere unfortunate fact that some of [The Point's] patrons may have gotten caught in the crossfire of several unlawful individuals who were loitering on said block at said time, cannot be attributed to [Plaintiff], any more than it can be attributed to other businesses located on said block." *(Id.* at pp. 5-6, ¶ 10.).

177.     Regarding the February shooting, the Final Order stated:

> While the Licensee could not have reasonably anticipated, that the individual who perpetrated the shooting would engage in such activity, a "public safety threat" being considered under a "probable cause hearing" under the Municipal Code of Chicago does not factor in reasonability, probability, or fault. While these topics potentially could be considered in a "nuisance abatement hearing", these are considerations beyond the purview of the instant hearing.

28

Here, [The Point] demonstrated that the perpetrator submitted to the security requirements outside the front door without incident, including providing identification, having a hand held metal detector waved over his person, and allowing a physical pat-down of his person. Nevertheless, said perpetrator is observed on video purchasing one (1) drink from the bar with his own credit card, leaving [The Point]'s establishment, and returning almost immediately thereafter to a location across the street from [The Point] wherein he proceeded to fire several bullets into the establishment causing an individual within [The Point]'s establishment to suffer a facial wound. Thus, the nexus of a patron causing a public safety threat as those prevailing terms are defined under the Municipal Code of Chicago, are satisfied.

(*Id*. at ¶ 12).

178.     Although *no* elements required to demonstrate a public safety threat were established at hearing, Plaintiff was nonetheless ordered to remain closed under the Summary Closure Ordinance.

*Plaintiff's Appeal of the Summary Closure*

179.     On August 12, 2022, Plaintiff timely filed a Complaint for Administrative Review with the Circuit Court of Cook County seeking to reverse the Final Order. That matter is currently pending under Case No. 2022 CH 07916 (the "Appeal").

180.     Plaintiff argues, generally and among other things, that the Commissioner improperly decided the Final Order based on a lack of evidence presented by the City, and that Plaintiff was denied due process, noting that the Final Order claimed "[w]hile [Plaintiff] could not have reasonably anticipated that the individual who perpetrated the shooting would engage in such activity, a 'public safety threat' being considered under a 'probable cause hearing'… does not factor in reasonability, probability, or fault."

181.     Upon information and belief, the Final Order can be cited by the City and used as evidence of a disciplinary history against Plaintiff in any future disciplinary hearing (i.e., a License Revocation Hearing).

*Plaintiff's Statements to the Media*

182. Plaintiff's principal, Joe Lin, made several statements to the media that were critical of the City, accused the City of "scapegoating" Plaintiff, and explained how Plaintiff was in no way responsible for the City's rising crime problem.

183. In an October 13, 2021 Block Club Chicago article, Mr. Lin stated that, prior to a shooting on Milwaukee Avenue, Plaintiff "closed 90 minutes early because staff grew concerned over rowdiness on the street… [b]ar staff called 911 several times to request police assistance ahead of the shooting." (Exhibit T).

184. The same February 7, 2022 article referenced above quotes Mr. Lin as stating, "he can't be blamed for what has become a 'Chicago violence problem.' The city recorded nearly 800 homicides last year, the most in 25 years," and "[w]e're doing everything we can in terms of being a business. We were simply victimized twice with shootings. That's violence in Chicago. I don't think the answer is to my close business, when we haven't done anything wrong." (*See* Exhibit E).

185. On May 12, 2022, Block Club Chicago published an article titled "Closed Wicker Park Bar Says It's Being Scapegoated For City's Crime Spike, Poses No Safety Threat." That article quoted Plaintiff's allegations in a filed document stating "[Plaintiff]'s operation and mere existence is not a threat to public safety; rather, the city is scapegoating [Plaintiff] to distract from the city's failure to control the increase and proliferation of crime throughout neighborhoods in the city of Chicago, including the very area in which [Plaintiff] resides." (Exhibit U).

186. On July 26, 2022, Block Club Chicago published an article titled "Wicker Park's The Point Must Stay Closed Until August — But Report Shows Bar Had Little To Do With Shootings That Forced Its Closure." Mr. Lin is quoted stating, "[w]e did nothing wrong…[w]e were the victims in this, and the city comes back and lashes out at the business owners. …This is

nothing more than scapegoating, and I believe the hearing proves, the facts of it prove, that they are scapegoating." The article further states:

> But the night of the shooting, the bar's staff did everything right, and they used video to identify Montgomery on social media, which helped lead to his arrest, Lin said.
>
> Lin said the report issued by the city essentially backs that up, and the city's reasoning rests only on the crime occurring within the "nexus" of The Point.
>
> Under that standard, the city's logic could be applied to anyone doing business within proximity to violent crime, Lin said.
>
> "If you read the body of the [hearing] ruling, I'm guilty of not being able to read a person's mind of what they do after the fact, that's all. How can I reasonably predict what someone's going to do after they leave my establishment?" he said.
>
> (Exhibit V).

187. Mr. Lin was quoted in a Chicago Sun-Times Article which states that "[t]he only thing I'm guilty of is, I couldn't read someone's mind." The article further stated that "[Mr. Lin] thinks the judge's line of reasoning sets a dangerous precedent for business owners… 'It's the perpetrator that should be punished… not the innocent business that the city — through this investigation — could not prove one thing we did wrong." (Exhibit W).

188. Regarding Plaintiff's Late-Hour License, that same article states "[Alderman] La Spata says he hopes the Point will voluntarily make changes — including possibly forgoing its 5 a.m. license — before reopening."

189. Since February 7, 2022, but before any License Revocation Hearing or charge seeking to revoke Plaintiff's Late-Hour License was noticed or overtly put in "the queue" by BACP, Plaintiff's principal made numerous public statements regarding the City's crime problem, that Plaintiff is not the source of the crime in the area, and that Plaintiff is being used as a "scapegoat" to conceal the City's inability to control the proliferation of violent crime.

*22-LR-11 and Plaintiff's Licenses*

190.    Prior to Plaintiff's Licenses expiring on November 15, 2022, Plaintiff took all necessary and possible steps to have its Licenses renewed before they expired so that Plaintiff could re-open as soon as possible pending the repairs of the Arts Building Violations.

191.    Plaintiff paid the fees associated with its PPA on September 22, 2022, in the amount of $770.00.

192.    Plaintiff paid the fees associated with its Tavern License on September 22, 2022 in the amount of $4,400.00.

193.    Plaintiff paid the fees associated with its Late-Hour License on September 22, 2022 in the amount of $6,000.00.

194.    On October 12, 2022, Mr. Lin spoke with Mark Mulyk, a City inspector, who informed Mr. Lin that Plaintiff could not renew its PPA until the Arts Building passed inspection and Plaintiff is permitted to open by the City.

195.    On October 28, 2022, Plaintiff filed a Complaint seeking injunctive relief to, among other things, compel FIB (later amended to compel the New Owners (defined below)) to repair the Arts Building Violations or stay Plaintiff's rental obligation for the Property.

196.    Plaintiff was granted a temporary restraining order on January 20, 2023 staying Plaintiff's rental obligation to the New Owners (defined below) for the Property until the Arts Building Violations are repaired.

197.    With regard to Plaintiff's Tavern License and Late-Hour License, Plaintiff learned on November 11, 2022 that Plaintiff's Licenses, as well as Plaintiff's principal's license for a different bar for which he also serves as principal, Bourbon on Division ("Bourbon"), were on "hold."

198.    After learning that the Licenses and Bourbon's licenses were on "hold," Plaintiff immediately sent this information to the City seeking further information.

199.    In response, on November 17, 2022, a City representative wrote in an email to Mr. Lin:

> There are two license adjudication holds on your account for two cases handled by Assistant Corporation Counsel… The first case, 22-SC-0002, you appealed under 22-CH-07916. The second case, 22-LR-0011, involves alleged violations on February 6, 2022, and will be heard before the Mayor's License Discipline Commission (MLDC). [Assistant Corporation Counsel] should be able to provide you with information about 22-LR-0011 and when it will be set before the MLDC.
>
> I overrode the license adjudication holds for the Public Place of Amusement application, the Tavern renewal application, and Late Hour renewal application so they should not prevent the licenses from issuing. However, there is also a hold on the account for the Department of Buildings closure order that can only be removed by the Department of Buildings.
>
> (Exhibit X).

200.    The same City representative also wrote: "License adjudication holds are place (sic) whenever a case is referred to the Law Department. The holds were on the account prior to September 22, 2022." (Exhibit Y).

201.    The City representative further stated that he had removed the holds on Bourbon's licenses, and Plaintiff's principal was allowed to renew and pick up the licenses for Bourbon the next day.

202.    Plaintiff's principal was given licenses for Bourbon, but they did not include the Mayor's signature, requiring Plaintiff's principal to return to City Hall to obtain licenses with the proper signatures.

203.    When Mr. Lin continued making inquiries to the City via email, the same City representative stated that Mr. Lin would have to appear and speak in person.

204. Plaintiff was not given notice by the City, and otherwise had no knowledge of the apparent existing matter (22-LR-11) prior to November 17, 2022.

205. The existence of 22-LR-11 directly contradicted a representation made roughly one month prior by the Assistant Corporation Counsel within BACP assigned to prosecute Plaintiff.

206. On September 22, 2022, Plaintiff's counsel emailed that Assistant Corporation Counsel, requesting information about "whether there is any order or edict in place from the Dept. of Buildings or any other City agency that would prevent The Point from reopening?"

207. Assistant Corporation Counsel responded the same day stating:

> I can't speak with regards to [the Department of Buildings] and every other City agency, but as far as the summary closure instituted by CPD is concerned, [The Point is] free to open as the summary closure expired on August 8, 2022. If [the Department of Buildings] has inspected and passed all outstanding violations for your client's premises, and they have given your client confirmation that they have lifted their Commissioner instituted closure, your client should be able to open. You may want to double check with [the Department of Buildings] to confirm that the commissioner closure has been lifted.

208. When Plaintiff and its counsel learned of the existence of 22-LR-11, Plaintiff's counsel asked Assistant Corporation Counsel if he was aware of any details surrounding 22-LR-11.

209. Assistant Corporation Counsel responded on November 17, 2022, stating "[t]he case is in the queue to be worked up and has not yet been set before the MDLC. Once it is ready to proceed, I will send the notice of hearing to your client, at the premises address and their registered agent."

210. On November 18, 2022, and only after counsel for Plaintiff demanded more information concerning the apparent charge, Assistant Corporation Counsel sent Plaintiff's counsel the Notice of Hearing for 22-LR-11 (the "Revocation Notice"), as well as the factual underpinnings and evidence which BACP would use to prosecute its case.

34

211.    Revocation of a liquor license is an "extraordinary remedy."

212.    The Revocation Notice lists a single count based *only* on the Citation. The relevant issues surrounding the Citation were previously litigated in the Probable Cause Hearing, wherein the Final Order – issued in July 2022 – found that BACP did *not* prove that a liquor license violation occurred by a preponderance of the evidence (and, relatedly, that the Vice Report was not clear on the allegations regarding the single liquor license violation.)

213.    The information provided by BACP in support of the Revocation Notice included the Vice Reports, the Citation, and a City document stating that the Citation had been non-suited by the City.

*The New Owners*

214.    The Arts Building was sold to NARE Flat Iron, LLC, CCT Flat Iron LLC, Buzzpartners Flat Iron LLC, and DM Flat Iron LLC (the "New Owners") on or around October 31, 2022.

215.    On November 4, 2022, Mr. Lin had a meeting with Savas Er ("Savas") who purported to represent the New Owners.

216.    This meeting occurred in person at the Property. Mr. Lin was accompanied by Liviu Chiru.

217.    At this meeting, Savas stated that Plaintiff's "problems were with [FIB] and not [the New Owners]." Savas stated it was "fine" that Plaintiff had sued FIB, but instructed that Plaintiff should not add the New Owners to any complaint or motion since the New Owners had an indemnity agreement with FIB.

218.    Savas further stated "I do not know how long it will take with the City, but I think the City has something against [Plaintiff] which is why I don't think they want [Plaintiff] to open."

35

219.    Mr. Lin responded by saying that it would not make any sense to switch to a 2:00 a.m. bar since the value of Plaintiff's Late-Hour License is the reason that Plaintiff agreed to such a high rent requirement in the Lease.

220.    Savas responded that "[he] does not think the City wants [Plaintiff] there as a 4:00 a.m. bar."

221.    Savas further stated that Plaintiff should reconsider being a 2:00 a.m. bar, and if it does, Plaintiff should stay as a tenant since Plaintiff "pays good rent."

222.    Savas later personally served Plaintiff with an eviction notice on or around November 9, 2022, citing an objectively out of context and arguably unenforceable provision in the Lease, which Plaintiff will challenge in due course.

223.    Savas further divulged to Plaintiff that when the New Owners purchased the Arts Building from FIB, it was the New Owners "understanding" that Plaintiff would "never be able to re-open."

*Summary*

224.    Since on or around February 8, 2022, and continuing to the present, the City has engaged in a campaign of punitive, retaliatory and harassing conduct, and has made specific and arbitrary determinations based on unfounded and illegitimate animus in violation of Plaintiff's due process, property, and equal protection rights and in violation of Plaintiff's rights under Illinois law and the United States Constitution. In light of the facts set forth above, Plaintiff seeks assistance from the Court to halt the blatant violations and prevent the City, and its investigatory and prosecutorial arms, from continuing their malicious and dogged attempts to prevent Plaintiff from operating indefinitely.

## COUNT I

### 42 U.S.C. § 1983 – Equal Protection Violations
**(Against The City, Beaudet, BACP, The Department of Buildings, David Brown, and CPD)**

225. Plaintiff restates and realleges by reference paragraphs 1 through 224 as if fully set forth herein.

226. At all times relevant hereto, Defendants acted through their final policymakers.

227. The actions of the Defendants against Plaintiff violated Plaintiff's rights guaranteed under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

228. Defendant Beaudet was acting in the scope of his employment at all times.

229. Defendant David Brown was acting in the scope of his employment at all times.

230. The Defendants' actions reflect an official policy, custom or practice of penalizing businesses that hold a Late-Hour License for discriminatory reasons and based on illegitimate animus in violation of the Fourteenth Amendment of the United States Constitution, and were committed, condoned, and perpetuated at the hands of policy makers and those to whom policy-making authority has been delegated.

231. Defendants' actions were intentional, willful, and malicious and/or in reckless disregard of Plaintiff's rights as secured by 42 U.S.C. § 1983 and the Civil Rights Act of 1991.

232. Defendants' conduct has caused Plaintiff damage to its reputation, lost business, lost income and sales, lost profits, inconvenience, future pecuniary losses, the Loss of its Licenses, the loss of its Lease, and other compensatory and consequential damages. The City's actions have and continue to irreparably tarnish Plaintiff's business reputation and goodwill.

## COUNT II

### 42 U.S.C. § 1983 – Violation of First Amendment
**(Against The City, Beaudet, BACP, The Department of Buildings, David Brown, and CPD)**

233.     Plaintiff restates and realleges by reference paragraphs 1 through 224 as if fully set forth herein.

234.     At all times relevant hereto, Defendants acted through their final policymakers.

235.     Defendant Beaudet was acting in the scope of his employment at all times.

236.     Defendant David Brown was acting in the scope of his employment at all times.

237.     Defendants' actions reflect an official policy, custom or practice of penalizing businesses, residents, and employees in violation of the First Amendment of the United States Constitution, and were committed, condoned, and perpetuated at the hands of policy makers and those to whom policy-making authority has been delegated.

238.     By Defendants' actions, Plaintiff suffered compensable injury and harm as a result of the denial of rights guaranteed to it pursuant to the First Amendment to the United States Constitution.

239.     Defendants' conduct violated Plaintiff's right to free association and free speech as provided by the First Amendment to the Constitution.

240.     Defendants intentionally retaliated against Plaintiff with malice or reckless indifference to Plaintiff's civil rights.

241.     Defendants' acts have caused Plaintiff damage to its reputation, lost business, lost income and sales, lost profits, inconvenience, future pecuniary losses, the Loss of its Licenses, the loss of its Lease, and other compensatory and consequential damages. The City's actions have and continue to irreparably tarnish Plaintiff's business reputation and goodwill.

242.     Defendants' actions were intentional, willful, and malicious and/or in reckless

disregard of Plaintiff's rights as secured by 42 U.S.C. § 1983 and the Civil Rights Act of 1991.

## COUNT III

### 42 U.S.C § 1983 – Violation of Due Process
**(Against The City, Beaudet, BACP, The Department of Buildings, David Brown, and CPD)**

243.     Plaintiff restates and realleges by reference paragraphs 1 through 224 as if fully set forth herein.

244.     At all times relevant hereto, Defendants acted through their final policymakers.

245.     The City's actions reflect an official policy, custom or practice of penalizing businesses that hold a Late-Hour License for discriminatory reasons and based on illegitimate animus in violation of the Fourteenth Amendment of the United States Constitution, and were committed, condoned, and perpetuated at the hands of policy makers and those to whom policy-making authority has been delegated.

246.     Defendant Beaudet was acting in the scope of his employment at all times.

247.     Defendant David Brown was acting in the scope of his employment at all times.

248.     Plaintiff has a property interest in its Late-Hour License and cannot be deprived of that right without due process.

249.     Denying a licensee an opportunity to cross examine witnesses and face a "trial on paper" and then use those findings against Plaintiff in a later proceeding constitute violations of due process.

250.     Finding that "[w]hile [Plaintiff] could not have reasonably anticipated that the individual who perpetrated the shooting would engage in such activity, a 'public safety threat' being considered under a 'probable cause hearing'…does not factor in reasonability, probability, or fault" is a violation of due process.

251.     Admission of hearsay accusatory statements in an Administrative Proceeding is a

violation of due process.

252.     The City's failure to meaningfully respond to any of Plaintiff's FOIA requests.

253.     Orchestrating a plan into action to either revoke or modify Plaintiff's Late-Hour Licenses through threat of revocation by using BACP as a prosecutorial arm to initiate enforcement proceedings and cause a Plaintiff to either enter into an indefinite Nuisance Abatement Plan or face a License Revocation Hearing is a violation of due process.

254.     Depriving Plaintiff of any means to satisfy the terms of a Nuisance Abatement Plan and resume normal operations is a violation of due process.

255.     Defendants targeted actions towards Plaintiff to revoke or modify its Late-Hour License is a violation of due process.

256.     Thus, Defendants violated Plaintiff's due process rights by targeting Plaintiff by using the Summary Closure Ordinance, the Emergency Closure Notice, 22-LR-11, and presenting only hearsay evidence at the Probable Cause Hearing to close Plaintiff down even though the Final Order, which upheld the Summary Closure, found that Plaintiff was in no way responsible for any of the allegations complained of by the City.

257.     Defendants' conduct has caused Plaintiff damage to its reputation, lost business, lost income and sales, lost profits, inconvenience, future pecuniary losses, the Loss of its Licenses, the loss of its Lease, and other compensatory and consequential damages. The City's actions have and continue to irreparably tarnish Plaintiff's business reputation and goodwill.

258.     Defendants' actions were intentional, willful, and malicious and/or in reckless disregard of Plaintiff's rights as secured by 42 U.S.C. § 1983 and the Civil Rights Act of 1991.

259.     Defendants' actions were knowing, willful, and callous and/or in reckless disregard of Plaintiff's rights as secured by 42 U.S.C. § 1983 and the Civil Rights Act of 1991.

## COUNT IV

### State Law Claim – Abuse of Process
**(Against The City, Beaudet, BACP, The Department of Buildings, David Brown, and CPD)**

260.    Plaintiff restates and realleges by reference paragraphs 1 through 224 as if fully set forth herein.

261.    Defendants improperly used the Summary Closure Ordinance, the Emergency Closure Notice, the Citation, the Arts Building Violations and/or 22-LR-11 for the ulterior purposes of intimidating, oppressing, punishing, and/or harassing Plaintiff to modify or revoke Plaintiff's Late-Hour License, or to close the business down.

262.    Defendants' actions in pursuing said charges were willful, wanton, and malicious.

263.    As a result of Defendants' improper use of these proceedings, Plaintiff has suffered the expiration of its Licenses, the potential revocation of Plaintiff's Late-Hour License, and the possibility Plaintiff will have to close the business.

264.    Plaintiff suffered substantial damages, including but not limited to, damage to Plaintiff's business, emotional distress, humiliation, attorneys' fees and costs.

## COUNT V

### State Law Claim – Conspiracy to Violate 42 U.S.C § 1983
**(Against All Defendants)**

265.    Plaintiff restates and realleges by reference paragraphs 1 through 224 as if fully set forth herein.

266.    At all times, Defendants acted in concert for the purpose of depriving Plaintiff of its Late-Hour Licenses, without compensation, by the agreements alleged above.

267.    All Defendants had knowledge of the conspiracy to deprive Plaintiff of its Late-Hour License, as well as the actions of the other Defendants.

268.     Defendants coordinated with each other through concerted action to further their plan to deprive Plaintiff of its Late-Hour License.

269.     As a proximate result of Defendants' conduct as set forth above, Plaintiff has been damaged, and continues to suffer damages.

**WHEREFORE**, Plaintiff seeks the following relief:

A)     All lost income and lost profits Plaintiff would have received while it was improperly caused to be or remain closed by the City, including but not limited to, all economic and tangible and intangible losses and pre-judgment interest, and all damages Plaintiff is entitled to under the law;

B)     Compensatory damages in an amount to be determined at trial;

C)     A permanent injunction enjoining the City from engaging in the retaliatory practices complained of herein;

D)     A declaratory judgment that City's actions violate the Equal Protection Clause to the United States Constitution;

E)     The Court retain jurisdiction of this case until such time as it is assured that Defendant has remedied the policies and practices complained of herein and are determined to be in full compliance with the law;

F)     An award of reasonable attorneys' fees, costs, and litigation expenses; and

G)     Such other relief as the Court may deem just or equitable.

February 2, 2023                                    Respectfully Submitted,

                                                   The Blue Note, Inc.


                                                   _____*s/Alex Kosyla*_____

                                                   One of its Attorneys


Daniel T. Fahner
(daniel.fahner@rkfglobal.com)
Alex Kosyla

(alex.kosyla@rkfglobal.com)
RKF Global PLLC
200 W. Madison St.
Suite 1940
Chicago, Illinois 60606
Tel: (312) 888-2000