**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE BLUE NOTE, INC. d/b/a The Point, an Illinois corporation, | ) | |
| Plaintiff, | ) | No. 23 CV 648 |
| v. | ) | Hon. Thomas M. Durkin |
| THE CITY OF CHICAGO, a Municipal Corporation, *et al.*, | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

BRADLEY G. WILSON
AARON T. DOZEMAN
City of Chicago, Department of Law
2 North Lasalle Street, Suite 520
Chicago, Illinois 60602
(312) 744-7686 / (312) 744-9018
Bradley.Wilson@cityofchicago.org
Aaron.Dozeman1@cityofchicago.org

*Attorneys for City Defendants*

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................2

A. The City's summary closure ordinance ........................................................ 2

B. The Point is established in 2020 in The Flat Iron Arts Building ................ 2

C. The Point is summarily closed by CPD after two shootings ...................... 3

D. DOB orders an emergency closure of The Point based on 53 Building Code violations ................................................................ 4

E. After a probable cause hearing, BACP upholds the summary closure order, and Blue Note seeks state-court review of that decision ........................... 5

F. Blue Note criticizes the City's actions to the media ................................. 6

G. BACP brings license disciplinary proceedings against The Point, and the emergency closure order is lifted ............................................................. 7

H. Blue Note's claims against the City Defendants and FIB.......................... 8

LEGAL STANDARDS ..........................................................................................9

ARGUMENT.......................................................................................................10

I. This Court Should Abstain From Hearing This Action And Dismiss It Under Rule 12(b)(1) Based On Ongoing State Proceedings. ..................................... 11

II. The Complaint Should Be Dismissed Under Rule 12(b)(6)............................ 14

A. Blue Note fails to allege that a City policy, practice, or custom caused the alleged constitutional violations. ......................................................... 15

B. Blue Note fails to plead any underlying constitutional deprivations........ 18

1. Blue Note fails to state a class-of-one equal protection claim.......................................................................18

2. Blue Note fails to state a retaliation claim. ........................20

3. Blue Note fails to satate a due process claim.....................21

III. This Court Should Decline To Exercise Supplemental Jurisdiction Over Blue Note's State-Law Claims Or Dismiss Them On The Merits........................... 23

A. Blue Note fails to state an abuse of process claim.................................. 24

B. Blue Note fails to state a conspiracy claim. .......................................... 25

C. The Tort Immunity Act bars Blue Note's state-law claims for damages. 26

CONCLUSION..................................................................................................27

**EXHIBITS**

Exhibit 1 MLDC Notice of Hearing

Exhibit 2 DOB Emergency Closure Lifting Notice

# TABLE OF AUTHORITIES

## Cases

*Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*,
599 F.3d 720 (7th Cir. 2010) .......... 24

*Amundsen v. Chi. Park Dist.*,
218 F.3d 712 (7th Cir. 2000) .......... 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......... 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......... 9, 10

*Bell v. City of Country Club Hills*,
841 F.3d 713 (7th Cir. 2016) .......... 21

*Berrada Props. Mgmt. Inc. v. Romanski*,
608 F. Supp. 3d 746 (E.D. Wis. 2022).......... 9

*Best v. City of Portland*,
554 F.3d 698 (7th Cir. 2009) .......... 15

*Bozek v. Bank of Am., N.A.*,
191 N.E.3d 709 (Ill. App. Ct. 2021) .......... 24

*Bridges v. Dart*,
950 F.3d 476 (7th Cir. 2020) .......... 16

*Brunson v. Murray*,
843 F.3d 698 (7th Cir. 2016). .......... 18

*Calusinski v. Kurger*,
24 F.3d 931 (7th Cir. 1994) .......... 16

*Cannici v. Vill. of Melrose Park*,
885 F.3d 476 (7th Cir. 2018) .......... 22

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988).......... 17

*Contreras v. City of Chicago*,
920 F. Supp. 1370 (N.D. Ill. 1996) .......... 23

*Crenshaw v. Sup. Ct. of Ind.*,
170 F.3d 725 (7th Cir. 1999) .......... 14

*D.B. ex rel. Kurtis B. v. Kopp*,
725 F.3d 681 (7th Cir. 2013) .................................................................................... 18

*Douglas v. Reeves*,
964 F.3d 643 (7th Cir. 2020) .................................................................................... 20

*Dvorkin v. Soderquist*,
2022 WL 1127697 (Ill. App. Ct. 2022) .................................................................... 25

*Fares Pawn, LLC v. Ind. Dep't of Fin. Inst.*,
755 F.3d 839 (7th Cir. 2014) .................................................................................... 18

*FKFJ, Inc. v. Vill. of Worth*,
11 F.4th 574 (7th Cir. 2021) ................................................................................ 18, 19

*Garcia v. City of Chicago*,
390 F. Supp. 2d 701 (N.D. Ill. 2005) ....................................................................... 17

*Green v. Benden*,
281 F.3d 661 (7th Cir. 2001) .................................................................................... 14

*Hamilton v. Gavin*,
No. 22 C 2285, 2023 WL 2161663 (N.D. Ill. Feb. 22, 2023) ..................................... 15

*Hartman v. Moore*,
547 U.S. 250 (2006) ................................................................................................ 21

*Hernandez v. Dart*,
635 F. Supp. 2d 798 (N.D. Ill. 2009) ....................................................................... 21

*Hess v. Flores*,
948 N.E.2d 1078 (Ill. App. Ct. 2011) ...................................................................... 26

*Idris v. City of Chicago*,
552 F.3d 564 (7th Cir. 2009) .................................................................................... 23

*J.B. v. Woodard*,
997 F.3d 714 (7th Cir. 2021) ...................................................................................... 9

*Kentucky v. Graham*,
473 U.S. 159 (1985) ................................................................................................ 15

*Kujawski v. Bd. of Comm'rs*,
183 F.3d 734 (7th Cir. 1999) .................................................................................... 17

*Leavell v. Ill. Dep't of Nat. Res.*,
600 F.3d 798 (7th Cir. 2010) .................................................................................... 22

*Long v. Shorebank Dev. Corp.*,
182 F.3d 548 (7th Cir. 1999) .......... 9

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......... 23

*McMillian v. Monroe Cty.*,
520 U.S. 781 (1997) .......... 15

*Milchtein v. Milwaukee Cty.*,
42 F.4th 814 (7th Cir. 2022) .......... 16

*Miller v. City of Monona*,
784 F.3d 1113 (7th Cir. 2015) .......... 19

*Monell v. Dep't of Soc. Servs. of N.Y.*,
436 U.S. 658 (1978) .......... 15, 16

*Nadzhafaliyev v. Hardy*,
403 F. Supp. 3d 663 (N.D. Ill. 2019) .......... 9

*Neurosurgery & Spine Surgery, S.C. v. Goldman*,
790 N.E.2d 925 (Ill. App. Ct. 2003) .......... 24, 25

*Nieves v. Bartlett*,
139 S. Ct. 1715 (2019) .......... 20

*Petropoulos v. City of Chicago*,
448 F. Supp. 3d 835 (N.D. Ill. 2020) .......... 16

*Pincham v. Ill. Judicial Inquiry Bd.*,
681 F. Supp. 1309 (N.D. Ill. 1988) .......... 14

*Rasche v. Vill. of Beecher*,
336 F.3d 588 (7th Cir. 2003) .......... 17

*RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*,
672 F.3d 476 (7th Cir. 2012) .......... 23

*Scherer v. Balkema*,
840 F.2d 437 (7th Cir. 1988) .......... 25

*Selby v. O'Dea*,
156 N.E.3d 1212 (Ill. App. Ct. 2020) .......... 24

*Swanson v. City of Chetek*,
719 F.3d 780 (7th Cir. 2013) .......... 18

*Taylor v. Carmouche*,
214 F.3d 788 (7th Cir. 2000) .......... 17

*Tucker v. City of Chicago*,
907 F.3d 487 (7th Cir. 2018) .......... 22

*Vill. of Willowbrook v. Olech*,
528 U.S. 562 (2000) .......... 18

*Waters v. City of Chicago*,
580 F.3d 575 (7th Cir. 2009) .......... 17

*Wilson v. Cook Cty.*,
742 F.3d 775 (7th Cir. 2014) .......... 16

*Wroblewski v. City of Washburn*,
965 F.2d 452 (7th Cir. 1992) .......... 18

*Younger v. Harris*,
401 U.S. 37 (1971) .......... 9

**Statutes**

28 U.S.C. § 1367 .......... 23

42 U.S.C. § 1983 .......... 15

5 ILCS 140/1 .......... 22

745 ILCS 10/1-101 .......... 24

745 ILCS 10/2-105 .......... 26

745 ILCS 10/2-201 .......... 27

745 ILCS 10/2-202 .......... 26

745 ILCS 10/2-207 .......... 26

MCC § 2-22-010 .......... 15

MCC § 2-25-020 .......... 15

MCC § 2-84-010 .......... 15

MCC § 4-4-285 .......... 2

MCC § 4-60-130 .......... 8

## INTRODUCTION

Defendants City of Chicago (the "City"), its Departments of Business Affairs and Consumer Protection ("BACP") and Buildings ("DOB"), DOB Commissioner Matthew Beaudet, Chicago Police Department ("CPD"), and CPD Acting Superintendent Eric Carter[1] (collectively, "City Defendants") respectfully submit this memorandum in support of their Fed. R. Civ. P. 12(b)(1) and (6) motion to dismiss the complaint of Plaintiff The Blue Note, Inc. ("Blue Note").

Blue Note challenges multiple City efforts to protect public safety after a shooting occurred at its Wicker Park bar, The Point, and dangerous building conditions were discovered during subsequent inspections of the premises. Those City actions are currently under review by an administrative tribunal and state court. As explained below, this matter should be dismissed because exercising jurisdiction would necessarily inject this Court into multiple ongoing state-law proceedings, and accordingly, would create the potential for inconsistency and confusion. But even if the Court exercises jurisdiction, the case is meritless. Blue Note has not alleged a basis for municipal liability; its equal protection and retaliation claims fail because its own allegations show that it was not irrationally singled out for unequal treatment and do not plausibly suggest that any enforcement action was motivated by retaliatory purposes; its due-process challenge to the administrative proceedings fails as a matter of law; and its state-law claims are statutorily barred and insufficiently pleaded. This Court should therefore dismiss Blue Note's claims against the City Defendants.

---

[1] Acting Superintendent Carter is substituted for Superintendent David Brown. *See* Fed. R. Civ. P. 25(d).

## BACKGROUND

### A. The City's summary closure ordinance

Section 4-4-285 of the Municipal Code of Chicago ("MCC") establishes a process by which CPD may summarily close an establishment to protect public safety. *See* MCC § 4-4-285; Dkt. 1, ¶ 53. The ordinance makes it "unlawful for any person to operate any establishment in a manner that presents a public safety threat," MCC § 4-4-285(b), and allows the CPD Superintendent to "abate the threat by ordering the summary closure of the establishment," *id.* § 4-4-285(c). A summary closure order may remain in effect for a maximum of six months, but it may be lifted sooner if (1) it is determined at an initial "probable cause hearing" or a "nuisance abatement hearing" that a public safety threat did not occur or (2) it is determined at a nuisance abatement hearing that the establishment no longer presents a public safety threat, "as may be evidenced by the submission and implementation of an acceptable nuisance abatement plan." *Id.* The owner of a summarily closed establishment can request a probable cause hearing before the BACP Commissioner within three days of a summary closure to determine whether a public safety threat occurred. *Id.* § 4-4-285(e). And an owner can request a nuisance abatement hearing at any time before the order expires. *Id.* § 4-4-285(f).

### B. The Point is established in 2020 in The Flat Iron Arts Building

The Flat Iron Arts Building ("Arts Building"), owned by defendant Flat Iron Building, LLC ("FIB"), is located on the 1500 block of N. Milwaukee Avenue in Chicago. Dkt. 1, ¶¶ 6, 15. The building hosts several businesses, including artist studios, a flower shop, a smoke shop, and a bar. *Id.* ¶ 93. Berger Realty Group, LLC was FIB's agent for the building. *Id.* ¶ 7.

On or around July 27, 2020, Blue Note leased space in the Arts Building to operate The Point, a bar and music venue. *Id.* ¶¶ 5, 15, 16. A bar called The Flat Iron Chicago had previously operated there since at least 2005; it was open every day until 4:00 a.m. *Id.* ¶¶ 17, 20. Blue Note

obtained three City licenses to operate The Point. First, it holds a "Late Hour Plan" liquor license ("Late-Hour license"), *id.* ¶¶ 21, 26, 33, which allows establishments to stay open and serve alcohol until 4:00 a.m. on weeknights and 5:00 a.m. on weekends, *id.* ¶ 21. Such licenses are tied to the address for which they are granted and cannot be transferred to a different address, but may be transferred to new ownership of a property. *Id.* ¶¶ 22, 23. Blue Note paid $350,000 for the Late-Hour license, which it intended to use for the duration of its 20-year lease. *Id.* ¶¶ 29, 31, 44. Second, Blue Note holds a Public Place of Amusement ("PPA") license, allowing The Point to operate as a music venue with a capacity over 100 and charge admission for concerts. *Id.* ¶¶ 27, 35. Finally, Blue Note holds a tavern license, allowing The Point to operate a bar. *Id.* ¶ 28.

### C. The Point is summarily closed by CPD after two shootings

On October 10, 2021, at around 3:42 a.m., a shooting at The Point left five people wounded and one dead. Dkt. 1-21, Ex. T. Afterwards, Jun "Joe" Lin, The Point's representative, criticized the City in the media, accusing it of "scapegoating" The Point and claiming the bar was not responsible for the City's rising crime problem. Dkt. 1, ¶ 182. A few months later, on February 6, 2022, a second shooting occurred at The Point. *Id.* ¶ 68. At 2:46 a.m., four patrons were allowed to enter The Point after presenting identification and being searched by security. *Id.* ¶¶ 68–71. They left around 4:49 a.m., *id.* ¶¶ 72–74, and one retrieved a firearm from a parked car, *id.* ¶ 76. At 5:06 a.m., six minutes after closing time, that individual fired at least eleven shots into the bar from across the street, seriously injuring one individual inside the bar. *Id.* ¶ 77.

Police soon arrived, *id.* ¶ 79, and cited The Point for having "numerous patrons inside the bar after the bar closed at [5:00 a.m.]," *id.* ¶ 81. The officer who issued the citation allegedly "stated something to the effect of, 'I did not want to give you this ticket, but someone higher up directed me to. I think it's total bullshit,'" *id.* ¶¶ 81–82. By February 8, 2022, CPD ordered The

Point summarily closed. *Id.* ¶ 84. Blue Note requested a probable cause hearing to contest whether a public safety threat occurred. *Id.* ¶ 137.

**D. DOB orders an emergency closure of The Point based on 53 Building Code violations**

On February 15, 2022, representatives from Blue Note, the City, CPD, and BACP attended a remote meeting, *id.* ¶ 142, during which a City attorney suggested that CPD conduct a security walkthrough at The Point to review its security plan, *id.* ¶ 144. On February 17, 2022, Blue Note and BACP began negotiating a nuisance abatement plan, *id.* ¶ 148, which is one means by which a licensee may have a summary closure order lifted, MCC §§ 4-4-285(c), (f).

On February 18, 2022, CPD and DOB inspectors inspected The Point and common areas of the Arts Building. *Id.* ¶ 144. On or around that same day, a DOB inspector posted a closure notice outside of The Point, stating that the "Entire Premises" was off limits. Dkt. 1-10, Ex. I.

An emergency closure order, effective February 18, 2022, was issued based on DOB Commissioner Beaudet's finding that the bar was "a public nuisance that is dangerous, hazardous and endanger[ed] the public health due to" 53 violations of the City's Building Code, including electrical, "Fire Protection/Egress/Structural," and plumbing violations. Dkt. 1-12, Ex. K, at 1–2. Commissioner Beaudet concluded that "the building pose[d] an immediate danger to the tenants and occupants of the premises" and ordered that The Point "be immediately closed, and remain vacant, and that entry be denied," notwithstanding a few exceptions for contractors. *Id.* at 2. Some of the violations, Blue Note claims, were for issues in common areas of the Arts Building, but no other businesses in the Arts Building were closed. Dkt. 1, ¶ 102.

Blue Note alleges that "on or after March 2, 2022, but before March 29, 2022," Rachel Breidinger, Berger Realty's Director of Operations, had a phone call with Commissioner Beaudet, who "agreed not to enforce the Arts Building Violations on the Arts Building or close

or restrict the other tenants of the Arts Building — other than [The Point] — so long as FIB agreed to forego repairing the Arts Building Violations until [The Point's] Late-Hour License was either modified or revoked by the City." *Id.* ¶ 104.

During this time, Blue Note negotiated with its landlord as to who was responsible for remedying some of the violations. On March 29, 2022, Lin had a Zoom call with a Ms. Berger[2] and Ms. Breidinger. *Id.* ¶ 106. Lin noted FIB's obligation under the lease to complete repairs on the Arts Building and asked when they would be completed. *Id.* ¶ 107. Ms. Berger responded that the lease had been signed by "two dead guys" (an apparent reference to her deceased father and a deceased leasing representative) and claimed she had nothing to do with it; she also stated that the Arts Building would be turned into a shopping mall. *Id.* ¶ 108. Ms. Berger expressed her belief that the City would not let The Point open again, *id.*, based on a discussion she claimed to have had with "politicians and powerful people," *id.* ¶ 113. She advised Mr. Lin to "walk away." *Id.* ¶ 110. In later discussions, Blue Note and Berger Realty disagreed as to who was responsible for remedying various violations and when they should be completed. *Id.* ¶¶ 102–134.

### E. After a probable cause hearing, BACP upholds the summary closure order, and Blue Note seeks state-court review of that decision

BACP and Blue Note agreed to postpone the probable cause hearing while they exchanged nuisance abatement plan proposals during February and March 2022. *Id.* ¶¶ 139, 148–160. BACP rejected Blue Note's proposed criteria for the plan, *id.* ¶ 159, and instead included a requirement that six months after execution of the plan, Blue Note could "contact [CPD] and the Department of Law to *potentially* set up a meeting with respect to the modification in the hours of operation," *id.* ¶ 160 (emphasis in complaint). Because the sale of a Late-Hour license does

---

[2] Ms. Berger, also referenced at Dkt. 1, ¶ 15, is presumably a principal or officer of Berger Realty Group.

not extinguish a nuisance abatement plan, Blue Note believed a continuing plan would impair its license's value. *Id.* ¶ 154.

Having failed to agree to a nuisance abatement plan, the parties proceeded with the probable cause hearing on June 22, 2022. *Id.* ¶ 167. In support of the closure, BACP submitted a Vice Investigation Report, prepared by an investigator, that described details of two aggravated-battery-with-a-gun incidents, one liquor license violation, and one weapons violation arrest. *Id.* ¶ 164; dkt. 1-19, Ex. R. The report concluded that The Point "presents an immediate and on-going public safety threat and warrants the application of Summary Closure." *Id*.

On July 8, 2022, the BACP Commissioner issued a decision upholding the summary closure order, concluding that the City met its burden to show by a preponderance of the evidence that a public safety threat occurred at The Point on February 6, 2022. Dkt. 1, ¶ 172; dkt. 1-20, Ex. S. The decision stated that the evidence showed a "nexus of a patron causing a public safety threat as . . . defined under the [MCC]." Dkt. 1, ¶ 177; dkt. 1-20 at 6.

Blue Note challenged BACP's administrative decision by filing an action in state court, which is pending in the Circuit Court of Cook County, Illinois under case number 2022 CH 07916. Dkt. 1, ¶ 179. The summary closure order expired by operation of law on August 8, 2022. *Id.* ¶ 207; *see* MCC § 4-4-285(c) (orders "remain in effect for an aggregate period of six months as measured from the date on which the public safety threat occurred").

### F. Blue Note criticizes the City's actions to the media

At some point following closure, just as he had done following the first shooting at The Point, dkt. 1, ¶ 182, Lin "made numerous public statements regarding the City's crime problem, that [The Point] is not the source of the crime in the area, and that [The Point] is being used as a 'scapegoat' to conceal the City's inability to control the proliferation of violent crime," *id.* ¶ 189. The media also reported that City alderman expressed dissatisfaction with Late-Hour license

establishments, *id.* ¶¶ 49–51; one was quoted as stating that he hoped The Point would make voluntary changes, including foregoing its Late-Hour license, *id.* ¶ 188.

### G. BACP brings license disciplinary proceedings against The Point, and the emergency closure order is lifted

On September 22, 2022, Blue Note paid renewal fees for its PPA, tavern, and Late-Hour licenses. *Id.* ¶¶ 191–93. The same day, Blue Note's attorney emailed a City attorney to inquire whether "'any order or edict in place . . . would prevent The Point from reopening[.]'" *Id.* ¶ 206. The City attorney responded that the summary closure order had expired on August 8, 2022, but that as to the emergency closure order DOB issued, The Point would be able to open only if DOB "inspected and passed all outstanding violations" and The Point received "confirmation" that the Commissioner had lifted the closure. *Id.* ¶ 207. The City attorney advised Blue Note's attorney to "double check with [DOB] to confirm that the commissioner closure has been lifted." *Id*.

On October 12, 2022, Mr. Lin spoke with a City inspector, who confirmed that the PPA license could not be renewed until the Arts Building passed inspection and the City permitted The Point to reopen. *Id.* ¶ 194. On October 29, 2022, Blue Note filed an action against FIB for injunctive relief, seeking to compel repairs or stay rental obligations. *Id.* ¶ 195. Blue Note successfully obtained preliminary relief against FIB on January 20, 2023. *Id.* ¶ 196.

As to the tavern and Late-Hour licenses, Blue Note learned on November 11, 2022, that those license renewals were on "hold" due to two pending license adjudications. *Id.* ¶ 197. On November 17, 2022, a BACP attorney informed Mr. Lin that one adjudication was related to the summary closure order (22-SC-2); the second was related to "alleged violations" stemming from the shooting on February 6, 2022 (22-LR-11) and was pending "before the Mayor's License Discipline Commission ("MLDC")." Dkt. 1-25, Ex. X. He informed Mr. Lin that the license

holds existed before September 22, 2022. Dkt. 1, ¶ 200; dkt. 1-26, Ex. Y. The BACP attorney removed the adjudication holds on all three licenses, but he informed Mr. Lin that there was another "hold on the account for the Department of Buildings closure order that can only be removed by the Department of Buildings." Dkt. 1, ¶ 199; dkt. 1-25, Ex. X.

Blue Note claimed that it had no notice and "no knowledge of the apparent existing matter (22-LR-11) prior to November 17, 2022." Dkt. 1, ¶ 204. Upon learning of 22-LR-11, Blue Note's attorney asked a City attorney if he knew any details about the case. *Id.* ¶ 208. The attorney responded that "[t]he case is in the queue to be worked up and has not yet been set before the MLDC. Once it is ready to proceed, I will send the notice of hearing to your client, at the premises address and their registered agent." *Id.* ¶ 209. Blue Note's attorney "demanded more information concerning the apparent charge[.]" *Id.* ¶ 210.

The following day, on November 18, 2022, the City attorney assigned to the matter sent Blue Note's attorney a "Notice of Hearing for 22-LR-11." *Id*. The notice alleged "[t]hat on or about February 6, 2022 the licensee, by and through its agent, allowed unauthorized persons to be on the licensed premises after 5:00 AM, in violation of Municipal Code of Chicago § 4-60-130(d)." (MLDC Notice of Hearing, attached hereto as **Exhibit 1**). The matter remains pending before the MLDC.

On March 13, 2023, DOB inspectors re-inspected The Point and determined that the various Building Code violations had "been corrected" and the dangerous conditions were "abated." (DOB Emergency Closure Lifting Notice, attached hereto as **Exhibit 2**). DOB issued a notice that the emergency closure order was lifted. *Id.*

### H. Blue Note's claims against the City Defendants and FIB

Based on these allegations, Blue Note brings five claims against the City Defendants, including three section 1983 claims and two state-law claims. It alleges a class-of-one equal

protection claim (Count I), First Amendment retaliation claim (Count II), and procedural due process claim (Count III). *Id.* ¶¶ 225–59. Blue Note also brings a state-law claim for abuse of process based on the City Defendants' alleged use of various administrative procedures to improperly modify or revoke The Point's Late-Hour license or close the establishment. *Id.* ¶¶ 261–64. And Blue Note raises a state-law conspiracy claim alleging that the City conspired with FIB to commit the underlying constitutional violations. *Id.* ¶¶ 265–69. Blue Note seeks compensatory damages, injunctive relief against any retaliatory practices, and declaratory relief as to any equal protection violations, along with attorney's fees and costs. *Id.* at 42.

## LEGAL STANDARDS

The City Defendants move to dismiss under Rules 12(b)(1) and (6). When a court abstains under the doctrine set out in *Younger v. Harris*, 401 U.S. 37 (1971), it may dismiss the action for lack of subject matter jurisdiction under Rule 12(b)(1). *E.g.*, *Nadzhafaliyev v. Hardy*, 403 F. Supp. 3d 663, 667 (N.D. Ill. 2019); *see also Berrada Props. Mgmt. Inc. v. Romanski*, 608 F. Supp. 3d 746, 754 (E.D. Wis. 2022) (Seventh Circuit has "implicitly accepted" Rule 12(b)(1) dismissals based on *Younger* abstention). On a Rule 12(b)(1) motion, "a district court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). But it may also "view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists," and "take judicial notice of matters of public record, including court filings and documents from the ongoing state court proceedings incorporated into the federal complaint." *Id.* (citation omitted); *see also J.B. v. Woodard*, 997 F.3d 714, 717 (7th Cir. 2021).

To avoid dismissal under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555; that is, the complaint must present a "short, plain, and plausible factual narrative that conveys a story that holds together," *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th Cir. 2022) (internal quotation and citation omitted). Although the factual allegations in the complaint are accepted as true and reasonable inferences are drawn in plaintiff's favor, bare legal conclusions are not. *Iqbal*, 556 U.S. at 678–79.

## ARGUMENT

Blue Note's challenge to the City's efforts to protect public safety fails for multiple reasons. As a threshold matter, Blue Note's claims implicate two pending, related state-law proceedings. The *Younger* abstention doctrine requires the Court to refrain from interfering with these ongoing state proceedings and to dismiss this action accordingly. But if this Court does not dismiss under *Younger*, Blue Note's claims against the City Defendants also fail on the merits for at least two reasons. First, among those defendants, the City is the only proper defendant under section 1983, and Blue Note fails to allege that any constitutional violation was the result of a municipal policy, practice, or custom, as required to state a claim against the City under section 1983. Second, Blue Note also fails to plead plausible constitutional violations that could serve as the substantive basis for liability under section 1983. As Blue Note's section 1983 claims fail, this Court should follow the usual practice of relinquishing jurisdiction over the state-law claims, or alternatively, dismiss them as well for failure to state a claim.

## I. This Court Should Abstain From Hearing This Action And Dismiss It Under Rule 12(b)(1) Based On Ongoing State Proceedings.

This Court should abstain from reaching the merits of Plaintiff's claims against the City Defendants (and therefore dismiss those claims) because the adjudication of this action would interfere with ongoing proceedings in state judicial and administrative tribunals. "[R]ooted in traditional principles of equity, comity, and federalism," the *Younger* doctrine "requires federal courts to refrain from exercising their jurisdiction when relief may interfere with certain state proceedings." *Ewell v. Toney*, 853 F.3d 911, 916 (7th Cir. 2017). If "there have been no proceedings of substance on the merits in the federal court," as is also the case here, then *Younger* applies "in full force." *Forty One News, Inc. v. Cty. of Lake*, 491 F.3d 662, 666 (7th Cir. 2007) (internal quotation marks and citations omitted).

The doctrine applies where: (1) ongoing state proceedings (2) implicate important state interests, and (3) the plaintiff has an adequate opportunity to raise constitutional challenges in those proceedings. *See Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). If these factors are met, courts should abstain absent a "showing of bad faith, harassment, or some other extraordinary circumstance that would make abstention inappropriate[.]" *Id.* at 435.[3]

The requirements for abstention are met here. First, Blue Note's claims are premised on conduct that is the subject of ongoing state proceedings. As referenced in the Complaint and above, there are two pending proceedings that are currently pending before other tribunals:

- *The Blue Note, Inc. d/b/a The Point v. Department of Business Affairs and Consumer Protection, et al.*, No. 2022 CH 07916, (Cir. Ct. Cook Cty., Ill.), an administrative review lawsuit seeking to overturn BACP's administrative decision to uphold the summary closure order.

[3] The doctrine applies to federal actions, like the one here, for injunctive or declaratory relief and money damages. *See Majors v. Engelbrecht*, 149 F.3d 709, 714 (7th Cir. 1998).

- *In re License Disciplinary Proceedings Regarding the City of Chicago Liquor License and All Other City Licenses Issued to The Blue Note, Inc. d/b/a The Point*, 22 LR 11, pending before the MLDC, alleges a violation of MCC § 4-60-130(d) on February 6, 2022, for allowing persons to be on the licensed premises after 5:00 AM. *See* Ex. 1.

The first of these — the state-court action challenging the BACP Commissioner's decision upholding the summary closure order — is clearly an ongoing state proceeding. And the second action — the MLDC proceeding — is a coercive, contested administrative action regarding potential discipline as to The Point's license, which is the sort of administrative procedure which also merits *Younger* abstention. *See Majors*, 149 F.3d at 711 ("[A]dministrative proceedings are 'judicial in nature' when they are coercive"); *Zummo v. City of Chicago*, 345 F. Supp. 3d 995, 1004 (N.D. Ill. 2018) (applying *Younger* to vehicle impoundment proceedings in City's Department of Administrative Hearings), *aff'd*, 798 F. App'x 32 (7th Cir. 2020).

Second, both proceedings implicate important state interests. The subject of the state-court action is the Summary Closure Ordinance, which prohibits any person from "operat[ing] any establishment in a manner that presents a public safety threat." MCC § 4-4-285(b) (titled "Unlawful act – Public nuisance"). Courts recognize a "strong" state interest in "promoting public safety," *e.g.*, *Culp v. Raoul*, 921 F.3d 646, 654 (7th Cir. 2019), as well as abating public nuisances, *e.g.*, *Sweeney v. Bartow*, 612 F.3d 571, 573 (7th Cir. 2010) (citing *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975)). Meanwhile, the States have traditionally regulated alcohol, *see Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2462–70 (2019), and the Illinois Liquor Control Act of 1934, 235 ILCS 5/4-1 *et seq.*, vests the City with liquor licensing decisions, *see Move N Pick Convenience, Inc. v. Emanuel*, 30 N.E.3d 661, 666 (Ill. App. Ct. 2015). Thus, the MLDC proceeding implicates important state interests as well.

Third, Blue Note can raise its constitutional claims in state court in both cases. The application of the Summary Closure Ordinance is subject to judicial review via a common law

writ of certiorari, *see* MCC § 4-4-285(i), by which "a party disappointed in a determination made by a municipality's administrative agency may seek review in the circuit court," *Holstein v. City of Chicago*, 29 F.3d 1145, 1148 (7th Cir. 1994). "Review is extremely broad in scope and extends to all questions of fact and law contained in the record before the court, including de novo review of any constitutional issues. *Id.* The MLDC proceeding is also subject to multiple levels of administrative and judicial review. First, a local commissioner (the MLDC) may revoke or suspend a license or impose a fine, 235 ILCS 5/7-5; second, in the City, a licensee may appeal that decision to the local License Appeal Commission, *id.*; third, a licensee that loses before the local License Appeal Commission must file a petition for rehearing, *id.* § 7-10; and finally, if the petition for rehearing is denied, a licensee may seek judicial review of the decision rendered by the Local Liquor Control Commissioner pursuant to the Illinois Administrative Review Law, *id.* §§ 7-9, 7-11. Similar to a writ of certiorari lawsuit described above, review under the Administrative Review Law "extend[s] to all questions of law and fact presented by the entire record before the court," 735 ILCS 5/3-110, and constitutional challenges to administrative decisions may be raised on administrative review, *e.g.*, *Shachter v. City of Chicago*, 962 N.E.2d 586, 593 (Ill. App. Ct. 2011). "[T]hat constitutional claims may be raised in state-court judicial review of the administrative proceeding" is sufficient to show that Blue Note has an adequate opportunity to raise its claims in the state-court forum. *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 629 (1986). "Minimal respect for the state processes . . . precludes any presumption that the state courts will not safeguard federal constitutional rights, *Middlesex Cty. Ethics Comm'n*, 457 U.S. at 431, and in fact "a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary," *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15 (1987).

Finally, with all factors for abstention met, no extraordinary circumstances counsel against it. Although Blue Note raises accusations of "illegitimate animus" and "malicious and dogged attempts" on the part of City Defendants to shut down The Point, dkt. 1, ¶ 224, the bad faith prosecution exception to *Younger* "is a narrow one and is to be granted parsimoniously," *Pincham v. Ill. Judicial Inquiry Bd.*, 681 F. Supp. 1309, 1324 (N.D. Ill. 1988), *aff'd*, 872 F.2d 1341 (7th Cir. 1989). Plaintiff bears the burden of establishing the exception, *see Green v. Benden*, 281 F.3d 661, 667 (7th Cir. 2001), and must allege "specific facts to support [their] inferences of bad faith, bias, and retaliation," not "mere allegations and conclusions," *Crenshaw v. Sup. Ct. of Ind.*, 170 F.3d 725, 729 (7th Cir. 1999). *See also Pincham*, 872 F.2d at 1349.

Here, the Complaint lacks "specific facts to support" the inference that any of the administrative enforcement matters were brought in bad faith, as is necessary. *Crenshaw*, 170 F.3d at 729; *see also Grandco Corp. v. Rochford*, 536 F.2d 197, 203 (7th Cir. 1976) (multiple prosecutions not sufficient to support inference of bad faith and harassment). To the contrary, the Complaint describes a legitimate basis for every alleged enforcement action: the summary closure order was issued after a shooting; Blue Note was cited because patrons were in the bar after closing; and the emergency closure order was based on 53 alleged Building Code violations, the legitimacy of which Blue Note does not contest. In sum, this Court should abstain under *Younger* to avoid interfering with ongoing state-court litigation and administrative enforcement matters that implicate important state interests.

## II. The Complaint Should Be Dismissed Under Rule 12(b)(6).

If this Court declines to dismiss this case under Rule 12(b)(1), it should dismiss it under Rule 12(b)(6) for failure to state a claim, for two independent reasons. First, Blue Note fails to allege that any constitutional deprivation was caused by a City policy, practice, or custom. Second, it fails to allege underlying equal protection, retaliation, or due process violations.

### A. Blue Note fails to allege that a City policy, practice, or custom caused the alleged constitutional violations.

Section 1983 provides a claim against a "person" acting under color of law who deprives another of a federal right. 42 U.S.C. § 1983. There is no respondeat superior liability for municipal governments under section 1983, but under *Monell v. Dep't of Soc. Servs. of N.Y.*, a municipality can be subject to section 1983 liability if its own conduct caused a constitutional deprivation. 436 U.S. 658, 694–95 (1978).

As a preliminary matter, all of the City Defendants except the City itself should be dismissed. Two of them — Commissioner Beaudet and Acting Superintendent Carter — are sued in their official capacity, and when a plaintiff sues a person in his or her official capacity under section 1983, that is treated as "an action against an entity of which [a person] is an agent," and it "is in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (internal quotations and citations omitted). District courts routinely dismiss official-capacity claims as redundant where the government entity is also a defendant. *E.g.*, *Hamilton v. Gavin*, No. 22 C 2285, 2023 WL 2161663, at *3 (N.D. Ill. Feb. 22, 2023); *Selmani v. Vill. of Bartlett*, 515 F. Supp. 3d 882, 888 (N.D. Ill. 2021). Moreover, City departments are not separate suable entities where state law grants them no independent legal existence, *see, e.g.*, *McMillian v. Monroe Cty.*, 520 U.S. 781, 784–86 (1997); *Best v. City of Portland*, 554 F.3d 698, 698 n.* (7th Cir. 2009) (police department "not a suable entity under § 1983"), as is the case with BACP, CPD, and DOB, which are established under the MCC as executive departments of the City and not as separate legal entities, *see* MCC §§ 2-22-010 (DOB), 2-25-020 (BACP), 2-84-010 (CPD). Defendants Beaudet, Carter, BACP, CPD, and DOB should be dismissed for these reasons.

With these defendants properly dismissed, the City is liable under section 1983 only if an alleged constitutional deprivation was caused by its own actions, as manifested through (1) an express municipal policy, (2) a widespread, though unwritten, custom or practice, or (3) a municipal agent with final policy making authority. *See Monell*, 436 U.S. at 694.

Blue Note alleges "that Defendants' actions reflect an official policy, custom or practice" of causing the alleged deprivations, and such actions "were committed, condoned, and perpetuated at the hands of policy makers and those to whom policy-making authority has been delegated." Dkt. 1, ¶¶ 230, 237, 245. These are boilerplate statements, which are insufficient on their own to allege *Monell* liability. *See Milchtein v. Milwaukee Cty.*, 42 F.4th 814, 826 (7th Cir. 2022).

Nor do the factual allegations suggest any basis for *Monell* liability. First, Blue Note alleges no express policy. Second, the factual predicate for a plausible custom or practice is lacking. "Courts in this District regularly dismiss *Monell* claims where the plaintiff has failed to allege instances other than that from which he suffered." *Petropoulos v. City of Chicago*, 448 F. Supp. 3d 835, 841–42 (N.D. Ill. 2020). A "single incident" will not establish a custom or practice, *Calusinski v. Kurger*, 24 F.3d 931, 936 (7th Cir. 1994), nor will "a random event or even a short series of random events," *Bridges v. Dart*, 950 F.3d 476, 479 (7th Cir. 2020). Not even three incidents suffice. *See Wilson v. Cook Cty.*, 742 F.3d 775, 780 (7th Cir. 2014). Blue Note fails to plead other incidents of allegedly unconstitutional conduct that show that a City custom or practice in this regard existed, much less was the moving force behind the enforcement actions taken against Blue Note. Indeed, its claim that The Point was "singled out" by the City and treated differently than other Late-Hour licensees or businesses, dkt. 1, ¶¶ 100, 103, belies any inference that a widespread practice or custom caused its alleged harm.

Third, the Complaint does not allege facts sufficient to establish that enforcement decisions here were made by a final policymaker. State or local law determines whether a person has policymaking authority for purposes of section 1983. *Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009). Policymaking authority is "a delegation of authority to set policy," which is distinct from decision-making authority. *See Kujawski v. Bd. of Comm'rs*, 183 F.3d 734, 739 (7th Cir. 1999) ("There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire."). "Generally, a person holding only executive power does not have policymaking authority," as "the policymaking authority in the city structure will be the city council." *Rasche v. Vill. of Beecher*, 336 F.3d 588, 601 (7th Cir. 2003). Here, the individual defendants were not final policymakers. Rather, the City Council was the final policymaking authority, as it enacted the ordinances creating the standards and criteria for summary and emergency closures and liquor licenses. Plaintiff, for its part, merely alleges that City officials applied and enforced the laws set out in City ordinances. That does not equate to final policymaking authority. *E.g.*, *Garcia v. City of Chicago*, 390 F. Supp. 2d 701, 705 n.2 (N.D. Ill. 2005) (that "Department of Buildings . . . implements and enforces the City Council's demolition policies" did not render "the Department of Buildings or its commissioner policymakers."); *see also Taylor v. Carmouche*, 214 F.3d 788, 791 (7th Cir. 2000) (being "a department head does not affect application of the *Monell* principle"). There are no allegations that any defendant who carried out enforcement duties under the ordinances at issue formulated a policy decision. In addition, as explained above, the officials' enforcement decisions are subject to multiple layers of review, and when an action "is subject to review," the decisionmaker does not "have final authority" to make policy. *Waters*, 580 F.3d at 583; *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Because Blue Note has alleged neither an express policy,

a custom or practice, nor the creation of policy by a final policymaker, the Court may dismiss its section 1983 claims for failure to allege municipal liability.

**B. Blue Note fails to plead any underlying constitutional deprivations.**

Not only does Blue Note fail to allege a basis for municipal liability, it also insufficiently pleads an equal protection, retaliation, or due process claim. This too warrants dismissal.

**1. Blue Note fails to state a class-of-one equal protection claim.**

The Equal Protection Clause of the Fourteenth Amendment "gives rise to a cause of action on behalf of a 'class of one' where," as here, "plaintiff d[oes] not allege membership in a class or group." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). To state a class-of-one equal protection claim, a plaintiff must "allege that [it] was 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Swanson v. City of Chetek*, 719 F.3d 780, 783 (7th Cir. 2013) (quoting *Olech*, 528 U.S. at 564). Although it is unsettled in this circuit whether a class-of-one plaintiff must allege "hostile intent or animus," the plaintiff must at minimum "demonstrate an absence of rational basis." *Brunson v. Murray*, 843 F.3d 698, 706 (7th Cir. 2016). If there exists "a rational basis for the challenged action, that will be the end of the matter — animus or no." *Fares Pawn, LLC v. Ind. Dep't of Fin. Inst.*, 755 F.3d 839, 845 (7th Cir. 2014). Thus, a plaintiff must "allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992). "Class-of-one claimants carry a heavy burden," *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 588 (7th Cir. 2021), for "[a]ll it takes to defeat the . . . claim is a *conceivable* rational basis for the difference in treatment," *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013).

Blue Note's class-of-one equal protection claim fails to show either that The Point was treated differently or that any differential treatment lacked a rational basis. Although a plaintiff

need not identify a comparator in its complaint, *see Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015), Blue Note points to other shooting incidents at Late-Hour licensed establishments. In 2019, CPD closed Sound Bar, located at 226 W. Ontario Street, after two individuals were shot in a nearby alley. Dkt. 1, ¶ 59. On September 18, 2021, a shooting occurred near LiqrBox, but it was not closed, which Blue Note suspects has to do with the owner's "ties to the City." *Id.* ¶ 61. There also were several incidents that occurred at non-late-hour license establishments. On September 18, 2021, a shooting occurred at a bar called Joy District at 112 W. Hubbard Street, which was owned by the same individuals who own LiqrBox. *Id.* Blue Note suspects that it was not closed because the owner has "ties to the City." *Id.* The McDonald's at 10 E. Chicago Avenue was not summarily closed after a shooting on May 19, 2022, but DOB closed the establishment for alleged Building Code violations that were discovered following an inspection of the premises. *Id.* ¶ 60. On January 1, 2023, a person was shot and killed at The Lyon's Den Hookah Lounge, at 2123 W. Division Street, but CPD did not summarily close it because it found no basis to do so. *Id.* ¶¶ 62, 63

None of these examples is "*prima facie* identical in all relevant respects or directly comparable . . . in all material respects," as is required to establish differential treatment. *FKFJ*, 11 F.4th at 588. In the LiqrBox case, Blue Note supplies no details about that shooting, thus failing to support any inference that the two establishments were treated differently. Nor does it explain how non-Late-Hour license establishments are *prima facie* identical but received differential treatment. Therefore, Blue Note fails to allege differential treatment in its Complaint.

Blue Note also fails to allege that there was no rational reason for the summary closure order, emergency closure order, or MLDC proceeding. To the contrary, the Complaint supplies a rational basis for each action, and that is all that is needed to defeat this claim. *See Miller*, 784 F.3d at 1121 ("[E]ven at the pleadings stage, all it takes to defeat a class-of-one claim is

a *conceivable* rational basis for the difference in treatment") (internal quotation omitted). The summary closure order was based on a shooting. Blue Note disagrees with the Commissioner's conclusion that there was sufficient "nexus" between the patron and The Point as required under the MCC to justify the order, but that disagreement does not render the rational basis for closure inconceivable. Meanwhile, the MLDC proceeding is based on the citation Blue Note received for having patrons in the bar after hours, *see* Ex. 1, and the emergency closure order was based on 53 Building Code violations.[4] Blue Note alleges no facts that undermine the legitimacy of either action, nor any facts supporting an inference of animus.

Thus, Blue Note alleges neither that The Point was treated differently from similarly situated comparators nor that the City lacked a rational basis for the summary and emergency closure orders or initiation of a MLDC proceeding. The class-of-one equal protection claim should be dismissed.

**2. Blue Note fails to state a retaliation claim.**

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (internal quotation omitted). To state a First Amendment retaliation claim, a plaintiff must allege facts suggesting that (1) it engaged in activity protected by the First Amendment, (2) it suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action. *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020).

[4] Blue Note suggests that enforcement of the DOB closure order was unfairly limited to The Point, even though the closure notice, in its view, applied to the entire Arts Building. Dkt. 1, ¶¶ 118, 147. But the "premises" covered by the DOB closure order was The Point's address. Dkt. 1-10, Ex. I. The closure order did not apply to the whole Arts Building, which houses businesses at several other addresses.

Here, Blue Note fails to plead factual content that allows the court to draw the reasonable inference that Lin's comments to the media (the alleged protected activity) had anything to do with the summary closure order, emergency closure order, or MLDC proceeding (the alleged adverse actions). *See Bell v. City of Country Club Hills*, 841 F.3d 713, 716–17 (7th Cir. 2016) (citing *Twombly*, 550 U.S. at 555); *see also Hernandez v. Dart*, 635 F. Supp. 2d 798, 807 (N.D. Ill. 2009) (dismissing retaliation claim "[b]ecause Plaintiff has not sufficiently alleged that Defendants were motivated by his First Amendment activity"). Blue Note does not connect any statement or set of statements to an alleged adverse action caused by a municipal policy, leaving the inference of causation entirely unsupported and thus unreasonable. And any such inference is further undermined by the obvious non-retaliatory bases for each alleged adverse action: as the Complaint itself explains, a shooting led to the summary closure order, 53 Building Code violations led to the emergency closure order, and the citation led to the MLDC proceeding. These "non-retaliatory grounds are in fact []sufficient to provoke the adverse consequences," defeating any retaliation claim. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). The claim is rendered even more implausible by the timing of the events at issue: some of the adverse actions of which Blue Note complains occurred *before* some of Mr. Lin's speech.

Because no facts support the reasonable inference that Lin's statements to the media had anything to do with the summary closure order, emergency closure order, or citation, Blue Note fails to plead a plausible retaliation claim.

**3. Blue Note fails to state a due process claim.**

The only procedural deficiencies that Blue Note identifies regarding the process it was (and is currently being) afforded relate to the probable cause hearing for the summary closure. The two elements of a procedural due process claim are (1) deprivation of a protected interest and (2) insufficient procedural protections surrounding that deprivation. *Tucker v. City of*

*Chicago*, 907 F.3d 487, 491 (7th Cir. 2018). There are two categories of deprivations: (a) those based on established state procedures and (b) those based on random, unauthorized acts by state actors. *See Leavell v. Ill. Dep't of Nat. Res.*, 600 F.3d 798, 804 (7th Cir. 2010). For the former category, due process typically requires a pre-deprivation hearing because the state can predict when a deprivation will occur. *See Cannici v. Vill. of Melrose Park*, 885 F.3d 476, 479 (7th Cir. 2018). "By contrast, when the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides a meaningful post-deprivation remedy." *Leavell*, 600 F.3d at 805 (quotation omitted).

Assuming there is a protected interest in a Late-Hour license and that the upholding of the summary closure order after the probable cause hearing caused a deprivation of that interest (albeit temporary), Blue Note cannot show that the process surrounding that deprivation was constitutionally inadequate.[5] Blue Note's core problem with the probable cause hearing was that it could not cross-examine witnesses about the Vice Report and it had to face a "trial on paper," dkt. 1, ¶¶ 169, 249, and the Vice Report was admitted into evidence over its objection, *id.* ¶¶ 168, 251.[6] Blue Note's due process claim thus represents an attack on established procedures, not that the City failed to follow its procedures through random, unauthorized acts.

---

[5] Notably, MLDC proceedings do not necessarily result in license revocation. If the licensee is held responsible, the Hearing Officer may order a lesser punishment than deprivation of the license — all the more reason that this case is premature because those proceedings are ongoing. *See* 235 ILCS 5/7-5.

[6] Blue Note raises several perceived deficiencies that do not relate in any way to the procedures surrounding the summary closure order, including complaints about the Commissioner's ultimate "findings," Dkt. 1, ¶ 250, failing to "meaningfully respond to" requests under the Freedom of Information Act, 5 ILCS 140/1 *et seq*., *id.* ¶ 252, "[o]rchestrating a plan" to either revoke or modify the Late-Hour license, *id.* ¶ 253, being deprived of a "means to satisfy" terms of a nuisance abatement plan, *id.* ¶ 254, and "targeted actions" to revoke or modify the Late-Hour license, *id.* ¶ 255. These allegations are irrelevant to any colorable procedural due process claim.

This claim has no merit. The amount of process due depends on the nature of the private interest at stake, the risk of decisional error, and the government's interest. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Blue Note fails to explain why having to undergo a "trial on paper," the inability to cross-examine witnesses, and the admission of the Vice Report violated its due process rights at the probable cause hearing. As a general matter, "[t]here is no law that mandates that [administrative] hearings are bound by formal rules of evidence," and "the ability to subpoena witnesses is not an absolute right." *See Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 717 (7th Cir. 2000). And "the due process clause allows administrative decisions to be made on paper . . . without regard to the hearsay rule." *Idris v. City of Chicago*, 552 F.3d 564, 568 (7th Cir. 2009) (citing *Richardson v. Perales*, 402 U.S. 389 (1971)). Blue Note does not allege that it was unable to present its defense that no public safety threat occurred, albeit in a less formal administrative adjudication. Thus, Blue Note fails to state a procedural due process claim based on the adequacy of procedures employed at the probable cause hearing.[7]

## III. This Court Should Decline To Exercise Supplemental Jurisdiction Over Blue Note's State-Law Claims Or Dismiss Them On The Merits.

The supplemental jurisdiction statute provides that the district court "may decline to exercise supplemental jurisdiction" over state law claims if the court has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 489 (7th Cir. 2012). Although this decision is discretionary, the usual practice is to relinquish federal jurisdiction over supplemental state-law claims if the

[7] Blue Note appears to be challenging the processes employed during the probable cause hearing phase, not the Summary Closure Ordinance itself. But a challenge to the Ordinance would fail, too: the Ordinance is a public safety measure for emergencies that quickly provides post-deprivation process and therefore satisfies constitutional scrutiny. *See, e.g., Contreras v. City of Chicago*, 920 F. Supp. 1370, 1393 (N.D. Ill. 1996) (where public safety is involved, "State may act first and ask questions later without offending the Due Process Clause"); *see also Holstein*, 29 F.3d at 1148 (existence of post-deprivation review through common law writ of certiorari "[c]learly . . . comport[s] with procedural due process").

federal claims are dismissed. *E.g.*, *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). Thus, after dismissing all federal claims based on the reasons outlined above, this Court can relinquish jurisdiction over the state-law claims by dismissing them without prejudice. If, however, this Court exercises supplemental jurisdiction over the two state-law claims, it should dismiss them for failure to state a claim. Blue Note's claims for damages are also barred by the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/1-101, *et seq.* (the "Tort Immunity Act").

**A. Blue Note fails to state an abuse of process claim.**

Blue Note fails to allege an abuse of process claim. The tort of abuse of process is not favored under Illinois law, and so courts strictly construe its elements. *See Neurosurgery & Spine Surgery, S.C. v. Goldman*, 790 N.E.2d 925, 929–30 (Ill. App. Ct. 2003). "Abuse of process is the misuse of legal process to accomplish some purpose outside the scope of the legal process itself." *Selby v. O'Dea*, 156 N.E.3d 1212, 1227 (Ill. App. Ct. 2020). To state a claim for abuse of process, a plaintiff must plead "(1) an improper motive and (2) some act in the use of legal process that is improper in the regular prosecution of proceedings." *Id.*

Blue Note fails to plead either element. The first element, "that the defendant had an improper motive," requires the plaintiff to "plead facts showing that the defendant instituted proceedings against the plaintiff for a purpose such as extortion, intimidation, or embarrassment." *Bozek v. Bank of Am., N.A.*, 191 N.E.3d 709, 725–26 (Ill. App. Ct. 2021) (internal quotation omitted). Blue Note alleges no improper purpose. Rather, as explained above, it pleads legitimate bases for the summary closure, emergency closure, and MLDC proceedings.

The second element requires Blue Note to show "that the process was used to accomplish some result that is beyond the purview of the process." *Selby*, 156 N.E.3d at 1227. In other words, "[w]hen process is used only for its intended purpose, there has been no misapplication of

process." *Neurosurgery & Spine Surgery*, 790 N.E.2d at 930. Here, no allegation suggests that the City sought any result not intended by the MCC — which specifically authorizes summary and emergency closures. Blue Note therefore fails to state a claim for abuse of process.

**B. Blue Note fails to state a conspiracy claim.**

Blue Note pleaded its conspiracy claim as a state-law claim, even though the conspiracy is "to violate 42 U.S.C. § 1983." Regardless, the elements of federal and state-law conspiracy claims are similar. Under Illinois law, "[t]he elements of civil conspiracy are (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Dvorkin v. Soderquist*, 2022 WL 1127697, at *15 (Ill. App. Ct. 2022). To state a section 1983 conspiracy claim, a plaintiff must allege facts from which the court may reasonably infer that there was "(1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988). Blue Note's claim fails under either theory.

Because a conspiracy claim is a derivative claim, Blue Note's claim fails because its underlying claims fail. Moreover, there are no allegations of a conspiracy to cause a constitutional deprivation. At most, the complaint alleges on information and belief that there was an agreement among Commissioner Beaudet and Ms. Breidinger that the City would not enforce Building Code violations against other Arts Building tenants if FIB did not remedy any Building Code violations until Blue Note's Late-Hour license was modified or revoked. Dkt. 1, ¶ 104. That is not an agreement to commit an underlying constitutional tort.

### C. The Tort Immunity Act bars Blue Note's state-law claims for damages.

Blue Note's claims for damages are also barred under various provisions of the Tort Immunity Act. Section 2-207 provides that a "public employee is not liable for an injury caused by his failure to make an inspection, or by reason of making an inadequate or negligent inspection, of any property . . . for the purpose of determining whether the property complies with or violates any enactment or contains or constitutes a hazard to health or safety." 745 ILCS 10/2-207. Section 2-205 of the Act applies this same immunity to the City. *Id.* § 10/2-105. Here, Blue Note's claims all stem from the allegations that the property was inspected and found to be in a dangerous condition — whether because of the danger addressed by the Summary Closure Order or the Building Code violations — which represent claims arising out of an inspection that are barred by the Tort Immunity Act. *See Hess v. Flores*, 948 N.E.2d 1078, 1092–94 (Ill. App. Ct. 2011) (holding that issuing stop work orders or ordering specific remedial measures, based on the findings of the inspection, are part of the inspection process and fall within the scope of the immunity), *abrogated on other grounds as recognized in Glover v. City of Chicago*, 2023 WL 1872744, at *6 (Ill. App. Ct. 2023).

City employees and the City are also immunized under sections 2-202 and 2-105 of the Tort Immunity Act. Section 2-202 of the Act provides that a governmental employee is "not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." *Id.* § 10/2-202. The Complaint alleges that City employees took various actions to enforce City ordinances to abate public safety threats and unsafe building conditions, but not that they engaged in willful and wanton conduct in doing so. Section 2-201 immunizes these employees for those enforcement actions, and section 2-105 therefore immunizes the City as well.

Lastly, under section 2-201, "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201. The same immunity applies to the City under section 2-105. *Id.* § 10/2-105. While the actions in this case did not represent the determination of policy for the reasons described in section II.A above, the Summary Closure Order, the DOB closure, and the initiation of license disciplinary proceedings all involved the exercise of discretion on the part of City officials in executing those City policies. The Tort Immunity Act thus immunizes employees taking those discretionary actions as well as the City itself.

**CONCLUSION**

For these reasons, this Court should abstain from hearing this action and dismiss it without prejudice. Alternatively, this Court should dismiss the complaint with prejudice for failure to state a claim.

Date: April 21, 2023

Respectfully submitted,

Acting Corporation Counsel for
the City of Chicago

By: s/ Aaron T. Dozeman
Assistant Corporation Counsel

BRADLEY G. WILSON
AARON T. DOZEMAN
City of Chicago, Department of Law
2 North Lasalle Street, Suite 520
Chicago, Illinois 60602
(312) 744-7686 / (312) 744-9018
Bradley.Wilson@cityofchicago.org
Aaron.Dozeman1@cityofchicago.org

*Attorneys for City Defendants*