**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE BLUE NOTE, INC. d/b/a The Point, an Illinois corporation, | ) | |
| Plaintiff, | ) | No. 23 CV 648 |
| v. | ) | Hon. Thomas M. Durkin |
| THE CITY OF CHICAGO, a Municipal Corporation, *et al.*, | ) | |
| Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT**

BRADLEY G. WILSON (IL 6301195)
AARON T. DOZEMAN (IL 6308909)
City of Chicago, Department of Law
Constitutional and Commercial
Litigation Division
2 North Lasalle Street, Suite 520
Chicago, Illinois 60602
(312) 744-7686 / (312) 744-9018
Bradley.Wilson@cityofchicago.org
Aaron.Dozeman1@cityofchicago.org

*Attorneys for the City*

## TABLE OF CONTENTS

INTRODUCTION .......... 1

BACKGROUND .......... 1

A. The Point is established in 2020 in The Flat Iron Arts Building .......... 1

B. The Point is summarily closed by the Chicago Police Department .......... 2

C. DOB orders an emergency closure of The Point based on unsafe conditions .......... 3

D. Summary closure proceedings before the BACP Commissioner .......... 6

E. After a probable cause hearing, BACP upholds the summary closure order, and Blue Note seeks state-court review of that decision .......... 7

F. BACP brings license disciplinary proceedings based on the Citation for too many patrons in The Point after closing .......... 8

G. The emergency closure order is lifted .......... 8

H. Blue Note's claims against the City and non-City defendants .......... 8

LEGAL STANDARDS .......... 9

ARGUMENT .......... 10

I. This Court Should Abstain From Hearing This Action And Dismiss It Under Rule 12(b)(1) Based On Ongoing State Proceedings. .......... 10

II. The Complaint Should Be Dismissed Under Rule 12(b)(6). .......... 13

A. Blue Note fails to allege that a City policy caused any alleged constitutional violation. .......... 14

B. Blue Note fails to plead any underlying constitutional deprivations. .......... 16

III. This Court Should Decline To Exercise Supplemental Jurisdiction Over Blue Note's State-Law Claims Or Dismiss Them On The Merits. .......... 23

A. Blue Note fails to state an abuse of process claim. .......... 24

B. Blue Note fails to state a conspiracy-to-violate-section-1983 claim. .......... 24

C. Blue Note fails to state a common-law fraud claim. .......... 26

D. Blue Note fails to state a conspiracy to violate the Illinois Consumer Fraud and Deceptive Practices Act .................................................................. 26

E. The Tort Immunity Act bars Blue Note's state-law claims for damages. 27

IV. Blue Note's Requests For Injunctive Relief Must Be Denied.......................... 28

CONCLUSION..........................................................................................................28

**EXHIBITS**

Exhibit 1 MLDC Notice of Hearing

# TABLE OF AUTHORITIES

**Cases**

*Affordable Recovery Housing v. City of Blue Island*,
No. 12 C 4241, 2016 WL 5171765 (N.D. Ill. Sept. 21, 2016)................................................ 22

*Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*,
599 F.3d 720 (7th Cir. 2010) ................................................................................... 23

*Ambrosius v. Chicago Athletic Clubs, LLC*,
203 N.E.3d 239 (Ill. App. Ct. 2021) ........................................................................ 26

*Amundsen v. Chi. Park Dist.*,
218 F.3d 712 (7th Cir. 2000) ................................................................................... 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................ 9, 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................... 9

*Bell v. City of Country Club Hills*,
841 F.3d 713 (7th Cir. 2016) ................................................................................... 20

*Berrada Props. Mgmt. Inc. v. Romanski*,
608 F. Supp. 3d 746 (E.D. Wis. 2022)........................................................................ 9

*Bozek v. Bank of Am., N.A.*,
191 N.E.3d 709 (Ill. App. Ct. 2021) ........................................................................ 24

*Bridges v. Dart*,
950 F.3d 476 (7th Cir. 2020) ................................................................................... 14

*Brunson v. Murray*,
843 F.3d 698 (7th Cir. 2016). .................................................................................. 16

*Calusinski v. Kurger*,
24 F.3d 931 (7th Cir. 1994) ..................................................................................... 14

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
761 F.3d 732 (7th Cir. 2014) ................................................................................... 26

*Castlerigg Master Invs., Ltd. v. AbbVie, Inc.*,
191 N.E.3d 121 (Ill. App. Ct. 2021) ........................................................................ 26

*Champion Parts, Inc. v. Oppenheimer & Co.*,
878 F.2d 1003 (7th Cir. 1989) ................................................................................. 26

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988) ........................................ 16

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984) ........................................ 28

*Contreras v. City of Chicago*,
920 F. Supp. 1370 (N.D. Ill. 1996) ........................................ 22

*Crenshaw v. Sup. Ct. of Ind.*,
170 F.3d 725 (7th Cir. 1999) ........................................ 13

*Culp v. Raoul*,
921 F.3d 646 (7th Cir. 2019) ........................................ 12

*D.B. ex rel. Kurtis B. v. Kopp*,
725 F.3d 681 (7th Cir. 2013) ........................................ 17

*Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.*,
795 F.2d 1344 (7th Cir. 1986) ........................................ 22

*Douglas v. Reeves*,
964 F.3d 643 (7th Cir. 2020) ........................................ 19

*Dvorkin v. Soderquist*,
2022 WL 1127697 (Ill. App. Ct. 2022) ........................................ 25

*Ewell v. Toney*,
853 F.3d 911 (7th Cir. 2017) ........................................ 10

*Fares Pawn, LLC v. Ind. Dep't of Fin. Inst.*,
755 F.3d 839 (7th Cir. 2014) ........................................ 16

*FKFJ, Inc. v. Vill. of Worth*,
11 F.4th 574 (7th Cir. 2021) ........................................ 17

*Forty One News, Inc. v. Cty. of Lake*,
491 F.3d 662 (7th Cir. 2007) ........................................ 11

*Garcia v. City of Chicago*,
390 F. Supp. 2d 701 (N.D. Ill. 2005) ........................................ 15

*Grandco Corp. v. Rochford*,
536 F.2d 197 (7th Cir. 1976) ........................................ 13

*Green v. Benden*,
281 F.3d 661 (7th Cir. 2001) ........................................ 13

*Hartman v. Moore*,
547 U.S. 250 (2006) ........ 20

*Hernandez v. Dart*,
635 F. Supp. 2d 798 (N.D. Ill. 2009) ........ 20

*Hess v. Flores*,
948 N.E.2d 1078 (Ill. App. Ct. 2011) ........ 27

*Holstein v. City of Chicago*,
29 F.3d 1145 (7th Cir. 1994) ........ 12

*Idris v. City of Chicago*,
552 F.3d 564 (7th Cir. 2009) ........ 21

*J.B. v. Woodard*,
997 F.3d 714 (7th Cir. 2021) ........ 9

*Leavell v. Ill. Dep't of Nat. Res.*,
600 F.3d 798 (7th Cir. 2010) ........ 20, 23

*Long v. Shorebank Dev. Corp.*,
182 F.3d 548 (7th Cir. 1999) ........ 9

*Majors v. Engelbrecht*,
149 F.3d 709 (7th Cir. 1998) ........ 10, 11

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ........ 21

*Middlesex Cty. Ethics Comm'n v. Garden State Bar Ass'n*,
457 U.S. 423 (1982) ........ 10, 13

*Milchtein v. Milwaukee Cty.*,
42 F.4th 814 (7th Cir. 2022) ........ 16

*Miller v. City of Monona*,
784 F.3d 1113 (7th Cir. 2015) ........ 17, 18

*Monell v. Dep't of Soc. Servs. of N.Y.*,
436 U.S. 658 (1978) ........ 14

*Move N Pick Convenience, Inc. v. Emanuel*,
30 N.E.3d 661 (Ill. App. Ct. 2015) ........ 12

*Nadzhafaliyev v. Hardy*,
403 F. Supp. 3d 663 (N.D. Ill. 2019) ........ 9

*Neurosurgery & Spine Surgery, S.C. v. Goldman*,
790 N.E.2d 925 (Ill. App. Ct. 2003) .......... 24

*Nieves v. Bartlett*,
139 S. Ct. 1715 (2019) .......... 19

*Pennzoil Co. v. Texaco, Inc.*,
481 U.S. 1 (1987) .......... 13

*Petropoulos v. City of Chicago*,
448 F. Supp. 3d 835 (N.D. Ill. 2020) .......... 15

*Pincham v. Ill. Judicial Inquiry Bd.*,
681 F. Supp. 1309 (N.D. Ill. 1988) .......... 13

*RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*,
672 F.3d 476 (7th Cir. 2012) .......... 23

*Scherer v. Balkema*,
840 F.2d 437 (7th Cir. 1988) .......... 25

*Schmidt v. Lessard*,
414 U.S. 473 (1974) .......... 28

*Selby v. O'Dea*,
156 N.E.3d 1212 (Ill. App. Ct. 2020) .......... 24

*Shachter v. City of Chicago*,
962 N.E.2d 586 (Ill. App. Ct. 2011) .......... 12

*Swanson v. City of Chetek*,
719 F.3d 780 (7th Cir. 2013) .......... 16

*Sweeney v. Bartow*,
612 F.3d 571 (7th Cir. 2010) .......... 12

*Taylor v. Carmouche*,
214 F.3d 788 (7th Cir. 2000) .......... 15

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
139 S. Ct. 2449 (2019) .......... 12

*Tucker v. City of Chicago*,
907 F.3d 487 (7th Cir. 2018) .......... 20

*Vargas v. Cook Cty. Sheriff's Merit Bd.*,
952 F.3d 871 (7th Cir. 2020) .......... 22

*Vill. of Willowbrook v. Olech*,
528 U.S. 562 (2000)........................................................................................................ 16

*Wilson v. Cook Cty.*,
742 F.3d 775 (7th Cir. 2014) ........................................................................................ 15

*Wroblewski v. City of Washburn*,
965 F.2d 452 (7th Cir. 1992) ........................................................................................ 16

*Younger v. Harris*,
401 U.S. 37 (1971).......................................................................................................... 9

*Zummo v. City of Chicago*,
345 F. Supp. 3d 995 (N.D. Ill. 2018) ............................................................................ 11

**Statutes**

28 U.S.C. § 1367............................................................................................................. 23

745 ILCS 10/1-101 .......................................................................................................... 24

745 ILCS 10/2-105 .......................................................................................................... 27

745 ILCS 10/2-201 .......................................................................................................... 28

745 ILCS 10/2-202 .......................................................................................................... 27

745 ILCS 10/2-207 .......................................................................................................... 27

815 ILCS 505/1................................................................................................................ 26

MCC § 14A-3-307. .......................................................................................................... 18

MCC § 4-4-285................................................................................................................ passim

## INTRODUCTION

Defendant City of Chicago submits this memorandum in support of its Fed. R. Civ. P. 12(b)(1) and (6) motion to dismiss the First Amended Complaint of Plaintiff The Blue Note, Inc. ("Blue Note"). Blue Note challenges multiple City efforts to protect public safety after a shooting occurred at its Wicker Park bar, The Point, and dangerous building conditions were discovered during subsequent inspections of the premises. Those City actions are currently under review by an administrative tribunal and state court. As explained below, this matter should be dismissed because exercising jurisdiction would necessarily inject this Court into multiple ongoing state-law proceedings, creating the potential for inconsistency and confusion. But even if the Court exercises jurisdiction, the case is meritless. Blue Note has not alleged a basis for municipal liability; its equal protection and retaliation claims fail because its own allegations show that it was not irrationally singled out for unequal treatment and do not plausibly suggest any retaliatory motive for the City's enforcement actions; its due-process challenge to the administrative proceedings fails as a matter of law; and its state-law claims are statutorily barred and insufficiently pled. This Court should therefore dismiss Blue Note's claims against the City.

## BACKGROUND

### A. The Point is established in 2020 in The Flat Iron Arts Building

The Flat Iron Arts Building ("Arts Building"), owned by defendant Flat Iron Building, LLC ("FIB"), is located on the 1500 block of N. Milwaukee Avenue in Chicago. Dkt. 24, ¶¶ 20, 21. The building hosts several businesses, including artist studios, a flower shop, a smoke shop, a bar, and (although not zoned for such use) residential tenants. *Id.* ¶ 115. Berger Realty Group, LLC was FIB's agent for the building. *Id.* ¶ 7.

On or around July 27, 2020, Blue Note leased space in the Arts Building to operate The Point, a bar and music venue. *Id.* ¶ 21. Blue Note obtained three City licenses to operate The

Point. First, it holds a "Late Hour Plan" liquor license ("Late-Hour license"), allowing it to stay open and serve alcohol until 4:00 a.m. on weeknights and 5:00 a.m. on weekends. *Id.* ¶¶ 30, 38. Blue Note paid $350,000 to the prior tenant for the Late-Hour license. *Id.* ¶ 35. Second, Blue Note holds a Public Place of Amusement ("PPA") license, allowing The Point to operate as a music venue with a capacity over 100 and charge admission for concerts. *Id.* ¶ 39. Third, Blue Note holds a Tavern license, allowing The Point to operate as a bar. *Id.* ¶ 40. All three licenses remain active. *Id.* ¶ 41.

### B. The Point is summarily closed by the Chicago Police Department

On October 10, 2021, at around 3:42 a.m., a shooting at The Point left five people wounded and one dead. Dkt. 24-37. Afterward, Jun "Joe" Lin, The Point's representative, criticized the City in the media, accusing it of "scapegoating" The Point and claiming the bar was not responsible for the City's rising crime problem. Dkt. 24, ¶¶ 277, 280.

Four months later, on February 6, 2022, a second shooting occurred at The Point. *Id.* ¶ 84. Near closing time, a patron left the bar to retrieve a firearm from a car, and at 5:06 a.m. (after closing) he fired at least 11 rounds into the bar from across the street, seriously injuring one individual inside the bar. *Id.* ¶ 93.

Police soon arrived and cited The Point for having "numerous patrons inside the bar after the bar closed at [5:00 a.m.]" *Id.* ¶¶ 95, 97. The officer who issued the citation allegedly "stated something to the effect of, 'I did not want to give you this ticket, but someone higher up directed me to. I think it's total bullshit.'" *Id.* ¶ 98.

By February 8, 2022, the Chicago Police Department ("CPD") Superintendent ordered The Point to be summarily closed under section 4-4-285 of the Municipal Code of Chicago ("MCC"), titled "Public safety threat – Summary closure." *Id.* ¶ 100. The ordinance makes it "unlawful for any person to operate any establishment in a manner that presents a public safety

threat," MCC § 4-4-285(b), and allows the CPD Superintendent to "abate the threat by ordering the summary closure of the establishment," *id.* § 4-4-285(c). A summary closure order may remain in effect for up to six months, but may be lifted sooner if (1) it is determined at a "probable cause hearing" or a "nuisance abatement hearing" that a public safety threat did not occur or (2) after a nuisance abatement hearing, it is determined that the establishment no longer presents a public safety threat, "as may be evidenced by the submission and implementation of an acceptable nuisance abatement plan." *Id.* The owner of a summarily closed establishment can request a probable cause hearing before the Commissioner of the Department of Business Affairs and Consumer Protection ("BACP") within three days of a summary closure to determine whether a public safety threat occurred. *Id.* § 4-4-285(e). A licensee can request a nuisance abatement hearing at any time before the order expires. *Id.* § 4-4-285(f).

After summary closure, Lin made several statements to the media that were critical of the City, and he accused the City of unfairly blaming The Point for criminal activity. *Id.* ¶¶ 279–84.

### C. DOB orders an emergency closure of The Point based on unsafe conditions

On February 15, 2022, Blue Note agreed to allow CPD to inspect The Point. *Id.* ¶¶ 111, 236. On February 18, 2023, CPD officers and inspectors from the City's Department of Buildings ("DOB") inspected The Point and common areas of the Arts Building. *Id.* ¶ 112.

Following the inspection, the DOB Commissioner issued an emergency closure order pursuant to MCC § 14A-3-307, "CLOSURE ORDER," which allows the City to close any "building, structure, or premises" with unsafe conditions. Dkt. 24-11. The emergency closure order was based on the Commissioner's finding that The Point was "a public nuisance that is dangerous, hazardous and endanger[ed] the public health due to" 53 violations of the City's Building Code, including electrical, "Fire Protection / Egress / Structural," and plumbing

violations. Dkt. 24-14 at 1. The order concluded that "the building pose[d] an immediate danger to the tenants and occupants of the premises" and required that The Point "be immediately closed, and remain vacant, and that entry be denied." *Id.* at 2. As required by MCC § 14A-3-307.2, a notice was posted on the outside of The Point, warning that the "entire premises" of The Point was ordered closed due to Code violations. Dkt. 24-11.

Blue Note alleges that "the City intentionally combined DOB violations for [The Point] with DOB violations for the entire Arts Building so that [it] would be unable to complete or even pull permits for all of the Arts Building Violations." *Id.* ¶ 124. On February 28, 2022, a contractor informed FIB and its agent for managing the Arts Building, defendant Berger Realty Group, LLC ("BRG"), that it was not possible to bring the Arts Building into compliance with the Building Code. *Id.* ¶ 119. Blue Note alleges that FIB, BRG, Baum Realty Group, LLC ("Baum Realty," which was FIB's agent for selling the Arts Building, *id.* ¶ 180), and Savas Er (an individual who "maintain[s] some level of interest" in four entities that would later purchase the Arts Building in September 2022, *id.* ¶ 182) "conspired to 'find middle ground' to keep [The Point] closed in order to curry favor with the City regarding the *other* building violations at the Arts Building (i.e. residential tenants and 'Structural' issues, among others, that affect the entire Arts Building as opposed to just [The Point])." *Id.* ¶ 120.

On March 2, 2022, Blue Note's attorneys and Breidinger emailed the DOB Commissioner, informing him that they had questions about remedying the Building Code violations and seeking a call with him. *See id.* ¶ 121; Dkt. 24-13. The Commissioner responded by forwarding them the emergency closure order and stating his belief at the time that the matter was subject to ongoing litigation. *See* Dkt. 24, ¶ 122; Dkt. 24-13.

Blue Note also alleges that "on or after March 2, 2022," Breidinger had a phone call with the DOB Commissioner, who "stated . . . something to the effect of, that":

- "the City wanted to restrict [The Point's] hours of operation (i.e., modify [Blue Note's] Late-Hour License) or eliminate [The Point] as an establishment if it were going to continue operating as a 5:00am bar";

- "FIB terminating [Blue Note's] Lease would show alignment with the City's plan";

- "FIB would not need to repair the Arts Building Violations that were keeping [The Point] closed pursuant to the Emergency Closure Notice"; and

- "in exchange for FIB's forbearance on the Arts Building Violations or terminating [Blue Note's] Lease, the City would not enforce the Arts Building Violations against the *other* tenants of the Arts Building (i.e., DOB would not close any other tenants of the Arts Building for any Arts Building Violations)."

Dkt. 24, ¶ 125.

Blue Note then alleges that "Breidinger stated to [the DOB Commissioner], something to the effect of, that FIB, BRG, and the other defendants agreed with the City's plan of action against [Blue Note], and FIB, BRG, and the other defendants' roles in the plan, as discussed on Breidinger and Beaudet's March 2, 2022 teleconference." *Id.* ¶ 127.

Blue Note claims that Breidinger, Berger, and Olear planned to terminate Blue Note's lease to "get on better footing in regards to correcting" Building Code violations in the Arts Building, *id.* ¶ 142, including violations that DOB did not know about, *id.* ¶¶ 115–17.

Blue Note and FIB continued to negotiate over who was responsible for repairing certain Building Code violations, *id.* ¶¶ 157–68, 179, and Blue Note's outstanding rent payments, *id.* ¶ 176. In October 2022, Blue Note sued FIB in state court over its disagreement with the lease obligations; that suit is pending in the Circuit Court of Cook County, Illinois, under case number 2022 CH 10505. *Id.* ¶ 221. Later that month, the Arts Building was sold to the entities in which Mr. Er had a partial ownership stake. *Id.* ¶ 228.

**D. Summary closure proceedings before the BACP Commissioner**

Meanwhile, enforcement of CPD's summary closure order proceeded separately and apart from the DOB emergency closure order. On February 17, 2022, Blue Note and BACP began negotiating a nuisance abatement plan, *id.* ¶ 148, which is one means by which a licensee may seek to have a summary closure order lifted, MCC § 4-4-285(c), (f). BACP initially proposed, among other things, that Blue Note would be subject to "heightened enforcement of rules on the licensed premises," that The Point would "be open no longer than 2:00AM on Sunday night through Friday night; and 3:00AM on Saturday night," and that Blue Note would provide six security guards to "patrol both the interior and the immediate exterior areas of the Premises, *including across the street*, until thirty . . . minutes after closing." *Id.* ¶ 242 (emphasis in Amended Complaint). BACP's proposed plan also allowed for Blue Note to be released from the plan at the earliest "[s]ix (6) months after the execution of the Nuisance Abatement Plan," by contacting CPD and Department of Law "to *potentially* set up a meeting with respect to the modification in the hours of operation." *Id.* ¶ 243 (emphasis in Amended Complaint). According to its terms, the plan would bind any successor to the Late-Hour license permit. *Id.* ¶ 246.

Blue Note proposed that the nuisance abatement plan include criteria for determining when it would expire, and it rejected the requirement that it provide security guards to patrol across the street from The Point. *Id.* ¶¶ 249, 250.

On March 29, 2022, BACP sent another draft nuisance abatement plan that removed the requirement that security guards patrol across the street but rejected the expiration criteria. *Id.* ¶¶ 251–53. The parties did not agree on a nuisance abatement plan, nor did Blue Note request a nuisance abatement hearing under MCC § 4-4-285(f).

### E. After a probable cause hearing, BACP upholds the summary closure order, and Blue Note seeks state-court review of that decision

While negotiating a nuisance abatement plan, Blue Note and BACP agreed to proceed with a probable cause hearing concurrently, *id.* ¶ 232, which is another means by which one may challenge a summary closure order, MCC § 4-4-285(c), (e).

The matter eventually proceeded to a probable cause hearing based on written submissions before the BACP Commissioner under case number 22 SC 0002. *See id.* ¶ 294. In support of the summary closure order, BACP submitted a Vice Investigation Report ("Vice Report"), which described four incidents at The Point: two shootings, one occurring on October 10, 2021, and the other on February 6, 2022; the February 6, 2022 citation for having too many patrons in the bar after closing; and one May 31, 2021 weapons violation arrest that occurred near The Point. *See* Dkt. 24-35. It concluded that "[t]he continued operations of The Blue Note Incorporated presents an immediate and on-going public safety threat and warrants the application of the Summary Closure." *Id.* Blue Note objected to the introduction of the report as hearsay, but the objection was overruled. Dkt. 24, ¶ 262. Blue Note was not permitted to cross-examine any witness with knowledge about the creation of the Vice Report. *Id.* ¶ 263.

The BACP Commissioner affirmed the summary closure order. Dkt. 24-36. The Commissioner rejected three of the four bases for summary closure outlined in the Vice Report (the October 10, 2021 shooting, February 6, 2022 citation, and May 10, 2021 weapons violation). *Id.* at 4–5, ¶¶ 8–10. But the Commissioner determined that the February 6, 2022 shooting established a "nexus of a patron causing a public safety threat" that justified summary closure under MCC § 4-4-285(e). *Id.* at 5, ¶ 11. The summary closure order expired on August 8, 2022, six months after the shooting. *See* MCC § 4-4-285(c) (orders "remain in effect for an aggregate period of six months as measured from the date on which the public safety threat occurred"). On

August 12, 2022, Blue Note filed a writ of certiorari action in the Circuit Court of Cook County challenging the BACP Commissioner's decision upholding the summary closure order. *Id.* ¶ 274.

### F. BACP brings license disciplinary proceedings based on the Citation for too many patrons in The Point after closing

On November 18, 2022, Blue Note was sent a "Notice of Hearing for 22-LR-11" before the Mayor's License Discipline Commission (MLDC), which adjudicates alleged ordinance violations related to liquor licenses. *Id.* ¶ 305. The notice alleged "[t]hat on or about February 6, 2022 the licensee, by and through its agent, allowed unauthorized persons to be on the licensed premises after 5:00 AM, in violation of Municipal Code of Chicago § 4-60-130 (d)." (MLDC Notice of Hearing, attached hereto as **Exhibit 1**). The matter remains pending before the MLDC.

### G. The emergency closure order is lifted

On March 13, 2023, DOB inspectors re-inspected The Point. *Id.* ¶ 324. The DOB Commissioner determined that the dangerous conditions were abated, and he lifted the emergency closure order. *Id.* ¶ 330.

### H. Blue Note's claims against the City and non-City defendants

Based on these allegations, Blue Note brings seven claims against the City, including three section 1983 claims and four state-law claims. It alleges a class-of-one equal protection claim (Count I), First Amendment retaliation claim (Count II), and procedural due process claim (Count III). *Id.* ¶¶ 334–69. Blue Note also brings a state-law claim for abuse of process based on the City's alleged use of various administrative procedures to improperly modify or revoke The Point's Late-Hour license or close the establishment. *Id.* ¶¶ 370–74. Blue Note raises a state-law conspiracy claim alleging that the City conspired with non-City defendants to commit the underlying constitutional violations. *Id.* ¶¶ 375–79. It alleges a fraud claim against all defendants. *Id.* ¶¶ 380–84. And Blue Note alleges that the City conspired with non-City

defendants to violate the Illinois Consumer Fraud and Deceptive Business Practices Act using "unfair and/or deceptive acts to gain leniency with the City so that the Arts Building Violations would not be enforced against the other tenants of the Arts Building." *Id.* ¶ 393. Blue Note seeks compensatory damages, injunctive relief against any retaliatory practices, and declaratory relief as to any equal protection violations, along with attorney's fees and costs. *Id.* at 66.

## LEGAL STANDARDS

The City moves to dismiss under Rules 12(b)(1) and (6). When a court abstains under the doctrine set out in *Younger v. Harris*, 401 U.S. 37 (1971), it may dismiss the action for lack of subject matter jurisdiction under Rule 12(b)(1). *E.g., Nadzhafaliyev v. Hardy*, 403 F. Supp. 3d 663, 667 (N.D. Ill. 2019); *see also Berrada Props. Mgmt. Inc. v. Romanski*, 608 F. Supp. 3d 746, 754 (E.D. Wis. 2022). On a Rule 12(b)(1) motion, "a district court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). But it may also "view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists," and "take judicial notice of matters of public record, including court filings and documents from the ongoing state court proceedings incorporated into the federal complaint." *Id.* (citation omitted); *see also J.B. v. Woodard*, 997 F.3d 714, 717 (7th Cir. 2021).

To avoid dismissal under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), meaning "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. That is, the complaint must present a "short, plain, and plausible factual narrative that conveys a story that holds together." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 777 (7th

Cir. 2022) (internal quotation and citation omitted). Although the factual allegations in the complaint are accepted as true and reasonable inferences are drawn in plaintiff's favor, bare legal conclusions are not presumed true. *Iqbal*, 556 U.S. at 678–79.

## ARGUMENT

Over 393 paragraphs and 43 exhibits — the opposite of the "short and plain statement of the claim" required by Federal Rule of Civil Procedure 8(a)(2) — Blue Note relates how, on one tragic night, one of its patrons fired 11 rounds into the bar, seriously wounding someone inside. The City then enforced public safety ordinances to remedy the building's unsafe conditions and abate the violent atmosphere that the bar fostered. As we explain, the Court should either abstain from hearing — and dismiss — these claims or dismiss them for failure to state a claim.

### I. This Court Should Abstain From Hearing This Action And Dismiss It Under Rule 12(b)(1) Based On Ongoing State Proceedings.

This Court should abstain from reaching the merits of Blue Note's claims against the City, and thus dismiss those claims, because adjudicating them would interfere with ongoing state judicial and administrative proceedings. Grounded in "principles of equity, comity, and federalism," the *Younger* doctrine "requires federal courts to refrain from exercising their jurisdiction when relief may interfere with certain state proceedings." *Ewell v. Toney*, 853 F.3d 911, 916 (7th Cir. 2017). The doctrine applies where: (1) ongoing state proceedings (2) implicate important state interests, and (3) the plaintiff has an adequate opportunity to raise constitutional challenges in those proceedings. *See Middlesex Cty. Ethics Comm'n v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). If these factors are met, courts will abstain absent a "showing of bad faith, harassment, or some other extraordinary circumstance that would make abstention inappropriate[.]" *Id.* at 435. The doctrine applies to federal actions, like this one, for injunctive or declaratory relief and damages. *See Majors v. Engelbrecht*, 149 F.3d 709, 714 (7th Cir. 1998).

If, as in this case, "there have been no proceedings of substance on the merits in the federal court," *Younger* applies "in full force." *Forty One News, Inc. v. Cty. of Lake*, 491 F.3d 662, 666 (7th Cir. 2007) (internal quotation marks and citations omitted). And each abstention factor is met here. First, Blue Note's claims are premised on alleged conduct that is the subject of ongoing state proceedings, and adjudicating the claims in federal court would interfere with those proceedings. As referenced in the Amended Complaint and above, two proceedings involving the same facts are currently pending before other tribunals:

- *The Blue Note, Inc. d/b/a The Point v. Department of Business Affairs and Consumer Protection, et al.*, No. 2022 CH 07916, (Cir. Ct. Cook Cty., Ill.), an administrative review action challenging BACP's decision to uphold the summary closure order.

- *In re License Disciplinary Proceedings Regarding the City of Chicago Liquor License and All Other City Licenses Issued to The Blue Note, Inc. d/b/a The Point*, 22 LR 11, pending before the MLDC, alleges Blue Note violated MCC § 4-60-130(d) on February 6, 2022, by allowing persons to be on the licensed premises after 5:00 AM. *See* Ex. 1.

The first of these — the state-court action challenging the BACP Commissioner's decision upholding the summary closure order — is obviously an ongoing state proceeding. The second action — the MLDC proceeding — is a coercive, contested administrative action regarding potential discipline as to The Point's license, the sort of administrative procedure that also justifies *Younger* abstention. *See Majors*, 149 F.3d at 711 ("administrative proceedings are 'judicial in nature' when they are coercive"); *Zummo v. City of Chicago*, 345 F. Supp. 3d 995, 1004 (N.D. Ill. 2018) (applying *Younger* to vehicle impoundment proceedings in City's Department of Administrative Hearings), *aff'd*, 798 F. App'x 32 (7th Cir. 2020).

Second, both proceedings implicate important state interests. The subject of the state-court action is the Summary Closure Ordinance, which prohibits any person from "operat[ing] any establishment in a manner that presents a public safety threat." MCC § 4-4-285(b) (titled "Unlawful act – Public nuisance"). Courts recognize a "strong" state interest in "promoting

public safety," *e.g.*, *Culp v. Raoul*, 921 F.3d 646, 654 (7th Cir. 2019), as well as abating public nuisances, *e.g.*, *Sweeney v. Bartow*, 612 F.3d 571, 573 (7th Cir. 2010) (citing *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975)). Meanwhile, the MLDC proceeding implicates important state interests, for states have traditionally regulated alcohol, *see Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2462–70 (2019), and the Illinois Liquor Control Act of 1934, 235 ILCS 5/4-1 *et seq.*, vests the City with liquor licensing decisions, *see Move N Pick Convenience, Inc. v. Emanuel*, 30 N.E.3d 661, 666 (Ill. App. Ct. 2015).

Third, Blue Note can raise its constitutional claims in state court in both cases. The application of the Summary Closure Ordinance is subject to judicial review via a common law writ of certiorari, *see* MCC § 4-4-285(i), by which "a party disappointed in a determination made by a municipality's administrative agency may seek review in the circuit court," *Holstein v. City of Chicago*, 29 F.3d 1145, 1148 (7th Cir. 1994). "Review is extremely broad in scope and extends to all questions of fact and law contained in the record before the court, including de novo review of any constitutional issues." *Id.* The MLDC proceeding also is subject to multiple levels of review: the MLDC's decision may be appealed to the License Appeal Commission, *see* 235 ILCS 5/7-5, 7-10, and then to the Illinois circuit court under the Illinois Administrative Review Law, *id.* §§ 7-9, 7-11. Similar to a writ of certiorari action described above, review under the Administrative Review Law "extend[s] to all questions of law and fact presented by the entire record before the court," 735 ILCS 5/3-110, and constitutional challenges to administrative decisions may be raised on administrative review, *e.g.*, *Shachter v. City of Chicago*, 962 N.E.2d 586, 593 (Ill. App. Ct. 2011). "[T]hat constitutional claims may be raised in state-court judicial review of the administrative proceeding" is sufficient to show that Blue Note has an adequate opportunity to raise its claims in the state-court forum. *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 629 (1986). Federal courts must assume that state courts will

protect federal constitutional rights. *See Middlesex Cty. Ethics Comm'n*, 457 U.S. at 431; *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15 (1987).

Finally, with all factors for abstention met, no extraordinary circumstances counsel against it. Although Blue Note raises accusations of "illegitimate animus" and "malicious and dogged attempts" on the part of the City to shut down The Point, Dkt. 24, ¶ 333, the bad faith prosecution exception to *Younger* "is a narrow one and is to be granted parsimoniously," *Pincham v. Ill. Judicial Inquiry Bd.*, 681 F. Supp. 1309, 1324 (N.D. Ill. 1988), *aff'd*, 872 F.2d 1341 (7th Cir. 1989). The plaintiff bears the burden of establishing the exception, *see Green v. Benden*, 281 F.3d 661, 667 (7th Cir. 2001), and must allege "specific facts to support [its] inferences of bad faith, bias, and retaliation," not "mere allegations and conclusions," *Crenshaw v. Sup. Ct. of Ind.*, 170 F.3d 725, 729 (7th Cir. 1999); *see also Pincham*, 872 F.2d at 1349. Here, Blue Note does not allege specific facts supporting the inference that any of the administrative enforcement matters were brought in bad faith. The mere fact that there were multiple enforcement actions does not support such an inference. *See Grandco Corp. v. Rochford*, 536 F.2d 197, 203 (7th Cir. 1976). And the Amended Complaint itself describes a legitimate basis for each enforcement action: the summary closure order was issued after a patron fired 11 shots into the bar; Blue Note was cited because patrons were in the bar after closing; and the emergency closure order was based on unsafe building conditions, the legitimacy of which Blue Note does not contest. This Court should therefore abstain under *Younger*.

## II. The Complaint Should Be Dismissed Under Rule 12(b)(6).

If this Court declines to dismiss this case under Rule 12(b)(1), it should dismiss it under Rule 12(b)(6) for failure to state a claim, for two independent reasons. First, Blue Note fails to allege that any constitutional deprivation was caused by a City policy, practice, or custom. Second, it fails to allege underlying equal protection, retaliation, or due process violations.

**A. Blue Note fails to allege that a City policy caused any alleged constitutional violation.**

*Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), holds that a municipality is subject to section 1983 liability only if its own conduct caused a constitutional deprivation. *Id.* at 694–95. Municipal conduct can be manifested through (1) an express policy, (2) a widespread, though unwritten, custom or practice, or (3) an agent with final policy making authority. *Id.* at 694.

Here, in an effort to allege a City policy, Blue Note alleges that the City has a "three-fold" "plan" to eliminate bars with Late-Hour Licenses," which it applied against Blue Note:

1) CPD improperly used its discretion under the Summary Closure Ordinance to close Plaintiff for up to six (6) months unless Plaintiff agreed to an indefinite Nuisance Abatement Plan;

2) DOB inspected the Property with the express intention of finding as many building violations as possible to keep the Plaintiff closed longer than the six (6) months allowed by the Summary Closure Ordinance until its Late-Hour License was modified or revoked; and

3) BACP prosecuted Plaintiff while it was closed under the Summary Closure Ordinance and by DOB until Plaintiff agreed to indefinitely modify the hours of its Late-Hour License, or have BACP move to revoke Plaintiff's Late-Hour License.

Dkt. 24, ¶¶ 59, 337, 347. Blue Note concedes that no express policy is at issue here. *Id.* ¶¶ 339, 348. And what Blue Note labels the City's "plan" does not describe a widespread custom or practice, nor does Blue Note even allege it was implemented by a final policymaker.

A widespread custom or practice requires something more than the single instance alleged here. *See Calusinski v. Kurger*, 24 F.3d 931, 936 (7th Cir. 1994) ("single incident" will not establish a custom or practice); *Bridges v. Dart*, 950 F.3d 476, 479 (7th Cir. 2020) ("a random event or even a short series of random events" does not suffice). "Courts in this District regularly dismiss *Monell* claims where the plaintiff has failed to allege instances other than that from which he suffered." *Petropoulos v. City of Chicago*, 448 F. Supp. 3d 835, 841–42 (N.D. Ill.

2020). Blue Note does not allege that the City applied its "plan" to any other Chicago business. Indeed, its claim that The Point was "singled out" by the City and treated differently than other Late-Hour licensees or businesses, Dkt. 24, ¶¶ 133, 136, belies any inference that a widespread practice or custom caused it harm, precluding this basis for *Monell* liability.[1]

As to liability based on the actions of a final policymaker, Blue Note does not allege that a final policymaker came up with or coordinated the alleged three-point "plan" — it merely alleges actions taken by three separate City departments. None of those actions, moreover, were final policy decisions attributable to the City. DOB and BACP Commissioners are not final policymakers when it comes to mere implementation or enforcement of ordinances. *E.g.*, *Garcia v. City of Chicago*, 390 F. Supp. 2d 701, 705 n.2 (N.D. Ill. 2005) (that DOB "implements and enforces the City Council's demolition policies" did not render "[DOB] or its commissioner policymakers"); *see also Taylor v. Carmouche*, 214 F.3d 788, 791 (7th Cir. 2000) (being "a department head does not affect application of the *Monell* principle"). It is City Council that creates policy by enacting ordinances creating standards and criteria for summary and emergency closures and liquor licenses. *See Waters v. City of Chicago*, 580 F.3d 575, 582 (7th Cir. 2009). Thus, no individuals who carried out enforcement duties under the ordinances at issue formulated a policy decision through their actions. In addition, as explained above, the DOB and BACP Commissioners' enforcement decisions are subject to multiple layers of review. When an action "is subject to review," the decisionmaker does not "have final authority" to make policy. *Id.* at 583; *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

[1] Blue Note's claim that the City has a plan to "completely eliminat[e] Late-Hour Licenses," Dkt. 24 ¶ 66, is further undermined by City data, which show there are over 100 of them held throughout the City. *See* City of Chicago Data Portal: Business Licenses - Current Liquor and Public Places of Amusement Licenses, available at https://data.cityofchicago.org/Community-Economic-Development/Business-Licenses-Current-Liquor-and-Public-Places/nrmj-3kcf/data

Blue Note offers no other factual allegations that satisfy *Monell*. It asserts that "Defendants' actions reflect an official policy, custom or practice" and "were committed, condoned, and perpetuated at the hands of policy makers and those to whom policy-making authority has been delegated." Dkt. 24, ¶¶ 339, 348. But these boilerplate statements are insufficient to allege *Monell* liability. *See Milchtein v. Milwaukee Cty.*, 42 F.4th 814, 826 (7th Cir. 2022). Blue Note's claims against the City should be dismissed accordingly.

**B. Blue Note fails to plead any underlying constitutional deprivations.**

Not only does Blue Note fail to allege a basis for municipal liability, it also insufficiently pleads an equal protection, retaliation, or due process claim. This too warrants dismissal.

**1. Blue Note fails to state a class-of-one equal protection claim.**

Where a plaintiff does not allege membership in a class or group, an equal protection challenge must proceed under the class-of-one framework. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). To state such a claim, a plaintiff must "allege that [it] was 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Swanson v. City of Chetek*, 719 F.3d 780, 783 (7th Cir. 2013) (quoting *Olech*, 528 U.S. at 564). Although it is unsettled in this circuit whether a class-of-one plaintiff must allege "hostile intent or animus," the plaintiff must at minimum "demonstrate an absence of rational basis." *Brunson v. Murray*, 843 F.3d 698, 706 (7th Cir. 2016). If there exists "a rational basis for the challenged action, that will be the end of the matter — animus or no." *Fares Pawn, LLC v. Ind. Dep't of Fin. Inst.*, 755 F.3d 839, 845 (7th Cir. 2014). Thus, a plaintiff must "allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992). "Class-of-one claimants carry a heavy burden," *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 588

(7th Cir. 2021), for any "*conceivable* rational basis for the difference in treatment" defeats the claim, *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013).

Blue Note's class-of-one equal protection claim fails to show either that The Point was treated differently or that any differential treatment lacked a rational basis. Although a plaintiff need not identify a comparator in its complaint, *see Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015), Blue Note points to other shooting incidents at Late-Hour licensed establishments as purportedly showing different treatment of similarly situated businesses. In 2019, CPD closed Sound Bar, located at 226 W. Ontario Street, after two individuals were shot in a nearby alley. Dkt. 24, ¶ 74. On September 18, 2021, "a shooting occurred during the operating hours at LiqrBox," which holds a Late-Hour license, "and Joy District," which does not. *Id.* ¶ 76. Blue Note suspects that these two bars, located in different areas of the City, were not closed because the owner of both bars has "ties to the City." *Id.* Blue Note also notes that the McDonald's at 10 E. Chicago Avenue was not summarily closed after a May 19, 2022 mass shooting, but admits that DOB closed the establishment for Building Code violations that were discovered following an inspection of the premises. *Id.* ¶ 75. On January 1, 2023, a person was shot and killed at The Lyon's Den Hookah Lounge, at 2123 W. Division Street, but CPD did not summarily close it because it found no basis under MCC § 4-4-285 to do so. *Id.* ¶¶ 77–78.

None of these examples is "*prima facie* identical in all relevant respects or directly comparable . . . in all material respects," as is required to establish differential treatment.[2] *FKFJ*, 11 F.4th at 588. Blue Note supplies no details about these various shootings at or near Late-Hour licensed and non-Late-Hour licensed establishments to determine whether a "public safety threat" occurred under MCC § 4-4-285, and no facts explain how The Point was similarly

[2] That these examples are each differently situated and differently treated also serves to undercut any inference that their treatment was part of a "plan" for *Monell* purposes. *See supra* section II.A.

situated but treated differently. Blue Note also fails to grapple with the fact that some of these establishments did not possess a Late-Hour license, and that one *was* ultimately closed by the City. Given these dissimilar scenarios, Blue Note fails to meet its "heavy burden" to show a high degree of similarity between itself and its comparators. *Id.*

Blue Note also attempts to show that it was treated differently from the Arts Building or other Arts Building tenants by claiming that, although the "Entire Premises" of the Arts Building "was ordered closed" by DOB, Dkt. 24, ¶¶ 114, 129, 133, the City and non-City defendants conspired to enforce DOB's emergency closure order solely against The Point, *id.* ¶¶ 125, 129, 133. But this argument relies on the mistaken presumption that any other entity was subject to DOB's emergency closure order. The plain language of DOB's closure notice and emergency closure order show otherwise. A closure order can apply to a "*building, structure*, or *premises*." MCC § 14A-3-307.1. In the emergency closure order, the Commissioner specified that "The Point" — no other establishment, building, or structure — was the subject of the order. Dkt. 24-14. The posted closure notice under MCC § 14A-3-307.2, *see* Dkt. 24-11, then alerted the public that the "entire premise" of The Point was closed. Because DOB never ordered the entire Arts Building closed, but only The Point's premises, Blue Note's claim that it was treated differently than the Arts Building or other Arts Building tenants fails.

Blue Note also fails to allege that there was no rational basis for the summary closure order, emergency closure order, or MLDC proceeding. To the contrary, the Amended Complaint supplies a valid basis for each action, dooming this claim. *See Miller,* 784 F.3d at 1121 ("even at the pleadings stage, all it takes to defeat a class-of-one claim is a *conceivable* rational basis") (internal quotation omitted). The summary closure order, stemming from a shooting, was upheld by the BACP Commissioner based on the "nexus of a patron causing a public safety threat." Dkt. 24-36 at 5, ¶ 11. Blue Note disagrees with that conclusion and asserts that CPD "improperly

use[d] its discretion under the Summary Closure Ordinance," Dkt. 24, ¶ 59, but that does not negate the conceivable rational basis for the summary closure decision or the subsequent steps contemplated under MCC § 4-4-285 (a six-month closure or nuisance abatement plan). Meanwhile, the MLDC proceeding, which is still ongoing, is based on the citation that Blue Note received for having patrons in the bar after hours. And as to the emergency closure order based on unsafe building conditions, Blue Note does not challenge any particular Code violation as unfounded or dispute that the violations rendered the premises unsafe. Blue Note complains that DOB inspected The Point looking for "as many building violations as possible," *id.* ¶ 337, but that is the legitimate purpose of a building inspection.

In sum, Blue Note alleges neither that The Point was treated differently from similarly situated comparators nor that the summary and emergency closure orders or MLDC proceeding had no rational basis. The class-of-one equal protection claim should be dismissed.

**2. Blue Note fails to state a retaliation claim.**

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (internal quotation omitted). To state a First Amendment retaliation claim, a plaintiff must allege facts suggesting that (1) it engaged in activity protected by the First Amendment, (2) it suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action. *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020).

Here, Blue Note fails to plead facts that would allow the reasonable inference that Mr. Lin's comments to the media (the alleged protected activity, ostensibly made on behalf of Blue Note) had anything to do with the summary closure order, emergency closure order, or MLDC proceeding (the alleged adverse actions). Blue Note alleges no facts tying Mr. Lin's statements to

an alleged adverse action. And any inference of causation is further undermined by the obvious non-retaliatory, unchallenged bases for the City's actions: a shooting led to the summary closure, unsafe building conditions led to the emergency closure, and too many patrons in the bar after closing led to a citation. These "non-retaliatory grounds are in fact []sufficient to provoke the adverse consequences," defeating any retaliation claim. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). The claim is even more implausible considering the timing of the events at issue: some of the adverse actions of which Blue Note complains occurred *before* some of Mr. Lin's speech.

Blue Note's failure to connect Mr. Lin's statements with the summary closure order, emergency closure order, or citation requires dismissal of its retaliation claim. *See Bell v. City of Country Club Hills*, 841 F.3d 713, 716–17 (7th Cir. 2016) (citing *Twombly*, 550 U.S. at 555); *see also Hernandez v. Dart*, 635 F. Supp. 2d 798, 807 (N.D. Ill. 2009) ("Plaintiff has not sufficiently alleged that Defendants were motivated by his First Amendment activity").

### 3. Blue Note fails to state a due process claim.

To plead a procedural due process claim, the plaintiff must allege a deprivation of a protected interest and insufficient procedural protections surrounding that deprivation. *Tucker v. City of Chicago*, 907 F.3d 487, 491 (7th Cir. 2018). Procedural due process claims may be based on an injury deriving from either "established state procedures" or "random, unauthorized acts" by state actors. *Leavell v. Ill. Dep't of Nat. Res.*, 600 F.3d 798, 804 (7th Cir. 2010). Blue Note fails to plead either type of procedural injury.

As to the first category, Blue Note fails to allege facts showing any deficiency in established City procedures. The only procedural deficiencies that Blue Note alleges relate to the probable cause hearing for the summary closure. Blue Note complains that it could not cross-examine witnesses about the Vice Report and had to face a "trial on paper," Dkt. 24, ¶ 359; "hearsay accusatory statements" were admitted into evidence, *id.* ¶ 361; and the Vice Report was

admitted over its objection, *id.* ¶¶ 168, 251.[3] Assuming that there is a protected interest in a Late-Hour license and that the upholding of the summary closure order caused a deprivation of that interest (albeit temporary), none of these alleged deficiencies supports a due process claim.

The amount of process due depends on the nature of the private interest at stake, the risk of decisional error, and the government's interest. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Under that framework, a hearing held on written submissions, including the Vice Report, to determine whether a "public safety threat" (*i.e.*, a shooting by a patron) occurred, *see* MCC § 4-4-285(a), did not violate Blue Note's right to due process. "There is no law that mandates that [administrative] hearings are bound by formal rules of evidence," and "the ability to subpoena witnesses is not an absolute right." *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 717 (7th Cir. 2000). And "the due process clause allows administrative decisions to be made on paper . . . without regard to the hearsay rule." *Idris v. City of Chicago*, 552 F.3d 564, 568 (7th Cir. 2009) (citing *Richardson v. Perales*, 402 U.S. 389 (1971)). These long-settled standards are reflected in the Illinois Municipal Code, 65 ILCS 5/1-2.1-6, and MCC § 2-14-076(h). Blue Note's procedural due process claim based on the procedures used at the probable cause hearing fails accordingly.

Moreover, Blue Note does not allege that the hearing procedures heightened the risk of decisional error or prevented it from presenting a defense to CPD's determination that a patron of The Point fired 11 rounds at the bar, causing a public safety threat. Indeed, Blue Note does not

[3] Blue Note raises several perceived deficiencies that do not relate in any way to the procedures surrounding the summary closure order, including complaints about the Commissioner's ultimate "finding," Dkt. 24, ¶ 360, "[o]rchestrating a plan" to either revoke or modify the Late-Hour license, *id.* ¶ 362, using DOB's emergency closure order to keep The Point closed longer than six months, *id.* ¶ 363, being deprived of a "means to satisfy" terms of a nuisance abatement plan, *id.* ¶ 364, and "targeted actions" to revoke or modify the Late-Hour license, *id.* ¶ 365. These allegations are irrelevant to any colorable procedural due process claim.

contest that the incident happened, effectively conceding that it has no defense to the summary closure.[4] To the extent that Blue Note disputes the Commissioner's ultimate "finding" that a public safety threat existed, Dkt. 24, ¶ 360, that is not a challenge to procedure. Due process does not mandate a successful — or even correct — outcome. *E.g.*, *Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc*., 795 F.2d 1344, 1350 (7th Cir. 1986); *Affordable Recovery Housing v. City of Blue Island*, No. 12 C 4241, 2016 WL 5171765, *14 (N.D. Ill. Sept. 21, 2016). And Blue Note is seeking state-court review of the decision, in any event, which confirms that it has process available to protect its rights.

As to the latter category of procedural due process claims based on a random, unauthorized act, "the federal due-process guarantee requires only that the state provide an adequate postdeprivation remedy," *Vargas v. Cook Cty. Sheriff's Merit Bd.*, 952 F.3d 871, 875 (7th Cir. 2020). Blue Note alleges that the City's conduct was improper in several ways unrelated to the probable cause hearing procedures. It claims that City officials "[o]rchestrat[ed] a plan" and took "targeted actions . . . to revoke or modify its Late-Hour license." *Id.* ¶¶ 362, 365. But as explained above, the MLDC proceeding is subject to multiple levels of review. Providing Blue Note with adequate postdeprivation remedies even were anything about that proceeding improper.[5]

---

[4] Blue Note appears to be challenging the processes employed during the probable cause hearing phase, not the Summary Closure Ordinance itself. A challenge to the Ordinance would fail, too: the Ordinance is a public safety measure for emergencies that provides immediate post-deprivation process and therefore satisfies constitutional scrutiny. *See, e.g.*, *Contreras v. City of Chicago*, 920 F. Supp. 1370, 1393 (N.D. Ill. 1996) (where public safety is involved, "State may act first and ask questions later without offending the Due Process Clause"); *see also Holstein*, 29 F.3d at 1148 (existence of post-deprivation review through common law writ of certiorari "[c]learly . . . comport[s] with procedural due process").

[5] Despite Blue Note's characterization of the MLDC proceeding as a "Revocation Hearing," those proceedings do not necessarily result in license revocation. If the licensee is held responsible, the Hearing Officer may order a lesser punishment than deprivation of the license — all the more reason that this case is premature because those proceedings are ongoing. *See* 235 ILCS 5/7-5.

Blue Note also contends that the City deprived it of a "means to satisfy" terms of a nuisance abatement plan. *Id.* ¶ 364. But Blue Note did not request a nuisance abatement hearing under MCC § 4-4-285(f). No procedural due process claim lies where a party did not avail itself of available procedures. *Leavell*, 600 F.3d at 805. Blue Note also claims its rights were violated because DOB's emergency closure order kept The Point closed longer than six months, *id.* ¶ 363, but as explained above, it does not allege that the Code violations were unfounded or dispute that unsafe condition of the premises. These allegations therefore fail to support any colorable procedural due process claim.

## III. This Court Should Decline To Exercise Supplemental Jurisdiction Over Blue Note's State-Law Claims Or Dismiss Them On The Merits.

The supplemental jurisdiction statute provides that the district court "may decline to exercise supplemental jurisdiction" over state law claims if the court has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 489 (7th Cir. 2012). Although this decision is discretionary, the usual practice is to relinquish federal jurisdiction over supplemental state-law claims if the federal claims are dismissed. *E.g.*, *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010). Thus, after dismissing all federal claims based on the reasons outlined above, this Court can relinquish jurisdiction over the state-law claims by dismissing them without prejudice. If, however, this Court exercises supplemental jurisdiction over the remaining state-law claims, it should dismiss them for failure to state a claim. Blue Note's claims for damages are also barred by the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/1-101, *et seq.* (the "Tort Immunity Act").

### A. Blue Note fails to state an abuse of process claim.

Blue Note fails to allege an abuse of process claim. The tort of abuse of process is not favored under Illinois law, and so courts strictly construe its elements. *See Neurosurgery & Spine Surgery, S.C. v. Goldman*, 790 N.E.2d 925, 929–30 (Ill. App. Ct. 2003). "Abuse of process is the misuse of legal process to accomplish some purpose outside the scope of the legal process itself." *Selby v. O'Dea*, 156 N.E.3d 1212, 1227 (Ill. App. Ct. 2020). To state a claim for abuse of process, a plaintiff must plead "(1) an improper motive and (2) some act in the use of legal process that is improper in the regular prosecution of proceedings." *Id.*

Blue Note fails to plead either element. The improper-motive element requires that the plaintiff "plead facts showing that the defendant instituted proceedings against the plaintiff for a purpose such as extortion, intimidation, or embarrassment." *Bozek v. Bank of Am., N.A.*, 191 N.E.3d 709, 725–26 (Ill. App. Ct. 2021) (internal quotation omitted). Here, Blue Note alleges no improper purpose. Rather, as explained above, it pleads legitimate bases for the summary closure, emergency closure, and MLDC proceedings.

The second element requires a showing "that the process was used to accomplish some result that is beyond the purview of the process." *Selby*, 156 N.E.3d at 1227. "When process is used only for its intended purpose, there has been no misapplication of process." *Neurosurgery & Spine Surgery*, 790 N.E.2d at 930. Here, no allegation suggests that the City sought any result not intended by the MCC, which specifically authorizes summary and emergency closures and license disciplinary hearings. Blue Note therefore fails to state a claim for abuse of process.

### B. Blue Note fails to state a conspiracy-to-violate-section-1983 claim.

Blue Note pleaded its conspiracy claim as a state-law claim, even though the conspiracy is "to violate 42 U.S.C. § 1983." Regardless, the elements of federal and state-law conspiracy claims are similar. Under Illinois law, "[t]he elements of civil conspiracy are (1) a combination

of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Dvorkin v. Soderquist*, 2022 WL 1127697, at *15 (Ill. App. Ct. 2022). To state a section 1983 conspiracy claim, a plaintiff must allege facts from which the court may reasonably infer that there was "(1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988). Blue Note's claim fails under either theory.

Because a conspiracy claim is derivative of the underlying substantive claims, it fails if the underlying claims fail. Moreover, Blue Note alleges no facts suggesting a conspiracy to cause a constitutional violation. Rather, the Amended Complaint alleges an implausible and puzzling agreement between the DOB Commissioner and Ms. Breidinger that the City would not enforce Building Code violations against the Arts Building if FIB did not remedy any Building Code violations until Blue Note's Late-Hour license was modified or revoked. Dkt. 24, ¶¶ 125, 127 (notwithstanding that, as Blue Note admits, DOB was unaware of some of the violations, like the presence of residential tenants, *see id.* ¶ 117). Despite this supposed agreement, DOB ultimately lifted the emergency closure order without Blue Note's Late-Hour license ever being modified or revoked. *Id.* ¶ 330. And, of course, DOB has no role in BACP's liquor license enforcement matters or CPD's summary closure orders. But regardless, these implausible and self-contradictory allegations do not describe an agreement to commit an underlying constitutional tort: Blue Note points to no alleged agreement to treat The Point differently than other similarly situated establishments for irrational reasons, retaliate against Mr. Lin for his media statements, or deprive Blue Note of any procedural protections surrounding its licenses.

### C. Blue Note fails to state a common-law fraud claim

The elements of common-law fraud are "(1) a false statement of material fact by the defendant, (2) who knew that the statement was false (3) and intended to induce the plaintiff to act in reliance upon the statement, (4) the plaintiff reasonably relied upon the truth of the statement, and (5) the plaintiff suffered damage as a result of action in reliance upon the statement." *Castlerigg Master Invs., Ltd. v. AbbVie, Inc.*, 191 N.E.3d 121, 126 (Ill. App. Ct. 2021). Blue Note supplies no facts that plausibly support any element of fraud, let alone meet the heightened pleading standards demanded by Rule 9(b) that apply to any claim premised on fraud. *See Champion Parts, Inc. v. Oppenheimer & Co.*, 878 F.2d 1003, 1008 (7th Cir. 1989). This claim must be dismissed.

### D. Blue Note fails to state a conspiracy to violate the Illinois Consumer Fraud and Deceptive Practices Act

To state a claim under the Illinois Consumer Fraud and Deceptive Practices Act ("Fraud Act"), 815 ILCS 505/1 *et seq.*, a plaintiff must show "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *Ambrosius v. Chicago Athletic Clubs, LLC*, 203 N.E.3d 239, 249 (Ill. App. Ct. 2021). This claim is also subject to Rule 9(b)'s heightened pleading standards. *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). Like the common-law fraud claim, the Amended Complaint comes nowhere close to alleging any element of this claim, let alone with the required heightened specificity. Blue Note's description of the Fraud Act violation offers no clarification, claiming only that "FIB and BRG committed the unfair and/or deceptive acts complained of throughout." Dkt. 24, ¶ 387. But, as explained above, there is no alleged fraud. Critical to the claim for conspiracy to violate the

Fraud Act, there are no allegations of an agreement between City officials and any defendants to commit an unfair or deceptive act. This claim must also be dismissed.

### E. The Tort Immunity Act bars Blue Note's state-law claims for damages.

Blue Note's state-law claims for damages are also barred under various provisions of the Tort Immunity Act. Section 2-207 provides that a "public employee is not liable for an injury caused by his failure to make an inspection, or by reason of making an inadequate or negligent inspection, of any property . . . for the purpose of determining whether the property complies with or violates any enactment or contains or constitutes a hazard to health or safety." 745 ILCS 10/2-207. Section 2-205 of the Act applies this same immunity to the City. *Id.* § 10/2-105. Here, Blue Note's claims all stem from the allegations that The Point was inspected and found to pose a threat to public safety by CPD and unsafe by DOB, thus falling under the immunity afforded by the Act. *See Hess v. Flores*, 948 N.E.2d 1078, 1092–94 (Ill. App. Ct. 2011) (holding that issuing stop work orders or ordering specific remedial measures, based on the findings of the inspection, are part of the inspection process and fall within the scope of the immunity), *abrogated on other grounds as recognized in Glover v. City of Chicago*, 2023 WL 1872744, at *6 (Ill. App. Ct. 2023).

City employees and the City are also immunized under sections 2-202 and 2-105 of the Tort Immunity Act. Section 2-202 of the Act provides that a governmental employee is "not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." *Id.* § 10/2-202. The Amended Complaint alleges that City employees enforced City ordinances to abate public safety threats and unsafe building conditions, but not that they engaged in willful and wanton conduct in doing so. Section

2-201 immunizes these employees for those enforcement actions, and section 2-105 therefore immunizes the City as well.

Lastly, under section 2-201, "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201. The same immunity applies to the City under section 2-105. *Id.* § 10/2-105. While the actions in this case did not represent the determination of policy for the reasons described in section II.A. above, the summary closure order, emergency closure order, and the initiation of license disciplinary proceedings all involved the exercise of discretion on the part of City officials in executing those City policies. The Act thus immunizes the City.

**IV. Blue Note's Requests For Injunctive Relief Must Be Denied**

Blue Note's request to "enjoin[] the City from engaging in the retaliatory practices complained of herein" is fatally vague. Dkt. 24 at 66, ¶ C. A plaintiff must specify the nature of the purported First Amendment activities for which it seeks future protection. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984) (emphasizing the "obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies"). Blue Note's request for injunctive relief does not even attempt to do this. Nor could the Court describe in detail "the act or acts restrained or required," as Rule 65(d)(1)(C) requires. *See Schmidt v. Lessard*, 414 U.S. 473, 474–75 (1974) (rejecting injunction request to bar "further enforcement of" state law as impermissibly vague under Rule 65).

**CONCLUSION**

This Court should abstain from hearing Blue Note's claims against the City and dismiss them without prejudice. Alternatively, it should dismiss them with prejudice for failure to state a claim.

Date: June 16, 2023

Respectfully submitted,

MARY B. RICHARDSON-LOWRY,
Acting Corporation Counsel for
the City of Chicago

By: *s/ Aaron T. Dozeman*
Assistant Corporation Counsel

BRADLEY G. WILSON (IL 6301195)
AARON T. DOZEMAN (IL 6308909)
City of Chicago, Department of Law
Constitutional and Commercial
Litigation Division
2 North Lasalle Street, Suite 520
Chicago, Illinois 60602
(312) 744-7686 / (312) 744-9018
Bradley.Wilson@cityofchicago.org
Aaron.Dozeman1@cityofchicago.org

*Attorneys for the City*