**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE BLUE NOTE, INC. d/b/a The Point, an Illinois corporation,<br><br>Plaintiff,<br><br>vs.<br><br>THE CITY OF CHICAGO, a Municipal Corporation, FLAT IRON BUILDING, LLC, an Illinois limited liability Company; BERGER REALTYGROUP, LLC, an Illinois limited liability company; ERICA BERGER, an individual; RACHEL BREIDINGER, an individual; ZVONKO OLEAR, an individual; ARTHUR KAWN, an individual; BAUM REALTY GROUP, LLC, an Illinois limited liability company; PATRICK FORKIN, an individual; and SAVAS ER an individual.<br><br>Defendants. | ) | Case No.1:23-cv-00648 |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT FLAT IRON BUILDING LLC'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

## INTRODUCTION

Plaintiff, The Blue Note, Inc. d/b/a The Point ("Plaintiff") filed its First Amended Complaint (the "Complaint") alleging, among other things, that the City of Chicago (the "City") conspired with, among others, with Flat Iron Building, LLC ("FIB") and its agents Erica Berger ("Berger"), Rachel Breidinger ("Breidinger"), Zvonko Olear ("Olear"), and Arthur Kwan ("Kwan") (collectively the "BRG Defendants") to modify or revoke Plaintiff's Late Hour License, or obstruct Plaintiff's operation long enough so that Plaintiff would be forced to close its business. Specifically, Plaintiff alleges that the City agreed not to enforce the Arts Building Violations against FIB's *other* tenants also located within the Arts Building, so long as FIB agreed not to

repair the Arts Building Violations that were keeping Plaintiff closed, until the City either modified or revoked Plaintiff's Late Hour License, or Plaintiff was forced to shut down or was evicted. For the reasons argued below, FIB's Motion to Dismiss the Complaint (the "Motion") should be denied.

**Relevant Allegations**

Plaintiff leases a bar located within the Arts Building (*see* Complaint ¶ 21); Plaintiff has a "Late Hour Plan" liquor license ("Late Hour License") (*id*. ¶ 30); the Arts Building has over 20 commercial tenants with multiple addresses (*id*. at Exhibit 9); all addresses of the Arts Building are part of the same overall building structure (*id*. ¶¶ 104-105); the basement and structure is common to the Arts Building which runs the length of the Arts Building, and Plaintiff does not control or lease the basement (*id.* ¶ 105; ¶ 135); On February 6, 2022, Breidinger sent an email to Berger and Baum Realty Group, LLC's agents ("Baum") identifying that there were residential tenants at the Arts Building for which it was not zoned, and that they were concerned the sale of the Arts Building could be affected (*id*. ¶¶ 108-109; *see* Exhibit 10); Plaintiff's bar ("the Property"), was closed by CPD under the Summary Closure Ordinance on February 8, 2022 (*Id.* ¶ 100); the Property was ordered closed by order of DOB commissioner Matthew Beaudet on February 18, 2022 ("Beaudet") (the "Emergency Closure Order") (*id.* ¶¶ 111-113; *see* Exhibit 13); DOB found building violations in the Arts Building that were exclusive to the basement, exclusive to the structural integrity of the Arts Building, or exclusive to the "Fire Protection" for the Arts Building (the "Arts Building Violations") (*see* Exhibit 14); the City intentionally combined building violations on the Emergency Closure Order for the Property with building violations for the Arts Building (*id.* ¶ 124; *see* Exhibit 14); On February 28, 2022, FIB learned that it could not bring the Arts Building up to the 2022 building code, and that it "[w]ill have to find a middle

ground on this" (*id*. ¶¶ 118-119; Exhibit 12); On March 2, 2022, Breidinger and Beaudet participated in a teleconference to discuss the Emergency Closure Order, and Plaintiff alleges Beaudet and Breidinger discussed that if FIB agreed not to repair the Arts Building Violations that were keeping Plaintiff closed, the City agreed not to enforce the Arts Building Violations against the other tenants of the Arts Building, or otherwise affect the sale of the Arts Building (*id*. ¶¶ 121-125; Exhibit 13); on March 2, 2022 FIB emailed Plaintiff not to pull any permits (*id*. ¶¶ 138-139; Exhibit 16. Exhibit 17); on March, 2, 2022 Breidinger stated to Berger and Olear:

> The problem is the Point Bar, regardless of how unfair it is. We will get no leniency, and John's friend who does consulting for inspections has said the city can drag this out for years, if they want to.
>
> My inclination is to terminate the tenancy to show alignment for what the city wants so we can get on better footing in regards to correcting the violations. Again, I know this isn't fair but my job is to protect the owner's interest!
>
> (*Id*. ¶ 140; Exhibit 17)

March 2, 2022, Olear responded to Breidinger and Berger:

> I think you are on the right track. It is obvious that the city is not happy with the bar, got fed up with it, and decided to shut it down. Do we want to stand by Jun and support him in his fight with the city hall? No. Way.
>
> The question is one of terminating his lease in a most legal manner. I believe that he is creating a nuisance to the building and in doing so breaking the terms of the lease. However, this is something that an attorney has to determine and carry out.
>
> If Erica is comfortable losing this tenant, I would say this is our course of action: get Jun out, apply for all necessary permits, make the required repairs, and have the city re-inspect the premises and the building.
>
> (*Id*. ¶ 141; Exhibit 17).

"Upon information and belief, the Arts Building was never subject to compliance monitoring as the case has not been sent to the Circuit Court of Cook County" (*id.* ¶ 128); Plaintiff was the only tenant of the Arts Building closed by DOB at any relevant time (*id.* ¶ 135); the most

significant violations were *not* at or on the Property (*id.* ¶¶ 132-134; *see* Exhibit 14); FIB identified on March 8, 2022 that, "[t]he [C]ity won't let [Plaintiff] open until all the violations are fixed, for the entire building" (*id.* ¶ 153; *see* Exhibit 19); Plaintiff alleges all parties came to an agreement between March 2, 2022 and March 8, 2022 (*Id.* ¶ 127); on March 8, 2022 FIB told Plaintiff to pull permits for the Property but not the Arts Building (*id.* ¶ 157; Exhibit 20); "The Emergency Closure Notice purposefully combined Arts Building Violations [between] the Arts Building and the Property so that it would be impossible for Plaintiff to remedy 'all the violations... for the entire building' without assistance from the owner of the Arts Building" (*id.* ¶ 155); Berger stated that she had spoken with a number of "politicians and powerful people" and that the City will "never let [Plaintiff] open again" (*id.* ¶ 167); as part of its agreement with the City, FIB concocted artificial or fraudulent reasons to terminate Plaintiff's lease (*id.* ¶¶ 160-176; *see* Exhibit 18); one method was FIB would allow Plaintiff's deferred rent to reach an amount FIB did not believe Plaintiff could pay, serve Plaintiff a 5-day notice based on that rent, and then move to evict Plaintiff for which Plaintiff would not have a defense (*id.* ¶¶ 170-174; Exhibit 21); a second method was, despite "[t]he lease [being] a mess in regards to what this space was actually leased for," FIB would evict Plaintiff for operating a bar instead of an "art studio/gallery" (*id.*); Kwan acknowledged responded to Breidinger that "we should take the route of evicting him based on the back rent." (i*d*.); on March 30, 2022, Berger responded that evicting Plaintiff based on rent "seems weak" and wanted to look at other options (*id.*); Olear responded stating "[o]ne way or the other, this is likely to end up in court. We may be better off limiting our conversation here" (*id*.); on April 15, 2022, Breidinger stated to Plaintiff that it had obtained all necessary permits and "work will begin next week" (*id.* ¶ 179); on May 10, 2022, Breidinger and Berger discussed "PVC piping needs to be replaced throughout basically the entire building and will be massively invasive

to tenants" (*id*. ¶ 185; Exhibit 22); on June 7, 2022 Breidinger emailed Berger and Olear stating they have already agreed not to move forward on the "PVC piping" and that the "fire pump" had still not been repaired even though it was "directly tied to life safety" (*id*. ¶ 190; Exhibit 25); on June 8, 2022 FIB stated it had pulled all necessary work permits for the Arts Building, that Plaintiff did not have an agreement for rent deferral, and that Plaintiff was in breach of its Lease (*Id*. ¶ 193; Exhibit 26); on June 9, 2022 Breidinger acknowledged the potential loss of life if the "fire pump" was not repaired (*id*. ¶ 195; Exhibit 25); Berger, Breidinger, and Forking discussed that not fixing the "PVC piping" could somehow put plaintiff in breach of its Lease (*Id*. ¶ 198; Exhibit 27); on June 17, 2022 Forking relayed to Berger and Breidinger that the buyer of the Arts Building did not want FIB to repair the Art Building Violations and that FIB should evict Plaintiff (*Id*. ¶ 203; Exhibit 28); Berger preferred eviction (*id*. ¶ 204-208; Exhibit 25); on September 13, 2022 FIB demanded $242,428.80 in back rent from Plaintiff in furtherance of its agreement with the City to terminate Plaintiff's lease (*id*. ¶¶ 212-214); on October 17, 2022 Breidinger identified that it had only completed the electrical and plumbing related repairs (*id*. ¶ 219; Exhibit 30, Exhibit 31); no Defendant had completed the Arts Building Violations that were the subject of the Emergency Closure Order as of March, 13, 2023 (*id.* ¶¶ 326-329); the City inspectors remarked that DOB commissioner Beaudet previously overrode his decision that the "sprinklers" were adequate when issuing the Emergency Closure Order (*id.* ¶ 327); on March 16, 2023, the City stated that, "…DOB inspectors conducted a re-inspection at The Point /1565 N Milwaukee Avenue[.] The Dangerous Fire Safety, Electrical, Plumbing, and Structural Issues have been corrected in the area approved for re-occupancy. The Dangerous Violations that warranted the Commissioner Closure on February 18th, 2022 have been abated" (*id.* ¶ 330; *see* Exhibit 43); the City stated work was completed under two electrical permits and one [plumbing permit] *(id.);* and no Defendant fixed

or pulled permits for the fire, structural, or "PVC piping" issues cited in the Arts Building Violations (*Id.* ¶ 332).

## ARGUMENT

### I. Plaintiff has Properly Alleged Count I, Count II, and Count III of the Complaint.

Plaintiff reincorporates and restates its arguments made in opposition to the City's Motion to Dismiss Plaintiff's Count I, Count II, and Count III.

### II. Plaintiff has Stated a Cause of Action for Conspiracy.

FIB argues, generally, that Plaintiff has not stated a cause of action for conspiracy since "the allegations of the Complaint remain clear that the alleged violations related to "the City's plan…" to eliminate Late-Hour Licenses…", that the BRG Defendants did not willfully participate in "the City's plan", and since City departments are not under FIB's control.

FIB's first argument that it cannot be held liable for conspiracy since the alleged motivation was "the City's plan" would render the entire notion of a conspiracy completely meaningless. Regardless of who comes up with an initial plan to conspire, co-conspirators can join a conspiracy *at any time* and are, most times, unable to escape liability for their actions at all.

Furthermore, Plaintiff has alleged the willful participation of BRG Defendants. Plaintiff has alleged that the BRG Defendants: (1) agreed with the City not to repair the most serious Arts Building Violations; (2) did not make necessary repairs even though the BRG Defendants knew that the City required those repairs, and the failure to make the repairs was keeping the Property closed; (3) misrepresented to Plaintiff that FIB was making the repairs; (4) contrived multiple reasons to terminate Plaintiff's lease and evict Plaintiff, the most brazen being that FIB allowed Plaintiff's rent to reach an amount the BRG Defendants did not believe Plaintiff would be able to pay, and then demanded that amount be paid, in full and immediately, since Plaintiff would have

no defense; and (5) demanded and accepted Plaintiff's rental payment even though FIB's willful inaction was keeping Plaintiff closed.

Plaintiff has alleged willful acts committed by, and coordinated between, the BRG Defendants in furtherance of its agreement with the City. Plaintiff has also alleged that the City did not take any action to enforce FIB's compliance under the Emergency Closure Order. Plaintiff has also alleged that required repairs for the Arts Building Violations were not being enforced against FIB in building court, nor was FIB subject to any City oversight or deadlines; and neither FIB nor the City argue otherwise. Indeed, the communications plead in the Complaint reveal that FIB was not compelled by the City to pull any permits or complete any repairs, and were seemingly free to sit idly by without DOB intervention.

The City's alleged agreement with FIB not to enforce the Arts Building Violations is evidenced by the fact the City allowed the Property to re-open months later, and despite the fact that few, if any, repairs had apparently been made, stating "[t]he Dangerous Fire Safety, Electrical, Plumbing, and Structural Issues have been corrected in the area approved for re-occupancy. The Dangerous Violations that warranted the Commissioner Closure on February 18th[,] 2022 have been abated." (*See* Exhibit 43). In support of its assessment, the City cited permits:

EPP Permit #100966859 issued by DOB on 04/13/2022 ("Permit 1");

Electrical Permit #100965788 issued by DOB on 04/06/2022 ("Permit 2");

Electrical Permit #100965772 issued by DOB on 4/6/2022 (Permit 3)."

(collectively the "Permits") (*Id.*)

As it is a matter of public record, Plaintiff asks the Court to take judicial notice of each of the above Permits, the descriptions of which are accessible through the City website. Permit 1 is described for the purpose of:

REPAIRS, PLUMBING CODE VIOLATIONS PLUMBING ONLY (PROVIDE VACUUM BREAKER FOR SERVICE SINK, REPLACE PVC WASTE PIPING WITH CODE APPROVED MATERIAL, PROVIDE APPROVED BACKFLOW PROTECTION ON WATER SUPPLY TO ICE MACHINE-SODA MACHINE. PROVIDE APPROVED INDIRECT WASTE.

Permit 2 is described for the purpose of "ELECTRICAL REPAIRS."

Permit 3 is described for the purpose of:

ADDRESS ELECTRICAL VIOLATIONS WITHIN THE TENANT SPACE. ADDING ADDITIONAL RECEPTACLES, REMOVING EXTENSION CORDS, PROVIDE WORKING EGRESS LIGHTING AND EXIT SIGNS.

The Emergency Closure Order states that, "[a] report from a licensed structural engineer, along with the method for repair must be submitted to [DOB] for review and a permit, listing contractors, must be obtained before making any changes or repairs." (*See* Exhibit 14). No such showings were made. Therefore, the Permits could not have abated the "[t]he Dangerous Fire Safety, Electrical, Plumbing, and Structural Issues… that warranted the Commissioner Closure on February 18th[,] 2022…"

The City's decision to re-open the Property is, therefore, irrational and illogical based when considering the reasons for issuing the Emergency Closure Order in the first place. The City's decision shows there was no actual reason for the Property to be closed, and the only reasonable inference that can be drawn is that the City only allowed the Property to re-open once this lawsuit brought the City's conduct to light. Accordingly, FIB's second argument should also be rejected.

FIB's lastly argues that it does not control City departments. Plaintiff did not allege that it did; and, importantly, Plaintiff has not alleged that FIB and any City department played the same role in the alleged conspiracy. Plaintiff has alleged and shown that FIB expressly agreed not to repair the Arts Building Violations subject of the Emergency Closure Order, and has alleged that this was done by agreement with the City that the City would not enforce the Arts Building

Violations. Plaintiff has also shown that the City did not enforce the Arts Building Violations and that the City re-opened the Property notwithstanding the fact that the repairs had not been completed. Based on Plaintiff's theory of this case, it matters not whether FIB "control[led] City departments" for it to become a member of the conspiracy. FIB's third argument, therefore, should similarly be rejected.

## III. Plaintiff has Stated a Claim for Fraud.

In this respect, FIB makes a boilerplate, unsupported argument that "Plaintiff does not identify any specific materially false statement of FIB, that FIB knew or believed to be untrue, on which Plaintiff relied and suffered damages due to its reliance." FIB offers no analysis in support of that claim.

Plaintiff has alleged that Plaintiff and FIB executed the lease for the Property and that FIB agreed with Plaintiff to defer its rent until Plaintiff was allowed to re-open, but that this was a misstatement of material fact since FIB used this agreement to allow Plaintiff's rent to reach an amount which FIB deemed Plaintiff could not pay. FIB then demanded the rent, which Plaintiff paid. FIB relied on this statement since it continued to make material investments into the Property in the form of upgrades.

FIB also stated to Plaintiff on numerous occasions that it was repairing the Arts Building Violations when the BRG Defendants had in fact agreed not to make those repairs. No to mention, Plaintiff was also prevented from making the repairs by the BRG Defendants. Plaintiff relied on these misstatements since it would have otherwise taken some action sooner to compel FIB to act. Plaintiff, however, did not become aware of the BRG Defendants' misrepresentations until much later.

Plaintiff has alleged a cause of action for Fraud and FIB's Motion should be denied.

## IV. Plaintiff has Stated a Claim for Violation of 815 ILCS 505/1

Plaintiff alleges that: (1) FIB was Plaintiff's commercial landlord by way of written lease during the relevant time period; (2) Plaintiff was closed under the Emergency Closure Notice; (3) the Emergency Closure Notice included building violations which only FIB had the ability and authority to fix; (4) the BRG Defendants prevented Plaintiff from repairing the Arts Building Violations; (5) Breidinger told Plaintiff that the BRG Defendants were taking action to repair the Arts Building Violations when the BRG Defendants had already internally agreed they would not make repairs to address those violations; (6) FIB told Plaintiff that it could defer its rent while it was closed, which was not true since FIB later used this agreement to demand an amount of rent it believed Plaintiff could not pay and for which Plaintiff would have no defense; and (7) FIB internally acknowledged that all tenants of the Arts Building were at risk of death or injury, yet chose not to make those repairs; and (8) collected rent for this entire time period.

Remarkably, notwithstanding substantial allegations addressing same, FIB argues that Plaintiff "does not describe how FIB's alleged actions were contrary to public policy," and that Plaintiff "fails to allege that FIB's actions were 'immoral, unethical, oppressive, or unscrupulous.'" Unsurprisingly, FIB offers no analysis to support those claims. The Complaint alleges that FIB and its agents lied to Plaintiff about its agreement to defer rent obligations and the prospect of completing repairs to address the Arts Building Violations so that FIB could contrive a reason to terminate the remainder of Plaintiff's 20-year lease, either to show alignment with the City, or so as not to disrupt the sale of the Arts Building, or both. FIB collected rent from Plaintiff during a time period when it was purposefully essentially forcing Plaintiff to remain closed based on repairs it internally agreed not to complete while at the same time telling Plaintiff that it would make the repairs and instructing Plaintiff not to pull any permits toward those repairs.

Plaintiff has a Late Hour License that it can only use for the Property, a lease that may not be unilaterally terminated, and Plaintiff has made significant investments into the Property. These circumstances lead to the inference, if not demonstrate, that there is and was no substitute space that would be available to Plaintiff, so Plaintiff would have no choice to submit to its commercial landlord.

FIB likewise provides no analysis to support its argument that Plaintiff has not satisfied the consumer nexus standard. FIB is a commercial landlord. Any commercial landlord who goes to the lengths alleged by the Plaintiff to obstruct and lie to a tenant with the goal of terminating the remainder of that tenants lease while collecting rent should be condemned, and its actions deemed a violation of public policy. There are no possible countervailing benefits to consumers based on FIB's alleged conduct, and there is no action Plaintiff could have taken to avoid FIB's conduct.

FIB's conduct as alleged is immoral, unethical, and deceptive, and FIB does not more than cite to case law stating general principles (which have no application here) to suggest otherwise. FIB's Motion relative to the consumer fraud count should be denied.

**CONCLUSION**

For the foregoing reasons, FIB's Motion should be denied in its entirety.

July 14, 2023

Respectfully Submitted,

The Blue Note, Inc.

*s/Daniel T. Fahner*
One of its Attorneys

Daniel T. Fahner (daniel.fahner@rkfglobal.com)
Alex Kosyla (alex.kosyla@rkfglobal.com)
RKF Global PLLC
555 Skokie Blvd, Suite 450
Northbrook, Illinois 60062
Tel: 312-888-2000