**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE BLUE NOTE, INC. d/b/a The Point, an Illinois corporation,<br><br>Plaintiff,<br><br>vs.<br><br>THE CITY OF CHICAGO, a Municipal Corporation, FLAT IRON BUILDING, LLC, an Illinois limited liability Company; BERGER REALTYGROUP, LLC, an Illinois limited liability company; ERICA BERGER, an individual; RACHEL BREIDINGER, an individual; ZVONKO OLEAR, an individual; ARTHUR KAWN, an individual; BAUM REALTY GROUP, LLC, an Illinois limited liability company; PATRICK FORKIN, an individual; and SAVAS ER an individual.<br><br>Defendants. | ) | Case No.1:23-cv-00648 |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT THE CITY OF CHICAGO'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS


**Page(s)**

INTRODUCTION ....................................................................................................4

Relevant Allegations ....................................................................................4

ARGUMENT ........................................................................................................8

I. The Court Should Not Abstain, Nor Should the Case Be Stayed ....................8

II. The Complaint Should Not Be Dismissed Under Monell ..............................11

a. Monell ....................................................................................................11

b. Equal Protection ......................................................................................14

c. Retaliation ..............................................................................................19

d. Due Process ............................................................................................20

III. Plaintiff has Stated an Abuse of Process Claim ..........................................22

IV. Plaintiff Stated a Conspiracy Claim ..............................................................22

V. Plaintiff Has Stated a Fraud Claim ................................................................24

VI. Plaintiff Has Alleged a Violation of 815 ILCS 505/1 ....................................24

VII. The City Is Not Immune ..............................................................................26

CONCLUSION ....................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Byrne v. Stern*, 103 Ill.App.3d 601 (1st Dist. 1981) ....................17

*Calusinski v. Kurger*, 24 F.3d 931 (7th Cir. 1994) ....................11

*Hanson v. Illinois Liquor Control Comm'n*, 201 Ill.App.3d 974 (2nd Dist. 1990) ....................17

*Jacquelyn's Lounge, Inc. v. License Appeal Comm'n*, 277 Ill.App.3d 959 (1st Dist. 1996)....................17

*Powe v. City of Chicago*, 664 F.2d 639 (7th Cir 1981) ....................11

*Soldano v. Illinois Liquor Control Comm'n*, 131 Ill.App.3d 10 (1st Dist. 1985) ....................17

*Swanson v. City of Chetek*, 719 F.3d 780 (7th Cir. 2013)....................14

*Turpin v. Mailet*, 619 F.2d 196 (2d Cir. 1980) ....................11

## Rules

Federal Rule of Civil Procedure 8(a)(2) ....................4

Federal Rule of Civil Procedure 9 ....................4

## Secondary Sources

https://webapps1.chicago.gov/buildingpermit/search/initializeapplication.do....................16

## INTRODUCTION

Plaintiff, The Blue Note, Inc. d/b/a The Point ("Plaintiff") filed its First Amended Complaint (the "Complaint") alleging, among other things, that the City of Chicago (the "City") conspired with, among others, Flat Iron Building, LLC ("FIB") and its agents to modify or revoke Plaintiff's Late Hour License, or obstruct Plaintiff's operation long enough so that Plaintiff would be forced to close its business. Specifically, Plaintiff alleges that the City agreed not to enforce the Arts Building Violations against FIB's *other* tenants also located within the Arts Building, so long as FIB agreed not to repair the Arts Building Violations that were keeping Plaintiff closed, until the City either modified or revoked Plaintiff's Late Hour License, or Plaintiff was shut down or evicted. Either way, the City would have achieved its goal.

The City's Motion to Dismiss the Complaint (the "Motion") argues simultaneously that the Complaint is the "opposite of the 'short and plain statement of the claim' required by Federal Rule of Civil Procedure 8(a)(2)" and that it does not comply with the pleading requirements of Federal Rule of Civil Procedure 9. The City can't have it both ways.

The City also argues, generally, that the City was at all times exercising proper authority that was: (1) not punitive; (2) did not target Plaintiff based on its Late-Hour License; and (3) was based on legitimate safety concerns, based on both, or either, the February 6, 2022 shooting or the February 18, 2022 closure of the Flat Iron Arts Building (the "Arts Building") by the City Department of Buildings ("DOB"). As alleged in the Complaint, and when interpreted in the light most favorable to the Plaintiff, Plaintiff's Complaint overcomes those arguments.

### Relevant Allegations

Plaintiff leases a bar located within the Arts Building (*see* Complaint ¶ 21); Plaintiff has a "Late Hour Plan" liquor license ("Late Hour License") (*id.* ¶ 30); the City was motivated to

eliminate Late Hour Licenses (*id.* ¶¶ 58-65); at the discretion of the Chicago Police Department ("CPD"), a business may be closed under the Summary Closure Ordinance but may re-open if a license holder agrees to an approved "plan of action" (a "Nuisance Abetment Plan") (*id.* ¶¶ 67-73); the City targeted Plaintiff because it was motivated to, and had the opportunity to, modify or revoke Plaintiff's Late Hour License and retaliated against Plaintiff when Plaintiff refused to agree to a Nuisance Abatement Plan (*id.* ¶¶ 81-83); Plaintiff's bar ("the Property"), was closed by CPD under the Summary Closure Ordinance on February 8, 2022 (*id.* ¶ 100); the basement and structure is common to the Arts Building which runs the length of the Arts Building, and Plaintiff does not control or lease the basement (*id.* ¶ 105; ¶ 135); Plaintiff agreed to allow CPD to conduct a security walkthrough of the Property, however CPD also brought inspectors from DOB who also inspected the basement and structural integrity of the Arts Building (*id.* ¶¶ 111-113; *see* Exhibit 13 (the "Emergency Closure Order")); DOB found building violations in the Arts Building that were exclusive to the basement, exclusive to the structural integrity of the Arts Building, or exclusive to the "Fire Protection" for the Arts Building (the "Arts Building Violations") (*see* Exhibit 14); Plaintiff alleges that DOB failed to cite the Arts Building for having residential tenants, *not* that DOB was unaware of the residential tenants (*id.* ¶¶ 116-117); the City combined building violations for the Property with building violations for the Arts Building to prevent Plaintiff from completing the repairs and so that it could induce FIB not to complete the repairs either (*id.* ¶ 124; *see* Exhibit 14); FIB knew it could not repair the Arts Building Violations and agreed not to complete the Arts Building Violations, and the City agreed not to enforce the Arts Building Violations on the *other tenants* of the Arts Building (i.e., the smoke shop or the flower shop, among others) (*id.* ¶¶ 118-128; *see* Exhibit 12); "Upon information and belief, the Arts Building was never subject to compliance monitoring as the case has not been sent to the Circuit Court of Cook

County." (*id.* ¶ 128); the City sought to keep Plaintiff closed so long as and until Plaintiff agreed to restrict its hours under a Nuisance Abatement Plan (*id.* ¶ 125); Plaintiff was the only tenant of the Arts Building closed by DOB at any relevant time (*id.* ¶ 135); the most significant violations were *not* at or on the Property (*id.* ¶¶ 132-134; *see* Exhibit 14); Plaintiff was singled out in the Emergency Closure Notice as a means to keep Plaintiff closed longer than the maximum period identified in the Summary Closure Ordinance (*id.* ¶ 136); FIB identified on March 3, 2022 that, "…the problem with the city will remain so long as Point Bar tries to operate" (*id.* ¶ 146; *see* Exhibit 18); FIB identified on March 8, 2022 that, "[t]he [C]ity won't let [Plaintiff] open until all the violations are fixed, for the entire building" (*id.* ¶ 153; *see* Exhibit 19); "The Emergency Closure Notice purposefully combined Arts Building Violations [between] the Arts Building and the Property so that it would be impossible for Plaintiff to remedy 'all the violations... for the entire building' without assistance from the owner of the Arts Building" (*id.* ¶ 155); Erica Berger stated that she had spoken with a number of "politicians and powerful people" and that the City will "never let [Plaintiff] open again" (*id.* ¶ 167); as part of its agreement with the City, FIB concocted artificial reasons to terminate Plaintiff's lease (*id.* ¶¶ 160-176; *see* Exhibit 18); FIB was informed in May 2022 that it would not pass inspection if it did not complete "PVC piping." (*id.* ¶¶ 183-187; *see* Exhibit 22); FIB confirmed on June 7, 2022 that it had already agreed not to replace the "PVC piping" (*id.* ¶ 190; *see* Exhibit 25); FIB identified on June 7, 2022 that the "the electrical work for the fire pump… is directly tied to ***life safety*** and should be completed even if sale is imminent" (emphasis added) (*id.*); FIB misrepresented the work it was purportedly in the process of completing, or would complete, at the Arts Building (*id.* ¶¶ 191-193; *see* Exhibit 26); on June 9, 2022, FIB identified that "[t]he only repercussions would be if the fire pump failed during an emergency and lives are lost [or]… if the emergency lighting and exit signage fails during an

emergency and there are injuries or deaths as people try to get out" (*id.* ¶¶ 194-195; *see* Exhibit 25); the City would only agree to a Nuisance Abatement Plan with an indefinite hours restriction that extended into perpetuity at the discretion of CPD (*id.* ¶¶ 243-244; 253); the City's prosecution to revoke Plaintiff's Late Hour License: (1) was initiated after Plaintiff made relevant statements to the media but before Plaintiff initiated this lawsuit; (2) is based on the same evidence Plaintiff had largely, if not wholly, disproven at the Probable Cause hearing (the "Hearing"); and (3) was never amended to include mitigating or exculpatory evidence or the findings at the Hearing; the Final Order found that Plaintiff was essentially blameless for the February 6, 2022 shooting (*id.* ¶¶ 256-272; *see* Exhibit 36); Plaintiff learned on November 17, 2022 that Plaintiff's and Plaintiff's principle's licenses were put on hold based on the Emergency Closure Order and Case No. 22-LR-11 (the "LR Matter") (*id.* ¶¶ 292-294); only DOB could remove its hold on Plaintiff's licenses (*id.* ¶ 294); when Plaintiff's principle was finally issued his licenses, they did not contain the Mayor's signature and were invalid without it (*id.* ¶ 297); the City confirmed on September 22, 2022 that Plaintiff's only remaining issues were with DOB and the Arts Building Violations (*id.* ¶¶ 301-302); Plaintiff did not learn of the LR Matter until November 17, 2022 (*id.* ¶ 299) that the City was (and still is) moving to revoke Plaintiff's Late Hour License under based on the same facts that were litigated at the Hearing and which would have been known to the City on September 17, 2022 and at the Hearing (*id.* ¶ 294; ¶ 307); the City gave Plaintiff notice of the LR Matter one day after Plaintiff inquired about the case (*id.* ¶¶ 304-305); the Property was re-inspected on March 13, 2023 (*id.* ¶ 324); no Defendant had completed the Arts Building Violations that were the subject of the Emergency Closure Order as of March, 13, 2023 (*id.* ¶¶ 324-332); the City inspectors remarked that DOB commissioner Matthew Beaudet ("Beaudet") previously overrode his decision that the "sprinklers" were adequate when issuing the Emergency Closure Order (*id.* ¶ 327); on

March 16, 2023, the City stated that, "…DOB inspectors conducted a re-inspection at The Point /1565 N Milwaukee Avenue[.] The Dangerous Fire Safety, Electrical, Plumbing, and Structural Issues have been corrected in the area approved for re-occupancy. The Dangerous Violations that warranted the Commissioner Closure on February 18th, 2022 have been abated" (*id.* ¶ 330; *see* Exhibit 43); the City stated work was completed under two electrical permits and one [plumbing permit] *(id.);* no Defendant fixed or pulled permits for the fire, structural, or "PVC piping" issues cited in the Arts Building Violations (*id.* ¶ 332); the Motion states that "Blue Note challenges multiple City efforts to protect public safety after… ***dangerous building conditions*** were discovered during subsequent inspections of the premises" (emphasis added) (Motion p. 9); the Motion states that, "the emergency closure order was based on ***unsafe building conditions***…" (*id.* p. 13); the City communicated with FIB via telephone instead of email (*id.* ¶ 151); FIB's agents agreed not to exchange written communication about the alleged conspiracy since "[o]ne way or the other, this is likely to end up in court" (*id.* ¶¶ 174-178; *see* Exhibit 21); City officials informed other City officials "not get involved with [Plaintiff or Mr. Lin]" (*id.* ¶ 255); and, the City would not communicate with Plaintiff's principle over email (*id.* ¶ 298).

## ARGUMENT

### I. The Court Should Not Abstain, Nor Should the Case Be Stayed.

The City maintains that the existence of two pending cases dictates that the present matter be stayed or that this Court should otherwise abstain from taking any action until the other cases have been resolved. The City's analysis, however, is flawed. Allowing this matter to proceed would have no practical effect on either of the other pending cases.[1]

The Appeal concerns an appeal of the final order (the "Final Order") issued by a City

---

[1] The City directs the Court to Case No. 2022 CH 07916, pending in the Circuit Court of Cook County, Illinois (the "Appeal") and the LR Matter.

commissioner following the Hearing. (*See* Exhibit 14). As is the case for all appeals, the Appeal record is fixed and complete, and no new evidence may be introduced by either party. In the Appeal, Plaintiff is not challenging a single factual finding made by the Commissioner, but rather only the claimed unreachable legal conclusion based on those findings of fact (i.e., Plaintiff is asking that the order be reversed and decided as a matter of law; Plaintiff is not seeking a re-hearing or to have the record reopened). It further bears noting that the record on the Appeal is also rather limited relative to the allegations Plaintiff makes here. Neither does the Appeal concern or address any non-City Defendant, any ulterior motives by the City, or Plaintiff's theory of this case.

The issues present in the LR Matter are even more limited than those raised in the Appeal. The *only* charge lodged against Plaintiff in the LR Matter is that Plaintiff violated MCC § 4-60-130 (d) for allegedly having patrons in the bar after hours. The relevant facts of the LR Matter were fully discussed at the Hearing, and Plaintiff has filed a Motion for Summary Judgment based on the Hearing record. Even if the City later seeks to introduce new evidence in the LR Matter, that case will not involve, concern, or discuss any non-City Defendant, any ulterior motives by the City, or Plaintiff's theory of this case.

The City mistakenly suggests that the Final Order forms the sole basis for Plaintiff's claim of a Constitutional violation, and that Plaintiff's appeal of either the Final Order or a decision in the LR Matter to the License Appeal Commission would somehow redress Plaintiff's injuries. While the specter of an appeal remains a possibility, Plaintiff's theory *in this case* is not *per se* relevant in either other matter.

In any event, Plaintiff has alleged specific facts here that lead to the (only possible) inference that the City singled out the Plaintiff due to its Late Hour License, acted in bad faith,

with animus, and in retaliation for, among other things, Plaintiff refusing to sign an indefinite Nuisance Abatement Plan.

For example, Plaintiff has clearly alleged that: (1) the Arts Building Violations were "Structural," "Fire Protection," or "PVC piping" in nature, were issues that permeated throughout the entirety of the Arts Building, and to the extent that the Property caused an unsafe condition or was hazardous to the public, then the same would apply for the *entire* Arts Building and *all* of its tenants (*see* Exhibit 14); (2) Plaintiff has further alleged that it was the *only* tenant out of more than 20 other tenants to be closed by DOB based on the above issues (s*ee* Exhibit 9); (3) FIB acknowledged the repairs would be "massively invasive to tenants." (*id*. ¶ 185; Exhibit 22); (3) DOB's decision to close only Plaintiff was to extend the length of closure allowed under the Summary Closure Ordinance (*id*. ¶ 59); (4) the City used the Arts Building Violations to put Plaintiff's licenses on hold *and* compel Plaintiff to enter into an indefinite Nuisance Abatement Plan (*id*. ¶¶ 70-83); (5) that no Non-City Defendant remedied the Arts Building Violations (*id*. ¶¶ 324-332); (6) that City inspectors stated that no work had been done, or that no permit had been pulled for work that had been done illegally (*id*.); (7) that the City allowed Plaintiff to re-open *after* Plaintiff filed this lawsuit and for repairs Plaintiff alleges were not completed (*id*.); and (8) the City based its decision on the Permits (defined below) that had nothing to do with the "Structural," "Fire Protection," or "PVC piping" issues (*id*.). Plaintiff's allegations show that the Emergency Closure Order, as well as the decision to re-open the Property, were completely irrational and illogical. These actions would only make sense if the City had some other motivation for issuing the Emergency Closure Order (e.g., modifying Plaintiff's Late Hour License), or allowing the Property to re-open despite the Arts Building Violations not having been repaired (e.g., this lawsuit). Plaintiff has alleged exactly that.

The City's final argument on this point that "the emergency closure order was based on unsafe building conditions, the legitimacy of which Blue Note does not contest" completely misses the mark. Plaintiff has alleged it was the only tenant of the Arts Building closed for "Structural" and "Fire Protection" building violations, and that no work was done to remedy those violations, but yet that the City allowed Plaintiff to open after this lawsuit was filed notwithstanding the fact that the work had not been completed. The *only* inference that may be drawn from that is that the Emergency Closure Order was illegitimate, either as to the Arts Building Violations or as enforced solely against Plaintiff. The City is attempting to argue that a "Structural" building violation does not apply to the structure or foundation of the Arts Building. The only inference to be drawn there is that structure means structure, and that a "Structural" violation would present the same danger to the tenant at the Property as it would to any other tenant in the Arts Building. Indeed, the City's attempts to legitimize the Arts Building Violations only strengthens Plaintiff's position. Plaintiff, therefore, has satisfied the bad faith prosecution exception to *Younger*.

## II. The Complaint Should Not Be Dismissed Under Monell.

### a. Monell

The City argues that a "single incident" will not establish a custom or practice under Monell. (Motion p. 14., citing *Calusinski v. Kurger*, 24 F.3d 931, 936 (7th Cir. 1994)); in other words that, "*normally*, the mere allegation of a single act of unconstitutional conduct by a municipal employee will not support the inference that such conduct was pursuant to official policies." *Powe v. City of Chicago*, 664 F.2d 639, 650 (7th Cir 1981) (court citing to *Turpin v. Mailet*, 619, 619 F.2d 196 (2d Cir. 1980), noting that "the allegation of a pattern of conduct or a series of acts violative of constitutional rights will in many cases raise an inference of municipal policy" and concluding that plaintiff who had alleged that "he was the victim of a series of

unlawful arrests, each arrest based upon the same, allegedly invalid, warrant" was "sufficient to raise the inference that the municipal defendants are responsible for the challenged arrests.") (emphasis added.) What the City fails to acknowledge, however, is that "where the plaintiff alleges a pattern or a series of incidents of unconstitutional conduct, then the courts have found an allegation of policy sufficient to withstand a dismissal motion." *Id.* at 650-651. Here, Plaintiff has alleged a pattern and a series of incidents which it alleges amounts to unconstitutional conduct to effectively, or actually, take and interfere with Plaintiff's Late Hour License, lease, and enjoyment of the Property.

Here, Plaintiff alleges: (1) that Plaintiff was the only tenant closed by DOB for the Arts Building Violations, and that the City used either the Summery Closure Ordinance or DOB to keep Plaintiff closed until the City accomplished its goal of modifying Plaintiff's Late Hour License, or revoking Plaintiff's Late Hour License, or otherwise caused Plaintiff to be unable to operate (Complaint ¶¶ 58-65; 81-83; 124; 135-136; 243-244; 253; 301-302; 332); (2) the City retaliated against Plaintiff for refusing to sign a Nuisance Abatement Plan with an indefinite duration, that the City conspired with FIB to keep Plaintiff closed under the Emergency Closure Order, that the Emergency Closure Order was used solely to coerce Plaintiff into signing an indefinite Nuisance Abatement Plan (as evidenced by the allegations that the Property was allowed to re-open despite the Arts Building Violations being in substantially the same condition was it was when the Emergency Closure Order was issued), and that the City continues to prosecute allegations for which Plaintiff was already found *not* responsible (*id*. ¶¶ 58-65; 81-83; 124; 135-136; 243-244; 253; 301-302; 332; 118-179; 307); and (3) that Plaintiff was allowed to re-open by the City only after this lawsuit was filed, and despite the fact that no work had been done or permits had been pulled to repair the "Structural," "Fire Protection," or "PVC piping" issues (*id*. ¶¶ 324-332). These

allegations, among others, are a clear series of claims which, if proven, would amount to unconstitutional conduct and establish that the City intentionally interfered with Plaintiff's Late Hour License or its lease.

In its Motion, the City ignores the aforementioned alleged pattern, and misdirects the Court to *only* the apparent motive behind the pattern. (Motion at p. 14 "Here, in an effort to allege a City policy, [Plaintiff] alleges that the City has a 'three-fold' 'plan' to eliminate bars with Late-Hour Licenses,' which it applied against [Plaintiff].") The remainder of the discussion concerning the way in which a municipality's conduct may be manifested in the way of "a widespread, though unwritten, custom or practice" makes no mention of Plaintiff's specific allegations.[2]

The City's argument that there are still over one hundred (100) Late Hour License holders is of no moment. Whether other Late Hour License holders agreed to an indefinite Nuisance Abatement Plan thus satisfying the City's primary objective (modification), or whether any other Late Hour License holders were shut down for their refusal to sign an indefinite Nuisance Abatement Plan remain open questions. What Plaintiff has alleged is that the City's goal is to eliminate Late Hour Licenses, specifically Plaintiff's Late Hour License, not that the City has completed its goal. Plaintiff has further alleged that Plaintiff was singled out by the City based on its Late Hour License and treated differently because of it.

Plaintiff has alleged numerous factual instances of misconduct, coordination between multiple City branches, departments, and officials, who all worked in concert to keep Plaintiff closed for as long as possible for the sole purpose of modifying or revoking Plaintiff's Late Hour License, or otherwise causing Plaintiff to shut down entirely. Plaintiff has further alleged that, in

---

[2] Further, the mere idea that "[Plaintiff] claim[s] that The Point was 'singled out' by the City and treated differently than other Late-Hour licensees or businesses, (Motion ¶¶ 133, 136) does nothing to suggest – let alone establish – that Plaintiff has failed to establish *Monell* liability. One may be "singled out" and treated disparately without eliminating the notion that it may *establish* Monell liability in this context. The two are not mutually exclusive.

order for the City to keep Plaintiff closed longer than the six (6) months allowed under the Summary Closure Ordinance, and in furtherance of its objective, the City enforced the Arts Building Violations selectively against Plaintiff only, despite the fact that the Arts Building is a commercial building which houses over 20 tenants (some of whom improperly reside in the Arts Building), and that the structural integrity and fire safety issues raised the same safety concerns to every tenant or their guests at the Arts Building. The Motion's arguments that the Property was closed for legitimate public safety concerns completely ignores these allegations.

The City's bad faith is further shown through the logic of its decision to abruptly allow Plaintiff to re-open. As argued below, the City based its decision to lift the Emergency Closure Order on the Permits (defined below). From the myriad acts the City took to close Plaintiff in the first place to the City's similarly illogical reasons for allow Plaintiff to re-open, Plaintiff has alleged far more than a mere single instance.

**b. Equal Protection**

Plaintiff has made ample allegations to satisfy all elements of an equal protection claim. Plaintiff, for example, has alleged that it was treated differently, and that there was no rational basis for the City's conduct. Plaintiff has further alleged facts that would support an inference of animus against it, which alone may sustain an equal protection charge. *See Swanson v. City of Chetek*, 719 F.3d 780, 782-783 (7th Cir. 2013) (court reversing the district court and noting that, "a clear showing of animus, [even] absent a robust comparison to a similarly situated individual, may sustain a class-of-one equal protection claim.")

The City argues that Plaintiff's claim that it was treated differently from the other tenants of the Arts Building "fails" since the Municipal Code allows for Beaudet to close only the Property. While that may be true in some instances, the City provides gives no treatment to Plaintiff's

allegations that: (1) the City intentionally combined the Arts Building Violations (for the common areas of the Arts Building) with the Property, used those common area violations as a means to keep Plaintiff closed, conspired with the owner of the Arts Building so that those common area violations would not be repaired, and did not enforce those common area violations against the other tenants of the Arts Building (Complaint ¶¶ 58-65; 81-83; 124; 135-136; 243-244; 253; 301-302; 332); (2) the Arts Building Violations were "Structural" and for "Fire Protection," which are violations that, by their very nature, could not be specific to the Property (*id*. ¶¶ 124; 132-134; 324-332; Exhibit 13; Exhibit 14; and (3) FIB's agents admitted on multiple occasions that the tenants of the entire Arts Building were at risk of death or injury based on the Arts Building Violations which they had already agreed not to repair (*id*. ¶¶ 190; 194-195; Exhibit 24; Exhibit 25). Without addressing these allegations, the Motion concludes that Plaintiff "fails" since Beaudet apparently decided the structure of the Arts Building is specific to the Property.

While the City argues the hypothetical bounds of Beaudet's authority or the engineering of structural or foundational support, Plaintiff has alleged that there was no rational bases for the Emergency Closure Order at all. Logically, Plaintiff could not have been the only tenant of the Arts Building who would have been affected by the "Structural" or "Fire Protection" violations.

The Emergency Closure Order states, "[a] report from a licensed structural engineer, along with the method for repair must be submitted to [DOB] for review and a permit, listing contractors, must be obtained before making any changes or repairs." (*See* Exhibit 14). The City allowed the Property to re-open, stating that "[t]he Dangerous Fire Safety, Electrical, Plumbing, and Structural Issues have been corrected in the area approved for re-occupancy. The Dangerous Violations that warranted the Commissioner Closure on February 18th[,] 2022 have been abated." (*See* Exhibit 43). In support of its assessment, the City cited the following permits:

EPP Permit #100966859 issued by DOB on 04/13/2022 ("Permit 1");

Electrical Permit #100965788 issued by DOB on 04/06/2022 ("Permit 2");

Electrical Permit #100965772 issued by DOB on 4/6/2022 (Permit 3)."

(collectively the "Permits") (*Id.*)

As it is a matter of public record, Plaintiff asks the Court to take judicial notice of each of the above Permits, the descriptions of which are accessible through the City website (https://webapps1.chicago.gov/buildingpermit/search/initializeapplication.do). Permit 1 is described for the purpose of:

> REPAIRS, PLUMBING CODE VIOLATIONS PLUMBING ONLY (PROVIDE VACUUM BREAKER FOR SERVICE SINK, REPLACE PVC WASTE PIPING WITH CODE APPROVED MATERIAL, PROVIDE APPROVED BACKFLOW PROTECTION ON WATER SUPPLY TO ICE MACHINE-SODA MACHINE. PROVIDE APPROVED INDIRECT WASTE

Permit 2 is described for the purpose of "ELECTRICAL REPAIRS"

Permit 3 is described for the purpose of:

> ADDRESS ELECTRICAL VIOLATIONS WITHIN THE TENANT SPACE. ADDING ADDITIONAL RECEPTACLES, REMOVING EXTENSION CORDS, PROVIDE WORKING EGRESS LIGHTING AND EXIT SIGNS.

Therefore, the Permits (and the work each would entail) could not have abated the "[t]he Dangerous Fire Safety, Electrical, Plumbing, and Structural Issues… that warranted the Commissioner Closure on February 18th[,] 2022…" All other allegations aside, the Permits alone show there was no rational basis for the Emergency Closure Order.

Plaintiff has also alleged facts that show there is no rational basis for the bringing of the continued pursuit of the LR Matter. The facts of the LR Matter were known to the City at the Hearing, litigated at the Hearing, and are objectively straightforward. What's more, counsel for the City claimed to be unaware of the LR Matter in September of 2022, yet the LR Matter appeared

in November of 2022 as a "hold" on Plaintiff's licenses when Plaintiff visited City Hall to have the licenses renewed. The LR Matter was also initiated after Plaintiff's principle made statements critical of the City to the media, and after City counsel (who is currently prosecuting the LR Matter) stated that he was unaware of its existence. (*See* Complaint ¶¶ 301-302).

The City argues that the LR Matter is based on a legitimate charge claiming that Plaintiff had patrons inside the bar at 5:06 am – which, in isolation, would appear legitimate. However, Plaintiff has alleged there is no rational basis for the LR Matter based on: (1) the timing of the LR Matter (*id*. ¶¶ 299-302; 277-284); (2) the City's use of irrelevant evidence (the unamended Vice Report) for which Plaintiff has already been found not to be responsible (*id*. ¶¶ 285-308; Exhibit 36); and (3) the City's failure to consider or offer a fine or suspension in lieu of a revocation hearing for an objectively minor charge to a business owner without any disciplinary history. (*See Soldano v. Illinois Liquor Control Comm'n*, 131 Ill.App.3d 10, 16 (1st Dist. 1985); *Byrne v. Stern*, 103 Ill.App.3d 601, 606 (1st Dist. 1981); *Jacquelyn's Lounge, Inc. v. License Appeal Comm'n*, 277 Ill.App.3d 959, 966-967 (1st Dist. 1996); *also Hanson v. Illinois Liquor Control Comm'n*, 201 Ill.App.3d 974 (2nd Dist. 1990)).

Plaintiff has also alleged there was no rational basis for the Summary Closure Order; and while Plaintiff does disagree with the conclusion of the Final Order, Plaintiff does not disagree with its factual findings (i.e., that Plaintiff was not responsible for and could not have anticipated *any* of the events that supposedly formed the basis for the charges brought by the City). Further, there was no rational basis for the Summary Closure since it was based on evidence compiled on February 9, 2022, only three (3) days after the shooting, and did not include *any* mitigating or exculpatory evidence that Plaintiff provided to CPD (i.e., the identities of the perpetrators, surveillance footage, or witness interviews), and the case was tried in such a way that it made it

impossible for Plaintiff to rebut the City's predetermined conclusion. Plaintiff was denied the opportunity to cross examine any witnesses who contributed toward the creation of the Vice Report or witnessed any events summarized in the Vice Report, was not informed prior to the Hearing that the City did not intend to call any witnesses. Plaintiff was therefore unable to object to any portions of the Vice Report since it was admitted into evidence as one voluminous narrative. The Final Order states:

> While the Licensee could not have reasonably anticipated that the individual who perpetrated the shooting would engage in such activity…the Municipal Code of Chicago does not factor in reasonability, probability, or fault…these are considerations beyond the purview of the instant hearing.

(*See* Exhibit 36.)

The conclusions ultimately drawn in the Final Order beg the question: what was the purpose of the Hearing if not to consider "reasonability, probability, or fault"? There was no rational basis for the Summary Closure since the Final Order shows there was no defense whatsoever Plaintiff could have mounted to overcome the City's predetermined conclusion that Plaintiff had created a "public safety threat."

The City's argument that Plaintiff "does not challenge any particular Code violation as unfounded or dispute that the violations rendered the premises unsafe" is objectively inaccurate. As set forth above, Plaintiff was the only tenant of the Arts Building closed based on the Emergency Closure Order, the City conspired with FIB so that the Arts Building Violations would not be repaired, the Arts Building Violations were not repaired, and the City allowed the Property to re-open nonetheless based on the Permits. To the extent that Plaintiff has not specifically alleged that there was no rational basis for the Emergency Closure Order or Arts Building Violations, or that either were illegitimate, the only inference that can be drawn from the facts alleged by Plaintiff is that both are illegitimate and were used as a means for the City to accomplish Plaintiff's theory

of the case.

**c. Retaliation**

Plaintiff has alleged that the City retaliated against it based on its refusal to sign an indefinite Nuisance Abatement Plan and its principle's statements to the media. While some of Plaintiff's statements came after some of the actions taken by the City, the City only brought and gave notice of the LR Matter *after* Plaintiff made statements to the media, *after* Plaintiff rejected the indefinite terms of the Nuisance Abatement Plan, *after* the Hearing during which the facts of the LR Matter were litigated, and *after* City counsel stated in September of 2022 that the City was unaware of any further license proceedings. As argued above, there was no rational basis for the Summary Closure, the Emergency Closure Order, or the LR Matter, and those actions were only brought to coerce Plaintiff to modify its Late Hour License, or in retaliation for Plaintiff's refusal to do so and/or in response statements to the media stating the same.

Plaintiff has a right to freedom of speech and the right to redress its grievances with the City, both which the City seeks to punish Plaintiff for. The retaliation against Plaintiff by the City would no doubt deprive or dissuade other businesses from speaking out regarding City matters, or from challenging the merits of any City charges. Indeed, if the City is able to enforce its agenda through coercion and escalating punitive measures without the need to provide witness testimony or foundation for its evidence, the only reasonable conclusion any business owner could reach is that the City is operating based on predetermined outcomes, and a business owner's only option would be to accept the terms of a Nuisance Abatement Plan, or other settlement the City is willing to offer.

**d. Due Process**

Plaintiff has alleged that it has a protected interest in its Lease and its Late Hour License, both of which the City unreasonably interfered with in its attempt to modify Plaintiff's Late Hour License or close Plaintiff down. As argued above, Plaintiff has also alleged that it was not afforded, or was otherwise denied, sufficient procedural protections to contest the summary closure or the Emergency Closure Notice, both of which denied Plaintiff the use of its Lease or Late Hour License. Plaintiff alleges that the City violated Plaintiff's due process rights by using DOB and CPD to close the Property as long as possible; actions which are, for the same reasons set forth above, irrational and only meant to coerce Plaintiff to agree to a Nuisance Abatement Plan which provides the City an indefinite ability to oversee Plaintiff's hours and operations. Plaintiff was denied due process since it could not contest or satisfy the Emergency Closure Order based on the Agreement between the City and FIB, which also mooted any Nuisance Abatement Hearing since, even if Plaintiff prevailed, the Property would be closed by the Emergency Closure Order.

Plaintiff has alleged a procedural insufficiency based on the entirety of the coordinated efforts by the City which must be viewed in the context of a whole, as opposed to isolated incidents. Plaintiff has alleged an elaborate and sprawling course of conduct by the City to improperly use its authority to force and coerce Plaintiff to modify its Late Hour License indefinitely and without compensation; the bounds of which cannot be viewed in isolation or confined to a single hearing, order, or decision.

The City's own Motion shows that there was no way Plaintiff could have prevailed at the Hearing. The Motion states, "[i]ndeed, [Plaintiff] does not contest that the incident happened, effectively conceding that it has no defense to the summary closure." Whether a "public safety threat" occurred is not a strict liability offense, and cannot be a simple results-based analysis, as

the City suggests. The Final Order stated in no uncertain terms that Plaintiff was not responsible for any of the incidents stated in the Vice Report, and that Plaintiff "could not have reasonably anticipated, that the individual who perpetrated the shooting would engage in such activity…" (*See* Exhibit 36 p. 5, ¶ 11). Plaintiff's due process rights were violated because DOB nullified a Nuisance Abatement Hearing as a means for Plaintiff to open sooner, Plaintiff could never have prevailed at the Hearing, and the Emergency Closure Order denied Plaintiff the right to remedy the Arts Building Violations itself.

Regardless of whether Plaintiff has appeal rights concerning any decisions rendered by the City, the damage to Plaintiff has already been done. The City has already closed Plaintiff for a significant period based on the Emergency Closure Order which included violations Plaintiff was not authorized to repair (which Plaintiff alleges the City did intentionally) and that the City agreed not to enforce and FIB agreed not to repair. The City has already closed Plaintiff under the Summary Closure Ordinance so that Plaintiff would be forced to sign an indefinite Nuisance Abatement Plan. The City has already conspired with the owner(s) of the Arts Building to keep Plaintiff closed as long as possible. And, the City has already pushed Plaintiff to the brink of indefinite, if not absolute, closure. Plaintiff will appeal whatever it deems necessary at the appropriate time, but that process cannot undo the damage the City has already caused.

While Plaintiff has not yet alleged this fact, Plaintiff undisputedly did request a nuisance abatement hearing; however, Plaintiff was never granted a hearing and any request would have been mooted by the Emergency Closure Notice. Further, at that time Plaintiff requested a Nuisance Abatement Hearing, and during much of the negotiations with the City, Plaintiff had no reason to realize or anticipate that the City was operating in bad faith when it "negotiated" the Nuisance Abatement Plan, or the City had also closed Plaintiff using the Emergency Closure Order as a

means to modify or revoke Plaintiff's Late Hour License.

## III. Plaintiff has Stated an Abuse of Process Claim

Plaintiff has alleged that the City had dictated a predetermined outcome and had an improper motive to modify or revoke Plaintiff's Late Hour License, simply due to the fact that Plaintiff is a Late Hour License Holder (which the City is alleged to have adopted as a matter of policy.) Plaintiff has also alleged that the City attempted to accomplish this goal by improperly using the legal process to: (1) use DOB to close Plaintiff by citing building violations present in common areas of the Arts Building, which FIB agreed not to repair and the City agreed not to enforce; (2) using the Summary Closure Ordinance to coerce Plaintiff into signing an indefinite Nuisance Abatement Plan, a proceeding the City agreed to settle if Plaintiff agreed to the indefinite Nuisance Abatement Plan; and (3) bringing the LR Matter based on irrelevant evidence which the Final Order had already concluded Plaintiff was not responsible for, and because Plaintiff refused to sign an indefinite Nuisance Abatement Plan and made statements critical of the City. Plaintiff has alleged the Emergency Closure Notice, the summary closure, and the LR Matter were all an abuse of process, all of which were designed to extort, intimidate, or embarrass Plaintiff into signing a Nuisance Abatement Plan of indefinite duration.

## IV. Plaintiff Stated a Conspiracy Claim

The City labels Plaintiff's theory as "implausible and puzzling," but the reality remains that Plaintiff has made detailed allegations and included relevant communications supporting those allegations. Plaintiff alleges how and when each alleged co-conspirator came to have knowledge of the conspiracy, as well as the role played by each. Plaintiff has alleged that: (1) the Property, was closed by CPD under the Summary Closure Ordinance on February 8, 2022 (s*ee* Complaint ¶ 100); (2) the basement and structure is common to the Arts Building which runs the length of the

Arts Building, and Plaintiff does not control or lease the basement (*id.* ¶ 105; ¶ 135); (3) DOB closed Plaintiff on February 18, 2022 for violations which related to common areas of the Arts Building (*id.* ¶¶ 111-113; Exhibit 13); (4) FIB knew it could not repair the Arts Building Violations and agreed not to complete the Arts Building Violations, and the City agreed not to enforce the Arts Building Violations against the other tenants of the Arts Building (i.e., the smoke shop or the flower shop, among others) (*id.* ¶¶ 118-128; *see* Exhibit 12); (5) Breidinger then relayed this information to Berger, Olear, and Kwan who regularly discussed the matter (collectively with Breidinger the "BRG Defendants") (Exhibit, pp. 18-25); (6) the BRG Defendants sought to contrive artificial reasons to terminate Plaintiff's Lease to show alignment with what the City wants (id. ¶¶ 103-228); the BRG Defendants disclosed and discussed their agreement with the City with Baum Realty Group LLC ("Baum") and Patrick Forkin ("Forkin"); (7) Forkin agreed to and did offer material support and counsel to the BRG Defendants and relayed messages between the BRG Defendants and Savas Er; (8) Baum agreed to and did offer material support and counsel to the BRG Defendants; (9) the BRG Defendants agreed not to make the repairs; (10) FIB never made the repairs; and (11) the City re-opened the Property based on the Permits once the conspiracy was brought to light *(id.* ¶¶ 224-332*).*

Plaintiff has satisfied the requirement that all alleged co-conspirators had knowledge of and offered material support to the alleged conspiracy. Plaintiff has also alleged that more than two persons conspired to keep Plaintiff closed as long as possible so the City could modify or revoke Plaintiff's Late Hour License, or cause Plaintiff to shut down completely. Plaintiff has provided *prima facie* evidence of an express agreement between the co-conspirators, and even evidence that the co-conspirators purposefully refrained from reducing their communications to writing since acknowledged that "[o]ne way or the other, this is likely to end up in court."

The City's remaining arguments also fail. For example, Plaintiff did not "admit[] [that] DOB was unaware of some of the violations, like the presence of residential tenants." Instead, Plaintiff alleges that the Arts Building was not cited for these issues in furtherance of FIB's agreement with the City, and the only reasonable inference is that DOB purposefully overlooked these violations.

The City also argues that "DOB has no role in BACP's liquor license enforcement matters or CPD's summary closure orders." While this may be the intended balance of powers, right or wrong, Plaintiff has alleged that DOB, BACP, and CPD all improperly used their authority to keep Plaintiff closed as long as possible so that Plaintiff would be forced to agree to an indefinite Nuisance Abatement Plan. Only CPD could issue the Summary Closure. Only DOB could keep Plaintiff closed longer than six (6) months. Only BACP could come to an agreement with Plaintiff on an indefinite Nuisance Abatement Plan. All three played an important, yet distinct, role in the alleged conspiracy, and Plaintiff has overcome the notion that these City branches did not coordinate to cause Plaintiff damage. Indeed, the City could not accomplish its goal of modifying Plaintiff's Late Hour License unless each played the role that they did.

## V. Plaintiff Has Stated a Fraud Claim.

As argued throughout, Plaintiff has satisfied the heightened pleading standards for fraud.

## VI. Plaintiff Has Alleged a Violation of 815 ILCS 505/1.

Plaintiff alleges that: (1) FIB was Plaintiff's commercial landlord by way of written lease during the relevant time period; (2) Plaintiff was closed under the Emergency Closure Notice; (3) the Emergency Closure Notice included building violations which only FIB had the ability and authority to fix; (4) the BRG Defendants prevented Plaintiff from repairing the Arts Building Violations; (5) Breidinger told Plaintiff that the BRG Defendants were taking action to repair the

Arts Building Violations when the BRG Defendants had already internally agreed they would not make repairs to address those violations; (6) FIB told Plaintiff that it could defer its rent while it was closed, which was not true since FIB later used this agreement to demand an amount of rent it believed Plaintiff could not pay and for which Plaintiff would have no defense; and (7) FIB internally acknowledged that all tenants of the Arts Building were at risk of death or injury, yet intentionally chose not to make those repairs; (8) the City, by agreement, did not enforce FIB's failure to repair the Arts Building Violations or pull permits; and (9) FIB collected rent for this entire time period.

It is logically impossible that FIB would have engaged in the alleged course of conduct if it were not compelled to satisfy the City. FIB never could have engaged in its alleged conduct unless the City failed to prosecute the Emergency Closure Notice, which it did. The Complaint alleges that FIB and its agents lied to Plaintiff about its agreement to defer rent obligations and the prospect of completing repairs to address the Arts Building Violations so that FIB could contrive a reason to terminate the remainder of Plaintiff's 20-year lease, either to show alignment with the City, or so as not to disrupt the sale of the Arts Building, or both. FIB collected rent from Plaintiff during a time period when it was purposefully essentially forcing Plaintiff to remain closed based on repairs it internally agreed not to complete while at the same time telling Plaintiff that it would make the repairs and instructing Plaintiff not to pull any permits toward those repairs.

Plaintiff has a Late Hour License that it can only use for the Property, a lease that may not be unilaterally terminated, and Plaintiff has made significant investments into the Property. These circumstances lead to the inference, if not demonstrate, that there is, and was, no substitute space that would be available to Plaintiff, so Plaintiff would have no choice to submit to its commercial landlord or the City.

FIB is a commercial landlord. Any commercial landlord who goes to the lengths alleged by the Plaintiff with the insistence or validation from the City to obstruct and lie to a tenant with the goal of terminating the remainder of that tenant's lease (while collecting rent) should be condemned, and its actions deemed a violation of public policy. There are no possible countervailing benefits to consumers based on FIB's alleged conduct, and there is no action Plaintiff could have taken to avoid FIB's conduct. FIB's conduct as alleged is immoral, unethical, and deceptive, and Plaintiff has stated a cause of action for an alleged violation.

VII. **The City Is Not Immune.**

Plaintiff reincorporates the argument set forth above that the Emergency Closure Order, summary closure, and LR Matter are not rationally based, were illegitimate, and were in furtherance of the City's goal to modify or revoke Plaintiff's Late Hour License, or cause Plaintiff to close completely. Here, Plaintiff has alleged willful and wanton conduct, as well as strong evidence supporting its claims (e.g., FIB's internal emails evidencing that it would not make the repairs, the timing of the LR Matter, the City's lack of enforcement of the Arts Building Violations, and the City's decision to re-open the Property based on the Permits).

As to the City's discretion in issuing the Emergency Closure Order, Plaintiff has alleged facts showing that there was no discretion in issuing a legitimate order but, as evidenced by the Permits and the fact that Plaintiff was the only tenant who was forced to be closed, the Emergency Closure Order was contrived to specifically keep Plaintiff closed for an improper and coercive purpose. Plaintiff has not alleged an abuse of discretion on the enforcement of a policy or a decision that did not go in Plaintiff's favor. Plaintiff has alleged a coordinated effort to misuse the City's power for the improper purpose of modifying or revoking Plaintiff's Late Hour License without due process, compensation to Plaintiff, or a resolution by City counsel.

## CONCLUSION

For the foregoing reasons, the City's Motion should be denied in its entirety.

July 14, 2023

Respectfully Submitted,

The Blue Note, Inc.

*s/Daniel T. Fahner*
One of its Attorneys

Daniel T. Fahner (daniel.fahner@rkfglobal.com)
Alex Kosyla (alex.kosyla@rkfglobal.com)
RKF Global PLLC
555 Skokie Blvd, Suite 450
Northbrook, Illinois 60062
Tel: 312-888-2000