**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE BLUE NOTE, INC. d/b/a The Point, an Illinois corporation, | ) | |
| Plaintiff, | ) | No. 23 CV 648 |
| v. | ) | Hon. Thomas M. Durkin |
| THE CITY OF CHICAGO, a Municipal Corporation, *et al.*, | ) | |
| Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

BRADLEY G. WILSON
AARON T. DOZEMAN
City of Chicago, Department of Law
2 North Lasalle Street, Suite 520
Chicago, Illinois 60602
(312) 744-7686 / (312) 744-9018
Bradley.Wilson@cityofchicago.org
Aaron.Dozeman1@cityofchicago.org

*Attorneys for the City*

**TABLE OF CONTENTS**


INTRODUCTION ........................................................................................................1

ARGUMENT ............................................................................................................1

I. Blue Note Fails To Show That *Younger* Abstention Is Not Warranted. ............ 1

II. Blue Note Does Not Plausibly Allege A Basis For Municipal Liability............ 3

III. Blue Note's Constitutional Claims Should Be Dismissed. ................................ 4

A. Blue Note fails to negate the conceivable rational bases for the City's enforcement actions. ..................................................................... 4

B. Blue Note's retaliation claim should be dismissed. .................................... 6

C. Blue Note's procedural due process claim should be dismissed. ............... 7

IV. Blue Note's State-Law Claims Should Be Dismissed....................................... 8

A. Blue Note fails to allege an abuse of process claim................................... 9

B. Blue Note fails to allege a conspiracy claim.............................................. 9

C. Blue Note abandoned its common-law fraud claim................................. 10

D. Blue Note abandoned its conspiracy to violate the Fraud Act claim........ 10

CONCLUSION.........................................................................................................10

## INTRODUCTION

As the City explained in its Motion to Dismiss, Plaintiff The Blue Note, Inc. ("Blue Note") casts the City's valid enforcement of public safety laws as constitutional wrongs, but its alleged injuries are merely a consequence of operating an establishment deemed a public nuisance. Its challenges to the City's enforcement proceedings are playing out in concurrent state proceedings, and the Court should abstain from addressing its claims here. But should the Court address the merits, Blue Note's allegations that the City unlawfully conspired to strip it of its license are both implausible and undermined by the legitimate bases for the City's actions.

Blue Note's response barely engages with, and does not meaningfully rebut, the City's arguments for dismissal. Its "Relevant Allegations" section — a nearly 1,400-word sentence — identifies no specific facts from its 393-paragraph pleading that refute the City's arguments. Worse, its Argument section fails to develop any argument with supporting authority. Several of the City's arguments for dismissal go unaddressed, which constitutes waiver. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). And Blue Note's responses to the arguments it does address are "underdeveloped and not supported with citations to relevant legal authorities," and thus also waived. *See Harris v. Union Pac. R.R.*, No. 16 C 11607, 2019 WL 4749982, at *12 (N.D. Ill. Sept. 30, 2019). Indeed, Blue Note cites case law in only three places, and for unexceptional legal propositions, not in support of a plausible claim. For these reasons and those explained below, this Court should dismiss Blue Note's claims against the City.

## ARGUMENT

### I. Blue Note Fails To Show That *Younger* Abstention Is Not Warranted.

As the City explained, Dkt. 37 at 10–13, this Court should abstain from reaching the merits of Blue Note's claims against the City under *Younger v. Harris*, 401 U.S. 37 (1971). Blue Note does not contest that the factors for abstention are met here: (1) there are ongoing state

proceedings (2) that implicate important state interests, and (3) there are opportunities to raise constitutional challenges in those proceedings. *See id*. But Blue Note asserts that abstention is not warranted because allowing this action to proceed "would have no practical effect on" the pending state court action or administrative proceeding before the Mayor's License Discipline Commission ("MLDC"). Dkt. 45 at 8–11.[1] That is not the test *Younger* prescribes, but regardless, Blue Note is incorrect. The linchpin of its claims is that the City's actions were not "based on legitimate safety concerns," *id.* at 4, but instead motivated by "animus," *id.* at 10. Blue Note thus attacks the validity of the pending state proceedings.

Blue Note also argues that the bad-faith prosecution exception to *Younger* applies, pointing to the enforcement of building code violations by the Department of Buildings ("DOB") against its bar, The Point. Dkt. 45 at 10. It protests that The Point was the only Arts Building tenant DOB closed for code violations and that DOB allowed it to reopen after Blue Note filed this lawsuit, even though no work was done to remedy those violations. *Id.* at 10–11. But that does not suggest that the pending state-court proceedings were brought in bad faith. The emergency closure by DOB for building code violations is a different proceeding from the pending matters — an administrative review action challenging BACP's decision to uphold the summary closure order and a license disciplinary proceeding before the MLDC. *See* Dkt. 37 at 19. And Blue Note's allegations about the emergency closure do not support an inference of bad faith in any event. The *Younger* doctrine "requires more than a mere allegation and a more than a 'conclusory' finding to bring a case within the harassment exception." *Grandco Corp. v. Rochford*, 536 F.2d 197, 203 (7th Cir. 1976). Here, the Point was the only Arts Building establishment that DOB inspected because it was the only business connected with the February

[1] Blue Note refers to this matter as the "LR matter," based on the case number 22-LR-11 assigned to it.

6, 2022 shooting that triggered the inspection, and the building code violations DOB discovered warranted emergency closure. Further, the Amended Complaint alleges that work *was* done to The Point and the Arts Building: "[w]ork was completed" to correct certain building code violations under several permits, *see* Dkt. 24 at ¶ 330, and FIB completed work on at least 21 violations by October 2022, *id.* ¶ 219 (citing Dkts. 24-30, 24-31). Following a March 2023 re-inspection, the DOB Commissioner concluded that the "Dangerous Violations that warranted the Commissioner Closure . . . have been abated." *Id.* ¶ 330. Lifting the emergency closure order after dangerous conditions were abated, even if some code violations remained outstanding, does not support an inference of bad faith. *Younger* abstention is proper.

**II. Blue Note Does Not Plausibly Allege A Basis For Municipal Liability.**

If this Court does not abstain from reviewing Blue Note's claims against the City, it should dismiss them because Blue Note alleges no basis for municipal liability for any § 1983 claim, as required by *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). As the City explained, Blue Note alleges no express policy, widespread practice, or decision by a final policymaker that caused its alleged constitutional deprivation. Dkt. 37 at 14–16.[2]

In response, Blue Note argues that it alleged a "pattern and a series of incidents" that amount to "unconstitutional conduct to effectively, or actually, take and interfere with [its] Late Hour License, lease, and enjoyment of the Property." Dkt. 45 at 12. But Blue Note merely narrates its own unique experience with City officials. *See id.* at 12–13. That is insufficient to allege a widespread custom or practice that the City applied more broadly. *See Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) ("what is needed is evidence that there is a true municipal policy at issue, not a random event" based on plaintiff's "own experience"); *Hardy v.*

[2] While the Amended Complaint claimed the City had a "three-fold plan" to shutter late night bars, Dkt. 24 ¶¶ 59, 337, 347, Blue Note abandons this theory by not mentioning it in its response.

*Wexford Health Sources, Inc.*, No. 12 C 6554, 2015 WL 1593597, at *15 (N.D. Ill. Apr. 2, 2015) ("courts in this district generally dismiss *Monell* claims" where "the allegations . . . pertain exclusively to the plaintiff") (cleaned up). Indeed, Blue Note undermines its *Monell* argument based on an alleged widespread practice by claiming The Point was "singled out" for unequal treatment. Dkt. 45 at 9, 13. This Court should dismiss the claims against the City for failure to allege municipal liability.

## III. Blue Note's Constitutional Claims Should Be Dismissed.

If this Court considers Blue Note's substantive claims, Blue Note's response offers no meaningful defense of its constitutional claims for money damages.[3]

### A. Blue Note fails to negate the conceivable rational bases for the City's enforcement actions.

To state a class-of-one equal protection claim, Blue Note must allege that it was treated differently from others similarly situated, with no rational basis for the different treatment. *See Swanson v. City of Chetek*, 719 F.3d 780, 783 (7th Cir. 2013). As the City explained, other licensed establishments that experienced shooting incidents are not similarly situated comparators. Dkt. 37 at 17–18. By not responding to that argument, Blue Note has abandoned any claim based on that comparison. Blue Note instead argues that other Arts Building tenants were similarly situated to but treated differently from it because no building code violations were enforced against them. Dkt. 45 at 15. Blue Note also argues that the City "intentionally combined" building code violations for common areas of the Arts Building and The Point in one closure order so that it could then convince FIB to not make repairs, preventing The Point from reopening even though the building's other tenants remained open. *Id.*

---

[3] Blue Note does not respond to the City's argument that the claims for prospective relief do not comply with Rule 65(d)(1)(C), thus abandoning any defense of those claims.

But the other Arts Building tenants are not similarly situated comparators. DOB inspected The Point, not the premises of the other tenants, Dkt. 37 at 18, and Blue Note offers no facts or legal authority supporting its argument that DOB should have enforced the code violations it found against every tenant, *see* Dkt. 45 at 14–15. As to FIB's alleged agreement with the City to not make certain repairs so that The Point would remain closed, Blue Note's allegations show the opposite: FIB repaired numerous violations, *see* Dkt. 24 ¶ 219, and Blue Note does not explain how any violation was left unremedied pursuant to a purported agreement between FIB and the City. Indeed, no facts suggest that the City inspector or DOB Commissioner even knew which repairs were FIB's responsibility, so there is no basis to infer that DOB strategically identified code violations to make it difficult for The Point to reopen.

Blue Note also fails to allege that there was no conceivable rational basis for the summary and emergency closure orders or MLDC proceeding. Dkt. 37 at 18–19. In its response, Blue Note makes the contradictory argument that, on one hand, the building code violations were insufficient to order The Point's emergency closure, because other Arts Building tenants were allowed to remain open, and on the other hand, the City irrationally allowed The Point to reopen before all the violations were remedied. Dkt. 45 at 15–16, 18. That contradictory argument does not negate the rational bases for the emergency closure. Given that The Point was inspected following a shooting, it was logical for the City to inspect and focus remedial actions on The Point and not other Arts Building tenants. Blue Note does not challenge any code violation as unfounded and admits that it and FIB made repairs to address plumbing, electrical, lighting, and signage issues. *Id.* at 16. The work Blue Note admits was done supports DOB's decision that enough of its concerns had been remedied to allow reopening. That some violations were still unremedied does not undermine every conceivable justification for the emergency closure order.

Blue Note next argues that there is no rational basis for the MLDC proceeding based on the citation that Blue Note was issued for allowing patrons in the bar after closing, Blue Note criticizes the license enforcement proceeding by pointing to: "(1) the timing" of the proceeding; "(2) the City's use of irrelevant evidence (the unamended Vice Report) for which Plaintiff has already been found not to be responsible"; and "(3) the City's failure to consider or offer a fine or suspension in lieu of a revocation hearing." *Id.* at 17. But none of that undermines the rational basis for the proceeding. The timing of the MLDC proceeding has no apparent relevance to its merit. Regarding the Vice Report — the relevance of which to the MLDC proceeding is unexplained — Blue Note was never cleared of responsibility for the infractions described in the report; rather, a hearing officer found that only one infraction in the report supported summary closure. *See* Dkt. 24 ¶¶ 268–71; Dkt. 24-36. Last, Blue Note does not dispute that patrons were in the bar after closing, and the MLDC will determine liability and any punishment for a violation, whether it be fine, suspension, or license revocation.

Finally, Blue Note's argument that there was no rational basis for the summary closure order boils down to its disagreement with the procedures used for such proceedings under the Summary Closure Ordinance, Municipal Code of Chicago, Ill. ("MCC") § 4-4-285. Dkt. 45 at 17–18. But that is a policy dispute with the ordinance itself; it does not undermine the rational basis for the summary closure —a Blue Note patron caused a public safety threat.

**B. Blue Note's retaliation claim should be dismissed.**

As the City explained, Blue Note alleges no facts tying Mr. Lin's comments to the media with the summary closure order, emergency closure order, or MLDC proceeding. Dkt. 37 at 19–20. In its response, Blue Note offers no coherent explanation of how the City retaliated against it for engaging in protected speech. Indeed, Blue Note admits that "some of Plaintiff's statements

came after some of the actions taken by the City," Dkt. 45 at 19, which undermines any argument that the comments motivated the City's enforcement actions.

Blue Note argues that "the City only brought and gave notice of the [MLDC proceeding] *after* Plaintiff made statements to the media." *Id*. But the MLDC proceeding was based on the citation issued on February 6, 2022, which was in turn based on the undisputed fact that there were patrons in the bar after closing. Blue Note does not state whether Mr. Lin's statements were made before the citation was issued. The undisputed, legitimate basis for the citation and MLDC proceeding defeats any inference that it was motivated by Mr. Lin's comments.

**C. Blue Note's procedural due process claim should be dismissed.**

Blue Note fails to identify a denial of process, in either the summary closure proceedings or the issuance of an emergency closure order. *See* Dkt. 37 at 20–23. Blue Note does not clarify whether its procedural due process claim is based on an injury deriving from "established state procedures" or one resulting from "random, unauthorized acts" by state actors. *Leavell v. Ill. Dep't of Nat. Res.*, 600 F.3d 798, 804 (7th Cir. 2010). Rather, Blue Note submits that a procedural due process claim can be based on "the entirety of the coordinated efforts by the City which must be viewed in the context of a whole, as opposed to isolated incidents." Dkt. 45 at 20. But procedural deficiencies are either established procedures or identifiable acts. Blue Note cites no authority supporting an alleged due process violation based on "an elaborate and sprawling course of conduct by the City to improperly use its authority to force and coerce Plaintiff to modify its Late Hour License indefinitely and without compensation; the bounds of which cannot be viewed in isolation or confined to a single hearing, order, or decision." *Id.* And even if this string of unspecified actions pleaded a violation, Blue Note acknowledges its adequate post-deprivation remedies: it "has appeal rights" and "will appeal whatever it deems necessary at the appropriate time." *Id.* at 21. That alone defeats its due process claim.

Blue Note also suggests for the first time that it "undisputedly did request a nuisance abatement hearing" but "was never granted a hearing." *Id*. Blue Note does not explain why this supports its due process claim, nor why its state-law remedies would be inadequate to remedy any purported procedural violation. Nevertheless, this allegation adds nothing. According to the Amended Complaint, Blue Note and BACP, by agreement, "continued the Probable Cause Hearing in the hopes of finalizing a Nuisance Abatement Plan." Dkt. 24 ¶ 232. An agreed continuance to facilitate negotiations is not a violation of procedural due process.

**IV. Blue Note's State-Law Claims Should Be Dismissed.**

If this Court exercises supplemental jurisdiction over state-law claims, it should dismiss them. At the outset, Blue Note's response confirms that all of its state-law tort claims — abuse of process, fraud, and conspiracy — are barred by the Tort Immunity Act, 745 ILCS 10/1-101 *et seq*. Blue Note does not explain why the state-law claims are not barred under sections 2-207 (immunizing inspections); 2-201 (immunizing an "act or omission in determining policy"); and 2-202 (immunizing an "act or omission in the execution or enforcement of any law"). Rather, it argues generally "that the Emergency Closure Order, summary closure, and [MLDC proceeding] are not rationally based, were illegitimate, and were in furtherance of the City's goal to modify or revoke Plaintiff's Late Hour License, or cause Plaintiff to close completely." Dkt. 45 at 26. Blue Note further argues that the City cannot invoke immunity under section 2-201 because the City used its discretion for an "improper purpose." *Id.*

These arguments, unsupported by specific facts or any case law, do not defeat the City's immunity. Moreover, the Illinois Supreme Court has explained that for immunity to attach under section 2-201, "[t]here are no added prerequisites for the discretion to be 'legal,' 'lawful,' or 'official,'" and "that even if the discretion is abused, immunity still attaches." *Strauss v. City of Chicago*, 2022 IL 127149, ¶ 75. Thus, the City is immune from damages here.

**A. Blue Note fails to allege an abuse of process claim.**

To state an abuse of process claim, Blue Note must plead an improper motive and an "act in the use of legal process that is improper in the regular prosecution of proceedings." Dkt. 37 at 24. Blue Note pleads neither. Its own complaint reveals legitimate bases for each proceeding: the February 6, 2022 shooting supported summary closure, building code violations supported emergency closure, and patrons in the bar after closing led to an MLDC proceeding. Blue Note also fails to allege facts suggesting "that the process was used to accomplish some result that is beyond the purview of the process." *Selby v. O'Dea*, 156 N.E.3d 1212, 1227 (Ill. App. Ct. 2020). The MCC authorizes summary and emergency closures, and Blue Note does not allege that the City seeks any unauthorized relief in the pending MLDC proceeding.

Blue Note's response ignores both the elements required to state an abuse of process claim and the City's arguments, which constitutes waiver. Blue Note instead makes the sweeping assertion that "the City . . . had an improper motive to modify or revoke Plaintiff's Late Hour License," and that all the proceedings "were designed to extort, intimidate, or embarrass Plaintiff into signing a Nuisance Abatement Plan." Dkt. 45 at 22. Those conclusory statements are insufficient. Blue Note points to no facts suggesting that the summary and emergency closures or MLDC proceeding were undertaken for the purpose of "extortion, intimidation, or embarrassment," *Bozek v. Bank of Am., N.A.*, 191 N.E.3d 709, 725–26 (Ill. App. Ct. 2021), rather than in response to public safety issues. Blue Note's abuse of process claim should be dismissed.

**B. Blue Note fails to allege a conspiracy claim.**

As the City explained, Blue Note alleges no facts suggesting a conspiracy to cause a constitutional violation. Dkt. 37 at 25. Blue Note's response does not clarify whether this is a state-law or federal conspiracy claim, but it suggests the City participated in an eleven-part conspiracy to keep The Point closed. Dkt. 45 at 23. In that plan, the only allegation of an

agreement involving the City is part 4: "FIB knew it could not repair the Arts Building Violations and agreed not to complete the Arts Building Violations, and the City agreed [with FIB] not to enforce the Arts Building Violations against the other tenants of the Arts Building[.]" *Id*. Blue Note alleges, however, that by October 2022, FIB had fixed several building code violations in the Arts Building. *See* Dkt. 24 at ¶ 219 (citing Dkts. 24-30, 24-31). And, as explained above, DOB had no basis to enforce building code violations against other Arts Building tenants whose premises it did not inspect. The inference of conspiracy Blue Note asks the Court to draw is unsupported, and the claim should be dismissed.

### C. Blue Note abandoned its common-law fraud claim.

The City argued in its Motion to Dismiss that Blue Note pleaded no facts that plausibly support any element of fraud, let alone meet Rule 9(b)'s heightened pleading standards. Dkt. 37 at 26. Blue Note fails to substantively defend this claim, *see* Dkt. 45 at 24, and thus abandons it.

### D. Blue Note abandoned its conspiracy to violate the Fraud Act claim.

Blue Note's claim that the City conspired to violate the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1 *et seq.*, lacks merit, as the City explained. Dkt. 37 at 26–27. Blue Note's response outlines a nine-part alleged course of conduct, mainly involving FIB's actions, but no part describes either an unfair or deceptive act with the specificity Rule 9(b) requires or a conspiracy with the City to cause an unfair or deceptive act. *Id.* at 24–25.

## CONCLUSION

This Court should abstain from hearing Blue Note's claims against the City and dismiss them without prejudice, or alternatively, dismiss them with prejudice for failure to state a claim.

Date: August 4, 2023

Respectfully submitted,

MARY B. RICHARDSON-LOWRY,
Corporation Counsel for
the City of Chicago

By: _s/ Aaron T. Dozeman_
Assistant Corporation Counsel

BRADLEY G. WILSON (IL 6301195)
AARON T. DOZEMAN (IL 6308909)
City of Chicago, Department of Law
Constitutional and Commercial
Litigation Division
2 North Lasalle Street, Suite 520
Chicago, Illinois 60602
(312) 744-7686 / (312) 744-9018
Bradley.Wilson@cityofchicago.org
Aaron.Dozeman1@cityofchicago.org

*Attorneys for the City*