**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE BLUE NOTE, INC. d/b/a The Point, an Illinois corporation,<br><br>Plaintiff,<br><br>vs.<br><br>THE CITY OF CHICAGO, a Municipal Corporation, FLAT IRON BUILDING, LLC, an Illinois limited liability Company; BERGER REALTY GROUP, LLC, an Illinois limited liability company; ERICA BERGER, an individual; RACHEL BREIDINGER, an individual; ZVONKO OLEAR, an individual; ARTHUR KAWN, an individual; BAUM REALTY GROUP, LLC, an Illinois limited liability company; PATRICK FORKIN, an individual; and SAVAS ER an individual.<br><br>Defendants. | ) | Case No. 1:23-cv-00648<br><br>Hon. Judge Thomas M. Durkin |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT SAVAS ER'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

## INTRODUCTION

Plaintiff, The Blue Note, Inc. d/b/a The Point ("Plaintiff") filed its First Amended Complaint (the "Complaint") alleging, among other things, that the City of Chicago (the "City") conspired with, among others, Flat Iron Building, LLC ("FIB"), Erica Berger ("Berger"), Rachel Breidinger ("Breidinger"), Zvonko Olear ("Olear"), and Arthur Kwan ("Kwan") (collectively the "BRG Defendants") and Savas Er ("Savas") conspired to obstruct Plaintiff's operation long enough such that Plaintiff would be forced to close its business or the City could modify or revoke Plaintiff's Late Hour License. Specifically, Plaintiff alleges that the City agreed not to enforce the Arts Building Violations against the *other* tenants also located within the Flat Iron Arts Building

(the "Arts Building") so long as FIB, and subsequent owners, agreed not to repair the Arts Building Violations that were keeping Plaintiff closed, until the City either modified or revoked Plaintiff's Late Hour License, or Plaintiff was forced to shut down or was evicted.

Plaintiff further alleges that Savas has some interest in NARE Flat Iron, LLC, CCT Flat Iron LLC, Buzzpartners Flat Iron LLC, and DM Flat Iron LLC (the "Buyers"), which are the four entities that eventually purchased the Arts Building from FIB. Plaintiff alleges that, prior to the sale of the Arts Building, Savas willfully joined and knowingly participated in the alleged conspiracy to defraud Plaintiff of its Lease and Late Hour License since the Buyer entities would inevitably purchase the Arts Building from FIB. For the reasons argued below, Savas's Motion to Dismiss the Complaint (the "Motion") should be denied.

Plaintiff will also seek to amend its Complaint to add Savas to Count VII and Count VIII as he was inadvertently omitted as a Defendant under those Counts.

**RELEVANT ALLEGATIONS**

During the entirety of FIB's ownership of the Arts Building beginning on February 18, 2022 onward, FIB consistently lied to Plaintiff that it was in the process of repairing the Arts Building Violations. (*See* Complaint ¶¶ 121, 139, 179). FIB is also alleged to have contrived artificial reasons to terminate Plaintiff's Lease, including but not limited to, reneging on an agreement whereby Plaintiff did not have to pay rent while the existence of the outstanding and unremedied Arts Building Violations forced Plaintiff to remain closed, and allowing Plaintiff's rent to reach an amount which FIB did not believe Plaintiff could pay before demanding a lump sum payment of said rent on short notice. (*Id.* ¶¶ 170-178, 193, 212-214; Exhibit 26). FIB was also aware that Plaintiff could not operate until the Arts Building Violations were repaired (*Id.* ¶¶ 152-154, 187, 196).

Plaintiff further alleged that, during the contemplation of the purchase of the Arts Building, Savas was made aware of FIB's contrived attempt to terminate Plaintiff's Lease and its lies about the repairs to the Arts Building (*Id.* ¶ 181). Patrick Forkin ("Forkin") stated on June 17, 2022 that he was going to, and in fact did, bring up the Arts Building Violations with Savas (*Id.* ¶ 198; Exhibit 27). Plaintiff alleges that Savas directed FIB not to complete the Arts Building Violations at his meeting with Forkin on June 17, 2022. (Complaint ¶ 200). During the same meeting, Savas is alleged to have instructed Forkin to tell FIB to "…proceed with evicting [Plaintiff]. Don't waste money on PVC. They are in default of lease so should instead work on getting them out of there. [Savas] understands could be (sic) some backlash but given recent events they are at a weak point with the community already so now is a good time." (*Id.* ¶ 203)

On October 17, 2022, Breidinger confirmed with the property manager for one of the Buyers that Savas was aware of the outstanding Arts Building Violations which forced Plaintiff to remain closed. (*Id.* ¶ 219; Exhibit 30). The Buyers integrated the outstanding Arts Building Violations into the sale of the Arts Building, and Savas directed FIB not to complete those violation; ones which Savas "knew about… all summer." (Complaint ¶¶ 222-227).

Savas stated he wanted a "fresh start" with Plaintiff, and wanted Plaintiff to open and pay rent. He also recommended that Plaintiff make a switch and operate as a 2:00 a.m. bar, and stated his belief that the City would not let Plaintiff operate until Plaintiff agreed to make that transition. (*Id.* ¶¶ 311-316). Savas then served Plaintiff with the Notice (defined below) after Plaintiff added the Buyers as a party to a different lawsuit (*Id.* ¶ 320). As argued below, Savas' statements were misstatements of material fact and part of Savas' attempt to defraud Plaintiff and deprive it of its Lease and Late Hour License, as well as to collect rent for a space which Plaintiff could not use or occupy based on the willful inaction of all Defendants in refraining from repairing the Arts

Building Violations.

## ARGUMENT

### I. Plaintiff has Properly Alleged a Claim in Count V.

Savas's Motion is nothing more than a generic statement of opposition. It is entirely devoid of any meaningful analysis or treatment of Plaintiff's allegations, even those that relate specifically to Savas. Savas merely (unfoundedly) claims that Plaintiff has failed to allege a conspiracy that involves Savas. Savas, however, overlooks what lies within the Complaint.[1]

Savas argues generally that Plaintiff has only made "blanket" allegations against him, that the Complaint is implausible, that Savas is "puzzled," and that "Plaintiff… fails to show how [Savas] participated in any unlawful scheme with the other Defendants or how he acted with an unlawful purpose or a lawful purpose by unlawful means." Those futile arguments do not carry his burden; indeed, simply ignoring allegations – including ones gleaned from documents produced by an aligned party (the Buyers) in a different proceeding – cannot support dismissal. *See Tyler v. Boston Scientific Corp.*, 2018 WL 2220531, *5-6 (N.D. Ill. May 15, 2018); *Higgins v. Village of Lyons*, 2023 WL 2456383, *6 (N.D. Ill. March 10, 2023) (denying in its entirety defendants' motion to dismiss and noting that "Defendants stray[ed] from the 12(b)(6) standard, reframing and overlooking pertinent alleged facts…").

*A. The Supposedly "Hired" Contractor to Fix Arts Building Violations.*

In support of his Motion, Savas halfheartedly argues that Plaintiff has plead itself out of a claim since "… the Buyers hired a contractor to correct fire code violations at the Arts Building in January of 2023—not long after their purchase of the Arts Building. [Dkt. # 24, ¶¶ 322-323]."

[1] Savas' "incorporate[ion] and adopt[ion] [of] the arguments raised in the City's Motion to Dismiss the First Amended Complaint" does nothing to bolster his hollow claim that Plaintiff has failed to state a claim of conspiracy against him.

Following that inconsequential note, Savas goes on to ask the hypothetical: "Why would [Savas] hire a contractor to remedy one of the 'big issue' Arts Building Violations right after the [Buyers'] purchase if he was trying to use the Arts Building Violations as a pretext to keep the Plaintiff from operating?" Savas' attempt to argue through reason, though, misses the mark – Savas ignores the reality that the act of "hiring" a contractor (one that apparently emailed the City) does not necessarily mean that work will be, or was, completed.[2] Here, Plaintiff alleges *that the work necessary to remedy the Arts Building Violations was not actually completed, or even initiated*; and the fact that no permits were ever pulled to do the work (see below) – which is a matter of public record – supports that claim.

Savas conveniently ignores Plaintiff's allegation that the City affirmatively acknowledged in March of 2023 that "nothing has changed," but that the City had resolved nonetheless to allow Plaintiff to reopen. Plaintiff further alleges that the City did not allow Plaintiff to re-open based on completion of the Arts Building Violations (which the City admits were not completed), but instead as a response to the filing of this lawsuit.

The Emergency Closure Order states, "[a] report from a licensed structural engineer, along with the method for repair must be submitted to [DOB] for review and a permit, listing contractors, must be obtained before making any changes or repairs." (*See* Exhibit 14). Plaintiff has alleged that no such report was completed, and that no permits were obtained for any repairs. That notwithstanding, the City allowed the Property to re-open, stating "[t]he Dangerous Fire Safety, Electrical, Plumbing, and Structural Issues have been corrected in the area approved for re-occupancy. The Dangerous Violations that warranted the Commissioner Closure on February

[2] Plaintiff has issued discovery in a different matter to the Buyers, and Plaintiff would be able to amend its Complaint to state that the Buyers' responses show conclusively that no work was actually completed and no permits were pulled for work that did not occur. Savas is attempting to use his hypothetical to confuse and mislead the Court into thinking that work was actually completed, which Plaintiff alleges, and the lack of permits prove, it was not.

18th[,] 2022 have been abated." (*See* Exhibit 43). In support of its assessment, the City cited permits:

EPP Permit #100966859 issued by DOB on 04/13/2022 ("Permit 1");

Electrical Permit #100965788 issued by DOB on 04/06/2022 ("Permit 2");

Electrical Permit #100965772 issued by DOB on 4/6/2022 ("Permit 3").

(collectively the "Permits") (*Id.*)

Plaintiff requests that the Court to take judicial notice of each of the above Permits as they are a matter of public record, the descriptions of which are accessible through the City website (https://webapps1.chicago.gov/buildingpermit/search/initializeapplication.do). Permit 1 is described for the purpose of:

> REPAIRS, PLUMBING CODE VIOLATIONS PLUMBING ONLY (PROVIDE VACUUM BREAKER FOR SERVICE SINK, REPLACE PVC WASTE PIPING WITH CODE APPROVED MATERIAL, PROVIDE APPROVED BACKFLOW PROTECTION ON WATER SUPPLY TO ICE MACHINE-SODA MACHINE. PROVIDE APPROVED INDIRECT WASTE

Permit 2 is described for the purpose of "ELECTRICAL REPAIRS"

Permit 3 is described for the purpose of:

> ADDRESS ELECTRICAL VIOLATIONS WITHIN THE TENANT SPACE. ADDING ADDITIONAL RECEPTACLES, REMOVING EXTENSION CORDS, PROVIDE WORKING EGRESS LIGHTING AND EXIT SIGNS.

Logically, the work associated with those Permits could not have abated "[t]he Dangerous Fire Safety, Electrical, Plumbing, and Structural Issues… that warranted the Commissioner Closure on February 18th[,] 2022….," which included necessary repairs to the basement of the Arts Building, e.g., fireproofing, which is not part of Plaintiff's rented space. Put simply, neither Savas nor any of his related entities repaired the "big issue" in the Arts Building.

To the extent that Savas urges the Court to focus on this singular issue as being dispositive, Illinois case law does not support such an isolated view of Plaintiff's allegations. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. *Kleen Prod., LLC v. Packaging Corp. of Am.*, 775 F.Supp.2d 1071, 1077, nn. 5, 9 (N.D. Ill. 2011).

*B. Plaintiff Has Alleged Why Savas Joined the Conspiracy.*

Plaintiff has concisely alleged, through direct evidence and the implications that can be drawn therefrom, *why* Savas would be motivated to cooperate with the City. Savas is alleged to have, and in fact does have, some interest in the Buyers (*See* Complaint ¶ 182). Based on Plaintiff's theory, Savas' failure to maintain "leniency" with the City would have resulted in the City enforcing the Arts Building Violations against the other tenants of the Arts Building, or actually requiring the "big issue" Arts Building Violations to be remedied. (*Id.* ¶ 201). Clearly, Savas and the entities in which he has an interest would benefit from the agreement with the City in order to allow the other tenants to remain open since those tenants would continue to pay rent. Further, should the City decline to enforce any violations against the other tenants of the Arts Building, the Buyers (Savas' entities) would avoid the expense of actually having to remedy the Arts Building Violations (which, again, is alleged not to have been done.)

*C. A Conspiracy May be Joined at Any Time.*

Savas' argument that the City's plan to eliminate Late-Hour Licenses began in 2020, before his involvement with the Arts Building, ignores legal precedent establishing that a party to a conspiracy may join the conspiracy *at any time*. It is not necessary to prove that the conspiracy originated with any part or all of the conspirators, or that they met during process of its concoction because every person entering into a conspiracy or common design already formed is deemed, in

law, a party to all acts done by any of the parties before or afterwards in furtherance of the common design. *Wilkinson v. Heberling*, 231 Ill.App. 539 (citing *People v. Lloyd*, 304 Ill. 23; *Ochs v. People*, 124 Ill. 399; *People v. Strauch*, 240 Ill. 60; *Greenleaf on Evidence*, sec. 92; *Purington v. Hinchliff*, 219 Ill. 159; *Doremus v. Hennessy*, 176 Ill. 614; *Franklin Union v. People*, 220 Ill. 377; 12 *Corpus Juris* 612, note 49; *Aughey v. Windrem*, [citation omitted]*; Wolfgram v. Dill*, 37 S. D. 282, 157 N. W. 1059.) All who take part in conspiracy after it is formed and while it is in execution, and all who, with knowledge of facts, concur in plans originally formed and aid in executing them, are fellow-conspirators, and their concurrence, without proof of an agreement to concur, is conclusive against them, and they commit offense when they become partners to transaction or further the original plan. *Ohlendorf v. Bennett*, 241 Ill. App. 563, 561 (1926). The fact that Plaintiff has alleged that Savas only joined the conspiracy once he had a direct interest in the outcome of the conspiracy is not dispositive; it rather is yet another red herring.

*D. Plaintiff Has Alleged Savas Had Knowledge of the Conspiracy and Willfully Participated.*

Savas further argues that Plaintiff has not alleged any agreement between Savas and the City, and that "Plaintiff's allegation that [Savas] attempted to get Plaintiff to switch to a 2:00 a.m. bar in furtherance of his (and the previous owner's) agreement with the City to modify Plaintiff's Late-Hour License is baseless." While Plaintiff does not *yet* have direct evidence of Savas' agreement with the City, Plaintiff *does* have direct evidence that Savas was working directly with FIB, BRG, and the other individual Defendants to keep Plaintiff closed, or cause Plaintiff to shut down, and Savas was doing this while he was contemplating, or completing, the purchase of the Arts Building. Savas is also alleged to have encouraged Plaintiff to switch to a 2:00 a.m bar before he initiated action to attempt to evict Plaintiff, which Plaintiff alleges was in furtherance of FIB and the City's conspiracy.

It is not required that each member of conspiracy have direct contact with each other member of conspiracy in order to have single conspiracy. *S.E.C. v. Kimmes*, 799 F.Supp. 852, 858 (N.D. Ill. 1992). If agreement, as required for civil conspiracy, is not overt, acts alleged must be sufficient to raise inference of mutual understanding. *Lamb v. City of Decatur*, 947 F. Supp. 1261, 1265-67 (C.D. Ill. 1996). Under Illinois law, an individual who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly, to do his or her part to further those objectives is liable as a conspirator. *Ohio Nat'l Life Assurance Corp. v. Davis*, 2014 WL 500539, *4 (N.D. Ill. Feb. 7, 2014). To be liable as a conspirator, a defendant must be a voluntary participant in a common venture, although defendant need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are; it is enough if defendant understands the general objectives of the scheme, accepts them, and agrees, either explicitly or implicitly, to do his part to further them. *United States ex rel. Lisitza v. Par Pharm. Cos.*, 276 F. Supp. 3d 779, 808 (N.D. Ill. 2017).

First, Plaintiff has alleged that Savas understood the general objectives of the scheme (i.e., to be willfully inactive in repairing the Arts Building Violations or to attempt to evict Plaintiff), accepted the objectives by, at the very least, directing FIB *not* to complete the Arts Building Violations that were keeping Plaintiff closed, and telling FIB to proceed with eviction even though there was no valid basis to do so. Moreover, Savas furthered those objectives by not making any repairs after the Arts Building was purchased by the Buyers in October of 2021, demanding rent from Plaintiff even though Savas' and the Buyers' willful inaction was keeping Plaintiff closed, and then attempting to terminate Plaintiff's Lease once the Buyers were added to a separate lawsuit (one which Savas explicitly admonished Plaintiff not to add the Buyers to.) What's more, Savas even negotiated any potential liability to Plaintiff and FIB's failure to repair the Arts Building

Violations into the purchase agreements for the Arts Building. Indeed, even without direct evidence of Savas' agreement with the City, his overt acts in furtherance of FIB's role in the conspiracy shows that he accepted the terms of the conspiracy, and is therefore liable as a co-conspirator.

Second, Plaintiff has never alleged that Savas or any owner of the Arts Building has the power to modify Plaintiff's Late-Hour License. Only the City has that power. What Plaintiff has actually alleged is that Savas, and FIB, were rewarded by the City for their inaction in fixing the Arts Building Violations, and in fact had the power to refrain from fixing the Arts Building Violations based on the City's agreement not to enforce the existing violations. While Plaintiff does allege that Savas asked Plaintiff to convert to a 2:00 a.m. bar and only moved to evict Plaintiff once Plaintiff rebuffed him, Plaintiff does not allege that Savas had the inherent power to modify or revoke Plaintiff's Late Hour License. Savas is alleged to have participated in the willful inaction to keep Plaintiff closed that *the City* was using as leverage to convince Plaintiff to modify its Late-Hour License. This is yet another example of Savas attempting to mislead and/or confuse the Court.

Third, the Notice of Termination of Tenancy (the "Notice") is relevant for several reasons. After first asking Plaintiff to pay its rent, Savas only served Plaintiff with the Notice *after* Plaintiff added the Buyers to its Chancery case (which sought, among other things, to halt Plaintiff's rental obligations until Plaintiff was allowed to re-open.), and after Savas told Plaintiff he wanted a "fresh start" and for Plaintiff to pay rent.[3]

[3] It also bears mentioning that, in the Chancery case, Plaintiff argues that Section 23(K) does not reflect the intention of the parties when they formed the amended lease. Savas' "unfettered right to terminate the Lease without compensation upon ninety days prior notice" will be litigated there in due course.

### II. Plaintiff has Stated a Cause of Action for Fraud.

To the extent that Plaintiff's Count VI is a "regurgitat[ion] [of] its claim for conspiracy to violate the Act in Count V," that is because both counts are premised on the same fraudulent and unethical conduct alleged throughout. Much as with Savas' other arguments, he cites only surface level and basic case law addressing fraud generally without providing any actual analysis or treatment to Plaintiff's allegations. Savas does not argue anything specifically, but instead that Plaintiff's allegations are simply not there.

Savas defrauded Plaintiff by ordering FIB not to complete the repairs, ordering FIB to proceed with an eviction without a valid basis, and working these orders into the sale of the Arts Building. Savas further defrauded Plaintiff by remaining willfully inactive once the Buyers purchased the Arts Building, demanding rent from Plaintiff despite Savas' willful inaction and prior orders to FIB to remain willfully inactive, and claims that Savas desired a "fresh start" before serving Plaintiff with the Notice shortly thereafter.

## CONCLUSION

For the foregoing reasons, Savas' Motion should be denied in its entirety.

August 23, 2023

Respectfully Submitted,

The Blue Note, Inc.

*s/Daniel T. Fahner*
One of its Attorneys

Daniel T. Fahner (daniel.fahner@rkfglobal.com)
Alex Kosyla (alex.kosyla@rkfglobal.com)
RKF Global PLLC
555 Skokie Blvd
Suite 450
Northbrook, Illinois 60062
(312) 888-2000