# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE BLUE NOTE, INC. d/b/a The Point, an Illinois corporation,<br><br>Plaintiff,<br><br>vs.<br><br>THE CITY OF CHICAGO, a Municipal Corporation, FLAT IRON BUILDING, LLC, an Illinois limited liability Company; BERGER REALTYGROUP, LLC, an Illinois limited liability company; ERICA BERGER, an individual; RACHEL BREIDINGER, an individual; ZVONKO OLEAR, an individual; ARTHUR KAWN, an individual; BAUM REALTY GROUP, LLC, an Illinois limited liability company; PATRICK FORKIN, an individual; and SAVAS ER, an individual.<br><br>Defendants. | ) | Case No.1:23-cv-00648 |

**FIRST AMENDED COMPLAINT**

Plaintiff, The Blue Note, Inc. d/b/a The Point, by and through its attorneys, RKF Global PLLC, complains against Defendants the City of Chicago, a Municipal Corporation, Flat Iron Building, LLC, an Illinois limited liability company, Berger Realty Group, LLC, an Illinois limited liability company, Erica Berger, an individual, Rachel Breidinger, an individual, Zvonko Olear, an individual, Arthur Kwan, an individual, Baum Realty Group, LLC, an Illinois limited liability company, Patrick Forkin, an individual, and Savas Er, an individual, and in support thereof states as follows:

**JURY TRIAL**

1. Plaintiff requests a trial by jury on all issues properly triable.

## INTRODUCTION

2. Plaintiff brings this action to redress acts of equal protection violations pursuant to 42 U.S.C. § 1983 (Count I); retaliation in violation of the First Amendment pursuant to 42 U.S.C. § 1983 in violation of Plaintiff's right to free speech (Count II); violations of Plaintiff's due process rights pursuant to 42 U.S.C. § 1983 (Count III); violations of Illinois Law for Abuse of Process (Count IV); Conspiracy to Violate 42 U.S.C § 1983 (Count V); Fraud (Count VI) Violation of the Consumer Fraud and Deceptive Business Practices Act (Count VII); and Conspiracy to Violate the Consumer Fraud and Deceptive Business Practices Act (Count VIII).

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

4. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because Plaintiff and Defendants either reside in this district or have their principal place of business in this district, and all events giving rise to Plaintiff's claims occurred within this district.

## PARTIES

5. Plaintiff The Blue Note, Inc. d/b/a The Point ("The Point" or "Plaintiff") is an Illinois corporation, as well as a bar and music venue, with its principal place of business located at 1579 N. Milwaukee Ave., Space 1569, Chicago, Illinois 60622 (the "Property"). The Point is a duly licensed bar that operates out of the Property.

6. Defendant Flat Iron Building, LLC ("FIB") is an Illinois limited liability company with its principal place of business located at 40 E. Oak Street, Chicago, Illinois 60611. Flat Iron Building was Plaintiff's commercial landlord for the Property for the period from July 27, 2020 until on or around October 31, 2022.

7. Defendant Berger Realty Group, LLC ("BRG") is, and was, FIB's agent for all matters related to the Property with its principal place of business located at 40 E. Oak Street, Chicago, Illinois 60611.

8. Defendant Erica Berger ("Berger") is an individual and principal of BRG and FIB, and upon information and belief, a resident of and works in Cook County, Illinois.

9. Defendant Rachel Breidinger ("Breidinger") is an individual and BRG's Director of Operations, and upon information and belief, a resident of and works in Cook County, Illinois.

10. Defendant Zvonko Olear ("Olear") is an individual and BRG's Chief Financial Officer, and upon information and belief, a resident of and works in Cook County, Illinois.

11. Defendant Arthur Kwan ("Kwan") is an individual and BRG's Manager, and upon information and belief, a resident of and works in Cook County, Illinois.

12. Defendant Baum Realty Group, LLC ("Baum Realty") is an Illinois limited liability company with its principal place of business located at 1030 W. Chicago Ave., Suite 200, Chicago, IL 60642.

13. Defendant Patrick Forkin ("Forkin") is an individual and former Director of Baum Realty, and upon information and belief, a resident of and works in Cook County, Illinois.

14. Defendant Savas Er ("Savas") is an individual and, upon information and belief, a resident of Turkey doing business in Cook County, Illinois.

15. Defendant City of Chicago ("City") is a municipality incorporated under the laws of the State of Illinois. Pursuant to Illinois law, the City possesses the power to license, regulate and/or prohibit the sale of alcoholic beverages at retail within its boundaries. Said powers include the power, by "general ordinance", to determine the number, kind and classification of local liquor licenses issued within its political subdivision provided said power is not exercised inconsistent

with the Illinois Liquor Control Act. *See* 235 ILCS 5/4-1 (1992).

**<u>OTHER ENTITIES AND INDIVIDUALS</u>**

16. The Department of Business Affairs and Consumer Protection ("BACP") issues business licenses in the City and regulates industries as diverse as retail, food establishments, day care centers, manufacturing facilities and motor vehicle repair shops. BACP also regulates the sale of retail liquor in the City. BACP prosecutes business license violations on behalf of the City and determines whether to seek to revoke or modify a business license and, in this matter, a Late-Hour License (defined below).

17. The Department of Buildings ("DOB") inspects property in the City, issues building Municipal Code violations, and ensures compliance with City building regulations.

18. Matthew Beaudet ("Beaudet") is the Commissioner of the City of Chicago Department of Buildings.

19. The Chicago Police Department ("CPD") is the municipal law enforcement agency for the City under the jurisdiction of the City Counsel.

**<u>FACTUAL ALLEGATIONS</u>**

***Plaintiff's Lease***

20. At all relevant times until on or around October 31, 2022, FIB was the owner of the Property, as well as the entire Flat Iron Arts Building located at 1579 N. Milwaukee Ave., Chicago, Illinois 60622, and 1565 N. Milwaukee Ave., Chicago, Illinois 60622 (the "Arts Building").

21. On or around July 27, 2020, Plaintiff and FIB entered into the Flat Iron Building Commercial Lease for the Property (hereinafter the "Original Lease"). (Lease attached as Exhibit 1).

22. Plaintiff negotiated the Original Lease with Blake Biggerstaff and Bob Berger on

or about July 27, 2020 in the midst of the COVID-19 pandemic.

23. Due to the timing of these negotiations (i.e., during the pandemic) Plaintiff was able to negotiate two (2) options to renew the Original Lease as opposed to the one (1) option to renew that was being offered to Plaintiff.

24. On or around February 19, 2021, Plaintiff and Olear, CFO of FIB, amended the Lease to "restate certain terms on page 2 of the Lease for the purpose of clarifying ambiguous language." (The "Lease Amendment" attached as Exhibit 2; Original Lease and Lease Amendment collectively referred to as "Lease").

25. The total term of the Lease, including both option periods, is 20 years.

26. Prior to Plaintiff's execution of the Lease, the Property was occupied by a bar called "The Flat Iron Chicago" ("The Flat Iron Bar"). The Flat Iron Bar was open "DAILY 4pm-4am | FRI 3pm-4am | Sun 1pm-4am."

27. The Flat Iron Bar marketed itself as a "a product of the Wicker Park community and its history" and "wanted to tap that talent and give Chicago's artists an opportunity to inspire the public that frequents our neighborhood and our bar."

28. The Flat Iron Bar began operating in 2005.

29. As early as 2005, and prior to Plaintiff signing the Lease, the Property operated as a late-night hour bar in the Wicker Park neighborhood, and served patrons that were similar to patrons who Plaintiff intended to attract to The Point.

***Plaintiff's Licenses***

30. Plaintiff has a "Late Hour Plan" liquor license (Code: 1484; License # 45681; Exp: 11/15/22) for the Property which allows Plaintiff to remain open until 4:00 a.m. or 5:00 a.m. depending on the day of the week ("Late Hour Plan" hereinafter referred to as a "Late-Hour

License;" Late-Hour License holder hereinafter referred to as a "Licensee").

31. Upon information and belief, a Late-Hour License is only applicable to, and remains with, the address for which it is granted and cannot be transferred for use at a new or different address (i.e., Plaintiff's Late-Hour License is specific to the Property address.)

32. Upon information and belief, Plaintiff is permitted to transfer or sell its Late-Hour License to another entity or individual only if that entity or individual uses Plaintiff's Late-Hour License at the Property.

33. If Plaintiff was denied the use and enjoyment of the Property or the Lease, it would also be denied the use and enjoyment of its Late-Hour License.

34. Plaintiff has a property interest in the Late-Hour License, and Plaintiff's Late-Hour License has considerable monetary value.

35. Plaintiff paid $350,000.00 to the prior owner of Plaintiff's Late-Hour License for use of the Late-Hour License at the Property.

36. When Plaintiff purchased its Late-Hour License and signed the Lease, it did so with the full knowledge and understanding that it was required by the City to use the Late-Hour License for the Property only.

37. When Plaintiff negotiated the Lease, FIB, BRG, and its employees and principal did so with the full knowledge and understanding that Plaintiff was required by the City to use the Late-Hour License for the Property only.

38. A Late-Hour License allows Plaintiff the special privilege of serving alcohol until 4 a.m. on weeknights and 5 a.m. on Friday nights/Saturday mornings and Saturday nights/Sunday mornings.

39. Plaintiff has a Public Place of Amusement License ("PPA") (Code: 1050; License

# 45679; Exp: 11/15/22) which allows Plaintiff to operate a music venue out of the Property with a capacity of over 100 patrons. Plaintiff's PPA also allows Plaintiff to charge admission to enter the Property during or before a show or concert.

40. Plaintiff has a Tavern License (Code: 1470; License # 45680; Exp: 11/15/22) which allows Plaintiff to operate a bar out of the Property. (Plaintiff's Tavern License, PPA, and Late-Hour License collectively referred to as "Licenses").

41. Plaintiff has since renewed its Licenses.

42. Plaintiff has paid $11,117.00 in fees to the City in connection with its Licenses since January 28, 2021.

43. Plaintiff purchased its Late-Hour License in reliance on having the opportunity to use its Late-Hour License at the Property for the length and negotiated term of the Lease (i.e., 20 years).

44. Plaintiff's business model is reliant on its Licenses and the Lease.

45. Plaintiff's Late-Hour License allows it to stay open and serve alcohol later on weekend nights.

46. The majority of Plaintiff's revenue is generated during the morning hours of 1:00 a.m. and 4 a.m./5 a.m. (depending on the day) which is, in part, because other bars in the area which do *not* hold a Late-Hour License are not allowed to operate or sell alcohol during those time periods.

47. Plaintiff's PPA allows Plaintiff to charge patrons admission for tickets to Plaintiff's shows and concerts. Even if Plaintiff allowed patrons to attend shows free of charge, the Property would still require a PPA since the Property allows for capacity over 100 patrons. Without a PPA, Plaintiff will not be able to operate as a music venue.

48. By virtue of the alterations and improvements made by Plaintiff, and since Plaintiff's Late-Hour License is specific to the Property, the Property is unique and specifically tailored to Plaintiff's needs based on its business model. There is no substitute space available in the City for Plaintiff.

49. As set forth in detail below, the City, FIB, BRG, and the other Defendants acted in bad faith to deprive Plaintiff of the use and enjoyment of its Licenses, the Lease, and the Property without compensation and in violation of Plaintiff's due process rights.

***Plaintiff's Operation of The Point and Improvements to the Property***

50. At the time that the Lease was entered into, the Property was not suited for Plaintiff's vision of a bar and music venue and required significant renovations.

51. Since July 2020, Plaintiff has spent in excess of $500,000.00 on improvements designed to convert the Property into a music venue.

52. The improvements which Plaintiff made to the Property include, but are not limited to: (a) installation of a new sign in the front of the Property; (b) rebuilding two bars; (c) replacement of the entire floor (due to the presence of asbestos); (d) painting the ceiling; (e) re-wiring of the entire electrical system to comply with City codes; (f) installation of new draft system to both bars; (g) installation of a new cooler room; (h) installation of new POS system; (i) installation of full length mirrors behind both bars; (j) renovations to both bathrooms; (k) installation of stage for music performances; (l) installation of a lighting rig on the truss; and (m) installation of a new audio system.

53. Plaintiff made these improvements based, and in reliance, on its principal's reasonable belief that it would be able to operate a bar and music venue out of the Property for the entirety of the 20-year term on the Lease (including both 5-year options.)

54. Plaintiff began operation of The Point as a bar and music venue on May 1, 2021.

55. Plaintiff held all required Licenses, had a Lease that ran for 20 years (including both 5-year option periods), and had the start-up capital to transform the Property in a suitable and appealing music venue.

56. Plaintiff has paid $516,381.09 in rent to FIB since it entered into the Lease and began operating as The Point.

57. Plaintiff has paid $266,291.05 in rent to FIB since FIB demanded payment in September of 2022.

***The City's Elimination of 5:00 A.M. Liquor Licenses***

58. Beginning in at least January of 2020, the City initiated a concerted effort to eliminate bars with Late-Hour Licenses under the belief that establishments holding Late-Hour Licenses contribute to violent crime in the areas in which they operate.

59. The City's plan to eliminate Late-Hour Licenses without compensation and in violation of a Licensee's due process rights is three-fold. 1) CPD improperly uses its discretion under the Summary Closure Ordinance (defined below) to close a business for up to six (6) months unless the business agrees to an indefinite Nuisance Abatement Plan (defined below); 2) DOB then inspects the premises with the express intention of finding as many building violations as possible to keep the Licensee closed longer than the six (6) months allowed by the Summary Closure Ordinance; and 3) BACP prosecutes the Licensee while the Licensee is closed under the Summary Closure Ordinance and by DOB until the Licensee agrees to indefinitely modify the hours of their Late-Hour License for the establishment to close earlier (even on weekends), or have BACP move to revoke their Late-Hour License.

60. This practice is widespread across the entire City of Chicago but is not an express

policy with any statutory authority.

61. Plaintiff was not aware of the concerted effort taken against it by the City on account of its Late-Hour License until, at the earliest, when it was closed by CPD on February 8, 2022.

62. On or around July 19, 2022, 2nd Ward Alderman Brian Hopkins was quoted in an article recounting an interview he gave, which stated:

> Second Ward Ald. Brian Hopkins, who represents parts of River North, as well as Wicker Park and West Town, told Block Club Chicago last week that bars with late-night tavern licenses — establishments that can serve until 4 a.m. on most nights, and until 5 a.m. Sunday — are "attracting the most violence." He's targeting downtown late-night tavern licenses, including those in River North. Hopkins also took to Twitter last week to argue his case writing that the police agree with his intentions.
>
> This week, Hopkins reiterated his stance in his July 18 newsletter to constituents writing that late-night violence in entertainment districts, such as the Hubbard Street restaurant and bar strip, causes "strain on police resources to handle these sizable late-night crowds."
>
> (*See* Exhibit 3 "Chicago Ponders Eliminating 5 A.M. Bar Licenses Downtown"; Exhibit 4 "No More After-Hours Bars In River North? Alderman Looks To Kill 5 AM Licenses As Area Struggles With Shootings.")

63. The Tweet referenced in the above article states "know who else agrees? the police, who are called to respond at 5am to unruly and intoxicated crowds -- crowds that now contain an increasing proportion of individuals with loaded guns."

64. In a February 7, 2022 interview, 1st Ward Alderman Daniel La Spata stated that "[he]… aims to meet with [Plaintiff] and local police soon to bolster their violence prevention plan. One measure that could help, the alderperson said, is cutting back The Point's hours of operation. Currently, the bar is allowed to stay open until 4 a.m. most of the week because [Plaintiff] holds a Late Hour Liquor License. On Sundays, the bar is permitted to stay open until 5 a.m." (*See* Exhibit 5 article published by Block Club Chicago titled "Wicker Park Bar Owner Says

City Violence, Not Late-Night Hours, To Blame After Another Shooting At The Point.")

65. The City's plan to eliminate Late-Hour Licenses is consistent with its 2021 rollback of alcohol sales, restricting those sales past midnight, and was conceived for the same or similar purposes.

66. As of at least 2021, the City decided that establishments with Late-Hour Licenses disproportionately contribute to crime and City resources, and that the City would be best served by completely eliminating Late-Hour Licenses, regardless of the property interest held in any Late-Hour License by a Licensee.

67. In 2015, the City enacted its "Public safety threat – Summary closure – When authorized" ordinance. (the "Summary Closure Ordinance"). *See* Municipal Code of the City of Chicago 4-4-285.

68. The Summary Closure Ordinance essentially grants CPD the immense power to immediately close a business which CPD, in its sole discretion, believes is associated with violence.

69. A business closed by the Summary Closure Ordinance is not allowed to re-open until it provides an approved "plan of action" or prevails on an appeal through the license disciplinary process.

70. A "plan of action" is referred to as a nuisance abatement plan (a "Nuisance Abatement Plan"). A Nuisance Abatement Plan sets forth operating and security criteria that a Licensee must follow, or else face additional legal and financial consequences. Examples of penalties associated with a Licensee's failure to abide by a Nuisance Abatement Plan include, but are not limited to, fines, extension of the length of the Summary Closure, and/or imprisonment.

71. CPD's exercise of its authority under the Summary Closure Ordinance is entirely

discretionary. Between the effective date of the Summary Closure Ordinance and September 2022, 58 Chicago businesses were closed under the Summary Closure Ordinance as the result of a shooting; most of those businesses are (or were) located on the South and West Sides.

72. CPD retains the discretion to enforce the Summary Closure Ordinance on both a geographical and business-by-business basis.

73. CPD retains the discretion to enforce the Summary Closure Ordinance consistent with the City's plan to eliminate Late-Hour Licenses.

74. In 2019, following a shooting of a security guard and the owner in the alley of the business which occurred during operating hours, Sound Bar, located at 226 W. Ontario St., Chicago, Illinois, was closed by CPD under the Summary Closure Ordinance. Upon information and belief, the entity that owned Sound Bar was a Late-Hour License holder.

75. On May 19, 2022, a mass shooting occurred during operating hours at the McDonald's located at 10 E. Chicago Ave., Chicago, Illinois, in the River North neighborhood. In that instance, CPD did not inspect the business. Instead, the Department of Buildings issued a closure order based on alleged building violations; violations that it uncovered only after inspection of the premises following the shooting. Upon information and belief, the entity that owns this McDonald's is not a Late-Hour License holder.

76. On September 18, 2021, a shooting occurred during operating hours at LiqrBox and Joy District. Those businesses were not closed by CPD or cited or closed by the Department of Buildings. Upon information and belief, LiqrBox and Joy District, a bar at 112 W. Hubbard St., are part of an entertainment group co-owned by individuals with ties to the City. Upon information and belief, LiqrBox has a Late-Hour License while Joy District does not.

77. On January 1, 2023, a person was shot and killed during operating hours at The

Lyon's Den Hookah Lounge located at 2123 W. Division St., Chicago, Illinois. Upon information and belief, "[n]eighbors said the shooting was the culmination of a string of fights, rowdiness and other incidents that [took] place outside the BYOB business, and some are demanding officials shut it down." The City, however, did not issue a Summary Closure Notice to the hookah lounge. Upon information and belief, the hookah lounge is not a Late-Hour License holder. (*See* Exhibit 6 article published by Block Club Chicago titled "Lyon's Den Hookah Bar Will Stay Open For Now, Police Say As Neighbors Push For Closure Following Fatal Shooting.").

78. A CPD representative stated that the reason that CPD did not close the hookah lounge was because "[i]n order for us to implement a summary closure, there has to be a violation done from the business itself… [i]n this specific incident from that evening, Lyon's Den had done everything as a business what they were supposed to do. And so in that reasoning for it, even though it was a tragic incident, the Police Department cannot hold the business at that point liable… Lyon's Den ownership is cooperating with police to establish a plan of operation for the business. That could include additional security and reduced hours of operation."

79. This language is in direct conflict with CPD's decision to close Plaintiff, as well as findings made in the Final Order (described below), wherein a City appointed commissioner upheld the decision by CPD to close Plaintiff based on the same reasoning CPD employed when it decided not to enforce the Summary Closure Ordinance against the hookah lounge.

80. CPD acted in bad faith when enforcing the Summary Closure Ordinance Against Plaintiff, and was specifically biased against Plaintiff in furtherance of the City's plan to eliminate Late-Hour Licenses.

81. As described throughout, the City was biased against Plaintiff and acted in bad faith while enforcing its policies against Plaintiff on account of Plaintiff's Late-Hour License, and since

Plaintiff refused to permanently or indefinitely modify its Late-Hour License.

82. Nuisance Abatement Plan terms include, but are not limited to, restricting the hours of operation of the Licensee, requiring a Licensee to provide additional security, and/or requiring the Licensee to attend community meetings. The terms, conditions, and restrictions imposed by the Nuisance Abatement Plan offered to Plaintiff did not include any milestones of completion or any process that would relieve Plaintiff from those terms, conditions, or restrictions, and would extend in perpetuity.

83. Beginning on February 8, 2022, and based on the City's bias against Plaintiff as Late-Hour License holder, the City initiated a bad faith plan of action to either revoke or modify Plaintiff's Late-Hour License by using BACP as a prosecutorial arm to initiate enforcement proceedings against Plaintiff and using DOB to keep Plaintiff closed beyond what is allowed by the Summary Closure Ordinance until Plaintiff agreed to modify the hours of its Late-Hour License, or Plaintiff's Late-Hour License was revoked.

***February 6, 2022 Shooting and Aftermath***

84. On February 6, 2022, Daveon Montgomery ("Montgomery") and three (3) other individuals arrived at the Property at 2:46 a.m. (Montgomery and the other individuals hereinafter referred to collectively as "Suspects").

85. Upon attempting to enter the Property, the Suspects were immediately searched by Plaintiff's security personnel. The Suspects were patted down, told to empty their pockets, and required to produce a valid form of ID proving that they were at least 21 years old.

86. A pat down of the Suspects did not reveal any weapons or contraband of any kind.

87. The Suspects all produced valid forms of identification which were then scanned, and once determined to be valid, the Suspects were permitted entry into the Property.

88. While at the Property, Montgomery purchased a round of drinks with his credit card.

89. Montgomery's credit card was registered to "Daveon Montgomery" and Montgomery signed the credit card receipt.

90. The Suspects remained at the Property without incident until they departed around 4:49 a.m.

91. The Suspects completely removed themselves from the Property, and proceeded to a location where they were no longer within view of the Property.

92. The Suspects walked to their parked vehicle on North Avenue, where Montgomery retrieved a firearm and returned to the general vicinity of the Property.

93. It has been reported and alleged that, at roughly 5:06 a.m. and after operating hours, Montgomery, while standing on the sidewalk *across the street* from the Property at 1562 N. Milwaukee, fired at least eleven (11) 9mm bullets directly into the Property, causing serious injury to one individual who was at the Property at the time of the shooting.

94. Montgomery then fled the scene. Montgomery turned himself in to the relevant authorities several days later.

95. CPD arrived at the Property shortly after the shooting occurred.

96. Plaintiff and its employees fully cooperated with CPD. Plaintiff allowed CPD full and unfettered access to the Property, its security cameras, and its employees. After Plaintiff's own investigation, Plaintiff even provided CPD with the identity of *all* of the Suspects within a few short days (if not hours) of the shooting.

97. The responding officer with Badge No. 07043 (the "R/O") issued Plaintiff's representative Anestis Tandari a citation for having "numerous patrons inside the bar after the bar

closed at 0500 hrs." (the "Citation" attached as Exhibit 7).

98. Upon issuance of the Citation to Mr. Tandari, the R/O stated something to the effect of, "I did not want to give you this ticket, but someone higher up directed me to. I think it's total bullshit."

99. The Citation would later be used by BACP as the foundation for the sole count lodged against Plaintiff as part of a license revocation proceeding targeting Plaintiff's Late-Hour License. Plaintiff was not given notice of the License Revocation Hearing until after it made several statements to the media (described below), after it filed the Appeal (described below), and after Plaintiff paid the renewal fees for its Licenses in September of 2022. Plaintiff's principal was not provided timely or proper notice by BACP, and only learned of the existence of the license revocation proceeding after he was informed that a hold had been placed on Plaintiff's Licenses, roughly ten (10) months after the Summary Closure proceeding had been initiated.

100. On February 8, 2022, the Property was ordered closed by "Order of the Superintendent of Police" pursuant to the Summary Closure Ordinance. (The "Summary Closure" attached as Exhibit 8).

101. The Summary Closure was specific to "The Point" and shuttered the Property only (i.e., no other businesses within the Arts Building were ordered closed by the CPD under the Summary Closure Ordinance.)

102. CPD did not meaningfully interview Plaintiff's employees or conduct a meaningful investigation into Plaintiff's actual conduct on the night of the shooting prior to issuing the Summary Closure.

***Closure of the Arts Building – Conspiracy to Close Plaintiff***

103. At all relevant times, the Arts Building had (and has) several other tenants, and each

tenant has its own address. One such address is 1565 N. Milwaukee Ave, Chicago, Illinois 60622. (List of tenants at the Arts Building attached as Exhibit 9).

104. Although the Arts Building has several addresses, they are all part of the same overall building structure.

105. Upon information and belief, all tenants of the Arts Building reside above a common basement, which runs the length of the entire Arts Building and which is not specific to or leased by any tenant. At all relevant times, the owner of the Arts Building was responsible for the condition and maintenance of the Arts Building basement, structural viability, and fire proofing.

106. On February 7, 2022, Plaintiff's representative Jun "Joe" Lin ("Mr. Lin") participated in a Zoom call with BRG representatives Brian Loft ("Loft") and Breidinger, BRG's "Director of Operations."

107. During the February 7, 2022 Zoom call, Breidinger and Loft expressed sympathy to Plaintiff's representative, Mr. Lin, and stated that FIB did not expect Plaintiff to pay rent during the period in which the Property remained closed. Neither Loft nor Breidinger stated that Plaintiff could not re-open using its Late-Hour License or that either was aware of any opposition the City might have to Plaintiff's re-opening.

108. After Breidinger and Loft's Zoom call with Mr. Lin, Breidinger, Berger, David Baum ("Baum") (CEO of Baum Realty), Mike Demetriou ("Demetriou") (president of Baum) and Doug Renner ("Renner") (managing director of Baum) began coordinating on the best way to handle the February 6, 2022 shooting giving rise to the Summary Closure.

109. While discussing the February 6, 2022 shooting at the Property, Breidinger stated, in part, in an email to Berger, Baum, Demetriou and Renner that:

> [Mr. Lin] also voiced frustration with the police. Before the first shooting, they had called and requested police come about an hour before the shooting happened, and they did not arrive until after. [Mr. Lin] said they literally were begging them to come as things escalated outside. [Mr. Lin] has done his best not to voice this frustration publicly, because he fears retaliation from [CPD] and knows he won't get any help in the future. [Mr. Lin] has also struggled getting any type of response from the Alderman regarding his concerns for the neighborhood and repeated requests for more police presence.
>
> While I have everyone here, I'd like thoughts and guidance on the people living at the Flat Iron. It is a legal and insurance nightmare that people live there - the building is not up to residential code and not zoned for residential use. We will see an increase in vacancies, should we work to eliminate this problem. Should we try to fix this, or leave it to the buyer? Does this issue effect the value of the property?
>
> (February 8, 2022 email from Breidinger attached as Exhibit 10).

110. Prior to February 18, 2022, Mr. Lin participated in a call with numerous CPD officials who requested a walkthrough of the Property so that they could develop a security plan for Plaintiff.

111. Plaintiff agreed with CPD's request for a walkthrough and the meeting was scheduled for February 18, 2022.

112. On February 18, 2022, CPD arrived at the Property with DOB inspectors who then inspected the entire Property and areas of the Arts Building.

113. CPD's request for a meeting on February 18, 2022 to create a security plan for Plaintiff was a ruse and part of the City's plan to use DOB to keep Plaintiff closed beyond the six (6) months allowed by the Summary Closure Ordinance.

114. On or around February 18, 2022, the "Entire Premises" (i.e., the Arts Building) was ordered closed by Department of Buildings inspector Bill Bugajski. ("Arts Building Closure Notice" attached as Exhibit 11).

115. The Arts Building allows for occupancy of numerous of tenants. Some of these tenants include, but are not limited to artist studios, a flower shop, a smoke shop, and numerous

residential tenants who live on the second and third floors of the Arts Building, despite the Arts Building "not up to residential code and not zoned for residential use."

116. Prior to February 18, 2022, FIB and BRG knew that numerous residential tenants were living in the Arts Building illegally.

117. The Arts Building was not cited by DOB for having residential tenants on February 18, 2022.

118. On February 28, 2022, FIB's general contractor, John Lahman of Lahman Construction LLC, stated to Loft via email in response to receiving the Emergency Closure Notice (defined below) that "I have a feeling they came after [Plaintiff] and we got caught in crossfire. I saw the list and its pretty ridiculous what they are asking for, we cannot bring a 100 year old building to 2022 code. Will have to find a middle ground on this." (February 28. 2022 email from John Lahman to Loft attached as Exhibit 12).

119. On February 28, 2022, FIB and BRG learned that it was not possible to bring the Arts Building into compliance with the current and relevant 2022 building code and would need to find a middle ground with the City.

120. On and after February 28, 2022, FIB, BRG, Berger, Breidinger, Olear, Kwan, Forkin, and Savas conspired to "find a middle ground" to keep Plaintiff closed in order to curry favor with the City regarding the *other* building violations at the Arts Building (i.e. residential tenants and "Structural" issues, among others, that affect the entire Arts Building as opposed to just the Property).

121. On March 2, 2022, Breidinger emailed Beaudet stating:

> I am the Director of Operations for Berger Realty Group and want to assure you we are committed to addressing all of the issues cited by the inspectors in regards to The Point as well as the Flat Iron Arts Building.

> Would you be open to getting on a call with me to discuss the issues at hand?
>
> (March 2, 2022 email attached as Exhibit 13).

122. Beaudet responded, stating:

> Thank you for your email. Attached please find a copy of the Emergency Closure Notice for dangerous and hazardous violations and a copy of the 53 violations recorded on February 18, 2022. I believe that the property is being sent to the Circuit Court of Cook County and will be the subject of compliance monitoring by the Court and subsequent inspections to verify compliance. Your architect will be able to inform you as to which building permits will need to be obtained and which will require permits with stamped architectural drawings and other documentation.

(*Id.*). (The "Emergency Closure Notice" attached as Exhibit 14 – violations listed on the Emergency Closure Notice hereafter the "Arts Building Violations.").

123. When Breidinger sent the March 2, 2022 email to Beaudet, she already knew from John Lahman that it was not possible to repair all of the Arts Building Violations or bring the Arts Building up to 2022 DOB code standards.

124. Regarding the Emergency Closure Notice and the Arts Building Violation, the City intentionally combined DOB violations for the Property with DOB violations for the entire Arts Building so that Plaintiff would be unable to complete or even pull permits for all of the Arts Building Violations.

125. On or around March 2, 2022, Beaudet and Breidinger participated in at least one telephone conference. On that teleconference, Beaudet stated to Breidinger something to the effect of, that the City wanted to restrict Plaintiff's hours of operation (i.e., modify Plaintiff's Late-Hour License) or eliminate Plaintiff as an establishment if it were going to continue operating as a 5:00am bar. Beaudet further stated something to the effect of, that FIB terminating Plaintiff's Lease would show alignment with the City's plan, and that FIB would not need to repair the Arts

Building Violations that were keeping Plaintiff closed pursuant to the Emergency Closure Notice. Beaudet further stated something to the effect of, that in exchange for FIB's forbearance on the Arts Building Violations or terminating Plaintiff's Lease, the City would not enforce the Arts Building Violations against the *other* tenants of the Arts Building (i.e., DOB would not close any other tenants of the Arts Building for any Arts Building Violations).

126. Between March 2, 2022 and March 8, 2022, Breidinger relayed all of Beaudet's statements from their March 2, 2022 teleconference to Berger, Olear, Kwan, Baum and its agents, and Forkin.

127. Between March 2, 2022 and March 8, 2022, Breidinger stated to Beaudet, something to the effect of, that FIB, BRG, and the other defendants agreed with the City's plan of action against Plaintiff, and FIB, BRG, and the other defendants' roles in the plan, as discussed on Breidinger and Beaudet's March 2, 2022 teleconference.

128. Upon information and belief, the Arts Building was never subject to compliance monitoring as the case has not been sent to the Circuit Court of Cook County.

129. Although the "Entire Premises" was ordered closed, the Emergency Closure Notice states: "I, Matthew Beaudet, Commissioner of the City of Chicago Department of Buildings… hereby find that the property commonly known as **The Point, located at 1565 N. Milwaukee Avenue**, Chicago, Illinois is a public nuisance that is dangerous, hazardous and endangers the public health…" (emphasis in original). (*Compare* Exhibit 11 with Exhibit 14).

130. As evidence of an alleged public safety threat, the Emergency Closure Notice cites electrical violations, basement violations, "Fire Protection/Egress/Structural Violations", and plumbing violations.

131. FIB was responsible for the "structural repairs for the Arts Building." (*See* FIB's

Responses to Plaintiff's Request for Admissions No. 3 verified by Breidinger and attached as Exhibit 15).

132. Although The Point does not own the Arts Building, the most significant violations cited by the DOB in the Emergency Closure Notice related to common areas of the Arts Building affecting all Arts Building tenants (i.e., basement, "Fire Protection", "Structural" and plumbing violations).

133. Though the "Entire Premises" was ordered closed, the City singled out Plaintiff as the *only* business subject to the Emergency Closure Notice based on Plaintiff's Late-Hour License and as a means to modify or revoke Plaintiff's Late-Hour License.

134. The Emergency Closure Notice concluded: "It has therefore been determined that the building poses an immediate danger to the tenants and occupants of the premises and constitutes an imminent threat to the public at large. THEREFORE, by the police powers vested in me Matthew Beaudet as Chicago Building Commissioner, I hereby order that **The Point, located at 1565 N. Milwaukee Avenue**, Chicago, Illinois be immediately closed, and remain vacant…"

135. Since February 18, 2022, The Point has been the *only* tenant of the Arts Building to have been closed by the City, notwithstanding the fact that the Arts Building Violations cited building code violations relating to the common areas and "Structural" components of the Arts Building. (*See* Exhibit 15, No. 7).

136. Plaintiff was singled out in the Emergency Closure Notice as a means to keep Plaintiff closed longer than the maximum period identified in the Summary Closure Ordinance, and so that the City could either modify or revoke Plaintiff's Late-Hour License during the period wherein Plaintiff remained closed without compensation to Plaintiff. The Emergency Closure

Notice included violations that were for the Arts Building and *not* the Property, causing Plaintiff to be entirely dependent on the owner of the Arts Building to remedy those violations.

137. The City knew Plaintiff would be reliant on the owner of the Arts Building to remedy those violations which is why it made the agreement with FIB, BRG, and the other Defendants between March 2, 2022 and March 8, 2022.

138. On March 2, 2022 at 4:00 pm, Loft emailed Breidinger and Mr. Lin that "As I mentioned before, do Not pull a permit for any building related work. This can backfire significantly on us and you. I understand you are anxious to move forward but it's a big mistake the city has included all the violations under the bar when clearly there are many issues unrelated to the bar. Rachel and I are trying to connect with the Commissioner to see if this can be resolved. (March 2, 2022 email from Loft to Breidinger and Mr. Lin attached as Exhibit 16).

139. On March 2, 2022 at 4:16 pm, Breidinger emailed Loft and Mr. Lin reiterating that "Hi Joe, I am in contact with the Commissioner. We will notify you of next steps. Do not pull any permits." (*Id.*)

140. On March 2, 2022 at 4:24 pm, Breidinger emailed Berger and Olear:

> The problem is the Point Bar, regardless of how unfair it is. We will get no leniency, and John's friend who does consulting for inspections has said the city can drag this out for years, if they want to.
>
> My inclination is to terminate the tenancy to show alignment for what the city wants so we can get on better footing in regards to correcting the violations. Again, I know this isn't fair but my job is to protect the owner's interest!
>
> We can get on a call or just let me know thoughts here - I'm still trying to get on a call with the Commissioner and if/when I do, I'll need to know my angle[.]"
>
> (March 2, 2022 email from Breidinger to Berger and Olear attached as Exhibit 17).

141. On March 2, 2022 at 7:47 pm, Olear responded via email to Breidinger and Berger

that:

> Rachel,
>
> I think you are on the right track. It is obvious that the city is not happy with the bar, got fed up with it, and decided to shut it down. Do we want to stand by Jun and support him in his fight with the city hall? No. Way.
>
> The question is one of terminating his lease in a most legal manner. I believe that he is creating a nuisance to the building and in doing so breaking the terms of the lease. However, this is something that an attorney has to determine and carry out.
>
> If Erica is comfortable losing this tenant, I would say this is our course of action: get Jun out, apply for all necessary permits, make the required repairs, and have the city re-inspect the premises and the building. We will likely need an architect for this. I would ask Brian Hammersley if he would be able to take on this project.
>
> (*Id.*).

142. On March 2, 2022, Breidinger, Berger, and Olear agreed to use unfair, contrived, and fraudulent means to terminate Plaintiff's Lease to "show alignment for what the [City] wants so we can get on better footing in regards to correcting the violations." Breidinger, Berger, and Olear were aware that what the City wanted was in alignment with terminating Plaintiff's tenancy and/or forbearing from completing repair of the Arts Building Violations.

143. On March 2, 2022 at 10:42 pm, Berger responded to Breidinger and Olear stating "[l]et's also ask David Baum what he thinks -- Are you both comfortable with me forwarding this?" (March 2, 2022 email from Berger to Breidinger and Olear attached as Exhibit 18).

144. On March 3, 2022, Breidinger stated to Berger and Olear that:

> When I spoke to Doug [Renner] about this space after the shooting, before this shakedown from the city, he already thought it was a PR nightmare. Let's see what David [Baum] says- I'm pretty confident he will agree.
>
> We will want to get this initiated as soon as possible, if it's the route we choose to go. I'll have to get Cary [Schiff] involved, and that can take some time....

(*Id.*)

145. On March 3, 2022, Olear responded to Berger and Breidinger that he was "fine with that[.]" *See* (*Id.*).

146. On March 3, 2022, Breidginer responded to Berger and Olear that:

> Yes, we will get on the renovations ASAP but the problem with the city will remain so long as Point Bar tries to operate. It would also be easier to work with the city if they think we are aligned with their assessment that the bar is a safety concern to the building and neighborhood.

(*Id.*)

147. On March 3, 2022, Berger forwarded David Baum and Demetriou Breidinger's email (line 140) and Olear's response (line 141).

148. On March 3, 2022, Berger emailed Baum and Demetriou the agreement between Berger, Breidinger, and Olear to terminate Plaintiff's tenancy in order to align with what the City wants, i.e., modification of Plaintiff's Late-Hour License or Plaintiff's inability to operate from the Property.

149. As of March 3, 2022, Berger, Breidinger, Olear, and Baum Realty had knowledge of the agreement posed by Beaudet to Breidinger on March 2, 2022, and knew they could show alignment with the City by terminating Plaintiff's Lease or forbearing on repairing the Arts Building Violations.

150. On March 4, 2022, Demetriou stated to Berger and David Baum in response to Berger forwarding Breidinger's email (line 140) and Olear's response (line 141) that "[w]e've chatted through these issues – it would be best to speak orally. Can you chat later this afternoon, or on Monday or Tuesday?" (*See* Exhibit 17).

151. On Monday March 7, 2022 at 2:00 pm, Berger, Breidinger, Demetriou and David Baum participated in a conference call where they discussed Beaudet's March 2, 2022 agreement

to Breidinger, means to contrive a reason to terminate Plaintiff's Lease without being sued, and how the Arts Building Violations would affect any future sale of the Arts Building.

152. On March 8, 2022, Berger emailed Breidinger a link from a music event set to take place at the Property sometime in April stating "[d]o we think this is happening?" (March 8, 2022 email from Berger to Breidinger attached as Exhibit 19).

153. On March 8, 2022, Breidinger responded to Berger stating "I cannot imagine how it could. The city won't let him open until all the violations are fixed, for the entire building." (*Id*.)

154. As of March 8, 2022 at the latest, Berger, Breidinger, BRG, and FIB were fully aware that the City would not allow Plaintiff to resume operation of its business from the Property until "all the violations are fixed, for the entire building."

155. The Emergency Closure Notice purposefully combined Arts Building Violations [between] the Arts Building and the Property so that it would be impossible for Plaintiff to remedy "all the violations…for the entire building" without assistance from the owner of the Arts Building.

156. As such, FIB's inaction to remedy the Arts Building Violations was willful and in furtherance of its agreement with the City not to remedy the Arts Building Violations until Plaintiff's Late-Hour License was modified or revoked by BACP.

157. Also on March 8, 2022, Breidinger emailed Mr. Lin stating "[h]i Jun, [y]ou can pull permits for The Point Bar, for address 1565 N Milwaukee Ave - only for that address. If you show them your lease agreement, that should suffice for you to get the permits for the space, since the official notice listed multiple addresses." (March 8, 2022 email from Breidinger to Mr. Lin attached as Exhibit 20).

158. Breidinger only authorized Plaintiff to pull permits for the Property once Berger, Breidinger, Olear, BRG,FIB, and Baum Realty agreed with the City to terminate Plaintiff's Lease

or forbear from repairing the Arts Building Violations so long as the Arts Building Violations did not affect any *other* tenants of the Arts Building, and with the agreement the City would not allow Plaintiff to re-open until "all the violations are fixed, for the entire building."

159. Berger, Breidinger, Olear, BRG and FIB never authorized Plaintiff to pull any permits for the Arts Building, as those were violations Berger, Breidinger, Olear BRG, FIB, Baum Realty, Forkin, and Savas had agreed not to fix (explained in detail below). Any repairs made by Plaintiff to the Property would be useless for the purposes of re-opening until the owner of the Arts Building fixed the "entire building."

160. On March 29, 2022, Mr. Lin participated in a Zoom call with Berger and Breidinger.

161. On that Zoom call, Mr. Lin asked Berger when the Arts Building Violations would be completed, and cited the Lease and FIB's obligations to complete repairs on the Arts Building.

162. Berger responded to Mr. Lin by stating that Plaintiff "signed a lease with two dead guys" (apparently in reference to Blake Biggerstaff and Bob Berger), and that she "had nothing to do with it." Berger further stated that "New York real estate" was going to turn the Arts Building into a shopping mall, and that she "did not think the City would ever let [Plaintiff] open again."

163. Mr. Lin responded that he would handle Plaintiff's issues with the City, and that FIB should instead concentrate on repairing the Arts Building Violations.

164. Berger responded by reiterating that she "spoke with someone from the [City] and that [she did] not think the [City] would ever let [Plaintiff] open again." Berger further stated that her "advice" was for Mr. Lin to "walk away."

165. Mr. Lin responded, asking about rent abatement during the period when the Arts Building was ordered closed, a condition that was agreed to with Mr. Loft and Breidinger in

February of 2022.

166. Ms. Berger stated that FIB had, to date, only hired a consultant and had not taken any other steps to repair the Arts Building Violations.

167. Ms. Berger further stated that she had spoken with a number of "politicians and powerful people" and that the City will "never let [Plaintiff] open again."

168. Ms. Berger further stated that Plaintiff "should think about being a 2:00 a.m. bar if [Plaintiff] wanted to re-open, or walk away."

169. On March 29, 2022, Berger expressed the City's desires to Mr. Lin, which is that either, Plaintiff modify the hours of its Late-Hour License or cease operating.

170. On March 30, 2022, Breidinger sent and email to Berger, Olear and Kwan regarding the March 29, 20202 discussion with Mr. Lin. In that email, Breidinger stated:

> I've gone through the lease, and have included my notes below.
>
> The backstory, for Zvonko and Arthur- Erica and I spoke to Joe yesterday in regards to the issues at the Point Bar, and after Joe has intimated that he would be open to "cutting his losses" and closing the business. However, when Erica brought this up during the conversation he basically has implied that he expects to be paid out for all his upfront investment, including his buyout of the previous lease and the costs for the work done to the space.
>
> My main takeaways:
>
> - Firstly, he owes us $74,170 in rent and $40,595 in deferred rent that will come due May 1. The lease specifies several times and in many ways that rent is to be paid regardless of tenant problems or issues. So, we could always serve him a landlord notice demanding rent and while he could try to fight it, I don't see what argument would hold up. **(This is what Cary has advised/will advise us to do, if we can't come to a mutual agreement with Joe.)**
>
> - The lease is a mess in regards to what this space was actually leased for, which could work ultimately in our favor. For example, the lease lists the Use of the premises "only as an art studio/gallery".

- Condition of Premises - Joe agreed that the premises was in good and satisfactory condition when he took possession; whatever work/improvements he made were at his own discretion.

- Should Landlord terminate the lease for breach - tenant would actually owe lump sum payment for the rent through the expiration date, as it's loss of income for us (there's more language around this about fair rental value estimates, but in general we have the right to the money we've lost).
- The only potential issue I found is this portion of Additional Terms on page 2:
**"The effectiveness of this Lease shall be contingent upon Joe Jun Lin closing the purchase of the corporate shares of Tenant. Lease will be effective once all back rent is paid from former tenant."**

Does the contingency put us more on the hook for his investment? I wouldn't think so.

Arthur and Zvonko- thoughts?

(March 30, 2022 email from Breidinger to Berger, Olear and Kwan attached as Exhibit 21).

171. On March 30, 2022, Kwan responded to Breidinger's email chain stating:

First, about the Additional Terms on page 2, as far as I know, Jun already closed the transaction with the former owner of the bar, and he also paid all back rent for the old Flat Iron Bar account (correct me if I am wrong). Because all conditions were met, this term is no longer relevant/has any meaning, and the lease is effective.

Whether the lease stated "only as an art studio/gallery" is irrelevant. We knew he would open a bar and still leased the space to him, so he got landlord approval.

Condition of Premises – he signed the lease, which stated the premises was in satisfactory condition, and he had possession of the space since 7/27/2020, so I don't think he could argue the space is in bad condition.

As for what we should do next, it all depends on what Erica would like to do. If we want him out, we should take the route of evicting him based on the back rent.

(*Id*.)

172. On March 30, 2022, Olear responded to Breidinger's email chain stating "Hi Rachel, Really good work on this. You probably know the history of this lease and how it was pushed through. A quick answer for you - that contingency has been met. Although I cannot say with any certainty that Jun has acquired all the shares from Nick, we have received all back rent

from Nick. [Nick Novich, the previous owner].” (*Id.*)

173. On March 30, 2022, Breidinger responded to Olear, Kwan and Berger stating:

> Thanks for this work and analysis team!
>
> It’s clear that this venue being at the building, irrespective of the measures Jun has taken, is unfortunately too dangerous for the rest of the tenants. We have to think about the entire building, not just this tenant.
>
> That being said, I’m worried about reputational issues; I also don’t want to get sued.
>
> I think evicting him on rent owed // back rent is what makes sense but also seems weak--I’m wondering what other options we have in arguing that the venue is endangering other tenants of the building?
>
> (*Id.*)

174. On March 30, 2022, Olear responded to Breidinger’s email chain stating:

> I am of the opinion that it would turn out to be very difficult to prove beyond any doubt that the venue is endangering other tenants in the building. The venue seems to be affecting the safety of others, in the building and on the street, so we can try, though. Lease default through nonpayment is something that is based in law, and it is in writing. One way or the other, this is likely to end up in court. We may be better off limiting our conversation here.
>
> (*Id.*)

175. On March 30, 2022, Berger, Breidinger, Olear and Kwan began to contrive artificial reasons to evict Plaintiff in furtherance of their agreement with the City to terminate the Lease or forbear on repairing the Arts Building Violations.

176. BRG, FIB, Berger, Breidinger, Olear, and Kwan only allowed Plaintiff to defer its rent while Plaintiff was unable to operate, instead of serving Plaintiff with a 5-day notice for non-payment of rent, so that they could later demand a balloon rent payment in excess of $200,000.00 that they believed Plaintiff would be unable to pay and would serve the basis for a 5-day notice.

177. Olear clearly recognized the fraudulent intent behind their communications which

Case 1:23-cv-00648 Document #: 24 Filed: 05/12/23 Page 31 of 67 PageID #:151

is why he stated "[o]ne way or the other, this is likely to end up in court. We may be better off limiting our conversation here."

178. On March 30, 2022, FIB, BRG, Berger, Breidinger, Olear and Kwan agreed not engage in written email correspondence about their conspiracy with the City against Plaintiff.

179. On April 15, 2022, Breidinger stated to Plaintiff, "We have obtained permits on our end for the work to the Flat Iron Building as a whole and work will begin next week. We will continue to work on our end as efficiently as possible, in the best manner for the building."

180. Prior to May 10, 2022, FIB was contemplating selling the Arts Building and was using Baum Realty as its sales agent.

181. Between May 10, 2022 and July 2022, FIB, BRG, Baum Realty, Berger, Breidinger, an (at least) Forkin had discussions with Savas regarding the sale of the Arts Building, Beaudet's agreement discussed on the March 2, 2022 teleconference with Breidinger, and FIB, BRG, and the other Defendants' agreement with the City to terminate Plaintiff's Lease or forbear from repairing the Arts Building Violations until Plaintiff's Late-Hour License was modified or revoked.

182. Although the Arts Building was eventually sold to four (4) entities in which Savas maintains some level of interest, those entities were not created until, at the earliest, September of 2022, so Savas could not have been operating in any corporate capacity when he directed FIB not to repair the Arts Building Violations and, instead, proceed with evicting Plaintiff in furtherance of the agreement with the City.

183. On May 10, 2022, Breidinger emailed a Jeff Jozwiak ("Jozwiak") of Norcon, Inc.:

> Hi Jeff,
>
> Can we please touch base about the FIB project tomorrow? From what I've been told, the plumbers want to start opening walls in the flower shop to remove the PVC

piping. Depending on the scope of this work, it will take a great deal of coordination on our end with the tenants of the spaces. We cannot move forward with opening walls in occupied spaces until I have a better idea of what this will entail.

(May 10, 2022 email from Breidinger attached as Exhibit 22)

184. Jozwiak responded to Breidinger the same day stating, among other things, that "[y]ou are right, this is very invasive and the finishes will be costly to repair…The problem with not doing it is that you will not pass inspection and your violation notice will remain open." (*Id.*)

185. On May 10, 2022, Breidinger stated to Berger "[b]ad news. In regards to the FIB code violations, PVC piping needs to be replaced throughout basically the entire building and will be massively invasive to tenants." (*Id.*)

186. Berger responded to Breidinger, among other things, that "[g]ood point! Let me know what [Olear] says. And let's ask [Forkin] if he thinks we should tell Jeff we're selling the building- -that might shift his pitch to us on scope of work?" (*Id.*)

187. On May 17, 2022, after discussing with Berger, Breidinger emailed Jozwiak stating "[y]es we have discussed…There are a variety of factors at play here that will inform our decision. We understand the code violations will stay in place if we do not move forward." (May 17, 2022 email from Breidinger to Jozwiak attached as Exhibit 23).

188. On June 7, 2022, Breidinger asked Jozwiak for an update on the repairs to the Arts Building. (June 7, 2022 email from Breidinger to Jozwiak attached as Exhibit 24).

189. Jozwiak responded to Breidinger the same day that "The remaining plumbing work is to replace all of the PVC piping on the upper floors. The rough estimate is $40,000 plus whatever it will take John Lahman to open and close walls and ceiling, which could be a large number. The remaining electrical is to replace exit signs and emergency lights throughout the building, as well as installing a new electrical service to the fire pump. Those two rough estimates are attached."

(*Id*.)

190. On June 7, 2022 Breidinger emailed Berger, Olear, and Forkin stating "[p]lease see below for outstanding violations at FIB. We've discussed we would not move forward with the PVC piping replacement, but a few other issues have come up to take into consideration. In my opinion, the electrical work for the fire pump and emergency lighting/exit signs is directly tied to life safety and should be completed even if sale is imminent." (June 7, 2022 email from Breidinger attached as Exhibit 25).

191. Although FIB was aware the Property would not be cleared to open until the "PVC piping replacement" was [remedied], FIB and BRG made the conscious decision not to complete this work, while at the same time representing to Plaintiff that they were.

192. As of June 2022, FIB had not made any repairs to the "Structural" or "Fire Proofing" violations cited in the Emergency Closure Notice.

193. On June 8, 2022, Breidinger, on behalf of BRG, responded to Plaintiff's on June 7, 2022 letter stating, among other things, that it had pulled all necessary work permits for the Arts Building, that there is some work that may not be complete by the requested date, that "[a]s far as rent abatement, we communicated that we may decide to defer rent payments until The Point was allowed to operate again, but never that rent would be fully abated. Regardless, no agreement was ever formalized by written amendment to the lease," and that Plaintiff is somehow in breach of the Lease. (June 8, 2022 correspondence attached as Exhibit 26).

194. On June 9, 2022, Forkin emailed Breidinger and Berger stating "Rachel…Does ownership face any immanent legal or monetary repercussions for not completing this work? The fact is, most likely, a buyer is going to have a list of items that he would like to have fixed before closing on the sale. If these items are already crossed off before we get to that point, then they will

just find something else. If these items could be pushed off for another month or so, without any repercussions, they (sic) I recommend we hold off. If this is a legal matter, then legal counsel should be considered." (*See* Exhibit 25).

195. On June 9, 2022, Breidinger responded to Forkin, Berger, and Olear that:

> Hello Patrick!
>
> There is no imminent legal or monetary repercussions. The only repercussions would be if the fire pump failed during an emergency and lives are lost. Similarly, if the emergency lighting and exit signage fails during an emergency and there are injuries or deaths as people try to get out.
>
> I personally believe we still have an obligation to the safety of the tenants for these particular issues, at the very least the fire pump. The sprinkler/fire alarm system does not work without the fire pump. The electrical work to the emergency lighting and exit signage I suppose could be put off, but it's not that expensive relatively speaking and is part of the life safety system of the building.
>
> [Olear], what do you think?
>
> (*Id*.)

196. On June 16, 2022, Forkin emailed Breidinger and Berger stating:

> Hi Erica!
>
> Don't mean to catch you on your way out of town but I want to get this in the universe. I'm thinking about the letter from Point Bar, and their hope to re-open by August 22 (the hearing is set for this date). If the city truly will not allow them to re-open until all violations on that list are fixed, then we have to consider moving forward with replacing the PVC piping on floors 2 and 3 at about $80,000 total cost.
>
> My reasoning for this is because I do not doubt for a second that Joe will try to file some sort of lawsuit against you and start screaming to anyone who will listen that Berger Realty has been aware of code violations for months that have not been corrected. He will try to get his story in the news.
>
> If we don't close until October, I think we have to deal with this Joe situation a little more proactively.
>
> Anyway, those are my thoughts. Whenever you are back in work mode we can discuss further!

(June 16, 2022 email from Forkin to Berger and Breidinger attached as Exhibit 27).

197. On June 17, 2022 Berger responded to Forkin and Breidinger asking "[w]hen did we find out about the scope of the pvc pipe work?"

(*Id*.)

198. On June 17, 2022, Forkin responded to Berger and Breidinger stating:

> Rachel mentioned the PVC some time ago. The recommendation has always been to leave everything status quo. It's debatable who is responsible for this and it makes The Point in default of their lease which is an opportunity for buyer to kick them out.
>
> Also the buyer is purchasing as-is so they are expecting there to be work like this that is necessary for them to get done. This is where having a group like ours is a good thing. Any lender or large corp is more likely to put up a fight for more of these things.
>
> I'll bring this up lightly to Savas today when we go see the basement.
>
> (*Id*.)

199. Beginning on at least June 17, 2022, Forkin had full knowledge of the conspiracy between Berger, Breidinger, Olear, Baum, and the City.

200. On June 17, 2022 Patrick Forkin had a meeting with Savas at the Arts Building. At that meeting, Forkin told Savas, which may not have been for the first time, that FIB, BRG, Berger, Breidinger, Olear, Kwan, Baum Realty, and Forkin had agreed not to terminate the Lease or forbear from completing all of the Arts Building Violations, and that FIB (and the other defendants) were working to contrive a reason to terminate Plaintiff's Lease in order to curry favor with the City so that the Arts Building Violations would not be enforced against the *other* tenants of the Arts Building. At that meeting, Savas told Forkin to direct FIB (and the other defendants) not to finish the repairs of the Arts Building Violations.

201. Savas had an interest in maintaining leniency with the City with respect to the City

not enforcing the Arts Building Violations against the *other* tenants of the Arts Building since Savas was in discussions to purchase the Arts Building, and had even negotiated the forbearance of repairing the Arts Building Violations into the purchase of the Arts Building.

202. On June 17, 2022, Breidinger sent Forkin the "two rough estimates" attached to Jozwiak's June 7, 2022 email. (*See* Exhibit 28).

203. On June 17, 2022, Forkin responded to Breidinger and Berger that:

> FYI - Savas thinks we should proceed with evicting [Plaintiff]. Don't waste money on PVC. They are in default of lease so should instead work on getting them out of there.
>
> [Savas] understands could be (sic) some backlash but given recent events they are at a weak point with the community already so now is a good time.

(*Id.*)

204. On June 20, 2022, Berger responded to Forkin and Breidinger that "[g]ot it--and they confirmed they don't want them in there as the new buyers, yes? Even with a potentially renegotiated lease to earlier hours? Just trying to cover all my bases in advance of a backlash from the owner." (*Id.*)

205. On June 20, 2022, Forkin responded to Berger and Breidinger stating "[y]es. But I would maybe get a legal opinion on this as well. And perhaps confirm with the buyer's counsel too. Or just continue to push it off, avoid fixing the PVC, and let the buyer deal with all those issues." (*Id.*)

206. On June 20, 2022, Berger responded to Forkin and Breidinger stating, "I would prefer the latter." (*Id.*)

207. On June 20, 2022 Forkin responded to Berger and Breidinger stating, "[u]nderstood." (*Id.*)

208. On June 21, 2022, Breidinger responded to Berger and Forkin that, "10-4! I am

going to consult with Cary [Schiff] to see if he can identify any potential legal liability for the August 22 hearing date. The buyers not wanting to move forward with PVC right now should shield any of that, but just in case!" (*Id*.)

209. On July 26, 2022, Mike Demetriou sent Berger a Block Club Article titled "Wicker Parks The Point Must Stay Closed Until August but City Report Shows Bar Had Little To Do With Shootings That Forced Its Closure." (July 26, 2022 email attached as Exhibit 29).

210. On July 26, 2022, Berger responded "[t]hank you for sending--I was the one who said I wouldn't allow him to stay open that late when he and chatted back in March / April..." (*Id*.)

211. On or around August 26, 2022, Plaintiff responded to FIB and BRG through counsel stating, among other things, that FIB "ha[d] failed to address several outstanding building violations, including at least the issues related to the basement of the Arts Building, which include (1) the required fire separation for the basement ceiling, (2) structural issues, and (3) the proper manhole cover. In any event, we are informed that you have not requested the scheduling of a final inspection. We are advised by the City of Chicago Building Department that we will not be permitted to re-open The Point until such time as those violations have been cured..."

212. On or around September 13, 2022, FIB responded through counsel stating, among other things, that counsel would not provide any new information on the status of the Arts Building Violations, that Plaintiff is responsible for its own "exigent financial circumstances," and that Plaintiff owes $242,428.80 in back rent.

213. Plaintiff did not learn until March 31, 2023 that FIB's September 13, 2023 demand for rent was part of a calculated effort to defer Plaintiff's rent until it reached an amount BRG, FIB, and the other defendants assumed Plaintiff would be unable to pay, so that a later demand for a balloon payment in excess of $240,000.00 could be made to Plaintiff, the amount of the demand

being accumulated during a period Plaintiff was shut down by FIB's inaction, in order to contrive a reason to terminate Plaintiff's Lease.

214. FIB demanded in excess of $240,000.00 from Plaintiff in furtherance of its agreement with the City to terminate Plaintiff's Lease.

215. Breidinger further stated on March 30, 2022 that she had already spoken with Mr. Schiff about the plan to terminate the Lease, that FIB "will get no leniency, and John's friend who does consulting for inspections has said the city can drag this out for years, if they want to," that her "inclination is to terminate the tenancy to show alignment for what the city wants so we can get on better footing in regards to correcting the violations," that Plaintiff "…owes us $74,170 in rent and $40,595 in deferred rent that will come due May 1," and "[t]he [L]ease specifies several times and in many ways that rent is to be paid regardless of tenant problems or issues. So, we could always serve him a landlord notice demanding rent and while he could try to fight it, I don't see what argument would hold up. **(This is what Cary has advised/will advise us to do, if we can't come to a mutual agreement with Joe.)**" (emphasis in original) (*See* Exhibit 17).

216. This is in addition to Kwan's email on March 30, 2022 that, "[a]s for what we should do next, it all depends on what Erica would like to do. If we want him out, we should take the route of evicting him based on the back rent." (*Id.*)

217. Although Breidinger identified on March 30, 2022 that Plaintiff's "deferred rent…will come due May 1," FIB did not demand rent from Plaintiff until September 13, 2022.

218. Although Plaintiff was under the impression that it had an agreement with FIB for the rent deferral during the Property closure period, Plaintiff paid all back rent to FIB when asked to do so, thus depriving FIB a valid reason to evict Plaintiff based on back rent.

219. On October 17, 2022, Breidinger emailed Martha Coronado, NARE Flat Iron, LLC's ("NARE") Director of Property Management, stating:

> I'm not sure if you're aware, but the building was hit with a long list of code violations following a shooting that happened outside of the Point Bar. The tenant of that space did not do himself or us any favors in his dealing with the city following that incident - which led to a raid on the building and a long list of violations that needed to be cured. We can talk more about this on Wednesday!
>
> Most of the infractions found were electrical and plumbing related, which we completed – I've attached a mark-up of the violations list here so you can see what was completed by us. Anything that says "BAR" was the responsibility of the tenant for the bar space, and anything highlighted in yellow is still outstanding (Savas is aware). The rest were completed and would have been the most recent updates to the plumbing and electrical for the building.

(October 17, 2022 email from Breidinger to NARE attached as Exhibit 30; attachment of October 17, 2022 email attached as Exhibit 31 and referred to as "Outstanding Violations").

220. As of October 17, 2022, and per their agreement to forbear from repairing all of the Arts Building Violations, Berger, Breidinger, Olear, Kwan, FIB, BRG, Baum Realty, Forkin and Savas caused substantial Arts Building Violations to remain outstanding, which all Defendants knew would need to be completed for Plaintiff to re-open.

221. On October 25, 2022, FIB's real estate attorney for the closing on the Arts Building circulated Plaintiff's initial complaint for breach of contract against FIB stating "[p]lease find attached a copy of the Complaint we received this afternoon regarding a Tenant Dispute. After your review, we can schedule a call to discuss further. Please note that the underlying Tenant Dispute was contemplated in the PSA and Purchaser was aware of the same." (October 25, 2022 email attached as Exhibit 32).

222. On October 27, 2022, counsel for the Buyer's on the closing for the Arts Building left FIB a voicemail "about escrowing additional funds related to the remaining code violations that need to be addressed other than those related to The Point." (October 27, 2022 email attached

as Exhibit 33).

223. On October 27, 2022, Berger emailed Forkin and Breidinger stating:

> They knew about the violations all summer - Patrick can you handle this? I'm not paying in advance for this work that they'll be doing - we already agreed they would do it, otherwise I would have done it myself this summer. By putting it off for them to do (which we agreed), I'm now in the lawsuit.
>
> It feels like they're nickel and dining (sic) as though we weren't transparent throughout the whole deal.

(*Id*.)

224. On October 27, 2022, FIB's counsel for the closing responded to Berger stating "[a]greed and this was my understanding." (*Id*.)

225. On October 27, 2022, Forkin responded to Berger and Breidinger that "I agree. While there was no formal complaint until now, they were aware of the issues at the present time and those issues were part of the negotiation at contract." (*Id*.)

226. On October 27, 2022, counsel for Buyers on the closing for the Arts Building stated "We are waiting to hear back from our client regarding the escrow for the Point Bar complaint. In the meantime, can you please draft the escrow agreement with your office holding the funds?" (*See* Exhibit 34).

227. FIB's closing attorney responded "I discussed a potential escrow for the remaining code violations with my client and they are not willing to do so as the Buyer previously communicated to them to not address such items during the Feasibility Period; otherwise, [FIB] would have remedied the same."

228. FIB later sold the Arts Building (on or around October 31, 2022) without ever completing the Arts Building Violations.

***BACP Prosecution – Summary Closure***

229. CPD, citing the Summary Closure Ordinance, ordered the Property to be closed, effective February 8, 2022.

230. Plaintiff timely submitted a request for a Probable Cause Hearing, and that request was accepted by BACP.

231. Between February and March of 2022, Plaintiff attempted to negotiate a Nuisance Abatement Plan with BACP.

232. By agreement, Plaintiff and BACP continued the Probable Cause Hearing in the hopes of finalizing a Nuisance Abatement Plan.

233. Plaintiff saw little downside in attempting to negotiate a Nuisance Abatement Plan with equitable terms, as DOB had ordered the *entire* Arts Building closed on February 18, 2022; and that inclusive closure would have prevented Plaintiff from opening even if it had finalized a Nuisance Abatement Plan or prevailed at the Probable Cause Hearing.

234. During this same time period, FIB also represented that it would address and remedy the Arts Building Violations.

235. On February 15, 2022, representatives from Plaintiff, the City, the CPD, and BACP participated in a remote meeting.

236. During that meeting, City's counsel suggested that CPD conduct a security walkthrough at the Property to review Plaintiff's proposed security plan.

237. On February 18, 2022, Plaintiff's and the City's respective representatives conducted a walkthrough of the Property to discuss Plaintiff's security plan.

238. Although the walkthrough's purpose was to enable a discussion between Plaintiff's principal and CPD to establish parameters of a security plan that would be included within a

Nuisance Abatement Plan, City inspectors DOB were brought to the Property on the security plan walkthrough, and subsequently issued the Arts Building Violations and Emergency Closure Notice.

239. Upon information and belief, the security plan walkthrough was only a ruse to facilitate entry into the Property by representatives from the Department of Buildings such that they could identify alleged building code violations designed to keep Plaintiff closed beyond the maximum period identified in the Summary Closure Ordinance (i.e., the Emergency Closure Notice).

240. As of February 18, 2022, Plaintiff was completely dependent on FIB to repair the Arts Building Violations since the "Entire Premises" was ordered closed by the City, and Plaintiff was not permitted to pull or obtain permits for areas outside its leased premises. Even if Plaintiff would have entered into a Nuisance Abatement Plan, it would not have been able to re-open until the Arts Building Violations were repaired, or the City withdrew them.

241. On February 17, 2022, BACP sent its "initial draft" of the Nuisance Abatement Plan (the "Initial Draft").

242. The Initial Draft provided, among other things, that the "incident…occurred outside of the licensed premises," that the Nuisance Abatement Plan would include a "heightened enforcement of rules on the licensed premises to be applied immediately upon reopening," that "[Plaintiff] shall be open no longer than 2:00AM on Sunday night through Friday night; and 3:00AM on Saturday night," and that Plaintiff "shall... [s]upply at least six (6) trained and licensed security guards who shall patrol both the interior and the immediate exterior areas of the Premises, *including across the street*, until thirty (30) minutes after closing." (emphasis added).

243. The only language included in the Initial Draft which would allow for Plaintiff to

Case: 1:22-cv-06648 Document #: 24 Filed: 03/08/23 Page 43 of 67 PageID #:3692

be released from the requirements of the Nuisance Abatement Plan was: "[s]ix (6) months after the execution of the Nuisance Abatement Plan, [Plaintiff]… can contact the Chicago Police Department and the Department of Law to *potentially* set up a meeting with respect to the modification in the hours of operation." (emphasis added).

244. The plain language of the Initial Draft included no criteria or direction that (even after the 6-month statutory period had lapsed) Plaintiff could follow to seek release from the requirements, or to show that it had complied fully with the Initial Draft, such that the terms would no longer restrict Plaintiff's business.

245. Upon information and belief, the City only enters into Nuisance Abatement Plans which allow the City the option to extend the terms of the Nuisance Abatement Plan at its sole discretion, without objective criteria, and in perpetuity.

246. Nuisance Abatement Plans also state that, "[t]he conditions imposed pursuant to [a] [Nuisance Abatement Plan] shall apply to the business address, Licensee, and to all officers, managers, partners, and direct and indirect owners of the licensed entity" and "[t]he sale of the business… does not void the above conditions on the license."

247. Not only would agreement to enter into the Nuisance Abatement Plan have affected Plaintiff's operation of the bar and its ability to remain profitable, but would also have negatively impacted in its Late-Hour License and the value of the business moving forward and/or in the event Plaintiff resolved to sell or transfer its Late-Hour License.

248. On March 8, 2022, Plaintiff's counsel sent revisions to the Initial Draft (the "Revised Draft").

249. The Revised Draft accepted the restricted hours, but specifically sought criteria that would prohibit the Nuisance Abatement Plan to extend in perpetuity, at the City's sole discretion,

and with no guarantee of due process to allow the Plaintiff the opportunity to be relieved of the plan's restrictions should it meet the plan's criteria (i.e., to have an independent body evaluate the City's position.)

250. Plaintiff's Revised Draft specifically excluded the City's proposed requirement that Plaintiff be required to "patrol… across the street" from the Property, as Plaintiff is not legally permitted to police a City-owned public way that has association with or adjacency to the Property.

251. BACP did not provide comment on the Revised Draft until March 29, 2022 (the "Third Draft"), twenty-one (21) days after Plaintiff's counsel sent the Revised Draft.

252. The Third Draft did not reintroduce the requirement that Plaintiff patrol across the street from the Property; however, BACP did remove Plaintiff's proposed language designed to ensure that the Nuisance Abatement Plan could not extend indefinitely and without available due process.

253. The Third Draft mirrored the language of the Initial Draft in stating that "[s]ix (6) months after the execution of the Nuisance Abatement Plan, the [Plaintiff] and their representative can contact the Chicago Police Department and the Department of Law to *potentially* set up a meeting with respect to the modification in the hours of operation." (emphasis added).

254. Following the exchange of competing drafts, Plaintiff was left with only two options: (1) sign a Nuisance Abatement Plan for an indefinite period of time that rendered Plaintiff's Late-Hour License meaningless and valueless; or (2) proceed to a Probable Cause Hearing.

255. Plaintiff's principal reached out to the Executive Director of the Public Building Commission of the City, Carina Sanchez, in an effort to obtain more information and to provide any advice she might offer to assist in remedying Plaintiff's quandary. Ms. Sanchez stated to Mr.

Lin that she had received a call from Beaudet, who told her he would not communicate with her concerning Plaintiff or Mr. Lin in writing. Beaudet further admonished Ms. Sanchez that she should "not get involved with [Plaintiff or Mr. Lin]."

***The Probable Cause Hearing***

256. In support of the Summary Closure, BACP submitted a Vice Investigation Report (the "Vice Report") which purported to outline the basis and support for the Summary Closure. (Vice Report attached as Exhibit 35).

257. The Vice Report was created February 9, 2022, and was *never* amended to include any of the mitigating factors that weighed against Summary Closure, including the fact that Plaintiff found and relayed the identity of the Suspects to CPD.

258. The "Purpose" of the Vice Report is as follows:

> Investigating officer (I/O) has initiated this Summary Closure report upon assignment by Lt. Chibe #591 on 07 February 2022. The closure was initiated following two (2) aggravated battery with a gun incidents, one (1) Liquor license violation where citations were issued… and one (1) Weapons Violation arrest. The shooting incidents occurred in a four (4) month span leaving a total of six (6) persons shot with one (1) fatally. The Continued operations of [The Point] presents an immediate and on-going public safety threat and warrants the application of Summary Closure.

(*Id*.).

259. The referenced "Liquor license violation" is the Citation.

260. The Vice Report made clear that the relevant issues to be considered were contained within the Report's self-described "Purpose." Specifically, summary closure was "warrant[ed]" based on two (2) gun incidents, one (1) liquor license violation, and one (1) weapons violation arrest. (*Id*.)

261. On June 22, 2022, a Probable Cause Hearing (the "Probable Cause Hearing") was conducted before an administrative officer (the "Commissioner").

262. At the Probable Cause Hearing, BACP presented its case "on paper" and submitted the Vice Report (with accompanying exhibits) as its *only* evidence in the matter. BACP did not call any fact witnesses to provide foundation, context or other support for the information contained in Vice Report. Plaintiff's hearsay objections were overruled, though Plaintiff acknowledges that the rules applied at the Probable Cause Hearing included relaxed evidentiary standards regarding hearsay evidence.

263. Plaintiff was denied the right of cross examination to question any witness possessing knowledge as to how the Vice Report was compiled, or what underlying information was relied upon in creating the Vice Report.

264. Prior to the Probable Cause Hearing, Plaintiff was unaware that the City did not intend on calling any witnesses to lay the foundation or otherwise to support the statements made and conclusions drawn in the Vice Report.

265. Plaintiff was left with the burden of defending itself against unsupported conclusions of law and fact.

***The Ruling***

266. On July 8, 2022, the Commissioner issued his ruling "Affirming the Summary Closure After Probable Cause Hearing" and held that, "[b]ased on the totality of the circumstances, the City of Chicago/BACP proved by a preponderance of the evidence, that a public safety threat occurred at [The Point] on February 6, 2022." (The "Final Order" attached as Exhibit 36).

267. According to the Summary Closure Ordinance "'Public safety threat' means the occurrence of all of the following: (1) a violent offense occurs at an establishment during the establishment's operating hours, and (2) the violent offense involves acts of the licensee/owner, or its employees, agents or patrons, or otherwise involves circumstances having a nexus to the

operation of the establishment, and (3) the superintendent reasonably determines, based on data or information in the superintendent's possession, that continued operation of the establishment presents a danger to the public."

268. Regarding the Citation, the Final Order held that the Vice Report was not clear on the allegations regarding the single liquor license violation, and that BACP did not prove that a Liquor License violation occurred by a preponderance of the evidence.

269. Regarding the alleged weapons violation, the Final Order concluded that the offender from that incident was arrested across the street and down the block from the Property, and that neither the female offender nor the CPD officer testified at hearing, that the Vice Report "…does not specify what the name of the bar was, where it was located, or when the altercation occurred," and that the female individual who was arrested never entered the Property and was not one of their patrons. (*Id*. at p. 4, ¶ 10).

270. Regarding the October shooting, the Final Order stated "[t]he mere unfortunate fact that some of [The Point's] patrons may have gotten caught in the crossfire of several unlawful individuals who were loitering on said block at said time, cannot be attributed to [Plaintiff], any more than it can be attributed to other businesses located on said block." (*Id*. at pp. 5-6, ¶ 10).

271. Regarding the February shooting, the Final Order stated:

> While the Licensee could not have reasonably anticipated, that the individual who perpetrated the shooting would engage in such activity, a "public safety threat" being considered under a "probable cause hearing" under the Municipal Code of Chicago does not factor in reasonability, probability, or fault. While these topics potentially could be considered in a "nuisance abatement hearing", these are considerations beyond the purview of the instant hearing.
>
> Here, [The Point] demonstrated that the perpetrator submitted to the security requirements outside the front door without incident, including providing identification, having a hand held metal detector waved over his person, and allowing a physical pat-down of his person. Nevertheless, said

> perpetrator is observed on video purchasing one (1) drink from the bar with his own credit card, leaving [The Point]'s establishment, and returning almost immediately thereafter to a location across the street from [The Point] wherein he proceeded to fire several bullets into the establishment causing an individual within [The Point]'s establishment to suffer a facial wound. Thus, the nexus of a patron causing a public safety threat as those prevailing terms are defined under the Municipal Code of Chicago, are satisfied.
>
> (*Id*. at ¶ 12).

272. Although *no* elements required to demonstrate a public safety threat were established at hearing, Plaintiff was nonetheless ordered to remain closed under the Summary Closure Ordinance.

273. The Vice Report was not amended to include the findings in the Final Order.

***Plaintiff's Appeal of the Summary Closure***

274. On August 12, 2022, Plaintiff timely filed a Complaint for Administrative Review with the Circuit Court of Cook County seeking to reverse the Final Order. That matter is currently pending under Case No. 2022 CH 07916 (the "Appeal").

275. Plaintiff argues, generally and among other things, that the Commissioner improperly decided the Final Order based on a lack of evidence presented by the City, and that Plaintiff was denied due process, noting that the Final Order claimed "[w]hile [Plaintiff] could not have reasonably anticipated that the individual who perpetrated the shooting would engage in such activity, a 'public safety threat' being considered under a 'probable cause hearing'… does not factor in reasonability, probability, or fault."

276. Upon information and belief, the Final Order can be cited by the City and used as evidence of a disciplinary history against Plaintiff in any future disciplinary hearing (i.e., a License Revocation Hearing).

***Plaintiff's Statements to the Media***

277. Plaintiff's principal, Joe Lin, made several statements to the media that were critical of the City, accused the City of "scapegoating" Plaintiff, and explained how Plaintiff was in no way responsible for the City's rising crime problem.

278. In an October 13, 2021 Block Club Chicago article, Mr. Lin stated that, prior to a shooting on Milwaukee Avenue, Plaintiff "closed 90 minutes early because staff grew concerned over rowdiness on the street… [b]ar staff called 911 several times to request police assistance ahead of the shooting." (Exhibit 44).

279. The same February 7, 2022 article referenced above quotes Mr. Lin as stating, "he can't be blamed for what has become a 'Chicago violence problem.' The city recorded nearly 800 homicides last year, the most in 25 years," and "[w]e're doing everything we can in terms of being a business. We were simply victimized twice with shootings. That's violence in Chicago. I don't think the answer is to my close business, when we haven't done anything wrong." (*See* Exhibit 5).

280. On May 12, 2022, Block Club Chicago published an article titled "Closed Wicker Park Bar Says It's Being Scapegoated For City's Crime Spike, Poses No Safety Threat." That article quoted Plaintiff's allegations in a filed document stating "[Plaintiff]'s operation and mere existence is not a threat to public safety; rather, the city is scapegoating [Plaintiff] to distract from the city's failure to control the increase and proliferation of crime throughout neighborhoods in the city of Chicago, including the very area in which [Plaintiff] resides." (Exhibit 37).

281. On July 26, 2022, Block Club Chicago published an article titled "Wicker Park's The Point Must Stay Closed Until August — But Report Shows Bar Had Little To Do With Shootings That Forced Its Closure." Mr. Lin is quoted stating, "[w]e did nothing wrong…[w]e were the victims in this, and the city comes back and lashes out at the business owners. …This is

nothing more than scapegoating, and I believe the hearing proves, the facts of it prove, that they are scapegoating." The article further states:

> But the night of the shooting, the bar's staff did everything right, and they used video to identify Montgomery on social media, which helped lead to his arrest, Lin said.
>
> Lin said the report issued by the city essentially backs that up, and the city's reasoning rests only on the crime occurring within the "nexus" of The Point.
>
> Under that standard, the city's logic could be applied to anyone doing business within proximity to violent crime, Lin said.
>
> "If you read the body of the [hearing] ruling, I'm guilty of not being able to read a person's mind of what they do after the fact, that's all. How can I reasonably predict what someone's going to do after they leave my establishment?" he said.
>
> (Exhibit 38).

282. Mr. Lin was quoted in a Chicago Sun-Times Article which states that "[t]he only thing I'm guilty of is, I couldn't read someone's mind." The article further stated that "[Mr. Lin] thinks the judge's line of reasoning sets a dangerous precedent for business owners… 'It's the perpetrator that should be punished… not the innocent business that the city — through this investigation — could not prove one thing we did wrong." (Exhibit 39).

283. Regarding Plaintiff's Late-Hour License, that same article states "[Alderman] La Spata says he hopes the Point will voluntarily make changes — including possibly forgoing its 5 a.m. license — before reopening."

284. Since February 7, 2022, but before any License Revocation Hearing or charge seeking to revoke Plaintiff's Late-Hour License was noticed or overtly put in "the queue" by BACP, Plaintiff's principal made numerous public statements regarding the City's crime problem, that Plaintiff is not the source of the crime in the area, and that Plaintiff is being used as a "scapegoat" to conceal the City's inability to control the proliferation of violent crime.

***22-LR-11 and Plaintiff's Licenses***

285. Prior to Plaintiff's Licenses expiring on November 15, 2022, Plaintiff took all necessary and possible steps to have its Licenses renewed before they expired so that Plaintiff could re-open as soon as possible pending the repairs of the Arts Building Violations.

286. Plaintiff paid the fees associated with its PPA on September 22, 2022, in the amount of $770.00.

287. Plaintiff paid the fees associated with its Tavern License on September 22, 2022 in the amount of $4,400.00.

288. Plaintiff paid the fees associated with its Late-Hour License on September 22, 2022 in the amount of $6,000.00.

289. On October 12, 2022, Mr. Lin spoke with Mark Mulyk, a City inspector, who informed Mr. Lin that Plaintiff could not renew its PPA until the Arts Building passed inspection and Plaintiff is permitted to open by the City.

290. On October 28, 2022, Plaintiff filed a Complaint seeking injunctive relief to, among other things, compel FIB (later amended to compel the New Owners (defined below)) to repair the Arts Building Violations or stay Plaintiff's rental obligation for the Property.

291. Plaintiff was granted a temporary restraining order on January 20, 2023 staying Plaintiff's rental obligation to the New Owners (defined below) for the Property until the Arts Building Violations are repaired.

292. With regard to Plaintiff's Tavern License and Late-Hour License, Plaintiff learned on November 11, 2022 that Plaintiff's Licenses, as well as Plaintiff's principal's license for a different bar for which he also serves as principal, Bourbon on Division ("Bourbon"), were on "hold."

293. After learning that the Licenses and Bourbon's licenses were on "hold," Plaintiff immediately sent this information to the City seeking further information.

294. In response, on November 17, 2022, a City representative wrote in an email to Mr. Lin:

> There are two license adjudication holds on your account for two cases handled by Assistant Corporation Counsel… The first case, 22-SC-0002, you appealed under 22-CH-07916. The second case, 22-LR-0011, involves alleged violations on February 6, 2022, and will be heard before the Mayor's License Discipline Commission (MLDC). [Assistant Corporation Counsel] should be able to provide you with information about 22-LR-0011 and when it will be set before the MLDC.
>
> I overrode the license adjudication holds for the Public Place of Amusement application, the Tavern renewal application, and Late Hour renewal application so they should not prevent the licenses from issuing. However, there is also a hold on the account for the Department of Buildings closure order that can only be removed by the Department of Buildings.
>
> (Exhibit 40).

295. The same City representative also wrote: "License adjudication holds are place (sic) whenever a case is referred to the Law Department. The holds were on the account prior to September 22, 2022." (Exhibit 41).

296. The City representative further stated that he had removed the holds on Bourbon's licenses, and Plaintiff's principal was allowed to renew and pick up the licenses for Bourbon the next day.

297. Plaintiff's principal was given licenses for Bourbon, but they did not include the Mayor's signature, requiring Plaintiff's principal to return to City Hall to obtain licenses with the proper signatures.

298. When Mr. Lin continued making inquiries to the City via email, the same City representative stated that Mr. Lin would have to appear and speak in person.

299. Plaintiff was not given notice by the City, and otherwise had no knowledge of the apparent existing matter (22-LR-11) prior to November 17, 2022.

300. The existence of 22-LR-11 directly contradicted a representation made roughly one month prior by the Assistant Corporation Counsel within BACP assigned to prosecute Plaintiff.

301. On September 22, 2022, Plaintiff's counsel emailed that Assistant Corporation Counsel, requesting information about "whether there is any order or edict in place from the Dept. of Buildings or any other City agency that would prevent The Point from reopening?"

302. Assistant Corporation Counsel responded the same day stating:

> I can't speak with regards to [DOB] and every other City agency, but as far as the summary closure instituted by CPD is concerned, [The Point is] free to open as the summary closure expired on August 8, 2022. If [DOB] has inspected and passed all outstanding violations for your client's premises, and they have given your client confirmation that they have lifted their Commissioner instituted closure, your client should be able to open. You may want to double check with [DOB] to confirm that the commissioner closure has been lifted.

303. When Plaintiff and its counsel learned of the existence of 22-LR-11, Plaintiff's counsel asked Assistant Corporation Counsel if he was aware of any details surrounding 22-LR-11.

304. Assistant Corporation Counsel responded on November 17, 2022, stating "[t]he case is in the queue to be worked up and has not yet been set before the MDLC. Once it is ready to proceed, I will send the notice of hearing to your client, at the premises address and their registered agent."

305. On November 18, 2022, and only after counsel for Plaintiff demanded more information concerning the apparent charge, Assistant Corporation Counsel sent Plaintiff's counsel the Notice of Hearing for 22-LR-11 (the "Revocation Notice"), as well as the factual underpinnings and evidence which BACP would use to prosecute its case.

306. Revocation of a liquor license is an "extraordinary remedy."

307. The Revocation Notice lists a single count based *only* on the Citation. The relevant issues surrounding the Citation were previously litigated in the Probable Cause Hearing, wherein the Final Order – issued in July 2022 – found that BACP did *not* prove that a liquor license violation occurred by a preponderance of the evidence (and, relatedly, that the Vice Report was not clear on the allegations regarding the single liquor license violation.)

308. The information provided by BACP in support of the Revocation Notice included the Vice Reports, the Citation, and a City document stating that the Citation had been non-suited by the City.

***The New Owners***

309. The Arts Building was sold to NARE Flat Iron, LLC, CCT Flat Iron LLC, Buzzpartners Flat Iron LLC, and DM Flat Iron LLC (the "New Owners") on or around October 31, 2022.

310. On November 4, 2022, Mr. Lin had a conversation with Savas in person at the Property. Also present at the meeting was Liviu Chiru.

311. Savas stated he wanted to "see the [Property]" and to get a "fresh start."

312. Savas further stated that "I am the new owner," and that Plaintiff "may have had issues with the old owner, but those issues were not with him." Savas further stated that "I see there is a lawsuit, so do not add me since I have an indemnity clause."

313. Mr. Lin responded that FIB had refused to fix the Arts Building violations and that all Plaintiff wanted to do was open its business.

314. Savas responded that he "wants [Plaintiff] to open" so that Plaintiff can "pay rent."

315. Savas further stated he "does not think the [City] wants [Plaintiff] there as a 4 am bar and that maybe [Plaintiff] should switch to a 2 am bar."

316. In terms of a timeline, Savas stated, "I do not know how long it will take with the [City] but I think the [City] has something against you which is why I don't think they want you to open."

317. Mr. Lin responded that change did not make sense for his business.

318. Savas then stated, "today is the first and in four days you have to pay rent."

319. On November 4, 2022, Plaintiff added the Buyers to this lawsuit.

320. On November 8, 2022, Buyers served Plaintiff with a "Notice of Termination of Tenancy" pursuant to Section 23(k) of the Lease.

321. Savas attempted to get Plaintiff to switch to a 2:00 am bar in furtherance of his (and the previous owner's) agreement with the City to modify Plaintiff's Late-Hour License, and Savas only moved to terminate Plaintiff's Lease once that avenue of modification was foreclosed by Mr. Lin.

322. On January 25, 2023, Buyers' contractor emailed the City stating "We have been hired to correct a fire code violation for a building located at 1565-1569 N Milwaukee Ave. The inspection was conducted by inspector Derrick Jones on 2/18/2022. The Hansen Case ID is 656925. The specific violation we are addressing is line item #8 CN012022 failure to construct floor over basement with 1 hour fire rating." (January 5, 2023 email attached as Exhibit 42).

323. The "specific violation" referenced in Exhibit 42 is the "Violation #8" Breidinger identified as a big issue on March 4, 2022.

***The Property Re-Opens***

324. On March 13, 2023, a building inspector for the City inspected the Property and the Arts Building.

325. Present at the walkthrough was Mr. Lin, City electrical inspector Thomas Lynch, and City construction inspector Derek Jones.

326. Mr. Lynch stated "nothing has changed" since the last time they inspected the Property and the Arts Building, and Mr. Lin confirmed that, to the best of this knowledge, that as accurate. Both City inspectors then inspected the basement of the Arts Building.

327. Mr. Jones further stated that the Arts Building had "sprinklers" which he previously "explained to" Beaudet were acceptable to pass inspection. Mr. Jones further stated that Commissioner Beaudet overrode his recommendation.

328. While checking the structural issues of the Arts Building, Mr. Jones then stated that permits were pulled previously, but that they seemed to have stopped work under those permits. Mr. Jones further stated that some work appeared to have been completed illegally.

329. Mr. Jones further stated that there was a structural issue that was completed without a permit, but that "I want to get you open and I am going to tell them you are good since there is a sprinkler."

330. On March 16, 2023, Luis Rosado, "On behalf of Matthew Beaudet, Commissioner Department of Buildings," sent an email to Plaintiff and over 40 City or CPD employees, stating:

> On Monday, March 13, 2023, DOB inspectors conducted a re-inspection at The Point /1565 N Milwaukee Avenue.. The Dangerous Fire Safety, Electrical, Plumbing, and Structural Issues have been corrected in the area approved for re-occupancy. The Dangerous Violations that warranted the Commissioner Closure on February 18th, 2022 have been abated.
>
> Work was completed under the following permits;

EPP Permit #100966859 issued by DOB on 04/13/2022
Electrical Permit #100965788 issued by DOB on 04/06/2022
Electrical Permit #100965772 issued by DOB on 4/6/2022

Therefore The Department of Buildings Commissioner Closure on THE POINT /1565 N MILWAUKEE AVE. s now lifted.

(emphasis removed and formatting changed) (March 16, 2023 email attached as Exhibit 43).

331. The Emergency Closure Notice was attached to Mr. Rosado's March 13, 2023 email.

332. Upon information and belief, none of the permits cited by Mr. Rosado's March 23, 2023 email were for "Fire Safety" or "Structural Issues."

***Summary***

333. Since on or around February 8, 2022, and continuing to the present, the City has engaged in a campaign of punitive, retaliatory and harassing conduct, and has made specific and arbitrary determinations based on unfounded and illegitimate animus in violation of Plaintiff's due process, property, and equal protection rights and in violation of Plaintiff's rights under Illinois law and the United States Constitution. In light of the facts set forth above, Plaintiff seeks assistance from the Court to halt the blatant violations and prevent the City, and its investigatory and prosecutorial arms, from continuing their malicious and dogged attempts to prevent Plaintiff from operating indefinitely.

## COUNT I

## <u>42 U.S.C. § 1983 – Equal Protection Violations</u>
## (Against The City)

334. Plaintiff restates and realleges by reference paragraphs 1 through 333 as if fully set forth herein.

335. At all times relevant hereto, the City acted through its final policymakers, agents, and departments.

336. As of at least 2021, the City decided that establishments with Late-Hour Licenses disproportionately contribute to crime and City resources, and that the City would be best served by completely eliminating Late-Hour Licenses, regardless of the property interest held in any Late-Hour License by a Licensee.

337. The City's plan to eliminate Plaintiff's Late-Hour License without compensation and in violation of Plaintiff's due process rights is three-fold. 1) CPD improperly used its discretion under the Summary Closure Ordinance to close Plaintiff for up to six (6) months unless Plaintiff agreed to an indefinite Nuisance Abatement Plan; 2) DOB inspected the Property with the express intention of finding as many building violations as possible to keep the Plaintiff closed longer than the six (6) months allowed by the Summary Closure Ordinance until its Late-Hour License was modified or revoked; and 3) BACP prosecuted Plaintiff while it was closed under the Summary Closure Ordinance and by DOB until Plaintiff agreed to indefinitely modify the hours of its Late-Hour License, or have BACP move to revoke Plaintiff's Late-Hour License.

338. The actions of the City against Plaintiff violated Plaintiff's rights guaranteed under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

339. This practice is widespread across the entire City of Chicago but is not an express policy with any statutory authority, that seeks to punish a Licensee by reason of being a Late-Hour License holder, and for discriminatory reasons and based on illegitimate animus in violation of the Fourteenth Amendment of the United States Constitution, and were committed, condoned, and perpetuated at the hands of policy makers and those to whom policy-making authority has been delegated.

340. The City's actions were intentional, willful, and malicious and/or in reckless disregard of Plaintiff's rights as secured by 42 U.S.C. § 1983 and the Civil Rights Act of 1991.

341. The City interfered with Plaintiff's use and enjoyment of its Licenses, the Property, and its Lease for the sole reason that Plaintiff is a Late-Hour License Holder.

342. The City's conduct has caused Plaintiff damage to its reputation, lost business, lost income and sales, lost profits, inconvenience, future pecuniary losses, the loss of the enjoyment of its Licenses, loss of its use and enjoyment of the Lease, and other compensatory and consequential damages. The City's actions have and continue to irreparably tarnish Plaintiff's business reputation and goodwill.

**COUNT II**

**42 U.S.C. § 1983 – Violation of First Amendment**
**(Against The City)**

343. Plaintiff restates and realleges by reference paragraphs 1 through 333 as if fully set forth herein.

344. At all times relevant hereto, the City acted through its final policymakers, agents, and departments.

345. As of at least 2021, the City decided that establishments with Late-Hour Licenses disproportionately contribute to crime and City resources, and that the City would be best served by completely eliminating Late-Hour Licenses, regardless of the property interest held in any Late-Hour License by a Licensee.

346. Plaintiff is a Licensee.

347. The City's plan to eliminate Plaintiff's Late-Hour License without compensation and in violation of Plaintiff's due process rights is three-fold. 1) CPD improperly used its discretion under the Summary Closure Ordinance to close Plaintiff for up to six (6) months unless Plaintiff

agreed to an indefinite Nuisance Abatement Plan; 2) DOB inspected the Property with the express intention of finding as many building violations as possible to keep the Plaintiff closed longer than the six (6) months allowed by the Summary Closure Ordinance until its Late-Hour License was modified or revoked; and 3) BACP prosecuted Plaintiff while it was closed under the Summary Closure Ordinance and by DOB until Plaintiff agreed to indefinitely modify the hours of its Late-Hour License, or have BACP move to revoke Plaintiff's Late-Hour License.

348. This practice is widespread across the entire City of Chicago but is not an express policy with any statutory authority, that seeks to punish a Licensee by reason of being a Late-Hour License holder, and for discriminatory reasons and based on illegitimate animus in violation of the Fourteenth Amendment of the United States Constitution, and were committed, condoned, and perpetuated at the hands of policy makers and those to whom policy-making authority has been delegated.

349. By the City's actions, Plaintiff suffered compensable injury and harm as a result of the denial of rights guaranteed to it pursuant to the First Amendment to the United States Constitution.

350. The City's conduct violated Plaintiff's right to free association and free speech as provided by the First Amendment to the Constitution.

351. The City intentionally retaliated against Plaintiff with malice or reckless indifference to Plaintiff's civil rights.

352. Plaintiff was intentionally treated differently from other businesses that do not hold a Late-Hour License, and there was no rational basis for the Summary Closure, or the City's other punitive actions against Plaintiff.

353. There was no rational basis for the Summary Closure since the shooting occurred

from across the street (which is why CPD did not close the hookah lounge), the Final Order showed Plaintiff was not at fault and could not have done anything differently, Plaintiff identified the Suspects to CPD, and the Vice Report, which was the only evidence used against Plaintiff, was created, at most, three (3) days after the shooting without ever being amended.

354. There was no rational basis to combine the violations for the Arts Building with the violations for the Property in the Emergency Closure Notice.

355. The City's conduct has caused Plaintiff damage to its reputation, lost business, lost income and sales, lost profits, inconvenience, future pecuniary losses, the loss of the enjoyment of its Licenses, loss of its use and enjoyment of the Lease, and other compensatory and consequential damages. The City's actions have and continue to irreparably tarnish Plaintiff's business reputation and goodwill.

356. Defendants' actions were intentional, willful, and malicious and/or in reckless disregard of Plaintiff's rights as secured by 42 U.S.C. § 1983 and the Civil Rights Act of 1991.

**COUNT III**

**<u>42 U.S.C § 1983 – Violation of Due Process</u>**
**(Against The City)**

357. Plaintiff restates and realleges by reference paragraphs 1 through 356 as if fully set forth herein.

358. Plaintiff has a property interest in its Late-Hour License and its Lease and cannot be deprived of those rights without due process and/or compensation.

359. Denying a Licensee an opportunity to cross examine witnesses and face a "trial on paper" and then use those findings against Plaintiff in a later proceeding constitute violations of due process.

360. Finding that "[w]hile [Plaintiff] could not have reasonably anticipated that the

individual who perpetrated the shooting would engage in such activity, a 'public safety threat' being considered under a 'probable cause hearing'…does not factor in reasonability, probability, or fault" is a violation of due process.

361. Admission of hearsay accusatory statements at the Probable Cause Hearing is a violation of due process.

362. Orchestrating a plan into action to either revoke or modify Plaintiff's Late-Hour License through threat of revocation by using BACP as a prosecutorial arm to initiate enforcement proceedings and cause a Plaintiff to either enter into an indefinite Nuisance Abatement Plan or face a License Revocation Hearing is a violation of due process.

363. Using DOB to keep Plaintiff closed longer than the six (6) months allowed in the Summary Closure Ordinance is a violation of due process.

364. Depriving Plaintiff of any means to satisfy the terms of a Nuisance Abatement Plan and resume normal operations is a violation of due process.

365. The City's targeted actions towards Plaintiff to revoke or modify its Late-Hour License is a violation of due process.

366. Thus, the City violated Plaintiff's due process rights by targeting Plaintiff by using the Summary Closure Ordinance, the Emergency Closure Notice, 22-LR-11, using DOB to keep Plaintiff closed longer than the six (6) months allowed in the Summary Closure Ordinance, and presenting only hearsay evidence at the Probable Cause Hearing to close Plaintiff down even though the Final Order, which upheld the Summary Closure, found that Plaintiff was in no way responsible for any of the allegations complained of by the City.

367. The City's conduct has caused Plaintiff damage to its reputation, lost business, lost income and sales, lost profits, inconvenience, future pecuniary losses, the Loss of its Licenses, the

loss of its Lease, and other compensatory and consequential damages. The City's actions have and continue to irreparably tarnish Plaintiff's business reputation and goodwill.

368. The City's actions were intentional, willful, and malicious and/or in reckless disregard of Plaintiff's rights as secured by 42 U.S.C. § 1983 and the Civil Rights Act of 1991.

369. The City's actions were knowing, willful, and callous and/or in reckless disregard of Plaintiff's rights as secured by 42 U.S.C. § 1983 and the Civil Rights Act of 1991.

**COUNT IV**

**State Law Claim – Abuse of Process**
**(Against The City)**

370. Plaintiff restates and realleges by reference paragraphs 1 through 369 as if fully set forth herein.

371. The City improperly used the Summary Closure Ordinance, the Emergency Closure Notice, the Citation, the Arts Building Violations, DOB to keep Plaintiff closed longer than the six (6) months allowed in the Summary Closure Ordinance and/or 22-LR-11 for the ulterior purposes of intimidating, oppressing, punishing, and/or harassing Plaintiff to modify or revoke Plaintiff's Late-Hour License, or to close the business down.

372. The City's actions in pursuing said charges were willful, wanton, and malicious.

373. As a result of the City's improper use of these proceedings, Plaintiff has suffered an interference with its right to use and enjoy its Licenses and the Lease.

374. Plaintiff suffered substantial damages, including but not limited to, damage to Plaintiff's business, emotional distress, humiliation, attorneys' fees and costs.

**COUNT V**

**<u>State Law Claim – Conspiracy to Violate 42 U.S.C § 1983</u>**
**(Against All Defendants)**

375. Plaintiff restates and realleges by reference paragraphs 1 through 356 as if fully set forth herein.

376. As stated throughout, at all times, Defendants acted in concert for the purpose of depriving Plaintiff of its Late-Hour License, without compensation, by the agreements alleged above.

377. As stated throughout, all Defendants had knowledge of the conspiracy to deprive Plaintiff of its Late-Hour License or the Lease, as well as the actions of the other Defendants.

378. As stated throughout, all Defendants coordinated with each other through concerted action to further their plan to deprive Plaintiff of its Late-Hour License or the Lease.

379. As a proximate result of Defendants' conduct as set forth above, Plaintiff has been damaged, and continues to suffer damages.

**COUNT VI**

**<u>State Law Claim – Fraud</u>**
**(Against All Defendants)**

380. Plaintiff restates and realleges by reference paragraphs 1 through 356 as if fully set forth herein.

381. As stated throughout, at all times, Defendants acted in concert for the purpose of depriving Plaintiff of its Late-Hour License, without compensation, by the agreements alleged above.

382. As stated throughout, all Defendants had knowledge of the conspiracy to deprive Plaintiff of its Late-Hour License or the Lease, as well as the actions of the other Defendants.

383. As stated throughout, all Defendants coordinated with each other through concerted action to further their plan to deprive Plaintiff of its Late-Hour License or the Lease.

384. As a proximate result of Defendants' conduct as set forth above, Plaintiff has been damaged, and continues to suffer damages.

**COUNT VII**

**State Law Claim – Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Against FIB and BRG)**

385. Plaintiff restates and realleges by reference paragraphs 1 through 356 as if fully set forth herein.

386. At all times peritent hereto, as Plaintiff's commercial landlord and landlord's agent, FIB and BRG were engaged in trade or commerce within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Act") and Plaintiff is a person meant to be protected by the Act's coverage.

387. FIB and BRG committed the unfair and/or deceptive acts complained of throughout.

388. FIB and BRG intended to use their unfair and/or deceptive acts to gain leniency with the City so that the Arts Building Violations would not be enforced against the *other* tenants of the Arts Building.

389. As stated throughout, at all times, Defendants acted in concert for the purpose of depriving Plaintiff of its Late-Hour License, without compensation, by the agreements alleged above.

390. As stated throughout, all Defendants had knowledge of the conspiracy to deprive Plaintiff of its Late-Hour License or the Lease, as well as the actions of the other Defendants.

391. As stated throughout, all Defendants coordinated with each other through concerted action to further their plan to deprive Plaintiff of its Late-Hour License or the Lease.

392. As a proximate result of Defendants' conduct as set forth above, Plaintiff has been damaged, and continues to suffer damages.

**COUNT VIII**

**State Law Claim – Conspiracy to Violate the Act**
**(Against the City, Berger, Breidinger, Olear, Kwan, Baum Realty and Forkin)**

393. Plaintiff restates and realleges by reference paragraphs 1 through 356 and 386-392 as if fully set forth herein.

**WHEREFORE**, Plaintiff seeks the following relief:

A) All lost income and lost profits Plaintiff would have received while it was improperly denied the use and enjoyment of its Licenses, the Lease, or the Property, including but not limited to, all economic and tangible and intangible losses and pre-judgment interest, and all damages Plaintiff is entitled to under the law;

B) Compensatory damages in an amount to be determined at trial;

C) A permanent injunction enjoining the City from engaging in the retaliatory practices complained of herein;

D) A declaratory judgment that City's actions violate the Equal Protection Clause to the United States Constitution;

E) The Court retain jurisdiction of this case until such time as it is assured that Defendant has remedied the policies and practices complained of herein and are determined to be in full compliance with the law;

F) An award of reasonable attorneys' fees, costs, and litigation expenses; and

Case: 1:23-cv-03648 Document #: 24 Filed: 05/12/23 Page 67 of 67 PageID #:1934

G) Such other relief as the Court may deem just or equitable.

May 12, 2023

Respectfully Submitted,

The Blue Note, Inc.

*s/Daniel T. Fahner*

One of its Attorneys

Daniel T. Fahner
(daniel.fahner@rkfglobal.com)
Alex Kosyla
(alex.kosyla@rkfglobal.com)
RKF Global PLLC
555 Skokie Blvd.
Suite 450
Chicago, Illinois 60062
Tel: (312) 888-2000