**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE BLUE NOTE, INC. d/b/a The Point, an Illinois corporation,<br><br>Plaintiff,<br><br>vs.<br><br>THE CITY OF CHICAGO, a Municipal Corporation, FLAT IRON BUILDING, LLC, an Illinois limited liability company; BERGER REALTYGROUP, LLC, an Illinois limited liability company; ERICA BERGER, an individual; RACHEL BREIDINGER, an individual; ZVONKO OLEAR, an individual; ARTHUR KAWN, an individual; BAUM REALTY GROUP, LLC, an Illinois limited liability company; PATRICK FORKIN, an individual; and SAVAS ER, an individual.<br><br>Defendants. | ) | Case No.1:23-cv-00648<br><br>Hon. Thomas M. Durkin |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS BERGER REALTY GROUP, LLC, ERICA BERGER, RACHEL BREIDINGER, ZVONKO OLEAR, AND ARTHUR KWAN'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

**INTRODUCTION**

Plaintiff, The Blue Note, Inc. d/b/a The Point ("Plaintiff") filed its First Amended Complaint (the "Complaint") alleging, among other things, that the City of Chicago (the "City") conspired with, among others, Berger Realty Group, LLC ("BRG"), Erica Berger ("Berger"), Rachel Breidinger ("Breidinger"), Zvonko Olear ("Olear"), and Arthur Kwan ("Kwan") (collectively the "BRG Defendants"), to keep Plaintiff closed long enough so that the City could modify or revoke Plaintiff's Late Hour License, or that the BRG Defendants would obstruct Plaintiff's operation long enough so that Plaintiff would be forced to close its business.

Specifically, Plaintiff alleges that the City agreed not to enforce the Arts Building Violations against Flat Iron Building, LLC's ("FIB") *other* Arts Building tenants, so long as FIB and the BRG Defendants agreed not to repair the Arts Building Violations that caused Plaintiff to remain closed, until the City either modified or revoked Plaintiff's Late Hour License, or Plaintiff was forced to shut down or was evicted. For the reasons argued below, the BRG Defendant's Motion to Dismiss the Complaint (the "Motion") should be denied.

**Relevant Allegations**

Plaintiff leases a bar located within the Arts Building (*see* Complaint ¶ 21); Plaintiff has a "Late Hour Plan" liquor license ("Late Hour License") (*id*. ¶ 30); the Arts Building has over 20 commercial tenants with multiple addresses (*id*. at Exhibit 9); all addresses of the Arts Building are part of the same overall building structure (*id*. ¶¶ 104-105); the basement and structure are common to the Arts Building which runs the length of the Arts Building, and Plaintiff does not control or lease the basement (*id.* ¶ 105; ¶ 135); on February 6, 2022, Breidinger sent an email to Berger and Baum Realty Group, LLC's agents ("Baum") identifying that there were residential tenants at the Arts Building for which it was not zoned, and that they were concerned that the sale of the Arts Building could be affected (*id*. ¶¶ 108-109; *see* Exhibit 10); Plaintiff's bar ("the Property"), was closed by CPD under the Summary Closure Ordinance on February 8, 2022 (Complaint ¶ 100); the Property was ordered closed by order of DOB commissioner Matthew Beaudet on February 18, 2022 ("Beaudet") (the "Emergency Closure Order") (*id.* ¶¶ 111-113; *see* Exhibit 13); DOB found building violations in the Arts Building that were exclusive to the basement, exclusive to the structural integrity of the Arts Building, or exclusive to the "Fire Protection" for the Arts Building (the "Arts Building Violations") (*see* Exhibit 14); the City intentionally combined building violations on the Emergency Closure Order for the Property with

building violations for the Arts Building (Complaint ¶ 124; *see* Exhibit 14); on February 28, 2022, BRG learned that it could not bring the Arts Building up to the 2022 building code, and that it "[w]ill have to find a middle ground on this" (Complaint ¶¶ 118-119; Exhibit 12); on March 2, 2022, Breidinger and Beaudet participated in a teleconference to discuss the Emergency Closure Order, and Plaintiff alleges that Beaudet and Breidinger discussed that, if FIB and the BRG Defendants agreed not to repair the Arts Building Violations that were keeping Plaintiff closed, the City agreed not to enforce the Arts Building Violations against the other tenants of the Arts Building, or otherwise affect the sale of the Arts Building (Complaint ¶¶ 121-125; Exhibit 13); on March 2, 2022, Breidinger emailed Plaintiff's representative, instructing him not to pull any permits (Complaint ¶¶ 138-139; Exhibits 16, 17); on March, 2, 2022, Breidinger stated to Berger and Olear:

> The problem is the Point Bar, regardless of how unfair it is. We will get no leniency, and John's friend who does consulting for inspections has said the city can drag this out for years, if they want to.
>
> My inclination is to terminate the tenancy to show alignment for what the city wants so we can get on better footing in regards to correcting the violations. Again, I know this isn't fair but my job is to protect the owner's interest!

(Complaint ¶ 140; Exhibit 17).

March 2, 2022, Olear responded to Breidinger and Berger:

> I think you are on the right track. It is obvious that the city is not happy with the bar, got fed up with it, and decided to shut it down. Do we want to stand by [Plaintiff] and support him in his fight with the city hall? No. Way.
>
> The question is one of terminating his lease in a most legal manner. I believe that he is creating a nuisance to the building and in doing so breaking the terms of the lease. However, this is something that an attorney has to determine and carry out.
>
> If Erica is comfortable losing this tenant, I would say this is our course of action: get [Plaintiff] out, apply for all necessary permits, make the required repairs, and have the city re-inspect the premises and the building.

(Complaint ¶ 141; Exhibit 17).

"Upon information and belief, the Arts Building was never subject to compliance monitoring as the case has not been sent to the Circuit Court of Cook County" (Complaint ¶ 128); Plaintiff was the only tenant of the Arts Building closed by DOB at any relevant time (*id.* ¶ 135); the most significant violations were *not* at or on the Property (*id.* ¶¶ 132-134; *see* Exhibit 14); Breidinger and Berger identified on March 8, 2022 that, "[t]he [C]ity won't let [Plaintiff] open until all the violations are fixed, for the entire building" (Complaint ¶ 153; *see* Exhibit 19); Plaintiff alleges the City, the BRG Defendants, and FIB came to an agreement to keep Plaintiff closed or terminate its Lease between March 2, 2022 and March 8, 2022 (Complaint ¶ 127); on March 8, 2022 Breidinger told Plaintiff to pull permits for the Property but not the Arts Building (*id.* ¶ 157; Exhibit 20); "The Emergency Closure Notice purposefully combined Arts Building Violations [between] the Arts Building and the Property so that it would be impossible for Plaintiff to remedy 'all the violations... for the entire building' without assistance from the owner of the Arts Building" (*id.* ¶ 155); Berger stated that she had spoken with a number of "politicians and powerful people" and that the City will "never let [Plaintiff] open again" (*id.* ¶ 167); as part of its agreement with the City, the BRG Defendants concocted artificial or fraudulent reasons to terminate Plaintiff's lease (*id.* ¶¶ 160-176; *see* Exhibit 18); one method was that the BRG Defendants, through FIB, would allow Plaintiff's deferred rent to reach an amount that the BRG Defendants did not believe Plaintiff could pay, demand rent from Plaintiff, and then move to evict Plaintiff for which Plaintiff would not have a defense (Complaint ¶¶ 170-174; Exhibit 21); a second method was, despite "[t]he lease [being] a mess in regards to what this space was actually leased for," the BRG Defendants, using FIB, would evict Plaintiff for operating a bar instead of an "art studio/gallery" (Complaint ¶¶ 170-174); Kwan responded to Breidinger that "we should take the route of evicting him based

on the back rent" (*id.*); on March 30, 2022, Berger responded, stating that an attempt to evict Plaintiff based on rent "seems weak" and expressed that she wanted to look at other options (*id.*); Olear responded stating "[o]ne way or the other, this is likely to end up in court. We may be better off limiting our conversation here" (*id.*); on April 15, 2022, Breidinger stated to Plaintiff's representative that BRG had obtained all necessary permits and that "work will begin next week" (*id.* ¶ 179); on May 10, 2022, Breidinger and Berger discussed "PVC piping needs to be replaced throughout basically the entire building and will be massively invasive to tenants" (*id.* ¶ 185; Exhibit 22); on June 7, 2022, Breidinger emailed Berger and Olear stating the BRG Defendants have already agreed not to move forward on the "PVC piping" and that the "fire pump" had still not been repaired even though it was "directly tied to life safety" (*id.* ¶ 190; Exhibit 25); on June 8, 2022, Breidinger stated that FIB had pulled all necessary work permits for the Arts Building, that Plaintiff did not have an agreement for rent deferral, and that Plaintiff was in breach of its Lease (Complaint ¶ 193; Exhibit 26); on June 9, 2022, Breidinger acknowledged the potential loss of life if the "fire pump" was not repaired (Complaint ¶ 195; Exhibit 25); Berger, Breidinger, and Patrick Forkin ("Forkin") discussed that not fixing the "PVC piping" could somehow put Plaintiff in breach of its Lease (Complaint ¶ 198; Exhibit 27); on June 17, 2022, Forkin relayed to Berger and Breidinger that the buyer of the Arts Building did not want FIB to repair the Arts Building Violations and that FIB should evict Plaintiff (Complaint ¶ 203; Exhibit 28); Berger preferred eviction (Complaint ¶¶ 204-208; Exhibit 25); on September 13, 2022, BRG, through FIB, demanded $242,428.80 in back rent from Plaintiff in furtherance of its scheme and agreement with the City to terminate Plaintiff's lease (Complaint ¶¶ 212-214); on October 17, 2022, Breidinger identified that it had only completed the electrical and plumbing related repairs (*id.* ¶ 219; Exhibit 30, Exhibit 31 violations 5, 7, 8 and 10); no Defendant had completed the Arts Building Violations

that were the subject of the Emergency Closure Order as of March, 13, 2023 (Complaint ¶¶ 326-329); the City inspectors remarked that DOB commissioner Beaudet previously overrode his decision that the "sprinklers" were adequate when issuing the Emergency Closure Order (*id.* ¶ 327); on March 16, 2023, the City stated that "…DOB inspectors conducted a re-inspection at The Point /1565 N Milwaukee Avenue[.] The Dangerous Fire Safety, Electrical, Plumbing, and Structural Issues have been corrected in the area approved for re-occupancy. The Dangerous Violations that warranted the Commissioner Closure on February 18th, 2022 have been abated" (*id.* ¶ 330; *see* Exhibit 43); the City stated work was completed under two electrical permits and one [plumbing permit] (Complaint ¶ 330); and no Defendant fixed or pulled permits for the fire, structural, or "PVC piping" issues cited in the Arts Building Violations (*id.* ¶ 332).

**Clarifications on Certain Points from the BRG Defendants' Motion**

The BRG Defendants state that "[t]wo shootings occurred at the Point on October 10, 2021, at 3:42 a.m. and on February 6, 2022, at 5:06 a.m." Plaintiff's allegations and the Final Order state the exact opposite.

The BRG Defendants argue that the Summary Closure Order (Plaintiff's Exhibit 8) "found that between August 2021 and February 2022, there had been fifty reported incidents at the Point, eleven of which were of a violent nature and revealed one 'Public Place of Amusement' license violation and three liquor license violations in November 2021." Plaintiff's Exhibit 8 consists of nothing more than an orange closure sticker which includes no findings whatsoever. To the extent that the BRG Defendants are arguing what was contained in the Vice Report, the Final Order did not make a single finding along the lines of what the BRG Defendants suggest.

The BRG Defendants argue that Plaintiff "was required to enter into a Nuisance Abatement Plan with the [City] and the decision to extend the closure or to accept a Nuisance

Abatement Plan was at the sole discretion of CPD and the City." First, Plaintiff was not "required" to enter into a nuisance abatement plan as any such agreement is voluntary. Second, there is no means to "extend the closure," as the maximum length of closure allowed under the Summary Closure Ordinance is six (6) months.

The BRG Defendants further state that Plaintiff alleged "On March 13, 2023, the Emergency Closure Order was lifted as the dangerous conditions and violations were remedied." This statement constitutes a misreading of the Complaint. Plaintiff has clearly alleged that the Property was allowed to reopen as a result of this lawsuit, and that the most serious violations of the Emergency Closure Order had not been completed when FIB sold the Arts Building.

## ARGUMENT

### I. Plaintiff Has Stated a Claim for Conspiracy to Violate 42 U.S.C § 1983.

Plaintiff has alleged and provided evidence that at the very least would give rise to the inference that Breidinger and Beaudet reached an understanding whereby the City would not enforce the Arts Building Violations against the numerous other tenants of the Arts Building, as well as against FIB, so long as the BRG Defendants agreed not to repair the Arts Building Violations that were keeping Plaintiff closed. Plaintiff has alleged that Breidinger relayed this understanding to Berger, Olear, and Kwan (*see* Exhibit 21), that the actions of the BRG Defendants were driven "to show alignment for what the [City] wants" as well as leniency with the Arts Building Violations (*See* Complaint ¶ 140; Exhibit 17, March 22, 2022 email from Breidinger: "My inclination is to terminate the tenancy to show alignment for what the [C]ity wants so we can get on better footing in regards to correcting the violations."), that the BRG Defendants had an express agreement not to remedy the Arts Building Violations that caused Plaintiff to remain closed (Complaint ¶ 223; Exhibit 33, October 27, 2022 email from Berger: "They knew about the

violations all summer… I'm not paying in advance for this work that they'll be doing - we already agreed they would do it, otherwise I would have done it myself this summer. By putting it off for them to do (which we agreed), I'm now in the lawsuit.), even though the BRG Defendants stated on numerous occasions to Plaintiff that FIB was completing said work (*see* Exhibit 26, June 8, 2022 email from Breidinger to Plaintiff: "…along with confirmation that Berger Realty Group had pulled its own permits and work would begin the following week… As has already been indicated, all necessary permits were obtained in April and work has since been underway"), that the BRG Defendants negotiated FIB's agreement not to repair the Arts Building Violations into the sale of the Arts Building (*see* Exhibit 33, p. 2: "I agree. While there was no formal complaint until now, they were aware of the issues at the present time and those issues were part of the negotiation at contract."), and that FIB sold the Arts Building having not repaired the Arts Building Violations that were keeping Plaintiff closed. (*See* Exhibit 18, Request to Admit Answer No. 8: "Admit or deny that not all of the Arts Building Violations have been repaired to the City's satisfaction as of October 31, 2022. **Answer**: Admit.")

### A. Underlying Constitutional Violations

Here, the BRG Defendants adopt the City's arguments in this regard, and assert nothing more. Plaintiff incorporates by reference the arguments it made in opposition to the City's Motion to Dismiss on this point.

### B. The BRG Defendants' Concerted Effort

The BRG Defendants argue that Plaintiff have not, and "cannot," allege a conspiracy against the BRG Defendants since: 1) the City had the ultimate authority to make certain decisions with respect to the alleged conspiracy; and 2) those decisions were made by the City before the alleged conspiracy began. Neither argument is of any consequence. Put simply, the BRG

Defendants completely ignore the well settled legal precedent that a conspiracy may be joined at any time.

It is not necessary to prove that the conspiracy originated with any part or all of the conspirators, or that they met during process of its concoction because every person entering into a conspiracy or common design already formed is deemed, in law, a party to all acts done by any of the parties before or afterwards in furtherance of the common design. *Wilkinson v. Heberling*, 231 Ill.App. 539 (citing *People v. Lloyd*, 304 Ill. 23; *Ochs v. People*, 124 Ill. 399; *People v. Strauch*, 240 Ill. 60; *Greenleaf on Evidence*, sec. 92; *Purington v. Hinchliff*, 219 Ill. 159; *Doremus v. Hennessy*, 176 Ill. 614; *Franklin Union v. People*, 220 Ill. 377; 12 *Corpus Juris* 612, note 49; *Aughey v. Windrem*, [citation omitted]*; Wolfgram v. Dill*, 37 S. D. 282, 157 N. W. 1059.) All who take part in conspiracy after it is formed and while it is in execution, and all who, with knowledge of facts, concur in plans originally formed and aid in executing them, are fellow-conspirators, and their concurrence, without proof of an agreement to concur, is conclusive against them, and they commit offense when they become partners to transaction or further the original plan. *Ohlendorf v. Bennett*, 241 Ill. App. 563. The fact that Plaintiff has alleged the BRG Defendants only joined the conspiracy once they had a direct interest in the outcome of the conspiracy is not dispositive; this is nothing more than another red herring.

The BRG Defendants go on to inexplicably state "[t]his theory is also disproven by the fact Defendants remedied the violations to the Arts Building which passed inspection. Id., ¶ 330." This statement is not grounded in fact, nor does it align with Plaintiff's allegations. Indeed, the Complaint explicitly claims that no Defendant remedied the Arts Building violations which caused the Plaintiff to remain closed. (*See* Complaint ¶¶ 324-332).

The BRG Defendants further argue that the Property was closed under the Summary Closure Ordinance "at all times relevant." This is also incorrect. First, Plaintiff has alleged that the Summary Closure expired August 8, 2022, and that the maximum duration of a summary closure is six (6) months (*Id*. ¶ 302). Second, Plaintiff has alleged that FIB owned the Arts Building until October 31, 2022, more than two (2) months *after* the summary closure lifted (*Id*. ¶ 309). Here, the BRG Defendants' arguments do not consider the substance of what Plaintiff has actually alleged, and accordingly the BRG Defendants' Motion should be denied.

## II. Plaintiff Has Alleged Fraud.

Plaintiff has alleged that the BRG Defendants made the following misrepresentations to Plaintiff: 1) that Plaintiff's rent would be abated until the Arts Building Violations were remedied and until Plaintiff was allowed to re-open, when in fact the BRG Defendants would later use the aggregate amount of rent that accumulated during this time period as a means to evict Plaintiff since the BRG Defendants did not believe Plaintiff could pay the outstanding amount; and 2) that FIB was remedying the Arts Building Violations and had pulled permits, when in fact the BRG Defendants had agreed internally not to repair the Arts Building Violations, had worked their willful inaction into the purchase price of the Arts Building, and that FIB had not pulled any permits to complete the work the BRG Defendants had already agreed not to fix.

Plaintiff has alleged who participated in these misrepresentations, and the dates on which those misrepresentations were made; the majority of the evidence supporting those claims having come directly from emails between the BRG Defendants obtained in discovery in different case. Plaintiff has properly alleged fraud against the BRG Defendants, and accordingly their Motion should be denied.

### III. Plaintiff has Alleged a Cause of Action Under the Consumer Fraud and Deceptive Business Practices Act.

The BRG Defendants argue that Plaintiff has not alleged "any factual support to claim [the] BRG [Defendants] engaged in a deceptive or unfair practice." The BRG Defendants appear to subscribe to the notion that it is not deceptive for a commercial landlord to lie to its tenant about making building repairs (ones which all parties agreed were the landlord's responsibility) when in fact that landlord was not doing those repairs *so that it could use that fact to attempt to terminate the commercial lease and keep the tenant closed*. The BRG Defendants further appear to argue that it is not deceptive for a commercial landlord and its agents to manufacture reasons to terminate a twenty (20) year commercial lease solely to benefit the owner of the Arts Building (*See* Erica Berger (*See* Complaint ¶ 140: "Again, I know this isn't fair but my job is to protect the owner's interest!").

Plaintiff has alleged that the BRG Defendants misrepresented to Plaintiff that it's rent would be abated so that FIB could use that as a means to later attempt to evict Plaintiff, and that the BRG Defendants lied on numerous occasions when they represented to Plaintiff that they were repairing the Arts Building Violations, when in fact they had negotiated their willful inaction into the purchase price of the Arts Building.

The BRG Defendants further argue that since no other tenants of the Arts Building were subject to the Emergency Closure Order, "any claim that [the] BRG [Defendants] used unfair or deceptive acts to keep [Plaintiff] closed in favor of other tenants remaining open is defeated." Plaintiff's Complaint alleges that the Arts Building Violations, although not enforced against any other tenants, *should have been enforced* since those violations related to the structural support and fireproofing failures pervading the *entire* Arts Building; a fact that was confirmed in emails between the BRG Defendants (*See* Exhibit 16: "I understand you are anxious to move forward but

it's a big mistake the city has included all the violations under the bar when clearly there are many issues unrelated to the bar. Rachel [Breidinger] and I are trying to connect with the Commissioner [Beaudet] to see if this can be resolved."). In other words, the fact that no other tenant of the Arts Building was closed actually *supports* Plaintiff's theory of the case.

Plaintiff has also alleged that no action was taken by the City against FIB for its failure to correct the Arts Building Violations (i.e., the City initiating a building enforcement action, assigning a prosecutor to enforce building violation compliance, assigning an inspector to ensure compliance, and assigning a judge for any failure to do so). Plaintiff alleges that no enforcement action was taken; and no Defendant has argued otherwise.

The BRG Defendants also argue that the Complaint is "devoid of any factual support for its claim that FIB and BRG made the conscious decision not to complete violation work, 'while at the same time representing to Plaintiff that they were'" and that "Plaintiff does not and cannot provide any factual support concerning these alleged misrepresentations, such as the who, what, when, where, and how of the alleged fraud." Plaintiff not only makes those allegations, but also provides time-stamped emails as evidence of communications between the BRG Defendants and/or between the BRG Defendants and Plaintiff.

*Allegations that BRG Represented to Plaintiff that they Were Completing Work*

- March 2, 2022 email from Breidinger to Plaintiff and Beaudet, among others: "Berger Realty Group and want to assure you we are committed to addressing all of the issues cited by the inspectors in regards to The Point as well as the Flat Iron Arts Building." (*See* Exhibit 13).

- June 8, 2022 correspondence from Breidinger on BRG letterhead to Plaintiff:

  "…[A]long with confirmation that Berger Realty Group had pulled its own permits and work would begin the following week… As has already been indicated, all necessary permits were obtained in April and work has since been underway. The only outstanding violation that we can guarantee will not be remedied by June 22, 2022, is the replacement of PVC piping in the walls. To correct this violation, we

must replace all the PVC piping throughout the upper floors as well, which is a massive undertaking and highly intrusive to all the other tenants in the building. There is currently also outstanding electrical work that we expect will be completed by June 22, 2022, but we in no way guarantee it." (*See* Exhibit 26).

*Allegations that the BRG Defendants Consciously Decided not to Complete the Work*

- March 8, 2022 email from Breidinger to Berger: "The city won't let [Plaintiff] open until all the violations are fixed, for the entire building." (*See* Exhibit 19).

- May 10, 2022 email from Jeff Jozwiak ("Jozwiak") to Breidinger: "The problem with not doing it is that you will not pass inspection and your violation notice will remain open." (*See* Exhibit 22);

- May 17, 2022 email from Breidinger to Jozwiak: "There are a variety of factors at play here that will inform our decision. We understand the code violations will stay in place if we do not move forward." (*See* Exhibit 23);

- June 7, 2022 email from Breidinger to Berger, Olear, and Forkin: "Please see below for outstanding violations at FIB. We've discussed we would not move forward with the PVC piping replacement, but a few other issues have come up to take into consideration. In my opinion, the electrical work for the fire pump and emergency lighting/exit signs is directly tied to life safety and should be completed even if sale is imminent." (*See* Exhibit 25).

- June 9, 2022 email from Forkin to Breidinger, Berger, and Olear:

  Does ownership face any immanent legal or monetary repercussions for not completing this work? The fact is, most likely, a buyer is going to have a list of items that he would like to have fixed before closing on the sale. If these items are already crossed off before we get to that point, then they will just find something else. If these items could be pushed off for another month or so, without any repercussions, I recommend we hold off. (*Id.*).

- June 17, 2022 email from Forkin to Berger and Breidinger: "Rachel mentioned the PVC some time ago. The recommendation has always been to leave everything status quo. It's debatable who is responsible for this and it makes The Point in default of their lease which is an opportunity for buyer to kick them out." (*See* Exhibit 27);

- June 17, 2022 email from Forkin to Berger and Breidinger: "FYI - Savas [Er] thinks we should proceed with evicting The Point. Don't waste money on PVC. They are in default of lease so should instead work on getting them out of there." (*See* Exhibit 24);

- June 20, 2022 email from Berger to Forkin and Breidinger: "Yes. But I would maybe get a legal opinion on this as well. And perhaps confirm with the buyer's counsel too. Or just *continue* to push it off, avoid fixing the PVC, and let the buyer deal with all those issues." (emphasis added) (*id.*);

- June 21, 2022 email from Breidinger to Forkin and Berger: "The buyers not wanting to move forward with PVC right now should shield any of that, but just in case!" (*id.*);

- October 27, 2022 email from Berger to Forkin and Breidinger:

  They knew about the violations all summer - Patrick can you handle this? I'm not paying in advance for this work that they'll be doing - we already agreed they would do it, otherwise I would have done it myself this summer. By putting it off for them to do (which we agreed), I'm now in the lawsuit. (*See* Exhibit 33).

The BRG Defendants again mistakenly argue that Plaintiff has alleged the Arts Building Violations were completed which is the reason the Emergency Closure Order was lifted. Plaintiff, however, has unequivocally alleged the Arts Building Violations were not completed.

*Allegations that the BRG Defendants did not Complete the Work*

- October 17, 2022 email from Breidinger to Martha Coronado "I'm not sure if you're aware, but the [Arts] [B]uilding was hit with a long list of code violations…[m]ost of the infractions found were electrical and plumbing related, which we completed – I've attached a mark-up of the violations list here so you can see what was completed by us. Anything that says 'BAR' was the responsibility of the tenant for the bar space, and anything highlighted in yellow is still outstanding (Savas [Er] is aware)." (*See* Exhibit 30; Exhibit 31);

- Request to Admit Answer No. 8: "Admit or deny that not all of the Arts Building Violations have been repaired to the City's satisfaction as of October 31, 2022. **Answer**: Admit." (*See* Exhibit 18).

The BRG Defendants later argue that "Plaintiff's… theory that instead of the rent abatement agreement…[the] BRG [Defendants] should have served a five-day notice" is "non-sensical." This is not an accurate recitation of Plaintiff's argument. First, the BRG Defendants disavowed their rental abatement agreement with Plaintiff. (*See* Exhibit 26). Second, the BRG Defendants' scheme as alleged (and shown through email correspondence) was to disavow the rental abatement so that the BRG Defendants could demand a lump sum they did not believe Plaintiff would be able to pay; which, in turn, would give FIB a legal reason to evict Plaintiff. Third, Plaintiff has clearly alleged the agreement allowed that non-payment of rent would continue

through the date Plaintiff was allowed to open, a date that did not come to fruition while FIB still owned the Arts Building.

The email correspondence between the BRG Defendants clearly shows that Berger, Breidinger, Olear and Kwan conspired to manufacture reasons to evict Plaintiff either on bases which the BRG Defendants knew to be meritless, or those which were created by the BRG Defendants willful inaction in failing to repair the Arts Building Violations.

## IV. Plaintiff Has Alleged a Conspiracy.

Plaintiff has alleged that the BRG Defendants conspired with each other and with the City to perpetrate the acts argued throughout, and therefore the Motion should be denied.

## CONCLUSION

For the foregoing reasons, the BRG Defendants' Motion should be denied in its entirety.

September 20, 2023

Respectfully Submitted,

The Blue Note, Inc.

*s/Daniel T. Fahner*
One of its Attorneys

Daniel T. Fahner (daniel.fahner@rkfglobal.com)
Alex Kosyla (alex.kosyla@rkfglobal.com)
RKF Global PLLC
555 Skokie Blvd, Suite 450
Northbrook, Illinois 60062
(312) 888-2000