**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE BLUE NOTE, INC. d/b/a The Point, an Illinois corporation, | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No.1:23-cv-00648 |
| THE CITY OF CHICAGO, a Municipal Corporation, FLAT IRON BUILDING, LLC, an Illinois limited liability Company; BERGER REALTYGROUP, LLC, an Illinois limited liability company; ERICA BERGER, an individual; RACHEL BREIDINGER, an individual; ZVONKO OLEAR, an individual; ARTHUR KWAN, an individual; BAUM REALTY GROUP, LLC, an Illinois limited liability company; PATRICK FORKIN, an individual; and SAVAS ER, an individual. | ) | Hon. Thomas M. Durkin |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT**
**BAUM REALTY GROUP, LLC's**
**MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

## INTRODUCTION

Plaintiff The Blue Note, Inc. d/b/a The Point ("Plaintiff") filed its First Amended Complaint (the "Complaint") alleging, among other things, that the City of Chicago (the "City") conspired with, among others, Berger Realty Group, LLC ("BRG"), Erica Berger ("Berger"), Rachel Breidinger ("Breidinger"), Zvonko Olear ("Olear"), and Arthur Kwan ("Kwan") (collectively the "BRG Defendants"), to keep Plaintiff closed long enough so that the City could modify or revoke Plaintiff's Late Hour License (as defined in the Complaint), or that the BRG Defendants would obstruct Plaintiff's operation long enough so that Plaintiff would be forced to close its business. Regarding Baum Realty Group, LLC ("Baum"), Plaintiff has alleged that Patrick

Forkin ("Forkin") was a "Director" of Baum for the relevant time periods, that Baum's President (Mike Demetriou), CEO (David Baum), and Managing Director (Doug Renner) (collectively the "Baum Executives") were made aware of FIB's and the BRG Defendants' alleged conspiracy with the City, that Baum contributed to the conspiracy by offering advice and counsel to, at least, Berger and Breidginer, and through the actions and statements of Patrick Forkin as stated in the Complaint.

**RELEVANT ALLEGATIONS**

Forkin used his Baum email address (patrick@baumrealty.com) when communicating with the BRG Defendants (*see* Complaint Exhibits 24, 25, 27, 28, 33); the BRG Defendants began corresponding with the Baum Executives shortly after the shooting at Plaintiff's bar (the "Property") within the Flat Iron Arts Building (the "Arts Building") (*see* Complaint ¶ 108; Exhibit 10); on March 3, 2022, Breidinger forwarded to Baum internal correspondence between the BRG Defendants wherein the BRG Defendants outlined their objective of "terminat[ing] [Plaintiff's] tenancy to show alignment for what the [C]ity wants…" (*see* Complaint, Exhibit 17); David Baum confirmed on March 4, 2022 that, "[w]e've chatted through these issues – it would be best to speak orally" (*id.*); Breidinger and Berger had a phone call with, at least, David Baum and Mike Demetriou regarding Breidinger's March 3, 2022 email between March 4, 2022 and March 8, 2022 (*id.*); on or before May 10, 2022 Breidinger was told "[t]he problem with not doing [the PVC piping] is that you will not pass inspection and your violation notice will remain open" (*see* Complaint ¶ 184, Exhibit 22); on May 10, 2022, Berger stated to Breidinger, "[a]nd let's ask [Forkin] if he thinks we should tell Jeff [Jozwiak] we're selling the building -- that might shift his pitch to us on scope of work?" (Compliant ¶ 186); on May 17, 2022, Berger stated "[y]es we have discussed...[w]e understand the code violations will stay in place if we do not move forward" (*id.*

at ¶ 186, Exhibit 23); on June 7, 2022, Breidinger emailed Berger, Olear, and Forkin stating "[w]e've discussed we would not move forward with the PVC piping replacement, but a few other issues have come up to take into consideration" (*id.* ¶ 189, Exhibit 25); on June 8, 2022, Breidinger, on BRG letterhead, sent Plaintiff correspondence stating that BRG had pulled all necessary work permits for the Arts Building (*id.* ¶ 193, Exhibit 26); on June 9, 2022, Forkin encouraged Breidinger not to complete the work at the Arts Building to correct the violations which Plaintiff has alleged was keeping it closed (*id.* ¶ 194, Exhibit 25); on June 17, 2022, Forkin stated to Berger (regarding the PVC piping), "[t]he recommendation has always been to leave everything status quo. It's debatable who is responsible for this and it makes The Point in default of their lease which is an opportunity for buyer to kick them out," and promised that he (Forkin) would "bring this up lightly to [Defendant] Savas [Er] today when we go see the basement" (*id.* ¶ 198, Exhibit 27); later on June 17, 2022, as promised, Forkin relayed communications between Defendant Savas Er and the BRG Defendants (*id.*, Exhibit 24, Exhibit 28) ("FYI - Savas thinks we should proceed with evicting The Point. Don't waste money on PVC. They are in default of lease so should instead work on getting them out of there.")); on June 17, 2022, Forkin had a meeting with Savas Er at the Arts Building to relay communications between the BRG Defendants and Savas Er (*id.* at ¶ 200); on June 17, 2022, after Forkin's meeting with Savas Er, Forkin confirmed with Berger that the buyers of the Arts Building did not want Plaintiff as a tenant "[e]ven with a potentially renegotiated lease to earlier hours[]" (*id.* ¶¶ 203-204); on June 20, 2022, Forkin stated to Breidinger, "[o]r just continue to push it off, avoid fixing the PVC, and let the buyer deal with all those issues" (*id.* ¶ 205); Forkin was aware that the buyers of the Arts Building were aware of the allegations Plaintiff has made against FIB and had worked the details of those allegations into the purchase of the Arts

Building (*see* Exhibit 33 ("[w]hile there was no formal complaint until now, they were aware of the issues at the present time and those issues were part of the negotiation at contract.")).

## ARGUMENT

### I. This Court Has Jurisdiction Over Baum.

Plaintiff has alleged federal causes of action against the City and has asked this Court to exercise supplemental jurisdiction over Plaintiff's state law claims that involve the same or similar conduct, witnesses, and evidence. To the extent Plaintiff has incorrectly stated the basis for this Court's jurisdiction, Plaintiff can merely amend.

### II. Plaintiff's Federal Claims

#### *A. Baum's Younger Argument*

Baum's *Younger* analysis offers nothing beyond that which was set forth by the City and addressed in Plaintiff's response (the "Response"). Plaintiff therefore restates and relies on its arguments stated in its Response to the City. In any event, even if this Court finds that the *Younger* doctrine applies in this case, the appropriate remedy is to stay this matter until 22-LR-11 is concluded; not "dismissal of this case in its entirety." (emphasis removed).

Still, because Baum misstates the record in its Motion, some measure of additional response is necessary here. Baum erroneously argues, "…all counts emanate from the alleged improper revocation of [Plaintiff's] license…" For clarity, Plaintiff's liquor license has *not* been revoked, a fact which the Court may take judicial notice of as it is a matter of public record.

Baum similarly argues, "Plaintiff further alleged that it appealed the revocation the license (sic) through the administrative process and apparently lost; and that process is, according to Plaintiff's First Amended Complaint, still ongoing." Again, Plaintiff's liquor license has not been revoked. It would also be impossible for a process Plaintiff "apparently lost" to still be ongoing.

Plaintiff has alleged that it appealed the Final Order (as defined in the Complaint), which is a process Plaintiff has since abandoned in order to focus on this matter and avoid any further *Younger* challenges.

*B. Baum's Rooker Argument*

For reasons unclear to Plaintiff, Baum appears to think that Plaintiff's *only* alleged Constitutional violations stem from the attempted revocation of Plaintiff's Late Hour License. While 22-LR-11 is a continuation of the City's ulterior motive against Plaintiff, Plaintiff's constitutional claims stem from: 1) the City's agreement with the BRG Defendants for FIB not to complete the Arts Building Violations in exchange for the City not enforcing those violations against the other tenants of the Arts Building so that Plaintiff would either modify its Late Hour License or be forced to close; and 2) the City's use of DOB to keep Plaintiff closed until Plaintiff agreed to modify the hours of its Late Hour License or Plaintiff was forced to close. Whether Plaintiff's Late Hour License is revoked through 22-LR-11 is not dispositive in this matter.

Moreover, even should Plaintiff's Late Hour License ultimately be revoked, process dictates that Plaintiff's avenue of appeal is to the Illinois Liquor Control Commission or the City's License Appeal Commission, depending, *not* federal Court. Put simply, Plaintiff has not alleged, nor does it seek that which Baum contends it does. Baum's *Rooker Feldman* arguments should therefore be discounted, if not outright ignored.

*C. Baum's Monell Arguments*

Baum repeats arguments previously made by the City, and cites case law without providing any independent analysis. As such, Plaintiff restates its arguments made in its Response to the City's *Monell* arguments.

### III. Plaintiff Has Alleged a Conspiracy.

Baum's primary argument here stems from the fact that Plaintiff has not alleged any coordination or communication directly between Baum and the City. Baum boldly proclaims that "[t]he First Amended Complaint provide (sic) not a scintilla of fact to support an 'understanding' or 'agreement' between Baum and the City of Chicago (*or any other defendant*)." (*see* Motion p. 12) (emphasis added). In reality, however, Plaintiff makes abundant allegations concerning a conspiracy *directly from emails between the alleged co-conspirators*. It is therefore eminently inaccurate, if not entirely inappropriate, for Baum to conclude that Plaintiff has not alleged a scintilla of fact.

Plaintiff has alleged that, before Berger's and Breidinger's phone call with the Baum Executives (which allegedly occurred between March 4, 2022 and March 8, 2022), the BRG Defendants corresponded concerning "terminat[ing] [Plaintiff's] tenancy to show alignment for what the [C]ity wants…" (*See* Exhibit 17, Exhibit 18). On March 2, 2022, Breidinger wrote to Berger and Olear, "[l]et's also ask David Baum what he thinks -- Are you both comfortable with me forwarding this?" (*See* Complaint ¶ 143, Exhibit 18). Berger and Olear responded in the affirmative and Breidinger sent their correspondence to the Baum Executives on March 3, 2022 at 10:19 a.m. (*Id.* ¶¶ 148-149, Exhibit 17). On March 3, 2022 at 8:42 a.m., Berger wrote "…the problem with the city will remain so long as [Plaintiff] tries to operate. It would also be easier to work with the city if they think we are aligned with their assessment that the bar is a safety concern to the building and neighborhood." (*Id.* ¶ 146, Exhibit 18).

Plaintiff has alleged that, prior to Berger's and Breidinger's phone call with the Baum Executives between March 4, 2022 and March 8, 2022: 1) Breidinger came to the agreement with Beaudet (sometime between March 2, 2022 and March 8, 2022) that FIB would not repair the Arts

Building Violations and that the City would not enforce the Arts Building Violations on the other tenants of the Arts Building (*see* Complaint ¶¶ 120-128); 2) the BRG Defendants were already aware that they "[could] not bring a 100 year old building to 2022 code" (*id.* ¶ 118, Exhibit 12); 3) the BRG Defendants agreed "[t]he problem is [Plaintiff], regardless of how unfair it is. We will get no leniency, and John's friend who does consulting for inspections has said the [C]ity can drag this out for years, if they want to" (*id.* ¶¶ 140-141, Exhibit 17); and 4) that "[Breidinger's] inclination is to terminate the tenancy to show alignment for what the city wants so we can get on better footing in regards to correcting the violations. Again, I know this isn't fair but my job is to protect the owner's interest!" (*id.*). In addition to Breidinger forwarding the BRG Defendants' correspondence to the Baum Executives on March 3, 2022, Plaintiff also alleges that Berger and Breidinger had a phone call with the Baum Executives between March 4, 2022 and March 8, 2022 to discuss "terminat[ing] [Plaintiff's] tenancy to show alignment for what the [C]ity wants…" (*id.* ¶¶ 148-151, Exhibit 17, Exhibit 18).

Plaintiff further alleges that: 1) it was Baum's decision not to reduce the conversation to writing (*id.* ("[w]e've chatted through these issues – it would be best to speak orally."); 2) Forkin, Baum's "Director" of investments, encouraged the BRG Defendants not to complete the Arts Building Violations after Berger and Breidinger's phone call with the Baum Executives (*id.* Exhibit 25); 3) Forkin relayed messages between Savas and the BRG Defendants (*id.* ¶ 194, Exhibit 24, Exhibit 28); and 4) Forkin was aware that the buyers of the Arts Building were aware of the allegations Plaintiff has made against FIB and had worked the details of those allegations into the purchase of the Arts Building (*id.* ¶ 223, *see* Exhibit 33).

Plaintiff has alleged far more than a mere suspicion or a bare allegation against Baum. Plaintiff has alleged and attached correspondence between the alleged co-conspirators from which

the only reasonable inference is that Baum encouraged and aided FIB and the BRG Defendants to keep Plaintiff closed to "show alignment for what the [C]ity wants."

Plaintiff has properly alleged the "specific defendants," Erica Berger, Rachel Breidinger, Zvonko Olear, Arthur Kwan, Patrick Forkin, BRG, FIB, the City, and Baum through the Baum Executives (David Baum (CEO), Mike Demetriou (President) Doug Renner (Managing Director)) and Baum's "Director" of investments, Forkin.

Plaintiff has also alleged the "approximate time of the conspiracy," as evident by the time and date stamps identified on Plaintiff's exhibits. Baum and the BRG Defendants began corresponding about Plaintiff on February 8, 2022 (*id.* ¶ 109, Exhibit 10), Baum and the BRG Defendants corresponded further in early March of 2022 (*id.* ¶¶ 148-151, Exhibit 17, Exhibit 18), and Forkin worked with the BRG Defendants through the sale of the Arts Building until on or around October 31, 2022. (*Id.* ¶ 198, Exhibit 27, Exhibit 33). Furthermore, Forkin fills in the gaps for the time periods for which Plaintiff has not yet seen correspondence. Forkin confirmed with the BRG Defendants that "[t]he recommendation has always been to leave everything status quo" and that the buyers "were aware of the issues at the present time and those issues were part of the negotiation at contract." Forkin confirms that Baum was not only aware of the alleged conspiracy in real time and through the date the Arts Building was sold, but also that Baum provided a "recommendation" which, based on the BRG Defendants' and Forkin's course of conduct, is reasonably inferred to be to "show alignment for what the [C]ity wants."

Plaintiff has also alleged the "general purpose" of the conspiracy, as well as that Baum understood that purpose. Breidinger stated that BRG should "terminate [Plaintiff's] tenancy to show alignment for what the [C]ity wants…" and later the other BRG Defendants agreed with that suggestion. (I*d*. ¶¶ 148-151, Exhibit 17, Exhibit 18). Breidinger then forwarded that

correspondence to the Baum Executives, who then had a phone call with Berger and Breidinger about BRG's objective to terminate Plaintiff's Lease. Baum's Managing Director told Breidinger prior to March 3, 2022 that the shooting at the Property was a "a PR nightmare." (*Id*. ¶ 144). On June 17, 2022, Forkin cited FIB's willful inaction as "an opportunity for buyer to kick them out," which is the "recommendation" agreed to by all. (*Id*. ¶ 198).

Baum identified that Plaintiff was "a PR nightmare," BRG stated its intention to terminate Plaintiff's tenancy so show alignment for what the City wants, and Forkin was included on discussions and provided guidance on FIB's willful as an action for FIB or "buyer to kick [Plaintiff] out." The purpose of the conspiracy is clearly alleged to have been to terminate Plaintiff's Lease or cause it to stop operating using its Late Hour License so that the City would show leniency on the other tenants of the Arts Building.

All of that notwithstanding, Baum further argues, "[m]oreover, the First Amended Complaint is completely silent on who at Baum and who at the City made this alleged agreement." This argument is of no moment. Put simply, there is no authority for the proposition Plaintiff is required to allege that Baum had any discussions directly with the *City* in order for Baum to be considered a participant in the conspiracy. Plaintiff has alleged that Baum was made a member of the conspiracy through FIB and the BRG Defendants and, as of now, *not* through the City.

It is not necessary to allege or prove that the conspiracy originated with any part or all of the conspirators, or that they met during process of its concoction because every person entering into a conspiracy or common design already formed is deemed, in law, a party to all acts done by any of the parties before or afterwards in furtherance of the common design. *Wilkinson v. Heberling*, 231 Ill.App. 539 (citing *People v. Lloyd*, 304 Ill. 23; *Ochs v. People*, 124 Ill. 399; *People v. Strauch*, 240 Ill. 60; *Greenleaf on Evidence*, sec. 92; *Purington v. Hinchliff*, 219 Ill. 159;

*Doremus v. Hennessy*, 176 Ill. 614; *Franklin Union v. People*, 220 Ill. 377; 12 *Corpus Juris* 612, note 49; *Aughey v. Windrem*, [citation omitted]*; Wolfgram v. Dill*, 37 S. D. 282, 157 N. W. 1059.) All who take part in conspiracy after it is formed and while it is in execution, and all who, with knowledge of facts, concur in plans originally formed and aid in executing them, are fellow-conspirators, and their concurrence, without proof of an agreement to concur, is conclusive against them, and they commit offense when they become partners to transaction or further the original plan. *Ohlendorf v. Bennett*, 241 Ill. App. 563.

However, the Supreme Court has reasoned that because conspiracies are often purposefully shrouded in mystery, claims of conspiracy do not permit the plaintiff to allege, with complete particularity, all of the details of the conspiracy or the exact role of the defendants in the conspiracy. *Scott v. Aldi, Inc.*, 301 Ill.App.3d 459, 465 (1st Dist. 1998) (citing *Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 62, 206 Ill.Dec. 636, 645 N.E.2d 888, 895 (1994). As a conspiracy is rarely susceptible of direct proof, a plaintiff cannot be required to plead with specificity the very facts that can only be proven by circumstantial evidence. (*Id*. citing Adcock)

Baum gives almost no treatment or analysis to Plaintiff's allegation(s) that Baum coordinated and communicated *with the BRG Defendants* to further the BRG Defendant's agreement with the City. Baum further gives no treatment to the fact that Forkin was one of its employees and Baum's "Director" of investments; rendering Baum's arguments completely meritless. Here, Plaintiff has clearly and sufficiently alleged that Baum was a co-conspirator. Baum's Motion accordingly should be denied.

## IV. Plaintiff Will Agree to Amend Count VI (Fraud.)

Plaintiff agrees to amend Count VI for fraud and remove Baum as a Defendant under that Count. Instead, Plaintiff seeks to amend its Complaint to add an additional count against Baum for

conspiracy to commit fraud based on similar allegations of Plaintiff's other conspiracy counts.

## V. Plaintiff Has Alleged a Violation of the Act.

### *A. Conspiracy to Violate the Act*

Baum claims that "[t]here [c]an [b]e [n]o [c]onspiracy [c]laim [u]nder Illinois [l]aw [t]o [v]iolate [a] [s]tatute." In that regard, Baum states that "[c]ase law is clear that Illinois law would not recognize such statutory violations as 'torts' for purposes of a civil conspiracy claim" and cites *Scott v. Aldi, Inc.*, 301 Ill.App.3d 459, 462 (1st Dist. 1998) in support of that proposition. Baum then quotes *Scott* stating, "holding that the 'violation of a statute or ordinance' can be tortious if the statute is 'designed to protect human life or property.'" These claims are on their face irreconcilable, and Baum's claims here are deserving of the Court's ire.

In *Scott*, the plaintiff alleged that defendant's involvement in a conspiracy caused her to travel in an unlawfully operated, uninsured for-hire vehicle and suffer damages as the result of a traffic accident. 301 Ill. App. 3d at 464 – 465. The plaintiff alleged two counts of negligence and one count of conspiracy against Aldi and "numerous violations of the Chicago Municipal Code and chapter 8 of the Illinois Vehicle Code, including provisions requiring proof of financial responsibility." *Id*. at 463. "Thus, the question [was] whether the operation of an unlicensed, uninsured for-hire vehicle service is not only illegal, but also tortious conduct." *Id*.

The function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts. *Id*. (citing *Adcock*). The gist of a civil conspiracy claim is not the agreement itself, but the tortious acts performed in furtherance of the agreement. *Id*. (citing *Adcock*). "It is only where means are employed, or purposes are accomplished, which are themselves tortious, that the conspirators who have not acted but have promoted the act will be held liable." (*Id*.) (citing *Adcock*). "The word

"tortious" generally describes conduct which may subject a defendant to liability under the law of torts. Restatement (Second) of Torts § 6 (1977)." *Id*. at 463.

The court in *Scott* held that the plaintiff had properly alleged a conspiracy since her claims were based in negligence, and that "the statute is a public safety statute, the violation of which is evidence of negligence." (*Id*.). The court considered whether a private cause of action existed under a criminal statute or the municipal code, but found that analysis unnecessary since the plaintiff had a private cause of action for negligence. *Id*. at 463-464.

Here, the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Act") provides for civil and criminal liability, and a private cause of action to all persons who suffer damage as a result of a violation of the Act. *Ashkanazy v. I. Rokeach & Sons, Inc.*, 757 F. Supp. 1527 (1977); *Bank One Milwaukee v. Sanchez,* 336 Ill. App .3d 319 (2d Dist. 2003). Even if the Act did not have a private cause of action, Illinois courts will imply a private cause of action where there is clear need to effectuate the purposes of a statute. *Board of Education v. A, C & S, Inc.*, 131 Ill.2d 428, 470-471 (1989).

Plaintiff has alleged that FIB and BRG engaged in deceptive practices as Plaintiff's commercial landlord and commercial management agency, respectively, that those deceptive practices caused Plaintiff to remain closed for a significant period of time, so that FIB and BRG could benefit from their deceptive acts, and during which time period Plaintiff has paid rent. As a violation of the Act imposed civil and criminal liability, Plaintiff has a private cause of action. *Scott* simply does not state that which Baum suggests it does.

*B. Plaintiff's Allegations*

Plaintiff has alleged that FIB and BRG engaged in deceptive practices as Plaintiff's commercial landlord or commercial management agency, that those deceptive practices caused

Plaintiff to remain closed for a significant period of time, so that FIB and BRG could benefit from their deceptive acts, and during which time period Plaintiff has paid rent. That notwithstanding, Baum argues that Plaintiff "provide[s] no facts to support that FIB or BRG made these alleged unfair and/or deceptive act directly to Plaintiff." (*See* Motion, p. 14). In reality, Plaintiff makes substantial allegations of deceptive practices employed by the BRG Defendants, as well as their misrepresentation and actions directly to Plaintiff.

*Allegations that BRG Represented to Plaintiff that they Were Completing Work*

- March 2, 2022 email from Breidinger to Plaintiff and Beaudet, among others: "I am the Director of Operations for Berger Realty Group and want to assure you we are committed to addressing all of the issues cited by the inspectors in regards to The Point as well as the Flat Iron Arts Building." (*See* Exhibit 13).

- June 8, 2022 correspondence from Breidinger on BRG letterhead to Plaintiff: "…along with confirmation that Berger Realty Group had pulled its own permits and work would begin the following week… As has already been indicated, all necessary permits were obtained in April and work has since been underway. The only outstanding violation that we can guarantee will not be remedied by June 22, 2022, is the replacement of PVC piping in the walls. To correct this violation, we must replace all the PVC piping throughout the upper floors as well, which is a massive undertaking and highly intrusive to all the other tenants in the building. There is currently also outstanding electrical work that we expect will be completed by June 22, 2022, but we in no way guarantee it." (*See* Exhibit 26).

*Allegations that the BRG Defendants Consciously Decided Not to Complete the Work*

- March 8, 2022 email from Breidinger to Berger: "The city won't let [Plaintiff] open until all the violations are fixed, for the entire building." (*See* Exhibit 19).

- May 10, 2022 email from Jeff Jozwiak ("Jozwiak") to Breidinger: "The problem with not doing it is that you will not pass inspection and your violation notice will remain open." (*See* Exhibit 22);

- May 17, 2022 email from Breidinger to Jozwiak: "There are a variety of factors at play here that will inform our decision. We understand the code violations will stay in place if we do not move forward." (*See* Exhibit 23);

- June 7, 2022 email from Breidinger to Berger, Olear, and Forkin: "Please see below for outstanding violations at FIB. We've discussed we would not move forward with the PVC piping replacement, but a few other issues have come up to take into consideration. In my

opinion, the electrical work for the fire pump and emergency lighting/exit signs is directly tied to life safety and should be completed even if sale is imminent." (*See* Exhibit 25).

- June 9, 2022 email from Forkin to Breidinger, Berger, and Olear: "Does ownership face any immanent legal or monetary repercussions for not completing this work? The fact is, most likely, a buyer is going to have a list of items that he would like to have fixed before closing on the sale. If these items are already crossed off before we get to that point, then they will just find something else. If these items could be pushed off for another month or so, without any repercussions, I recommend we hold off." (*Id.*)

- June 17, 2022 email from Forkin to Berger and Breidinger: "Rachel mentioned the PVC some time ago. The recommendation has always been to leave everything status quo. It's debatable who is responsible for this and it makes The Point in default of their lease which is an opportunity for buyer to kick them out." (*See* Exhibit 27);

- June 17, 2022 email from Forkin to Berger and Breidinger: "FYI - Savas [Er] thinks we should proceed with evicting The Point. Don't waste money on PVC. They are in default of lease so should instead work on getting them out of there." (*See* Exhibit 24);

- June 20, 2022 email from Berger to Forkin and Breidinger: "Yes. But I would maybe get a legal opinion on this as well. And perhaps confirm with the buyer's counsel too. Or just *continue* to push it off, avoid fixing the PVC, and let the buyer deal with all those issues." (*id.*) (emphasis added);

- June 21, 2022 email from Breidinger to Forkin and Berger: "The buyers not wanting to move forward with PVC right now should shield any of that, but just in case!" (*id.*);

- October 27, 2022 email from Berger to Forkin and Breidinger: "They knew about the violations all summer - Patrick can you handle this? I'm not paying in advance for this work that they'll be doing - we already agreed they would do it, otherwise I would have done it myself this summer. By putting it off for them to do (which we agreed), I'm now in the lawsuit." (*See* Exhibit 33).

*Allegations that the BRG Defendants did not Complete the Work*

- October 17, 2022 email from Breidinger to Martha Coronado "I'm not sure if you're aware, but the [Arts] [B]uilding was hit with a long list of code violations…[m]ost of the infractions found were electrical and plumbing related, which we completed – I've attached a mark-up of the violations list here so you can see what was completed by us. Anything that says 'BAR' was the responsibility of the tenant for the bar space, and anything highlighted in yellow is still outstanding (Savas [Er] is aware)." (*See* Exhibit 30; Exhibit 31);

- Request to Admit Answer No. 8: "Admit or deny that not all of the Arts Building Violations have been repaired to the City's satisfaction as of October 31, 2022. **Answer**: Admit." (*See* Exhibit 18).

Baum later argues that "[n]othing in the First Amended Complaint provides any factual support that either FIB or BRG provide any of these advertising or offering acts to Plaintiff." (*See* Motion p. 14). Baum cites *Falk v. Perez*, 973 F.Supp.2d 850 (N.D. Ill. 2013) for the proposition that "the court rejected a claim that an eviction was a trade or commerce because there was no advertising or offering." *Falk*, however, has no application here, where Plaintiff is a commercial, as opposed to a residential, tenant.

In *Falk*, a ***residential tenant*** of a residence subject to foreclosure brought action against the sheriff and deputy who carried out the eviction, alleging violations of her Fourth and Fourteenth Amendment rights. (*Id* ¶¶ 852-853). The court there held the "[d]eputy's eviction of tenant of *residence* subject to foreclosure order was not 'advertising,' 'offering for sale,' 'sale,' or 'distribution,' and thus did not qualify as 'trade' or 'commerce' under [the Act]." (*Id.* at 868) (emphasis added.) Plaintiff here is not a residential tenant, but instead a *commercial tenant* who operates a business in the Arts Building which is a multi-story, multi-tenant, commercial building.

*C. Plaintiff Has Alleged Fraud.*

For the reasons argued throughout, Plaintiff has alleged fraud.

**CONCLUSION**

For the foregoing reasons, Baum's Motion should be denied in its entirety.

October 6, 2023

Respectfully Submitted,

The Blue Note, Inc.

*s/Daniel T. Fahner*
One of its Attorneys

Daniel T. Fahner (daniel.fahner@rkfglobal.com)
Alex Kosyla (alex.kosyla@rkfglobal.com)
RKF Global PLLC
555 Skokie Blvd, Suite 450
Northbrook, Illinois 60062
(312) 888-2000