**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **THE BLUE NOTE, INC. d/b/a** | ) | |
| **THE POINT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 23-cv-648** |
| | ) | |
| **v.** | ) | **Judge Jeffrey I. Cummings** |
| | ) | |
| **THE CITY OF CHICAGO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff, The Blue Note, Inc. d/b/a The Point ("Blue Note"), brings this action against the City of Chicago (the "City") under 42 U.S.C. §1983, alleging that the City issued two closure orders and instituted administrative hearings against Blue Note in violation of its First and Fourteenth Amendment rights. Along with its federal claims, Blue Note lodges five state law claims, (namely, abuse of process, conspiracy,[1] fraud, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, and conspiracy to violate that Act), against the City and nine other defendants, (namely, Flat Iron Building, LLC, Berger Realty Group, LLC, Erica Berger, Rachel Breidinger, Zvonko Olear, Arthur Kwan, Baum Realty Group, LLC, Patrick Forkin, and Savas Er), based on Blue Note's allegations that defendants conspired to deprive Blue Note of its lease and its license to operate until 4:00 a.m. on weekdays and 5:00 a.m. on weekends.

---

[1] Blue Note pleaded its conspiracy claim as a state-law claim, even though the alleged conspiracy is "to violate 42 U.S.C. § 1983." Because the requirements to allege federal and state-law conspiracy are similar, *see Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004); *Brown v. City of Chicago*, 633 F.Supp.3d 1122, 1174 (N.D.Ill. Sept. 30, 2022), and because Blue Note does not otherwise argue that it intended to bring a federal conspiracy claim, the Court will treat Blue Note's conspiracy claim as a state-law claim for purposes of resolving the present motions.

Before the Court are defendants' motions to dismiss, (Dckt. ##36, 38, 46, 54, 60), pursuant to Federal Rule 12(b)(6),[2] which assert, among other things, that dismissal of Blue Note's federal claims is proper because they are either barred by the doctrine against claim splitting or insufficiently pleaded. For the reasons set forth below, the Court agrees. Defendants' motions to dismiss are therefore granted with respect to Blue Note's federal claims against the City, and the Court relinquishes jurisdiction over Blue Note's state law claims against defendants.

## I.    LEGAL STANDARD UNDER RULE 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a motion to dismiss under Rule 12(b)(6), the Court construes "the complaint in the light most favorable to the [non-moving party] accepting as true all well-pleaded facts and drawing reasonable inferences in [the non-moving party's] favor." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013).

When resolving a motion under Rule 12(b)(6), "in addition to the allegations set forth in the complaint itself," the Court may consider, "documents that are attached to the complaint,

---

[2] The pending motions are as follows: Motion by City of Chicago to Dismiss Under *Younger* Abstention Doctrine and Failure to State a Claim, (Dckt. #36); Motion to Dismiss for Failure to State a Claim by Defendant Flat Iron Building, LLC, (Dckt. #38); Motion to Dismiss for Failure to State a Claim by Defendant Savas ER, (Dckt. #46); Motion to Dismiss by Defendants Erica Berger, Berger Realty Group, LLC, Rachel Breidinger, Arthur Kwan, Zvonko Olear, (Dckt. #54); and Motion to Dismiss by Defendant Baum Realty Group, LLC, (Dckt. #60). The City filed a supplement to its motion to dismiss, in which, among other things, it withdrew its arguments under the *Younger* abstention doctrine. (Dckt. #74 at 2). Blue Note responded to the City's supplement, (Dckt. #74), and the Court considers the parties' arguments raised in the supplemental briefing in deciding the parties' motions.

documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Indeed, it is "well-settled in this circuit that documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [its] claim." *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018) (cleaned up); *Kuebler v. Vectren Corp.*, 13 F.4th 631, 636 (7th Cir. 2021) (same, citing cases).

## II.    FACTUAL BACKGROUND

The Court draws the facts set forth below from Blue Note's first amended complaint (the "Complaint"), (Dckt. #24) and the exhibits attached to the Complaint.

### A.    Blue Note's Business Operations.

Plaintiff, Blue Note, is a bar and music venue located in the Flat Iron Arts Building ("Arts Building") owned by defendant, Flat Iron Building, LLC ("FIB").  (Dckt. #24 ¶¶5, 6, 20). Blue Note holds a "Late Hour Plan" liquor license, which permits Blue Note to serve alcohol until 4:00 a.m. on weeknights and 5:00 a.m. on weekends (the "Late-Hour License").  (*Id.* ¶¶30, 38).  A majority of Blue Note's revenue is generated between 1:00 a.m. and close because neighboring bars which do not hold Late-Hour Licenses are not allowed to operate or sell alcohol during that time.  (*Id.* ¶46).

### B.    The Summary Closure Ordinance.

In 2015, the City enacted a "Public safety threat—Summary closure—When authorized" ordinance (the "Summary Closure Ordinance").  (*Id.* ¶67; *see also* Chicago Municipal Code §4-4-285).  Under the Summary Closure Ordinance, the Superintendent of Police is permitted to order "the summary closure of [any] establishment" that the superintendent determines "presents a public safety threat."  (Chicago Municipal Code §4-4-285(c)).  Once a summary closure is

ordered under the Summary Closure Ordinance, it remains in effect for six months from the date the public safety threat occurred unless, prior to the six-month expiration, it is determined: (1) at a probable cause hearing that the public safety threat did not occur; or (2) at a nuisance abatement hearing that the establishment no longer presents a danger to the public, which may be evidenced by the submission and implementation of an acceptable nuisance abatement plan. (*Id.* at §4-4-285(b)–(c); *see also* Dckt. #24 ¶69).

C.      **Shooting Incidents Outside Blue Note, the Owner's Subsequent Statements to the Media, and the Summary Closure Order.**

Within the first eight months that Blue Note was open, two shootings occurred near its premises. The first—a drive-by shooting on October 10, 2021—left four injured and one dead. (Dckt. #24-44 at 2). At least one news source reported that prior to the shooting there was an altercation inside Blue Note which prompted staff to close the bar early, but Jun Lin ("Lin"), the owner of Blue Note, denied that claim in statements he made to the media after the incident. (*Id.*). According to Lin, staff grew concerned over rowdiness on the street, prompting them to close the bar early and call 911 several times to request police assistance ahead of the shooting. (*Id.*).

The second shooting took place less than four months later on February 6, 2022, when a shooter, who had patronized Blue Note earlier the same morning, fired at least eleven shots into the bar at approximately 5:06 a.m., causing serious injury to an individual who was inside the bar at the time. (Dckt. #24 ¶¶87, 93). The Chicago Police Department later arrived at the bar and, in addition to investigating the shooting, issued Blue Note a citation for having "numerous patrons inside the bar after the bar was closed at 0500 hrs," (the "Citation"). (*Id.* ¶97). On February 7, 2022, the day after the second shooting, Lin was quoted in an article published by Block Club

4

Chicago saying that, "he can't be blamed for what has become a 'Chicago violence problem.'" (*Id.* ¶279).

On February 8, 2022—two days after the second shooting—the superintendent ordered Blue Note to close pursuant to the Summary Closure Ordinance (the "Summary Closure Order"). (Dckt. #24 ¶100).

> ### D. Negotiation of a Nuisance Abatement Plan and the February 18, 2022 Property Inspection.

Following the issuance of the Summary Closure Order, Blue Note attempted to negotiate a nuisance abatement plan with the Department of Business Affairs and Consumer Protection ("BACP"), which prosecutes business license violations on behalf of the City. (Dckt. #24 ¶¶16, 231). The initial draft—which the BACP sent on February 17, 2022—provided among other things that Blue Note would be "open no longer than 2:00AM on Sunday night through Friday night; and 3:00AM on Saturday night," and would supply "at least six . . . trained and licensed security guards" to patrol its premises, including across the street, for up to thirty minutes after closing. (*Id.* ¶242). The draft further provided that six months after the execution of the plan, Blue Note could "contact the Chicago Police Department and the Department of Law to potentially set up a meeting with respect to the modification in the hours of operation." (*Id.* ¶243).

During a meeting related to the nuisance abatement plan, the City suggested that the Chicago Police Department conduct a walkthrough of the property to review Blue Note's proposed security plan. (*Id.* ¶236). The walkthrough subsequently occurred on February 18, 2022 and included representatives from the City's Department of Buildings ("DOB"). (*Id.* ¶¶237–38).

### E.    The Emergency Closure Notice.

During the walkthrough, the DOB identified several violations at Blue Note and with the Arts Building as a whole, including electrical, basement, "Fire Protection/ Egress/ Structural," and plumbing violations.  (*Id.* ¶¶130, 132).  Defendant Matthew Beaudet, the Commissioner of the DOB, determined that Blue Note was "a public nuisance that [was] dangerous, hazardous and endanger[ed] the public health", (*id.* ¶129), and ordered its closure, effective February 18, 2022 (the "Emergency Closure Notice"), (Dckt. #24-14).  The Emergency Closure Notice specifically named "The Point," and was limited to 1565 N. Milwaukee Avenue—Blue Note/The Point's address.  (*Id*).[3]  No other tenants of the Arts Building were closed by the City in relation to the DOB's findings.  (Dckt. #24 ¶135).

### F.    Alleged Plan to Revoke Blue Note's Late-Hour License.

On March 2, 2022, Beaudet participated in a telephone call with defendant Rachel Breidinger ("Breidinger")—the director of operations of defendant Berger Realty Group, an agent of FIB, (*id.* ¶125)—during which Beaudet explained that the City wanted to either restrict Blue Note's hours of operation (i.e., modify its Late-Hour License) or eliminate it as an establishment if it was going to continue to stay open until 5:00 a.m, (*id.*).  Beaudet also stated that if FIB terminated Blue Note's lease, it would show alignment with the City's plan, FIB would not need to repair the Arts Building violations that were keeping Blue Note closed

---

[3] Blue Note argues that "On or around February 18, 2022, the 'Entire Premises' (i.e., the Arts Building) was ordered closed by Department of Buildings inspector Bill Bugajski."  (Dckt. #24 ¶114).  Blue Note's allegation that the *entire* building was ordered closed is at odds with the notice issued by Bugajski, included as an exhibit to the complaint—which limited the closure to Blue Note's premises at 1565 N. Milwaukee.  (Dckt. #24-11).  It is also inconsistent with the Emergency Closure Notice, also submitted as an exhibit to the complaint—which specified that The Point, at 1565 N. Milwaukee Ave., was being closed.  (Dckt. #24-14).  Because "the exhibit ordinarily controls" when "an exhibit incontrovertibly contradicts the allegations in the complaint . . . even when considering a motion to dismiss," *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013), the Court rejects Blue Note's allegation that the entire Arts Building was ordered closed.

pursuant to the Emergency Closure Notice, and the City would not enforce the Arts Building

violations on the building's other tenants.  (*Id.*).

### G.     Negotiation of the Nuisance Abatement Plan in Spring 2022.

On March 8, 2022, over two weeks after the BACP provided its initial draft of the

nuisance abatement plan, Blue Note submitted its revisions which excluded the City's proposed

requirement that Blue Note be required to "patrol . . . across the street" and sought a different

process for lifting the plan's restrictions.  (*Id.* ¶¶249–50).  The BACP responded with a third

draft on March 21, 2022 which accepted the modifications to security patrol, but repeated the

prior language indicating Blue Note could "potentially set up a meeting with respect to the

modification in the hours of operation" six months after execution.  (*Id.* ¶253).  The parties failed

to reach agree upon a plan, and Blue Note elected to pursue a probable cause hearing as an

alternative avenue to lift the Summary Closure Order earlier than the six-month default period.

(*Id.* ¶¶254, 261).

### H.     Lin's Additional Statements to the Media in May 2022.

Before the Probable Cause Hearing, Lin spoke to the media again.  In an article issued on

May 12, 2022, Lin stated, "We're doing everything we can in terms of being a business.  We

were simply victimized twice with shootings . . . That's violence in Chicago.  I don't think the

answer is to [close my] business when we haven't done anything wrong."  (*Id.* ¶279).  The article

also quoted a filing submitted by The Point seeking subpoenas for documents and testimony

from city officials concerning the closure, which stated: "[Blue Notes]'s operation and mere

existence is not a threat to public safety; rather, the city is scapegoating [Blue Note] to distract

from the city's failure to control the increase and proliferation of crime throughout

neighborhoods in the city of Chicago, including the very area in which [Blue Note] resides." (*Id.* ¶280).

### I.    Probable Cause Hearing and Ruling, Subsequent Statements by Lin, and Writ of Certiorari to the Circuit Court.

The Probable Cause Hearing concerning the Summary Closure Order ultimately went forward on June 22, 2022. (*Id.* ¶261). In support of the Summary Closure Order, BACP submitted a Vice Investigation Report (the "Vice Report"), dated February 9, 2022, which purported to outline the basis and support for the Summary Closure Order. (*Id.* ¶256). The Vice Report indicated that summary closure was warranted based on two gun incidents, a liquor license violation, and one weapons violation arrest. (*Id.* ¶260). At the hearing, BACP did not present any witnesses, Blue Note was not able to cross-examine any witnesses, and Blue Note's hearsay objections were overruled. (*Id.* ¶¶262–63).

On July 8, 2022, the Commissioner issued a ruling "Affirming the Summary Closure After Probable Cause Hearing" and held that, "[b]ased on the totality of the circumstances, the City of Chicago/BACP proved by a preponderance of the evidence, that a public safety threat occurred at [Blue Note] on February 6, 2022," (*Id.* ¶266), i.e., the February 6, 2022 shooting was a public safety threat. Notably, the Commissioner found that the three other incidents—the October 10, 2021 shooting, the weapons violation arrest, and the February 6, 2022 liquor license violation (i.e., the Citation for having too many patrons in the bar after close)—did *not* constitute public safety threats. (*Id.* ¶¶267–70).

Following the ruling, Lin was quoted as saying, "[t]he city was looking to scapegoat the business and blame the violence on us. . . It is virtually the same thing as someone robbing a bank [who] happened to have an account in the bank. So you close the bank? If I could get shut

down for simply serving a drink, imagine—this law is so arbitrary that the city can weaponize it and literally shut down any business they want." (Dckt. #24-39 at 25).

On August 12, 2022, Blue Note filed a timely Complaint for Administrative Review with the Circuit Court of Cook County seeking to reverse the Commissioner's ruling (the "State Court Action"). (Dckt. #24 ¶274). Blue Note argued, generally, that the Commissioner's finding was based on a lack of evidence presented by the City and that Blue Note was denied due process because the Commissioner declined to consider "reasonability, probability, or fault" in the analysis of whether a public safety threat occurred. (*Id.* ¶275). On August 9, 2023—after Blue Note initiated the present suit—the Circuit Court of Cook County dismissed Blue Note's challenge to the summary closure order as moot. (Dckt. #74-1; *see also* Dckt. #72-1).

### J.    Hearing Before the Mayor's License Discipline Commission.

At the time Blue Note filed the instant suit, it was involved in a second administrative proceeding before the Mayor's License Discipline Commission ("MLDC") regarding alleged ordinance violations related to the bar's liquor license (the "MLDC Matter"). On November 11, 2022, Blue Note learned that certain of its licenses, including its Late-Hour License, were on "hold." (Dckt. #24 ¶292). On November 17, 2022, Lin received an email from a City representative which stated in relevant part that:

> There are two license adjudication holds on your account for two cases handled by Assistant Corporation Counsel… The first case, 22-SC-0002, you appealed under 22-CH-07916 [i.e., the State Court Matter]. The second case, 22-LR-0011, involves alleged violations on February 6, 2022, and will be heard before the Mayor's License Discipline Commission (MLDC). [Assistant Corporation Counsel] should be able to provide you with information about 22-LR-0011 and when it will be set before the MLDC.

(*Id.* ¶294). Blue Note was not given notice by the City, nor did it otherwise have knowledge, of the MLDC Matter prior to November 17, 2022. (*Id.* ¶299). The following day, counsel sent

Blue Note a Notice of Hearing for the MLDC Matter (the "Revocation Notice"), which listed a single count based on the Citation. (*Id.* ¶¶305–07). The information provided by BACP in support of the Revocation Notice included the Vice Report, the Citation, and a City document stating that the Citation had been non-suited by the City. (*Id.* ¶308). On October 24, 2023, the MLDC Matter was resolved by settlement. (Dckt. #72-2).

### K. The Closure is Lifted.

On March 13, 2023, a building inspector for the City reinspected The Point and the Arts Building. (Dckt. #24 ¶324). Prior to that date, Breidinger confirmed that certain building issues—such as electrical and plumbing related violations—had been completed. (*Id.* ¶219). On March 16, 2023, Blue Note received an email which stated that the "Dangerous Fire Safety, Electrical, Plumbing, and Structural Issues [had] been corrected in the area approved for reoccupancy" and the "Dangerous Violations that warranted the Commissioner Closure on February 18th, 2022 [had] been abated." (*Id.* ¶330). The closure was therefore lifted. (*Id.*). The email further identified certain permits that the work was performed under, however, none of the permits cited in the email were for "Fire Safety" or "Structural Issues." (*Id.* ¶332).

### L. Blue Note's Federal Lawsuit

On February 2, 2023, Blue Note initiated the instant suit, ("the Federal Action"), pursuant to Section 1983, alleging federal equal protection, retaliation, and due process claims against the City arising out of the Summary Closure Order, Emergency Closure Notice, and administrative hearings. In addition to its federal claims, Blue Note alleged state claims against the City, FIB, Beaudet, Breidinger, BRG, Erica Berger (principal of FIB and BRG), Zvonko Olear (BRG's Chief Financial Officer), Arthur Kawn (BRG's Manager), Baum Realty Group, LLC (a participant to certain calls regarding the Summary Closure Order), Patrick Forkin (former

Director of Baum Realty), and Savas Er (interest holder in the four entities to which the Arts Building was later sold), for violations of Illinois law for abuse of process; conspiracy; fraud; violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Act"); and conspiracy to violate the Act.

## III.   ANALYSIS

Defendants move to dismiss the Complaint.  Given that the Court's jurisdiction over Blue Note's state law claims against defendants hinges on the viability of its federal claims against the City, the Court begins with the latter.  The City argues that the federal claims alleged against it should be dismissed because: (1) to the extent those claims are based on Summary Closure Order, they are barred under the doctrine of claim splitting; and (2) Blue Note otherwise fails to adequately state its federal claims.  For the reasons set forth below, the Court agrees that Blue Note's federal claims against the City must be dismissed and relinquishes jurisdiction over Blue Note's state law claims in accordance with Seventh Circuit guidance.

### A.   Blue Note's Claims Arising from the Summary Closure Order Are Barred Under the Doctrine of Claim Splitting

The City argues that Blue Note's claims based on the Summary Closure Order fail under the doctrine of claim splitting.  (Dckt. #72 at 2-3).  The Court agrees.

"The doctrine of claim-splitting precludes a plaintiff from alleging claims that arise from the same transaction or events that underlie claims brought in a previous lawsuit." *Rexing Quality Eggs v. Rembrandt Enterprises, Inc.*, 392 F.Supp.3d 965, 971 (S.D.Ind. 2019), *aff'd*, 953 F.3d 998 (7th Cir. 2020).  Claim splitting is "based on the same principles as res judicata and bars not only those issues that were actually decided in a prior lawsuit, but also all issues which could have been raised in that action."  *Id.* at 971 (citing *Barr v. Bd. of Trustees of W. Ill. Univ.*, 796 F.3d 837, 839 (7th Cir. 2015)).  "Unlike traditional claim preclusion, however, the bar

against claim splitting can be applied before either action reaches a final judgment on the merits." *Rexing*, 392 F.Supp.3d at 972; *Scholz v. United States*, 18 F.4th 941, 942 (7th Cir. 2021) ("The requirements of claim splitting are not quite as stringent and do not require . . . finality of judgment."). Claim splitting, unlike traditional claim preclusion, also allows the court to exercise its discretion in determining whether claim splitting warrants dismissal. *See Cooper v. Retrieval-Masters Creditors Bureau, Inc.*, 42 F.4th 688, 697 (7th Cir. 2022). Thus, to determine whether a plaintiff has engaged in improper claim splitting, this Court need only determine whether there is: (1) an identity of the parties; and (2) an identity of the causes of action. *Scholz*, 18 F.4th at 952.

The Court notes that "a motion asserting that a claim has been improperly split is better treated as a Civil Rule 12(c) motion for judgment on the pleadings. Claim splitting is not really a failure to adequately state a claim on the merits, but rather in the nature of an affirmative defense, similar to 'res judicata' (or claim preclusion)." *Medcor, Inc. v. Kelley*, No. 1:23-CV-02109, 2025 WL 2590388, at *3 (N.D.Ill. Sept. 8, 2025). However, where the existence of a valid defense such as claim splitting "is plain from the face of the complaint and properly noticed facts, "the use of Rule 12(b)(6) is of no consequence." *Stelmokas v. Bank of Am., N.A.*, 819 Fed.Appx. 441, 443 (7th Cir. 2020) (affirming motion to dismiss under Rule 12(b)(6) with respect to a res judicata defense); *see also Holmes v. Marion Cnty. Sheriff's Off.*, 141 F.4th 818, 822 (7th Cir. 2025), *reh'g denied*, No. 22-3032, 2025 WL 2078828 (7th Cir. July 23, 2025) ("there exists a narrow and pragmatic exception to the general rule that affirmative defenses lead to dismissals under Rule 12(c) rather than Rule 12(b)(6): if the affirmative defense is clear from the face of the complaint, the court may dismiss under Rule 12(b)(6) instead."); *Jones v. Trans Union LLC*, No. 23 C 15805, 2025 WL 815645, at *2–4 (N.D.Ill. Mar. 13, 2025) (cleaned up)

(reaching a claim preclusion defense on a Rule 12(b)(6) motion); *Guzman v. Life Care Servs. LLC*, No. 24 CV 3291, 2024 WL 5040840, at *2-3 (N.D.Ill. Dec. 9, 2024) (reaching a claim splitting defense on a Rule 12(b)(6) motion).

For the reasons that follow, the Court, within its discretion, finds that claim splitting applies to the extent Blue Note's claims are based on the Summary Closure Order.

### 1. There is an identity of parties between the State Court Action and Federal Action.

Here, an identity of parties exists between the State Court Action and Blue Note's federal claims in the Federal Action. In both, plaintiff, Blue Note, sues the same defendant: the City.

Blue Note argues that there is no identity of parties because it named additional defendants—namely, FIB, BRG, Berger, Breidinger, Olear, Kwan, Baum Realty, Forkin, and Er—as parties to the Federal Action. This argument fails.

First, Blue Note cannot "circumvent the same-parties rule merely by adding new defendants . . . when instituting a second suit." *Strickland v. City of Markham*, No. 1:22-CV-01419, 2024 WL 4818719, at *6 (N.D.Ill. Nov. 18, 2024) (cleaned up); *see also Stiel v. Heritage Numismatic Auctions, Inc.*, No. 3:17-CV-02086-M, 2019 WL 12095440, at *2 (N.D.Tex. Jan. 23, 2019), *aff'd*, 816 Fed.Appx. 888 (5th Cir. 2020) (explaining that requiring complete identity of parties "would eviscerate the res judicata [or claim splitting] doctrine by allowing a party to easily circumvent it by joining one new party.").

Second, and more importantly here, Blue Note's claims in the State Court Action and its *federal claims* in the Federal Action, which are the present focus of this Court, are aimed at the same defendant—the City—not, FIB, BRG, Berger, Breidinger, Olear, Kwan, Baum Realty, Forkin, or Er. Thus, the Court finds there is an identity of parties between the State Court Action and the instant federal claims.

### 2. There is an identity between the causes of action in the State Court Action and the Federal Action.

There is also identity of the causes of action between the State Court Action and the instant federal claims. As the Seventh Circuit has explained, "this element is satisfied if the claims arise out of the same set of operative facts or the same transaction. That is to say, for claim splitting to apply, the legal theories for the claims in each case need not be the same provided they are based on the same, or nearly the same, factual allegations." *Scholz*, 18 F.4th at 952 (cleaned up). Here, both the State Court Action and the instant federal claims arise out of the same main event: the City's decision to issue the Summary Closure Order.

Blue Note argues that there is nevertheless no identity of the causes of action because, according to Blue Note, it could not have raised its instant claims in the Circuit Court. But Blue Note cites no authority for this proposition. In fact, to the contrary, "[i]n Illinois, a party disappointed in a determination made by a municipality's administrative agency may seek review in the circuit court by the common law writ of *certiorari* . . . Review is extremely broad in scope and extends to *all* questions of fact and law contained in the record before the court, including *de novo* review of any constitutional issues." *See Holstein v. City of Chicago*, 29 F.3d 1145, 1148 (7th Cir. 1994) (emphasis added); *see also Walczak v. Chicago Bd. Of Educ.*, 739 F.3d 1013, 1017 (7th Cir. 2014) ("We have held that Illinois litigants seeking circuit-court review of administrative proceedings implicating events that also give rise to a federal civil-rights claim must join that claim with the judicial-review action in the circuit court") (citing cases); *Graff v. City of Chicago*, 9 F.3d 1309, 1325 (7th Cir. 1993). Blue Note makes no effort to distinguish this precedent and does not otherwise cite any authority for its position that it was barred from previously raising its constitutional claims before the Circuit Court. *See Howard v. Lawton*, 175 N.E.2d 556, 557 (Ill. 1961) ("Second, it is contended that constitutional issues

14

cannot be raised in a complaint for administrative review. We have recognized the contrary practice . . and for good reason. To hold otherwise would result in piecemeal litigation by first requiring review of an administrative body's decision and then entertaining another action to test constitutionality brought on by such decision.").

Given the binding precedent cited above, the Court finds that Blue Note could have raised its constitutional equal protection, retaliation, and due process claims with respect to the Summary Closure Order before the Circuit Court and it is therefore barred by the doctrine of claim splitting from raising them now.

### 3. None of the Exceptions to Claim-Splitting Apply.

Blue Note argues, in the alternative, that an exception to the bar against claim splitting applies because: (1) the City acquiesced to Blue Note's filing of a second claim by not raising its claim splitting arguments when the Federal Action was filed; (2) Blue Note was unable to obtain relief on its claim in the State Court Action because it could not file a counterclaim and the record was limited; (3) the case involves a continuing or recurrent wrong because Blue Note was closed for thirteen months—longer than the six months proscribed by the Summary Closure Order; and (4) Blue Note has clearly and convincingly shown that the policies favoring preclusion of a second action are overcome for an extraordinary reason. Each of these arguments lacks merit.

First, Blue Note, relying on *Piagentini v. Ford Motor Co.*, 901 N.E.2d 986, 997 (Ill.App.Ct. 2009), argues that the City acquiesced to claim splitting because it knew about the State Court Action at the time the Federal Action was filed, yet waited to raise its objection. But *Piagentini*—which found the defendant acquiesced to the plaintiff's res judicata claim where it defended the case for three-and-a-half years before filing raising its objection on summary

judgment—does not support applying a claim splitting exception here, where the City raised its objection only four months after its initial motion to dismiss. Indeed, courts typically find that a defendant has acquiesced to claim splitting where, unlike here, the case has progressed far beyond the pleadings before the defendants raised their objections. *See Lawler v. Peoria Sch. Dist. No*. 150, 837 F.3d 779, 785 (7th Cir. 2016) (concluding that the defendants acquiesced to claim-splitting because they "waited more than 18 months to raise res judicata as a potential affirmative defense . . ."); *Geraci v. Union Square Condo. Ass'n*, No. 15 C 2466, 2017 WL 372303, at *4 (N.D.Ill. Jan. 26, 2017) (finding defendant acquiesced where it did not mention claim splitting until discovery was nearly closed and did not move for a ruling on claim preclusion until eighteen months after the suit was filed). Because defendants objected while the case was still at the pleadings stage, the Court finds that they did not acquiesce to Blue Note's claim splitting.

Second, Blue Note argues that claim splitting should be permitted in this case because it was unable to obtain relief in the State Court Action. As it relates to its federal claims, Blue Note argues that the testimony at the Probable Cause Hearing was limited only to what was necessary to counter the evidence presented by the City supporting the Summary Closure Order, and that it did not advance the theory underlying its claims. But, as explained above, review before the Circuit Court "is extremely broad in scope and extends to *all* questions of fact and law contained in the record before the court, including *de novo* review of any constitutional issues." *See Holstein*, 29 F.3d at 1148; *see also Walczak*, 739 F.3d at 1017 ("We have held that Illinois litigants seeking circuit-court review of administrative proceedings implicating events that also give rise to a federal civil-rights claim must join that claim with the judicial-review action in the circuit court"). Blue Note cites no authority in support of its contention that fails to demonstrate

that it was barred from raising its constitutional claims and related evidence before the Circuit Court – even if it could not. Simply put, Blue Note's failure to raise these claims in the Circuit Court does not equate to an inability to do so.

Finally, Blue Note summarily argues that an exception to claim splitting applies because the facts of this case involve a recurring wrong (defendants' aggregate actions eventually led Blue Note to the conclusion that the City was taking improper action against it), and the policies favoring preclusion of Blue Note's second action are overcome for an extraordinary reason (the Circuit Court's review was limited to the Probable Cause Hearing record and if defendants raised their claim splitting argument earlier, Blue Note could have consolidated its claims). Blue Note fails to point to any support, other than its own arguments, for these conclusions. Moreover, these conclusions are contrary to the precedent, including *Walzack* which provides that a plaintiff *must* join events giving rise to a federal civil-rights claim with the judicial-review action in the Circuit Court. *Id.* This Court therefore finds neither argument is sufficient to demonstrate an exception to claim splitting.

In sum: the Court finds that there is an identity of parties and identity of causes of action between the State Court Action and the instant federal claims sufficient to apply the bar against claim splitting. The portion of the Federal Action based on the Summary Closure Order is therefore dismissed with prejudice.[4] *See, e.g., Guzman*, 2024 WL 5040840, at *3 (dismissing

---

[4] Blue Note also argues that the City waived its claim splitting argument because it first raised the argument in its later-filed supplement, rather than its motion to dismiss, and that it brought its claim splitting argument under false pretenses because the City did not inform Blue Note that it intended to raise its objection to claim splitting when it sought Blue Note's permission to file the supplement. For the reasons stated herein, the Court finds that the City's claim splitting argument is timely and proper, as Blue Note had the opportunity to respond to the City's supplement and has not alleged that it suffered any prejudice as a result of the City's filing.

amended complaint with prejudice pursuant to Rule 12(b)(6) where "it is evident that claim-splitting has occurred").

### B.   Blue Note Fails to Properly Allege Its Federal Claims Against the City

The Court turns to the City's arguments that Blue Note fails to properly allege its federal claims against the City. Because all claims related to the Summary Closure Order are barred by the doctrine of claim splitting, the Court focuses on Blue Note's arguments as they relate to the Emergency Closure Notice and the MLDC Matter. For the reasons set forth below, the Court finds that Blue Note fails to state its federal claims against the City.

#### 1.   Blue Note's Equal Protection Claim Must Be Dismissed Because the Complaint Fails to Plead a Class-of-One Theory.

The Complaint alleges that the City violated Blue Note's rights under the Equal Protection clause of the Fourteenth Amendment by leveraging the Arts Building's common area violations to close Blue Note pursuant to the Emergency Closure Notice, while failing to enforce those same violations against the other tenants. Blue Note does not allege that it is a member of a protected class, so it proceeds on its equal protection claim under a class-of-one theory. *Fares Pawn, LLC v. Ind. Dep't. of Fin. Insts.*, 755 F.3d 839, 841 (7th Cir. 2014).

To state a claim under a class-of-one theory, a plaintiff must allege: "(1) that [it] has been intentionally treated differently from others similarly situated, and (2) that there is no rational basis for the difference in treatment." *Id.* at 845. The City argues that Blue Note fails to adequately allege both elements and the Court agrees.

First, Blue Note fails to allege that the other tenants of the Arts Building, who were not forced to close their businesses, were similarly situated. "To be similarly situated, a comparator must be identical or directly comparable to the plaintiff in all material respects." *Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015) (cleaned up). In this case, that means Blue Note

was required to put forth a proposed comparator that was also inspected by the DOB, found to have code violations within its premises (in addition to violations in common spaces), yet was not required to close. Blue Note has alleged nothing akin to this in its complaint.

Instead, Blue Note attempts to show that it was treated differently from other Arts Building tenants by alleging that, although the "Entire Premises" of the Arts Building "was ordered closed" by the DOB, (Dckt. #24 ¶¶114, 129, 133), defendants conspired to enforce the Emergency Closure Notice solely against Blue Note, (*id.* ¶¶125, 129, 133). But the DOB never ordered the entire Arts Building closed—only The Point's premises, by specifically naming the Point and providing its address—1565 N. Milwaukee—on the closure notices. (Dckt. #24-14); *supra*, at n.3. Blue Note therefore fails to identify any similarly situated comparators, let alone allege that those comparators were treated more favorably.

Blue Note also fails to allege that there was no rational basis for the Emergency Closure Notice and the MLDC Matter. When evaluating an equal protection claim, a court considers whether "a *conceivable* rational basis for the difference in treatment" exists. *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013) (emphasis in original). "Class-of-one claimants carry a heavy burden," *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 588 (7th 2021), for the rational basis need not even be "the *actual* justification." *Id.* "[A]ny reasonably conceivable state of facts that could provide a *rational basis*" will suffice. *See Scherr v. City of Chicago*, 757 F.3d 593, 598 (7th Cir. 2014) (cleaned up) (emphasis in original). Thus the question before this Court is whether the Complaint alleges a rational basis for treating Blue Note differently. *Kopp*, 725 F.3d at 686. The Court finds that it does.

The Complaint alleges that Beaudet ordered Blue Note closed following an inspection by the DOB which revealed several violations both within Blue Note itself and the Arts Building as

a whole and that Blue Note was issued the Citation for having patrons in the bar after its closing time. Blue Note does not challenge that the violations assessed by the DOB existed, nor does it dispute that there were patrons in the bar after it closed on February 6, 2022. Instead, Blue Note argues that it has alleged there is no rational basis for the City's actions and the "only inference that can be drawn from the facts alleged" is that the Emergency Closure Notice and MLDC Matter were "illegitimate" and "used as a means for the City to accomplish [Blue Note's] theory." (Dckt. #45 at 18–19).

Blue Note is incorrect. The allegations of the Complaint identify an objectively rational basis for the Emergency Closure Notice and the MLDC Matter. In particular, it is rational to close a property which does not meet its inspection requirements—particularly given that certain violations were specific to The Point—and it is rational for the City to refer a licenscing issue to the MLDC. *See* 235 ILCS 5/7-5 ("The local liquor control commissioner may revoke or suspend any license issued by him if he determines that the licensee has violated any of the provisions of this Act . . .).

Of course, a conspiracy to coerce Blue Note into agreeing to modify its hours may also plausibly explain why the City issued the Emergency Closure Notice and instituted the MLDC proceedings. But the test for rationality does not ask whether the benign justification was the *actual* justification. *See, e.g.*, *Heller v. Doe*, 509 U.S. 312, 320 (1993) (explaining that a classification "must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.") (cleaned up).

Accordingly, the Court finds that the Complaint itself alleges an inescapable rational basis for treating Blue Note differently and its equal protection claim must be dismissed with prejudice.

20

### 2. Blue Note's First Amendment Retaliation Claim Fails Because It Does Not Allege that the City was Aware of Its Alleged Protected Speech.

Blue Note argues the City retaliated against it for: (1) refusing to sign the nuisance abatement plan; and (2) making statements to the media.

To make a prima facie showing on its First Amendment retaliation claim, Blue Note must establish that "(1) it engaged in activity protected by the First Amendment, (2) it suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was . . . 'at least a motivating factor' in the [City's] decision to take the retaliatory action." *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008), *quoting Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Blue Note argues that its failure to sign the nuisance abatement plan resulted in a violation of its First Amendment rights, but Blue Note fails to cite, and the Court is not aware of, any authority indicating that refusing to sign the abatement plan is protected First Amendment speech. The Court thus turns to the parties' arguments regarding Blue Note's statements to the media.

In its Complaint, Blue Note cites to, and attaches, several news articles which contain quotes from Lin. However, in order to have retaliated against Blue Note for Lin's statements, a defendant had to have first known of Lin's protected speech. *McGreal v. Village of Orland Park*, 850 F.3d 308, 313 (7th Cir. 2017) ("To show that [an adverse action] was motivated by his protected speech, [a plaintiff] must first demonstrate that the defendants knew of the protected speech."). To survive a motion to dismiss, Blue Note thus has to allege that the relevant decision makers at the City were aware of Lin's speech before they issued the Emergency Closure Notice and instituted the MDLC Matter.

Blue Note has not met its burden. Blue Note has not put forth any allegations indicating that the City was aware of any of Lin's statements to the media before it issued the Emergency Closure Notice and instituted the MDLC Matter. This alone requires dismissal of its claim. *Caldwell v. City of Elwood, Ind.*, 959 F.2d 670, 672–73 (7th Cir. 1992) ("Caldwell has not pled that any of the defendants actually knew of the conversation with the mayor or of the matters that were allegedly discussed. Instead, he argues that at the pleading stage he is entitled to a reasonable inference that it was this conversation that led to the disciplinary measures. Caldwell mistakenly interprets 'reasonable inferences' to include bridging the gap between his speech and the disciplinary measure taken against him."); *see also Stagman v. Ryan*, 176 F.3d 986, 999–1000 (7th Cir. 1999) ("Allegedly protected speech cannot be proven to motivate retaliation, if there is no evidence that the City knew of the protected speech.") (cleaned up). The Court further notes that several of Lin's statements—for example, his statements in May 2022—took place *after* the Emergency Closure Notice was issued on February 18, 2022 and therefore could not serve as a motivating factor for the City to take retaliatory action. Accordingly, the Court finds that Blue Note's First Amendment retaliation claim must be dismissed.

### 3. Blue Note Fails to Allege a Due Process Claim.

Blue Note alleges that it was not afforded, or was otherwise denied, sufficient procedural protections to contest the Emergency Closure Notice, which deprived Blue Note the use of its lease and Late-Hour License.

In the Seventh Circuit, a procedural due process claim is based on an injury deriving from "established state procedures" or one resulting from "random, unauthorized acts" by state actors. *Leavell v. Ill. Dep't of Nat. Res.*, 600 F.3d 798, 804 (7th Cir. 2010).

22

In the present case, Blue Note's claim is based on "random, unauthorized" conduct by the City. The Complaint alleges that the City used the Emergency Closure Notice and MLDC Matter "to keep [Blue Note] closed longer than the six (6) months allowed in the Summary Closure Ordinance," (Dckt. #24 ¶366), and Blue Note's response brief asserts "procedural insufficiency" arising out of "the coordinated efforts by the City . . . to improperly use its authority to force and coerce [Blue Note] to modify its Late Hour License indefinitely and without compensation." (Dckt. #45 at 20). In other words, Blue Note is not arguing that the underlying state procedures that govern the Emergency Closure Notice or the MDLC Matter fail to supply basic due process, it is alleging that the City's "random, unauthorized" actions with respect to those procedures gives rise to its due process claim. Consequently, to allege its due process claim, Blue Note must either "avail [it]self of state post-deprivation remedies or demonstrate that the available remedies are inadequate." *Leavell*, 600 F.3d at 805 (cleaned up).

In this case, Blue Note has not argued that state post-deprivation remedies fail to satisfy due process. To the contrary, Blue Note concedes in its response brief that it has adequate remedies for its alleged injuries, including "appeal rights" that it will invoke as "it deems necessary at the appropriate time." *Id.* at 21. "[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them." *Id.* at 806, *quoting Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir. 1982). The Court therefore dismisses Blue Note's Section 1983 procedural due process claim.[5]

---

[5] Blue Note also suggests for the first time that it "undisputedly did request a nuisance abatement hearing" but "was never granted a hearing." (Dckt. #45 at 21). However, Blue Note fails to demonstrate both that a state law remedy is unavailable and why state-law remedies would be inadequate to remedy any purported procedural violation. *Leavell*, 600 F.3d at 805.

### C.     The Court Relinquishes Jurisdiction Over Blue Note's State Law Claims

With the federal claims dismissed, only Blue Note's state law claims against the defendants for abuse of process, conspiracy, fraud, consumer fraud, and conspiracy to commit consumer fraud remain.  The Seventh Circuit has described a "sensible presumption that if the federal claims drop out before trial, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). Accordingly, the Court, in its discretion, declines to exercise supplemental jurisdiction over Blue Note's pendent state law claims.  *See Carlsbad Tech. Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."); 28 U.S.C. §1367(c)(3).  Blue Note's state law claims against defendants are dismissed without prejudice so that they may be pursued in a state forum.  *Doxtator v. O'Brien*, 39 F.4th 852, 867 (7th Cir. 2022) ("Without any federal claims over which it had original jurisdiction, the district court's decision not to exercise supplemental jurisdiction over the pendent state law claims was not an abuse of discretion.").

### CONCLUSION

For all the reasons stated above, defendants' motions to dismiss, (Dckt. ##36, 38, 46, 54, 60), are granted with respect to Blue Note's federal claims against the City.  Blue Note's claims arising from the Summary Closure Order and its equal protection claim (Count I) are dismissed with prejudice.  Blue Note's retaliation claim (Count II) and due process claim (Count III) are dismissed without prejudice.  The Court relinquishes jurisdiction over Blue Note's state law claims against defendants and dismisses them without prejudice.  Blue Note is granted until

October 9, 2025 to file an amended complaint, to the extent that it can do so consistent with this

Memorandum Opinion and Order and the dictates of Federal Rule of Civil Procedure 11.

**DATE:**        **September 25, 2025**

**Jeffrey I. Cummings**
**United States District Court Judge**